## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80387 CIV RYSKAMP/VITUNIC

STEVEN A. SILVERS, an individual,

      Plaintiff,

v.

GOOGLE, INC., a Delaware corporation,

      Defendant.

_____/

GOOGLE, INC., a Delaware corporation,

      Counterclaimant,

v.

STEVEN A. SILVERS, an individual;
STELOR PRODUCTIONS, INC., a
Delaware corporation; STELOR PRODUCTIONS, LLC,
a business entity of unknown form; and
STEVEN ESRIG, an individual,

      Counterdefendants.

_____/

### NOTICE OF FILING DECLARATION OF ANDREW BRIDGES
### IN SUPPORT OF GOOGLE INC.'S MOTION TO BIFURCATE

    Defendant and Counterclaimant GOOGLE INC., by its undersigned counsel, hereby files

the Declaration of Andrew BRIDGES In Support of GOOGLE INC.'s Motion to Bifurcate.

JDA/213526.0001/N0569114_1

Dockets.Justia.com

Case No. 05-80387-CIV (Ryskamp/Vitnac)

ADORNO & YOSS LLP

_____

Jan Douglas Atlas
Florida Bar No.: 226246
jatlas@adorno.com
350 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, FL 33301
Tel:     (954) 763-1200
Fax:     (954) 766-7800

Andrew P. Bridges
California Bar No. 122761
abridges@winston.com
Jennifer A. Golinveaux
California Bar No. 203056
jgolinveaux@winston.com
WINSTON & STRAWN LLP
101 California Street, Suite 3900
San Francisco, CA 94111
Tel:     (415) 591-1000
Fax:     (415) 591-1400

Attorneys for Defendant and Counterclaimant
Google, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by mail on this _5th_ day of October, 2005 upon:  HARLEY S. TROPIN, ESQ., KENNETH R. HARTMANN, ESQ. and GAIL A. McQUILKIN, ESQ., Kozyak, Tropin, Throckmorton, P.A., 2525 Ponce de Leon, 9th Floor, Miami, FL 33134; ADAM T. RABIN, ESQ., Dimond, Kaplan & Rothstein, P.A., 525 South Flagler Drive, Trump Plaza, Suite 200, West Palm Beach, FL 33401; and KEVIN C. KAPLAN, ESQ., Burlington, Weil, Schwiep, Kaplan & Blonsky, P.A., 2699 South Bayshore Drive, Miami, FL 33133.

_____

Jan Douglas Atlas

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Palm Beach Division

Case No. 05-80387-CIV (Ryskamp/Vitunac)

STEVEN A. SILVERS, an individual            )
                                            )
         Plaintiff,                         )
                                            )
v.                                          )
                                            )
GOOGLE INC., a Delaware corporation         )
                                            )
         Defendant,                         )
_____)
                                            )
GOOGLE INC., a Delaware corporation         )
                                            )
         Counterclaimant,                   )
                                            )
v.                                          )
                                            )
STEVEN A. SILVERS, an individual;           )
STELOR PRODUCTIONS, INC., a Delaware )
corporation; STELOR PRODUCTIONS, LLC;)
a business entity of unknown form; and      )
STEVEN ESRIG, an individual,                )
                                            )
         Counterdefendants,                 )
_____)

**DECLARATION OF ANDREW BRIDGES IN SUPPORT OF GOOGLE INC.'S
MOTION TO BIFURCATE**

I, Andrew P. Bridges, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am a partner in the law firm of Winston & Strawn LLP and am counsel for defendant and counterclaimant Google Inc. in this action.  I have personal knowledge of all facts stated in this declaration.

2.      According to the records of the United States Patent and Trademark Office, The Googles Children's Workshop, Inc., a New Jersey corporation ("GCW"), filed an application to register the trademark GOOGLES AND DESIGN for children's books with the U.S. Patent and Trademark Office on August 2, 1996.  GCW obtained the registration, for children's books, on August 12, 1997.  Attached to this Declaration as Exhibit A is a copy of the application as retrieved from USPTO records.  The application file discloses that, in response to an inquiry by the Patent and Trademark Office, Mr. Silvers, responding on behalf of GCW, specifically confirmed that the applicant was the corporation GCW and not himself personally.  Attached to this Declaration as Exhibit B is a copy of the relevant correspondence as retrieved from USPTO records and as described above.  Attached to this Declaration as Exhibit C is a copy of Certificate of Registration No. 2,087,590 for the mark, showing GCW as the owner of the registration.

3.      The records of the New Jersey State Business Gateway Service disclose that GCW was dissolved without assets on October 22, 1997.  Attached to this Declaration as Exhibit D is a copy of a status display for GCW from the New Jersey State Business Gateway Service as of November 16, 2004.

4.      According to documents filed with the USPTO, Mr. Silvers executed on May 18, 1999, a document purporting to assign the GOOGLES AND DESIGN mark and registration from the defunct company to himself.  Exhibit E is a copy of the document retrieved from USPTO records at my direction.

5.    Attached to this Declaration as Exhibits F and G are copies of agreements between Steven A. Silvers with The Aurora Collection in 2000 and with Counterdefendant Stelor Productions, Inc. ("Stelor") in 2002 as disclosed in litigation filings by Mr. Silvers. (Exhibit G includes both a license agreement and a consulting agreement.)

6.    According to records of the USPTO, an attorney named Ira C. Edell executed a Combined Declaration Under Sections 8 and 15 in the name of GCW with respect to Registration No. 2,087,590. The purpose of a Combined Declaration Under Sections 8 and 15 is to maintain the registration and to secure "inconstestable" status for it as described in the Lanham Act. Failure to file a Section 8 Declaration within the sixth year of the registration, or within a 6-month grace period after the sixth year, causes a registration to be cancelled by the USPTO. A copy of the Combined Declaration filed on March 26, 2003, in the name of GCW is attached to this Declaration as Exhibit H. According to the records of the USPTO, after that affidavit was filed, on July 22, 2004, Silvers caused the 1999 document with the purported assignment (Exhibit E referred to above) to be recorded. Attached to this Declaration as Exhibit I. are copies of the assignment recordal information sheet and the Trademark Assignment Details from USPTO records.

7.    Sometime during 2005, Stelor Productions as Silvers' licensee launched a new website at googles.com advertising (but apparently not yet delivering) Internet directory/search and email services. A copy of pages from that website, as saved in Adobe Acrobat (PDF) format, is attached to this Declaration as Exhibit J.

8.    Attached to this Declaration as Exhibit K is an earlier settlement agreement between Stelor and Silvers filed publicly in this Court and retrieved by me from the Court's records. The agreement pertains an earlier case between Stelor and Silvers in which they

appear to regulate their respective roles and rights in connection with litigation against Google Inc.   At page 6-7 of the agreement, Silvers and Stelor optimistically set forth their respective shares of recoveries over $120 million.  (Exhibit K contains two copies of the agreement because each party executed a different copy.)

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 30, 2005.

_____
Andrew P. Bridges

# EXHIBIT A

19 245 361

75150767

| MARK (Identify the mark) | CLASS NO. (If known) |
|---|---|
| **GOOGLES** | **016** |

APPLICANT'S NAME: Attn: Steven A. Silvers, The Googles Children's Workshop, Inc.

APPLICANT'S BUSINESS ADDRESS: ~~P.O. Box 2123~~

(Display address exactly as it should appear on registration) ~~Union, NJ 07083~~

Tel# 908-688-3995

Potmac, Md 20859-0210

---

Individual - Citizenship: (Country)

Partnership - State where organized (Country, if appropriate)     [partnership domicile]

Names and Citizenships (Country) of General Partners     [names/citizenship]

Corporation - State (Country, if appropriate) of Incorporation: New Jersey/ U.S.A.

Other: (Specify Nature of Entity and Domicile)     [other]     NJ

---

Applicant request registration of the above-identified trademark/service mark shown in the accompanying drawing in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. 1051 et. seq., as amended.) for the following goods/services (SPECIFIC GOODS AND/OR SERVICES MUST BE INSERTED HERE):

International Classification: 016 books, stickers

---

Applicant is using the mark in commerce on or in connection with the above identified goods/services. (15 U.S.C. 1051(a), as amended.) Three specimens showing the mark as used in commerce are submitted with this application.

• Date of first use of the mark in commerce which the U.S. Congress may regulate (for example, interstate or between the U.S. and a foreign country): June 1996

• Specify the type of commerce: Interstate

• Date of first use of the mark anywhere: June 1994 (Stationary reproduced with logo).

• Specify manner or mode of use of mark on or in connection with the goods/services:     [manner ...] invoices, business cards, stationary, advertising, labels, books, purchase orders.

(For example, trademark is applied to labels, service mark is used in advertisements)

[ ] Applicant has a bona fide intention to use the mark in commerce on or in connection with the above identified goods/services. (15 U.S.C. 1051(b), as amended.)

• Specify intended manner or mode of use of mark on or in connection with the goods/services:

(For example, trademark will be applied to labels, service mark will be used in advertisements)

[ ] Applicant has a bona fide intention to use the mark in commerce on or in connection with the above identified goods/services, and asserts a claim of priority based upon a foreign application in accordance with 15 U.S.C. 1126(d), as amended

• Country of foreign filing:     [country]     • Date of foreign filing:     [date]

[ ] Applicant has a bona fide intention to use the mark in commerce on or in connection with the above identified goods/services and, accompanying this applications, submits a certification or certified copy of a foreign registration in accordance with 15 U.S.C. 1126(e), as amended.

• Country of registration:     [country]     • Registration number:     [reg #]

## DECLARATION

The undersigned being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person firm, corporation, or association has the right to use the above identified mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

7/26/96

Date

Signature

Tel# 903-688-3995

Telephone Number

Steven A. Silvers;
The Googles Children's Workshop, Inc.

Print or Type Name and Position

# DRAWING PAGE

16

2, 5, 22, 23, 29, 37, 38, 50    75150767

APPLICANT'S NAME:    Attn: Steven A. Silvers    THE GOOGLES CHILDREN'S WORKSHOP, INC.

APPLICANT'S ADDRESS:    P.O. Box 2123
Union, NJ 07083
Tel# 908-688-3995

GOODS AND SERVICES: Books

FIRST USE:

FIRST USE IN COMMERCE:

June 1996

June 1996







75150767

**Children's Workshop, Inc.**
**P.O. Box 2123**
**Union, NJ 07083**
**(908) 688-3995**

*"AN INNOVATIVE COMPANY TEACHING CHILDREN OF TODAY, VISIONS OF TOMORROW"*



**Children's Workshop, Inc.**
P.O. Box 2123
Union, NJ 07083
(908) 688-3995





"AN INNOVATIVE COMPANY TEACHING CHILDREN OF TODAY, VISIONS OF TOMORROW"



AN AFFILIATE OF:

**SAS ENTERTAINMENT GROUP**

*"AN INNOVATIVE COMPANY TEACHING*
*CHILDREN OF TODAY, VISIONS*
*OF TOMORROW"*

**MICHAEL SILVERS, Pres.**
**P.O. Box 2123**
**Union, NJ 07083**
(908) 688-3995

*C H I L D R E N ' S   W O R K S H O P, I N C.*



# EXHIBIT B





L0106#



## The GOOGLES

### CHILDREN'S WORKSHOP, INC.

Steven A. Silvers
P.O. Box 60210
Potomac, MD 20859-0210

Assistant Commissioner
For Trademarks
Attn: Elissa Garber Kon,
Trademark Attorney
Law Office 106
2900 Crystal Drive
Arlington, VA 22202-3513

Re: **GOOGLES & DESIGN TRADEMARK**
    **SERIAL NUMBER: 75/150767**
    **RESPONSE TO FEBRUARY 21, 1997 OFFICE ACTION**

Dear Ms. Kon:

Pursuant to our recent conversation, I felt it best to comply with
your Office Action letter, as noted above, prior to my departure to
Florida. Since I'll be gone for nearly a month, I wanted you to be
in receipt of my paperwork so that, perhaps, while I'm away you
could be prosecuting my Googles' trademark for Registration
acceptance.

In response to your inquiry surrounding the **APPLICANT'S NAME**,
please be advised that The Googles Children's Workshop, Inc., a New
Jersey registered corporation, is the applicant for Trademark
registration purposes. I'm the corporation's duly appointed
president and as such have executed the preamble of the application
as an officer of said corporation.

As to **IDENTIFICATION OF GOODS**, (children's books) would suffice for
said identification purposes.

As to **SPECIMENS**, I've enclosed a copy of my recently self-published
children's edutainment book, which denotes, on the back cover, the
(GOOGLES) mark. I've also enclosed, and as annexed hereto, a black
and white stamp of the mark for your publishing purposes in the
GAZETTE and for further prosecution of my trademark. I further
verify pursuant to 37 C.F.R. Section 2.20, that the substituted
specimens were in use in commerce at least as early as the filing
date of the application (citing 37 C.F.R. Section 2.59(a); TMEP
section 905.10).

*"AN INNOVATIVE COMPANY TEACHING CHILDREN OF TODAY, VISIONS OF TOMORROW"*

Elissa G. Kon, Esq.
Page 2.
February 27, 1997

The specimen, as noted on the back of the copy of the enclosed children's book, denotes the Googles' mark (in color format), however, the applicant would aver that color is not germane to the trademark application.  Furthermore, the whited out area is where the letters (TM) is noted and as such has been removed, as requested by your office action letter for trademark registration purposes.

It is further averred that the undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Title 18 U.S.C. 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, respectfully declares that the facts set forth, hereinabove, in this response to said office action letter of February 21, 1997, are true and correct to the best of my knowledge, recollection, and memory, and that all statements contained herein have been rendered of my own knowledge, are true and the same are made and based on my own beliefs.


Steven A. Silvers, President & Officer
The Googles Children's Workshop, Inc.
P.O. Box 60210
Potomac, MD 20859-0210 (Mailing Address)
(301)299-4939

**EXECUTED THIS 27TH DAY OF FEBRUARY 1997:**





# UNITED STATES DEPARTMENT OF COMMERCE
## Patent and Trademark Office

| | | |
|---|---|---|
| **SERIAL NO.** | **APPLICANT** | **PAPER NO.** |
| 75/150767 Googles Children's Workshop, Inc., The | | |
| **MARK** | | **ADDRESS:** |
| GOOGLES AND DESIGN | | **Assistant Commissioner for Trademarks** 2900 Crystal Drive Arlington, VA 22202-3513 |
| **ADDRESS** STEVEN A SILVERS THE GOOGLES CHILDRENS WORKSHOP INC PO BOX 60210 POTOMAC MD 20859-0210 | **ACTION NO.** | If no fees are enclosed, the address should include the words "Box Responses - No Fee." |
| | **MAILING DATE** FEB 2 1 1997 | Please provide in all correspondence: |
| | **REF. NO.** | 1. Filing Date, serial number, mark and Applicant's name. 2. Mailing date of this action. 3. Examining Attorney's name and Law Office number. |
| **FORM PTO-1525 (5-90)**    U.S. DEPT. OF COMM. PAT. & TM OFFICE | | 4. Your telephone number and ZIP code. |

## PRIORITY ACTION

| EXAMINING ATTORNEY | PERSON CALLED/INTERVIEWED | TELEPHONE NUMBER |
|---|---|---|
| Elissa Garber Kon, Trademark Attorney | Steven Silvers | (908) 688-3995 |
| X | TELEPHONE CALL | INTERVIEW DATE | ATTORNEY |
| | PERSONAL INTERVIEW | February 21, 1997 | X | APPLICANT |

| CALL RECORD/NOTES |
|---|
| OFFICE SEARCH: The examining attorney has searched the Office records and has found no similar registered or pending mark which would bar registration under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d). TMEP section 1105.01. RE: Serial Number 75/150767 |

| GOOGLES and design |
|---|

This case will be given priority as an amended case if Applicant or applicant's attorney responds to the requirements stated below within two months of the above mailing date. In any event, a proper response to this Priority Action must be received within SIX MONTHS from the mailing date stated above in order to avoid ABANDONMENT.

## APPLICANT'S NAME

The preamble of the application identifies the applicant as "Attn: Steven A. Silvers, The Googles Children's Workshop, Inc." but the applicant's entity is listed as a corporation. However, Mr. Silver signed the application, without indicating his title. The applicant must explain this inconsistency. TMEP section 802.03. If the preamble is incorrect, the applicant may simply amend the preamble. If the applicant is The Googles Children's Workshop, Inc. , a New Jersey corporation, with Mr. silver signing the application as its officer, then the applicant should amend the application to so state. The applicant must also indicate Mr. Silvers' title with the corporate applicant, and whether he is an officer of same.

## IDENTIFICATION OF GOODS

The wording "books" in the identification of goods is unacceptable as indefinite. The applicant must amend the identification to indicate the field or subject matter of the publications. TMEP section 804.03(c). The applicant may adopt the following identification, if accurate: **children's books** (*or if not children's books, indicate the*

75/150767                          -2-

subject matter, e.g., cook books, books in the field of golf, business, etc.). TMEP section 804.

## SPECIMENS

The specimens are unacceptable as evidence of actual trademark use because they are stationery used in the applicant's business but do not show the mark used on the goods. Invoices, announcements, order forms, bills of lading, leaflets, brochures, publicity releases and other printed advertising material generally are not acceptable specimens. *In re Bright of America, Inc.*, 205 USPQ 63 (TTAB 1979); TMEP sections 905.05 and 905.07. *See In re Ultraflight Inc.*, 221 USPQ 903 (TTAB 1984). The applicant must submit three specimens showing the mark as it is used in commerce. 37 C.F.R. Section 2.56. Examples of acceptable specimens are tags, labels, instruction manuals, containers, and photographs that show the mark on the goods or packaging.

The applicant must verify, with an affidavit or a declaration under 37 C.F.R. Section 2.20, that the substitute specimens were in use in commerce at least as early as the filing date of the application. 37 C.F.R. Section 2.59(a); TMEP section 905.10. The following is a properly worded declaration under 37 C.F.R. Section 2.20. At the end of the response, the applicant should insert the declaration signed by the applicant.

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, declares that the facts set forth in this application are true; all statements made of his/her own knowledge are true; and all statements made on information and belief are believed to be true.

_____
(Signature)

_____
(Print or Type Name and Position)

_____
(Date)

## DRAWING

The drawing is not acceptable because it is a photocopy which will not reproduce satisfactorily. The applicant must submit a new drawing showing the mark clearly and conforming to 37 C.F.R. Section 2.52. TMEP section 807.05. If the rectangular background that appears on the drawing is not part of the mark, the applicant should not include it on the new drawing.

Additionally, the "tm" symbol is not part of the mark, and the applicant should delete this from the drawing. TMEP sections 807.03 and 807.13(a).

75/150767                                    -3-

The requirements for a special-form drawing, in addition to the heading, are as follows.

(1) The drawing must appear in black and white; no color is permitted.

(2) Every line and letter must be black and clear.

(3) **The use of gray to indicate shading is unacceptable.**  If the applicant wishes to indicate shading, the applicant should do so using stippling (little dots).

(4) The lining must not be too fine or too close together.

(5) The preferred size of the area in which the mark is displayed is 2 1/2 inches (6.1 cm.) high and 2 1/2 inches (6.1 cm.) wide.  In no case may it be larger than 4 inches (10.3 cm.) high or 4 inches (10.3 cm.) wide.

(6) If the reduction of the mark to the required size renders any details illegible, the applicant may insert a statement in the application to describe the mark and these details.

37 C.F.R. Sections 2.51 and 2.52; TMEP section 807.05.  The Office will enforce these drawing requirements strictly.  TMEP section 807.

## HOW TO RESPOND TO THIS ACTION

No set form is required for response to this Office action.  The applicant must respond to each point raised.  The applicant should simply set forth the required changes or statements and request that the Office enter them.  The applicant must sign the response. In addition to the identifying information required at the beginning of this letter, the applicant should provide a telephone number to speed up further processing.

In all correspondence to the Patent and Trademark Office, the applicant should list the name and law office of the examining attorney, the serial number of this application, the mailing date of this Office action, and the applicant's telephone number.

If the applicant has any questions or needs assistance in responding to this Office action, please telephone the assigned examining attorney.

Elissa Garber Kon, Trademark Attorney
Law Office 106, (703) 308-9106 ext. 224

# EXHIBIT C

Int. Cl.: 16

Prior U.S. Cls.: 2, 5, 22, 23, 29, 37, 38 and 50

Reg. No. 2,087,590

## United States Patent and Trademark Office

Registered Aug. 12, 1997

### TRADEMARK
### PRINCIPAL REGISTER



GOOGLES CHILDREN'S WORKSHOP, INC.,
THE (NEW JERSEY CORPORATION)
P.O. BOX 60210
POTOMAC, MD 208590210

FOR: CHILDREN'S BOOKS, IN CLASS 16
(U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 6-0-1994; IN COMMERCE
6-0-1996.

SER. NO. 75-150,767, FILED 8-2-1996.

ELISSA GARBER KON, EXAMINING ATTOR-
NEY

# EXHIBIT D

NJ Business Entity Status Reports



# New Jersey State Business Gateway Service
## Corporate and Business Information Reporting

## Business Entity Status Report

**Printing Instructions:** Open your Browser's Page Setup menu and set your page margins to 0.25". Use your Browser's Print option to print the report as seen on screen.

**Saving Instructions:** Save this file to your hard drive for later viewing by using the Browser's "Save As" function.

**All available information is displayed.**

---

Status Report for THE GOOGLES CHILDREN'S WORKSHOP, INC.

| | |
|---|---|
| **Business Name:** THE GOOGLES CHILDREN'S WORKSHOP, INC. | **Report Date:** 11/16/2004 |
| **Business ID Number:** 0100599561 | **Transaction Number: Sequence:** 677251: 1 |

---

**Business Type:** DOMESTIC PROFIT CORPORATION

**Status:** DISSOLVED WITHOUT ASSETS

---

| | |
|---|---|
| **Filing Date:** 08/24/1994 | **Home Jurisdiction:** NJ |
| **Status Change Date:** 10/22/1997 | **Stock Amount:** 100 |
| **DOR Suspension Start Date:** | **DOR Suspension End Date:** |
| **Tax Suspension Start Date:** | **Tax Suspension End Date:** |

**Annual Report Month:** 4

**Last Annual Report Filed:** 01/03/1997

**For Last Annual Report Paid Year:** 1996

---

**Incorporator:** MICHAEL L. SILVERS

**Agent:** STEVEN A SILVERS

**Agent Address:** 1751 COLGATE PLACE

UNION, NJ 07083

**Office Address Status:** Deliverable

**Main Business Address:** 1051 STUYVESANT AVE. STE 352

UNION, NJ 07083

**Principal Business Address:**

---

**Associated Names**

**Name:**                                     **Type Description:**

---

file:///C|/CaseDocuments/Google-Googles%20(Stelor%...%20Report%20-%20Google%20Children's%20Workshop.htm (1 of 2)11/17/2004 11:11:27 AM

# EXHIBIT E

SEP 14 2004 12:38    DI HNE HAMMOND & ASSOCIAT  70( 383-5549    P.3

07/22/04  15:32 FAX    COWAN, LIEBOWITZ & LATMAN    ☑004/004

## ASSIGNMENT OF REGISTRATION OF A MARK

Whereas _Googles Children's Workshop, The (GCW)_
(Name of assignor)

of _3741 N.E. 163rd St, Ste. 325, North Miami Beach, Fl. 33160_
(Address)

has adopted, used and is using a mark which is registered in the United States Patent and Trademark Office, Registration No. _2,077,590_, dated _Aug. 12, 1997_ and

Whereas _Steven A. Silvers_
(Name of assignee)

of _3741 N.E. 163rd St. Ste. 325, North Miami Beach, Fl 33160_
(Address)

is desirous of acquiring said mark and the registration thereof. Now, therefore, for good and valuable consideration, receipt of which is hereby acknowledged, said _GCW_
(Name of assignor)

does hereby assign to the said _Steven A. Silvers_
(Name of assignee)

all right, title and interest in and to the said mark, together with the good will of the business symbolized by the mark, and the above identified registration thereof.
Pral S466-482427 448 5 24 248

_____    FoRMER Pres.
(Signature of assignor; if assignor is a corporation or other juristic organization, give the official title of the person who signs for assignor)

State of _Florida_
County of _Dade_            ss
On this _18th_ day of _May_, _1999_, before me appeared _Steven A. Silvers_ the person who signed this instrument, who acknowledged that he/she signed it as a free act on his/her own behalf (or on behalf of the identified corporation or other juristic entity with authority to do so).

_____
(Signature of notary public)

RECORDED: 07/22/2004

**TRADEMARK**
**REEL: 002899 FRAME: 0702**

# EXHIBIT F

## LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT

THIS LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT ( hereinafter the "Agreement"), is made this 21 day of July, 2000, by and between STEVEN A. SILVERS, an individual whose principal business address is 3741 NE 163rd St., North Miami Beach, Florida 33160, (hereinafter referred to as " LICENSOR") and THE AURORA COLLECTION, INC., a corporation whose principal business address is 4651 SW 51st St., Davie, Florida, 33314 (hereinafter referred to as" LICENSEE"), Said addresses shall be used for notices between the parties of an official or legal nature.

### RECITALS

LICENSOR is the sole owner, creator, developer, author and artist of a product line and concept which includes all intellectual property rights and all other rights to the Googles family and products, as further defined hereafter.

LICENSOR desires to engage LICENSEE in the manufacture, marketing, distribution, and commercial expansion of the Googles family and products.

LICENSEE desires to acquire the exclusive right to manufacture, market, distribute and expand the product line known as the Googles family and products, both as to existing designs, concepts and products, as well as future designs, concepts and products, under the terms and conditions set forth herein.

LICENSOR desires to grant LICENSEE the rights referred to above, under the terms and conditions set forth herein.

THEREFORE, in consideration of the premises and of the mutual covenants herein and for other good and valuable consideration, the parties agree as follows:

### TERMS AND CONDITIONS

1.  **Recitals.**    The recitals stated above are hereby made a part of and are incorporated into the Agreement.

2.  **Definitions.**    As used in the Agreement, the terms "Licensed Articles" and "Licensed Products" shall mean that which is contained in ' (a)'. "Gross sales price" is defined

Page 1 of 6

FROM : SILVERS ENT                    FAX NO. : 5617849959                    Jan. 17 2005 12:10PM  P4

in ' (b)'. " Net profit(s)" is defined in ' (c)'. "Gross receipts" is defined in ' (d)'.

(a)     The products which deal with a creative character known as Googles, together with any and all other products which comprise and which will comprise those characters, likenesses, stories, ideas, concepts, designs, Googles spin offs and family members, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs and tapes, DVDs and all other forms of communication and publication, programs, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, servicemarks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates, and variations, and all other items associated therewith, whether in the singular or plural.

(b)     The term "gross sales price" shall mean the price charged by LICENSEE to its customers, but shall not include any sales or other taxes, nor shall it include any shipping and handling charges.

(c)     The term "net profit(s)" shall mean that amount of money left after the deduction of expenses of LICENSEE for the manufacture, marketing and sale of those Licensed Articles that are subject to distribution/division of net profits..

(d)     The term "gross receipts" shall mean money received by LICENSEE for the sale of licensed articles and products, but shall not include taxes, shipping and handling charges.

<u>LICENSE</u>

3.     <u>The Grant</u>     LICENSOR hereby grants to LICENSEE and LICENSEE hereby accepts from LICENSOR, upon the terms and conditions set forth herein, the sole and exclusive right and license to manufacture, market, distribute, sell, use and otherwise commercialize, licensed products and articles. LICENSEE shall have the right to grant sub-licenses without the prior consent of LICENSOR, so long as all sub-licensees operate in the spirit and intent of providing wholesome, non-violent entertainment and education. So long as LICENSEE is in compliance with the terms of this Agreement, LICENSEE shall have the right to continue to exercise all rights granted by this license

4.     <u>Best Efforts</u>     .LICENSEE will use its best efforts to engage in the commercial venture whose end goal is the ethical marketing and sale of licensed articles, however, nothing herein shall obligate LICENSEE to meet

Page 2 of 6

FROM : SILVERS ENT                    FAX NO. : 5617849959            Jan. 17 2005 12:11PM P5

any particular quota, schedule, time table, volume requirement or monetary minimums. If, in the sole opinion of LICENSEE, LICENSEE desires to abandon this LICENSE and all rights hereunder, LICENSEE shall be free to do so. During the term of its license, LICENSEE will assume the costs of production, marketing and sale of those items that it chooses to market, as well as the fees and costs of obtaining, defending and/or protecting any patent and trademark rights to such items. Best efforts means the active promotion and marketing of said products.

5.   <u>LICENSOR Representations.</u>     LICENSOR represents, and LICENSEE has relied on the fact and assertion, that LICENSOR is the creator and owner, with all rights of ownership, of the Googles family and products and licensed articles and has the sole right, title, interest and authority to grant this license. LICENSOR further represents that he knows of no claims, notices, suits, threatened or otherwise, which would in any way limit or impede his right to grant this license, other than those attached hereto as Exhibit A. LICENSOR represents that there are no brokers or agents involved in this matter and that LICENSOR alone is entitled to any remuneration herein. LICENSOR agrees to hold harmless and indemnify LICENSEE for all costs, fees and charges should claims or suits be brought against LICENSEE which allege that LICENSOR did not possess the right, title and interest in those licensed articles that were in existence at the time of, and which formed a great part of the consideration for, this transaction.

6.   <u>Retained Ownership Interest.</u>     LICENSOR retains sole creative ownership rights to licensed articles which predate this Agreement and shall have final approval rights for all additions and changes in the future.

## ROYALTIES AND PAYMENTS

7.   <u>Consideration.</u>     Fees, stock and royalties paid under this agreement shall be in consideration for the sum total of all rights conferred by LICENSOR to LICENSEE.

8.   <u>License Issuance Fee.</u>     Upon execution of this Agreement, LICENSEE shall pay LICENSOR a license issuance fee in the amount of Ten Thousand Dollars ( $10,000.00 ).

9.   <u>License Issuance Stock.</u>   Upon execution of this Agreement, LICENSEE

01/17/2005 MON 11:07  [TX/RX NO 5766] @005

## TERMINATION RIGHTS AND METHODS

15.  **Cause Not Needed.** LICENSEE reserves the right to cancel this Agreement, if in its sole business judgment, the Agreement is no longer in the best interests of the company. LICENSEE shall have the right to sell its existing inventory and those items that cannot be canceled without financial penalty, but shall not cause additional items to be manufactured thereafter. In the event of termination, LICENSOR shall be given all original material that he provided to LICENSEE.

16.  **Use of Name After Termination.** In the event of termination, LICENSEE shall have the right to continue to use the name(s) associated with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

## ADDITIONAL PROVISIONS

17.  **Authorization.** LICENSOR and LICENSEE represent and warrant that the consummation of this Agreement has been duly authorized by all requisite corporate and personal action and this Agreement is enforceable against the parties in accordance with its terms. Both parties represent and warrant that the making and performance of this Agreement will not violate any agreement or understanding to which they are a party or to which they are bound.

18.  **Assignment.** LICENSEE shall not have the right to sell, transfer or assign, in whole, or in part, its rights under this Agreement, without the written consent of LICENSOR, which consent shall not be unreasonably withheld if the proposed buyer, transferee or assignee is willing and able to carry out the goals and mission of the Googles project to ethically market non-violent entertainment and educational products to the public. Furthermore, such sale, transfer or assignment shall include a provision that permits LICENSOR, at his option, to become employed by the new entity for a period of six months, or if not employed, to become a paid consultant for six months for a fee which equals his last salary when employed by LICENSEE.

19.   Waiver.    No waiver of any breach of any provision of this Agreement shall constitute a waiver of any other breach of the same or any other provision hereof, and no waiver shall be effective unless made in writing and signed by the parties hereto.

20.   Interpretation.    This Agreement and performances hereunder shall be interpreted and governed by the laws of the State of Florida. No provision shall be interpreted against any party because that party or their legal representative drafted, modified or recommended inclusion of, such provision. Venue for any legal action, whether equitable or otherwise, shall be in Broward County, Florida.

21.   Entire Agreement.    This Agreement constitutes the entire Agreement between the parties and no warranties, representations or understandings which may have been made by either party shall be enforceable unless specifically expressed herein. Any amendment, alteration or modification of this Agreement will be enforceable only if it is signed by both of the parties.

22.   Binding Effect.    This Agreement shall inure to the benefit and be binding upon the parties, their heirs, legal representatives, successors and assigns.

23.   Severability.  If any provision or sub-provision of this Agreement is declared invalid or void by a court of competent jurisdiction, the remainder of the Agreement shall nevertheless remain in full force and effect.

24.   Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original. Each shall constitute one and the same Agreement.

25.   Paragraph Headings.    Paragraph headings and titles contained herein are inserted as a matter of convenience and reference only and shall not be used in construing the meaning of, or enforcing any of the provisions of, this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized signatures the day and year first written above.

AS TO LICENSOR:

STEVEN A. SILVERS

AS TO LICENSEE:

MYLES W. FARRINGTON, as
President of The Aurora Collection, Inc.

# EXHIBIT G

# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This **LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT** between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (**LICENSOR**), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (**LICENSEE**), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

## WITNESSETH

**WHEREAS, LICENSOR** is the sole and exclusive owner of the **GOOGLES** characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

**WHEREAS, LICENSOR** is the sole and exclusive owner of the **GOOGLES** trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

**WHEREAS, LICENSOR** has the power and authority to grant to **LICENSEE** the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

**WHEREAS, LICENSEE** has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

**WHEREAS, LICENSEE** desires to obtain from **LICENSOR** an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

**WHEREAS, LICENSEE** has agreed, pursuant to a letter agreement, to act as a consultant for **LICENSOR;** and

**NOW, THEREFORE,** in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## I. LICENSE GRANT

    A.    **LICENSOR** hereby grants to **LICENSEE**, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to **LICENSOR**), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement; provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording.

## II.  TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III.  COMPENSATION

A.    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.



E. All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F. Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A. LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B. In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C. All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D. In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A. LICENSOR represents and warrants that:

(i) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii) the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii) LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.



(iv) ........... the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v) except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B. LICENSEE represents and warrants that:

(i) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii) the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

(iii) it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C. Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D. LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A. The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B. The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C. Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A. Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B. Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.





## VIII. INTELLECTUAL PROPERTY PROTECTION

A.       LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.       LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.       LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.       LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.       Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A       Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

5

B.    LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C.    Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X. POST TERMINATION RIGHTS

A.    Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B.    Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C.    Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D.    Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI. INFRINGEMENTS

A.    During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B.    Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII. INDEMNITY

A.    LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.



B.    LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.    With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII.  LIMITATION OF LIABILITY

A.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES.  THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.    EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV.  INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV.  FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.



## XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of LICENSEE and/or with the consent of LICENSOR, which shall not be unreasonably withheld or delayed. By way of example and not limitation, LICENSEE may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1ʳᵗ, 2002, and     executed     between     the     above     mentioned     parties



IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                         STELOR PRODUCTIONS, INC.

Steven A. Silvers                         By: _____
Title: Owner/LICENSOR                     Printed Name: Steven A. Esrib
Dated: 5/09/02                            Title: President
                                          Dated: 5/9/02

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc.) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term.  This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year  extended Term on the



same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

Succession
Rights of Survivor

5/9/02

In the event of the Death of Licensor all of the Licensor's rights under this agreement Shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.

_____
5/09/02

5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

11

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

This letter agreement ("Agreement") will serve to memorialize the terms of the consultancy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

1.    Engagement of Consultant.

a.    Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003. All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of the Agreement. During the term of this Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

2.    Relationship of Parties. The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchisor and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.    <u>Duties of Consultant.</u>  Consultant's duties hereunder are as follows:

a.    Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

b.    During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

c.    Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and /or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

d.    Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

4.    <u>Duties of Company.</u>

2

a.      Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.      Term and Termination.

a.      Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.      Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecuted under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.      Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.      Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.      Proprietary Information; Proprietary Rights.

a.      In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedules of accounts, plan , programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

3

b.      The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.      The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.      <u>Limitations of Liability</u>.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.      <u>Miscellaneous</u>.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument. This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder. This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

STEVEN A. SILVERS       Date 5/07/02

Sicko Productions, Inc.

By:       Date 5/9/02
Name:  Steven H. Esris   Title: President

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

4

# EXHIBIT H

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re TRADEMARK Registration of

Googles Children's Workshop, Inc., The

Registration No: 2,087,590                    **Box POST REG FEE**

Registration Date: August 12, 1997

Mark: GOOGLES and design

Class: 16

COMBINED DECLARATION OF USE AND INCONTESTABILITY
UNDER SECTIONS 8 & 15

The registrant, The Googles Children's Workshop, Inc., a corporation organized under the
laws of the New Jersey, declares that: they are located and doing business at P.O. Box 60210,
Potomac, Maryland, 20859; that they are the owner of Registration No. 2,085,590 dated August 12,
1997, as shown by the records in the United States Patent and Trademark Office; that the mark
described therein is still in use and has been in continuous use in interstate commerce among the
several states of the United States for more than five (5) consecutive years from June 1996, through
the present, subsequent to the date of registration, on or in connection with the goods identified in
the Certificate of Registration; that the mark is still in use in such interstate commerce as evidenced
by the accompanying specimen in the form of the cover of a book and a title page therefrom; and that
there has been no final decision adverse to registrant's claim of ownership of the subject mark for
such goods or its right to register the same, or to keep the same on the register, and that there is no
proceeding involving said rights pending in the United States Patent and Trademark Office or in a
court and not finally disposed of.

04/08/2003 CHMY11    00000090 2087590
01 FC:6205                    100.00 GP
02 FC:6206                    200.00 GP

The Registrant hereby appoints  Ira C. Edell, a member of the Bars of the District of Columbia and the State of Maryland, Alexander H. Butterman, a member of the Bars of the States of New York, New Jersey and the District of Columbia, Stuart B. Shapiro, a member of the Bar of the State of Maryland, Patrick J. Finnan, a member of the Bar of the State of Maryland, Howard R. Richman, a member of the Bars of the District of Columbia and the States of Maryland and Virginia, Andrew J. Aldag, a member of the Bar of the State of Wisconsin and John M. Hemenway, a member of the Bar of Virginia, attorneys with the firm of EDELL, SHAPIRO, & FINNAN, LLC, 1901 Research Boulevard, Suite 400, Rockville, Maryland 20850, telephone number (301) 424-3640, as its attorneys to file this declaration, with full power of substitution and revocation, and to transact all business in the Patent and Trademark Office in connection therewith.

The undersigned further declares that: all statements made herein of his own knowledge are true and all statements made on information and belief are believed to be true; and these statements were made with the knowledge that willful, false statements and the like so made are punishable by fine or imprisonment or both, under § 1001 of Title 18 of the United States Code, and that such willful, false statements may jeopardize the validity of the above registration.

Googles Children's Workshop, Inc., The

_____
Date    3/25/03

Ira C. Edell
Attorney for Applicant
Edell, Shapiro & Finnan, LLC.
1901 Research Blvd, Suite 400
Rockville, Maryland 20850





# EXHIBIT I

SEP 14 2004 12:38    D  HNE HAMMOND & ASSOCIAT  70  683-5549    P.2

2

07/22/04  18:32 FAX    COWAN, LIEBOWITZ & LATMAN    ☒003/004

U.S. Department of Commerce
Patent and Trademark Office

### RECORDATION FORM COVER SHEET
## TRADEMARKS ONLY

To the Honorable Commissioner of Patents and Trademarks: Please record the attached original documents or copy thereof.

| 1. Name of conveying party(ies): | 2. Name and Address of receiving party(ies): |
|---|---|
| The Googles Children's Workshop, Inc. | Name: Steven A. Silvers |
| ___ Individual(s)            ___ Association | Address: 3741 N.E. 163rd Street |
| ___ General Partnership      ___ Limited Partnership | Suite 325 |
| _X_ Corporation-State        | North Miami Beach, Florida 33160 |
| ___ Other __New Jersey__ | |
| Additional name(s) of conveying party(ies) attached? ___ Yes _x_ No | |

**3. Nature of conveyance:**

_X_ Assignment          ___ Merger

___ Security Agreement  ___ Change of Name

___ Other _____

Execution Date: _____ May 15, 1999

_X_  Individual(s) citizenship United States

___ Association

___ General Partnership

___ Limited Partnership

___ Corporation-State _

___ Other _____

If assignee is not domiciled in the United States, a domestic representative designation is attached: ___ Yes ___ No
(Designations must be a separate document from assignment)
Additional name(s) & address(es) attached? ___ Yes _x_ No

**4. Application number(s) or registration number(s):**

A. Trademark Application No.(s)        B.  Trademark Registration No.(s) 2,087,590

Additional numbers attached? ___ Yes _x_ No

| 5. Name and address of party to whom correspondence concerning document should be mailed: | 6. Total number of applications and registrations involved: 1 |
|---|---|
| Deborah K. Squires | |
| Cowan, Liebowitz & Latman, P.C. | 7. Total fee (37 CFR 3.41)...... $_40__ |
| 1133 Avenue of the Americas | ___ Enclosed |
| New York, NY 10036-6799 | ___ Any deficiency is authorized to be charged to |
| | _X_ Deposit Account No. 03-3415. |
| | 8. Deposit Account No. 03-3415 |
| | (Attach duplicate copy of this page if paying by deposit account) |

DO NOT USE THIS SPACE

**9. Statement and signature.**

*To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.*

Deborah K. Squires          Deborah K. Squires          7/22/04

Name of Person Signing          Signature          Date

Total number of pages including cover sheet, attachments, and document: __2__

Mail to: Mail Stop Assignment Recordation Services USPTO, P.O. Box 2450, Alexandria, Virginia 22313-1450

25702/000/639821.1

700101225

**TRADEMARK
REEL: 002899 FRAME: 0701**

USPTO Assignments on the Web                                                    Page 1 of 1

 **United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help 

## Assignments on the Web > Trademark Query

# Trademark Assignment Details

**Reel/Frame:** 2899/0701     **Received:** 07/22/2004     **Recorded:** 07/22/2004          **Pages:** 2
**Conveyance:** ASSIGNS THE ENTIRE INTEREST

**Total properties:** 1

**1     Serial #:** 75150767     **Filing Dt:** 08/02/1996     **Reg #:** 2087590     **Reg. Dt:** 08/12/1997
        **Mark:** GOOGLES

**Assignor**
**1  GOOGLES CHILDREN'S WORKSHOP, INC., THE**                        **Exec Dt:** 05/18/1999
                                                                    **Entity Type:** CORPORATION
                                                                    **Citizenship:** NEW JERSEY

**Assignee**
**1  SILVERS, STEVEN A.**                                            **Entity Type:** INDIVIDUAL
    3741 N.E. 163RD STREET                                          **Citizenship:** UNITED STATES
    SUITE 325
    NORTH MIAMI BEACH, FLORIDA 33160

**Correspondence name and address**
    COWAN, LIEBOWITZ & LATMAN, P.C.
    DEBRORAH K. SQUIERS
    1133 AVENUE FO THE AMERICAS
    NEW YORK, NY 10036-6799

                                                    Search Results as of: 08/05/2005 01:17 PM
                        If you have any comments or questions concerning the data displayed, contact OPR / Assignments at 703-308-9723

                        | .HOME | INDEX | SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

# EXHIBIT J

9/22/2005





















Take a moment to see the future. Take our tour of Gootopia. Over 600,000 people have already pushed the 'Register Me' button on www.googles.com and this is your chance to get ahead of the pack by pre-registering for the biggest news ever in children's entertainment... Gootopia! (Featuring the Googles from Goo™.)

# One GooWorld

Click the 'Album Cover' to hear the Googles first big hit, One GooWorld. Or click the 'Listen' button to meet one of the characters from Gootopia, Jingles the Jukebox. Jingles will play a number of Googles songs for you and even let you join in the fun with Karaoke!

Listen ●   Buy! ●   ▬▬▬

Don't have Flash? Can't see this page? Click here.

Stelor Productions © 2005
The Googles from Goo™ are a creation of Steven A. Silvers

Gootopia

http://www.googles.com/

9/22/2005

Gootopia

Page 1 of 2

9/22/2005

Gootopia



Take a moment to see the future. Take our tour of Gootopia. Over 600,000 people have already pushed the 'Register Me' button on www.googles.com and this is your chance to get ahead of the pack by pre-registering for the biggest news ever in children's entertainment... Gootopia! (Featuring the Googles from Goo™.)

## One GooWorld

Click the 'Album Cover' to hear the Googles first big hit, One GooWorld. Or click the 'Listen" button to meet one of the characters from Gootopia, Jingles the Jukebox. Jingles will play a number of Googles songs for you and even let you join in the fun with Karaoke!

Listen  Buy! 



Don't have Flash? Can't see this page? Click here.

Stelor Productions © 2005
The Googles from Goo™ are a creation of Steven A. Silvers

http://www.googles.com/

9/22/2005

Gootopia

# Gootopia Tour

 

## Chapter Index

Welcome to the Gootopia Tour! Here you can find out what's what and learn how Gootopia works. The tour is broken up into chapters. Use the buttons below to play, pause, stop, and move forward and back between chapters. You can also use the index to go directly to a specific section in a chapter. Choose a section, or just hit the play button to start.



### Chapter 1
Control Frame Items

Basic Navigation

### Chapter 2
Content Description

Subpages

### Chapter 3
Quizzes

GooPoints

### Chapter 4
Content Review

Hidden Items

Help Screens

Navigating Subpages

### Chapter 5
GooItems

GooItem Puzzle

### Chapter 6
Gootar the Computer

Internet Links

I Ruizing

Gooter Control

### Chapter 7
Photo Submissions

Billiard Frames

# Gootopia Tour

 

## Chapter 6: Gooter the Computer

It's time to meet 'Gooter the Computer!'



Case 9:05-cv-80387-KLR    Document 57    Entered on FLSD Docket 10/06/2005    Page 70 of 94

# Gootopia Tour

 

### Chapter 6: Internet Links

Let's click on the green panel.



Case 9:05-cv-80387-KLR   Document 24   Entered on FLSD Docket 10/06/2005   Page 71 of 94

# Gootopia Tour

 

## Chapter 6: Internet Links

Here you find all of the website links that have been approved. Click the links to travel the web safely! Remember... at Googles.com the 's' is for safely.

## LINK LIST

TIME for Kids

Encyclopedia.com

Kidsnewsroom.org

White House Kids Page

Bamph

On the American Trail

# EXHIBIT K

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into by Stelor Productions, Inc. ("Stelor") and Steven A. Silvers ("Silvers"). Stelor and Silvers are collectively referred to herein as "the Parties."

WHEREAS, Stelor brought a complaint in the United States District Court for the Southern District of Florida (Case No. 04-80954-CIV-HURLEY) against Silvers alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers brought a counter-complaint against Stelor alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers on January 13, 2005 sent a notice of termination of the Licensing, Distribution and Manufacturing Agreement to Stelor;

WHEREAS, Stelor has invested substantial time, effort, and money in developing a business involving the GOOGLES IP and fully intends to continue developing and commercializing such business, including sub-licensing some or all of the GOOGLES IP;

WHEREAS, the Parties intend that full performance by each Party of its obligations under this agreement cures the breaches alleged against each by the other Party, and

WHEREAS, the Parties wish to resolve all of the foregoing disputes to their mutual satisfaction.

//

//

SILVERS _____                    - 1 -                    STELOR_____

THEREFORE, the Parties hereby agree as follows:

1. <u>Domain Name Administration</u>:

    a.  Silvers shall give Stelor, as the administrative contact for the GOOGLES

        IP domain names, the right to control the DNS records and make changes

        to the administrative contact information for all GOOGLES IP domain

        names, and shall advise the domain name registrar known as godaddy.com

        to this effect. Silvers will provide proof that Stelor has such rights no later

        than February 15, 2005. Silvers shall cooperate with any other request

        from Stelor regarding necessary administrative issues relating to the

        domain names, and all communications by Silvers, relating to domain

        names, shall be through Kozyak Tropin and Throckmorton ("KTT").

    b.  KTT will create and control a domain name renewal database to ensure

        timely renewal of domain names owned by Silvers, and will communicate

        with Stelor's counsel regarding any deadlines or other administrative

        issues.

2. <u>Pending and Future Actions Relating to the GOOGLES IP</u>:  Silvers will cooperate

  with Stelor and Stelor's counsel in all respects in pending and future trademark and

  domain name dispute proceedings filed by Stelor, including but without limitation,

  providing any and all documents and other evidence needed to support Stelor's

  position.

3. <u>The License, Distribution and Manufacturing Agreement</u>:  Silvers withdraws his

  notice of termination of the License Agreement, and reaffirms his obligations under

SILVERS _____         - 2 -         STELOR_____

the License Agreement.

4.  <u>Post-Settlement Communications:</u>   Silvers shall communicate with Stelor solely through KTT.

5.  <u>USPTO Correspondent of Record:</u>   Silvers shall change the correspondent on all GOOGLES IP trademark applications and registrations to the name of Stelor's counsel no later than February 15, 2005, and shall not change the correspondent in the future as long as the Licensing, Manufacturing and Distribution Agreement is in effect.  Stelor's counsel shall copy KTT with all correspondence to and from the USPTO

6.  <u>Sale or Assignment of the GOOGLES IP:</u>  KTT and Stelor's counsel shall include each other in any and all negotiations and discussions with Google Inc. that relate to resolving the pending trademark and domain name disputes or the sale or assignment of the GOOGLES IP.

7.  <u>Domain Name Renewal Expenses:</u>   Stelor agrees to reimburse Silvers for documented expenses incurred to date in renewing GOOGLES IP domain names.  Future GOOGLES IP domain name renewal expenses will be reimbursed by Stelor.  All requests for reimbursement will be submitted by KTT to Stelor, and all payments by Stelor will be sent to Silvers through KTT.

8.  <u>Options Acknowledgement:</u> Stelor agrees that it will confirm in writing that no additional options have been granted that would obligate it to provide such options under the now expired Letter Agreement.

9.  <u>LLC Acknowledgement:</u> The Parties acknowledge that Stelor Inc., a Delaware "C" Corporation, is in the process of converting to a Delaware LLC. Any options granted

SILVERS                     - 3 -                     STELOR_____

to Silvers from the Stelor Inc. "C" Corporation will be converted to a like amount of unit interests under the LLC.

10. <u>Royalty Advances:</u>

    a.  For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor shall advance Silvers $60,000 a year against future royalties. The advance will be made in equal monthly installments payable on the first of each month beginning February 1, 2005.

    b.  For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor will provide Silvers with an additional monthly advance on expected future royalties equivalent to that amount required by Silvers to maintain his insurance coverage through the Aurora Collection, Inc. (or other insurance or medical provider of Silvers' choosing), as long as such coverage is offered. Such advance will not exceed $1,000 per month.

    c.  Stelor will reimburse Silvers for insurance premiums through the expiration of the "Letter Agreement," not to exceed $4,000. Such reimbursements will be provided to Silvers within 15 days of Stelor receiving evidence of paid premiums.

11. <u>Recoupment and Termination of Royalty Advances:</u>  Royalties advanced under this Agreement will be recaptured by Stelor once royalty payments exceed the amount specified in paragraph 8. Such deductions will not exceed 20% of any given royalty payment.

12. <u>Royalty Statements:</u>  Stelor shall confirm in writing that no royalty payments are outstanding, and thus no royalty statements are due.

SILVERS       - 4 -     STELOR_____

13. <u>Trademark Registrations:</u>   Stelor shall provide to Silvers through KTT proof that all applications and registrations for trademarks and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement filed by or on behalf of Stelor show Silvers as the owner.

14. <u>Audit:</u>   Stelor shall cooperate in the audit of the books and records of Stelor by Aronson and Company onsite at Stelor Productions as per section IV of the Licensing, Distribution and Manufacturing Agreement.  Any information obtained by the auditor will be restricted to KTT , on an "attorneys' eyes only" basis and the identity of any licensee, sub-licensee, vendor, or any other third-party shall remain confidential.

15. <u>Licensed Products Samples:</u>   Stelor shall provide Silvers through KTT samples of any Licensed Product that is being offered for sale.

16. <u>USPTO Correspondence:</u>   Stelor's counsel shall keep KTT advised as to the status of any pending or future trademark or domain name disputes filed by Stelor against Google Inc. by copying KTT on all pleadings and correspondence, and by giving notice to KTT of any other trademark or domain name disputes filed against Google Inc.

17. <u>Reservation of Jurisdiction:</u>   The Parties agree to submit to the exclusive continuing jurisdiction of the United States District Court, Southern District of Florida, for enforcement of all provisions of this Agreement.  In the event that a dispute arises concerning the obligations of any Party under this Agreement, the Parties agree to submit any such dispute to this court for resolution.  The successful or prevailing party (as determined by the Court) shall be entitled to recover its reasonable attorneys'

SILVERS                    - 5 -                    STELOR_____

fees and other costs incurred in that litigation from the unsuccessful or non-prevailing party in addition to any other relief to which the prevailing party might be entitled.

18. <u>Injunctive Relief:</u> The Parties hereby agree that there is no adequate remedy of law in the event that either party negotiates or settles the disputes with Google Inc. without the other party. In the event that either party attempts to negotiate with Google Inc. without the other party's participation, that shall be a breach of this Agreement, and such breach will create irreparable harm, and that injunctive relief will be necessary to maintain the rights of the non-breaching party. Accordingly, each party agrees to such injunctive relief.

19. <u>Joint Settlement Negotiations with Google Inc.:</u>

    a.   In view of the current existence of litigation and proceedings in the TTAB, jointly referred to as "Litigation", the parties recognize the need to resolve this Litigation reasonably such that Stelor can continue to develop and promote its business.

    b.   Due to the present status of development of Stelor's business, any event that causes Stelor to delay offering its web-based service to the public will cause severe injury to Stelor. Silvers therefore agrees that, in the event of a settlement with Google Inc., he will not object to Stelor's continued use of the googles.com domain to transition to a new domain name. The length of time of such transition will be at Stelor's sole discretion.

    c.   In the event of a monetary, stock, or similar settlement with Google Inc., Such sale will include a complete sale or assignment of the GOOGLES IP, The proceeds from that settlement shall be divided as follows:

SILVERS       - 6 -      STELOR_____

Silvers shall receive 70% of the first $30 million; 50% of the next $20 million; 30% of the next $30 million; 20% of the next $20 million; 10% of the next $20 million and 5% of any amount over $120 million, with the remainder in each case going to Stelor  Silver's total share of the proceeds shall not exceed $50 Million in any event.

d. Nothing in this provision creates an affirmative action by either party to enter any settlement with Google Inc., or to sell or assign the GOOGLES IP to Google Inc.  Silvers understands and agrees that he cannot sell or assign the GOOGLES IP to Google Inc. without obtaining Stelor's written approval. Both parties agree that they will negotiate in good faith.

20. Confidentiality and Disposition of this Action:

a. The settlement shall not be provided to the court unless necessary to enforce rights, and then under seal.  A Joint Stipulated motion to withdraw actions shall be filed no later than Friday, January 28, 2005. The fact that a settlement has been reached and all terms and obligations shall be confidential except to the extent necessary to advise Google Inc. that the parties have resolved all differences.

b. The complaint and counterclaim shall be dismissed without prejudice.

21. Exclusive Authority/No Assignment:

a. Stelor and Silvers represent and warrant that no other person or entity has or had any interest in the Claims, demands, obligations, or causes of action

SILVERS                      - 7 -                     STELOR_____

released as part of this Agreement, that they have the sole right and

exclusive authority to execute this Agreement and receive the

considerations specified herein, and that they have not sold, assigned,

transferred, conveyed, or otherwise disposed of any of the Claims,

demands, obligations, or causes of action released as part of this

Agreement.

b. The signatories to this Agreement each warrant that they have the power

to bind the person or entity on whose behalf they signed, and will hold

harmless any party to this Agreement for any attorney fees, costs,

expenses, or damages incurred or paid as a result of finding that such

person or entity lacks such authority, or does not have sole right to the

Claims that are the subject of this Agreement, or that any such Claim has

been assigned.

22. <u>Voluntary Agreement</u>:   Stelor and Silvers each represent that the Agreement is freely

and voluntarily entered into, with the independent advice of each party's attorneys

and they have not been induced to execute this Agreement by reason of the disclosure

or non-disclosure of any fact or representation not set forth in this Agreement.

23. <u>Non-disparagement</u>:  Each Party, on behalf of itself, its officers, directors, attorneys,

agents, and employees, agrees not to make or publish, either orally or in writing, any

disparaging statements concerning the other Party or its current and former officers,

directors, attorneys, agents, shareholders, or employees.

24. <u>Entire Agreement</u>:   This Agreement constitutes the entire agreement between the

parties and supersedes all prior and contemporaneous contracts, agreements, promises

SILVERS _____                          - 8 -                          STELOR_____

and understandings, with the exception of the License, Distribution and

Manufacturing Agreement as well as the Letter Agreement previously entered into by

the parties. This Agreement may not be altered, modified or otherwise changed in

any respect except by writing, duly executed by Stelor and Silvers. No

representations, circumstances or conditions existing before the Agreement shall be

used in any way by any party to the Agreement to modify the Agreement.

25. Joint Preparation:   Stelor and Silvers declare that they have read this Agreement, and

know and understand its contents, and they each comprehend and agree to all its

terms, conditions, and meanings and their significance; all signatories and their

counsel have cooperated in the drafting and preparation of this Agreement, and this

Agreement therefore shall not be construed against any signatory. The Agreement

shall not be construed against any of them based upon any claim of unequal

sophistication or bargaining power.

26. Governing Law:   This Agreement shall be deemed to be made under, shall be

construed in accordance with, and shall be governed by the laws of the State of

Florida.

27. Duplicate Originals:   This Agreement may be executed in duplicate originals, each of

which is equally admissible in evidence in an action to enforce this Agreement, and

each original shall fully bind each party who has executed it.

28. Facsimile Signatures:   The signatures required for the execution of this Agreement

may be transmitted by facsimile, and any such signature shall be deemed a duplicate

original, and may be admitted in evidence and shall fully bind the party and person

making such signature.

SILVERS _____  - 9 -  STELOR_____

29. <u>Effective Date</u>:  The Effective Date of this agreement shall be the date on which all Parties have signed this Agreement.

30. <u>Each Party Agrees to operate in good faith as to the terms of this agreement</u>.

[Signature Page Follows]

SILVERS                          - 10 -                         STELOR_____

THE FOREGOING IS AGREED TO BY:

DATED: January ____, 2005          Stelor Productions, Inc.

                                   By:    _____

                                   Its:   _____

DATED: January 28, 2005            Steven A. Silvers

                                   By:    _____

APPROVED AS TO FORM AND CONTENT:

DATED: January ____, 2005          Summers Rubinstein, P.C.

                                   By:    _____

                                   Yano L. Rubinstein, Esq.

                                   Attorneys for Stelor Productions, Inc.

DATED: January 28, 2005            Kozyak, Tropin & Throckmorton, P.A.

                                   By:    _____

                                   Gail McQuilkin, Esq.

                                   Attorneys for Steven A. Silvers

SILVERS                            - 11 -                    STELOR_____

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into by Stelor

Productions, Inc. ("Stelor") and Steven A. Silvers ("Silvers"). Stelor and Silvers are

collectively referred to herein as "the Parties."

WHEREAS, Stelor brought a complaint in the United States District Court for the

Southern District of Florida (Case No. 04-80954-CIV-HURLEY) against Silvers alleging

breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter

Agreement;

WHEREAS, Silvers brought a counter-complaint against Stelor alleging breach

of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter

Agreement;

WHEREAS, Silvers on January 13, 2005 sent a notice of termination of the

Licensing, Distribution and Manufacturing Agreement to Stelor;

WHEREAS, Stelor has invested substantial time, effort, and money in developing

a business involving the GOOGLES IP and fully intends to continue developing and

commercializing such business, including sub-licensing some or all of the GOOGLES IP;

WHEREAS, the Parties intend that full performance by each Party of its

obligations under this agreement cures the breaches alleged against each by the other

Party, and

WHEREAS, the Parties wish to resolve all of the foregoing disputes to their

mutual satisfaction.

/ /

/ /

SILVERS_____      1      STELOR_____

THEREFORE, the Parties hereby agree as follows:

1. <u>Domain Name Administration</u>:

   a. Silvers shall give Stelor, as the administrative contact for the GOOGLES

      IP domain names, the right to control the DNS records and make changes

      to the administrative contact information for all GOOGLES IP domain

      names, and shall advise the domain name registrar known as godaddy.com

      to this effect. Silvers will provide proof that Stelor has such rights no later

      than February 15, 2005. Silvers shall cooperate with any other request

      from Stelor regarding necessary administrative issues relating to the

      domain names, and all communications by Silvers, relating to domain

      names, shall be through Kozyak Tropin and Throckmorton ("KTT").

   b. KTT will create and control a domain name renewal database to ensure

      timely renewal of domain names owned by Silvers, and will communicate

      with Stelor's counsel regarding any deadlines or other administrative

      issues.

2. <u>Pending and Future Actions Relating to the GOOGLES IP</u>:  Silvers will cooperate

   with Stelor and Stelor's counsel in all respects in pending and future trademark and

   domain name dispute proceedings filed by Stelor, including but without limitation,

   providing any and all documents and other evidence needed to support Stelor's

   position.

3. <u>The License, Distribution and Manufacturing Agreement</u>:  Silvers withdraws his

   notice of termination of the License Agreement, and reaffirms his obligations under

SILVERS_____

2

STELOR _____ 

the License Agreement.

4. <u>Post-Settlement Communications:</u>   Silvers shall communicate with Stelor solely through KTT.

5. <u>USPTO Correspondent of Record:</u>   Silvers shall change the correspondent on all GOOGLES IP trademark applications and registrations to the name of Stelor's counsel no later than February 15, 2005, and shall not change the correspondent in the future as long as the Licensing, Manufacturing and Distribution Agreement is in effect.  Stelor's counsel shall copy KTT with all correspondence to and from the USPTO

6. <u>Sale or Assignment of the GOOGLES IP:</u>  KTT and Stelor's counsel shall include each other in any and all negotiations and discussions with Google Inc. that relate to resolving the pending trademark and domain name disputes or the sale or assignment of the GOOGLES IP.

7. <u>Domain Name Renewal Expenses:</u>   Stelor agrees to reimburse Silvers for documented expenses incurred to date in renewing GOOGLES IP domain names. Future GOOGLES IP domain name renewal expenses will be reimbursed by Stelor. All requests for reimbursement will be submitted by KTT to Stelor, and all payments by Stelor will be sent to Silvers through KTT.

8. <u>Options Acknowledgement:</u> Stelor agrees that it will confirm in writing that no additional options have been granted that would obligate it to provide such options under the now expired Letter Agreement.

9. <u>LLC Acknowledgement:</u> The Parties acknowledge that Stelor Inc., a Delaware "C" Corporation, is in the process of converting to a Delaware LLC. Any options granted

SILVERS_____                                3                          STELOR 

to Silvers from the Stelor Inc. "C" Corporation will be converted to a like amount of unit interests under the LLC.

10. <u>Royalty Advances:</u>

    a.  For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor shall advance Silvers $60,000 a year against future royalties. The advance will be made in equal monthly installments payable on the first of each month beginning February 1, 2005.

    b.  For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor will provide Silvers with an additional monthly advance on expected future royalties equivalent to that amount required by Silvers to maintain his insurance coverage through the Aurora Collection, Inc. (or other insurance or medical provider of Silvers' choosing), as long as such coverage is offered. Such advance will not exceed $1,000 per month.

    c.  Stelor will reimburse Silvers for insurance premiums through the expiration of the "Letter Agreement," not to exceed $4,000. Such reimbursements will be provided to Silvers within 15 days of Stelor receiving evidence of paid premiums.

11. <u>Recoupment and Termination of Royalty Advances:</u>  Royalties advanced under this Agreement will be recaptured by Stelor once royalty payments exceed the amount specified in paragraph 4. Such deductions will not exceed 20% of any given royalty payment.

12. <u>Royalty Statements:</u>  Stelor shall confirm in writing that no royalty payments are outstanding, and thus no royalty statements are due.



13. <u>Trademark Registrations:</u>   Stelor shall provide to Silvers through KTT proof that all applications and registrations for trademarks and domain names with the "GOO" prefix or identified as Googles IP in the License Agreement filed by or on behalf of Stelor show Silvers as the owner.

14. <u>Audit:</u>   Stelor shall cooperate in the audit of the books and records of Stelor by Aronson and Company onsite at Stelor Productions as per section IV of the Licensing, Distribution and Manufacturing Agreement.  Any information obtained by the auditor will be restricted to KTT , on an "attorneys' eyes only" basis and the identity of any licensee, sub-licensee, vendor, or any other third-party shall remain confidential.

15. <u>Licensed Products Samples:</u>   Stelor shall provide Silvers through KTT samples of any Licensed Product that is being offered for sale.

16. <u>USPTO Correspondence:</u>   Stelor's counsel shall keep KTT advised as to the status of any pending or future trademark or domain name disputes filed by Stelor against Google Inc. by copying KTT on all pleadings and correspondence, and by giving notice to KTT of any other trademark or domain name disputes filed against Google Inc.

17. <u>Reservation of Jurisdiction:</u>   The Parties agree to submit to the exclusive continuing jurisdiction of the United States District Court, Southern District of Florida, for enforcement of all provisions of this Agreement.  In the event that a dispute arises concerning the obligations of any Party under this Agreement, the Parties agree to submit any such dispute to this court for resolution.  The successful or prevailing party (as determined by the Court) shall be entitled to recover its reasonable attorneys'

STELOR 

fees and other costs incurred in that litigation from the unsuccessful or non-prevailing party in addition to any other relief to which the prevailing party might be entitled.

18. <u>Injunctive Relief:</u> The Parties hereby agree that there is no adequate remedy of law in the event that either party negotiates or settles the disputes with Google Inc. without the other party. In the event that either party attempts to negotiate with Google Inc. without the other party's participation, that shall be a breach of this Agreement, and such breach will create irreparable harm, and that injunctive relief will be necessary to maintain the rights of the non-breaching party. Accordingly, each party agrees to such injunctive relief.

19. <u>Joint Settlement Negotiations with Google Inc.:</u>

    a.  In view of the current existence of litigation and proceedings in the TTAB, jointly referred to as "Litigation", the parties recognize the need to resolve this Litigation reasonably such that Stelor can continue to develop and promote its business.

    b.  Due to the present status of development of Stelor's business, any event that causes Stelor to delay offering its web-based service to the public will cause severe injury to Stelor. Silvers therefore agrees that, in the event of a settlement with Google Inc., he will not object to Stelor's continued use of the googles.com domain to transition to a new domain name. The length of time of such transition will be at Stelor's sole discretion.

    c.  In the event of a monetary, stock, or similar settlement with Google Inc., Such sale will include a complete sale or assignment of the GOOGLES IP, The proceeds from that settlement shall be divided as follows:

SILVERS_____              6              STELOR_____ 

Silvers shall receive 70% of the first $30 million; 50% of the next $20 million; 30% of the next $30 million; 20% of the next $20 million; 10% of the next $20 million and 5% of any amount over $120 million, with the remainder in each case going to Stelor. Silver's total share of the proceeds shall not exceed $50 Million in any event.

d. Nothing in this provision creates an affirmative action by either party to enter any settlement with Google Inc., or to sell or assign the GOOGLES IP to Google Inc. Silvers understands and agrees that he cannot sell or assign the GOOGLES IP to Google Inc. without obtaining Stelor's written approval. Both parties agree that they will negotiate in good faith.

20. Confidentiality and Disposition of this Action:

a. The settlement shall not be provided to the court unless necessary to enforce rights, and then under seal. A Joint Stipulated motion to withdraw actions shall be filed no later than Friday, January 28, 2005. The fact that a settlement has been reached and all terms and obligations shall be confidential except to the extent necessary to advise Google Inc. that the parties have resolved all differences.

b. The complaint and counterclaim shall be dismissed without prejudice.

21. Exclusive Authority/No Assignment:

a. Stelor and Silvers represent and warrant that no other person or entity has or had any interest in the Claims, demands, obligations, or causes of action



released as part of this Agreement, that they have the sole right and exclusive authority to execute this Agreement and receive the considerations specified herein, and that they have not sold, assigned, transferred, conveyed, or otherwise disposed of any of the Claims, demands, obligations, or causes of action released as part of this Agreement.

b. The signatories to this Agreement each warrant that they have the power to bind the person or entity on whose behalf they signed, and will hold harmless any party to this Agreement for any attorney fees, costs, expenses, or damages incurred or paid as a result of finding that such person or entity lacks such authority, or does not have sole right to the Claims that are the subject of this Agreement, or that any such Claim has been assigned.

22. Voluntary Agreement:  Stelor and Silvers each represent that the Agreement is freely and voluntarily entered into, with the independent advice of each party's attorneys and they have not been induced to execute this Agreement by reason of the disclosure or non-disclosure of any fact or representation not set forth in this Agreement.

23. Non-disparagement:  Each Party, on behalf of itself, its officers, directors, attorneys, agents, and employees, agrees not to make or publish, either orally or in writing, any disparaging statements concerning the other Party or its current and former officers, directors, attorneys, agents, shareholders, or employees.

24. Entire Agreement:  This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous contracts, agreements, promises

SILVERS_____                                    STELOR 

and understandings, with the exception of the License, Distribution and

Manufacturing Agreement as well as the Letter Agreement previously entered into by

the parties. This Agreement may not be altered, modified or otherwise changed in

any respect except by writing, duly executed by Stelor and Silvers. No

representations, circumstances or conditions existing before the Agreement shall be

used in any way by any party to the Agreement to modify the Agreement.

25. <u>Joint Preparation</u>: Stelor and Silvers declare that they have read this Agreement, and

know and understand its contents, and they each comprehend and agree to all its

terms, conditions, and meanings and their significance; all signatories and their

counsel have cooperated in the drafting and preparation of this Agreement, and this

Agreement therefore shall not be construed against any signatory. The Agreement

shall not be construed against any of them based upon any claim of unequal

sophistication or bargaining power.

26. <u>Governing Law</u>: This Agreement shall be deemed to be made under, shall be

construed in accordance with, and shall be governed by the laws of the State of

Florida.

27. <u>Duplicate Originals</u>: This Agreement may be executed in duplicate originals, each of

which is equally admissible in evidence in an action to enforce this Agreement, and

each original shall fully bind each party who has executed it.

28. <u>Facsimile Signatures</u>: The signatures required for the execution of this Agreement

may be transmitted by facsimile, and any such signature shall be deemed a duplicate

original, and may be admitted in evidence and shall fully bind the party and person

making such signature.

9

SILVERS_____                                              STELOR_____ 

29. <u>Effective Date</u>:  The Effective Date of this agreement shall be the date on which all Parties have signed this Agreement.

30. <u>Each Party Agrees to operate in good faith as to the terms of this agreement</u>.

[Signature Page Follows]

SILVERS_____                                    STELOR_____ 

THE FOREGOING IS AGREED TO BY:

DATED: January 2\&, 2005          Stelor Productions, Inc.

                                  By: _____

                                  Its: _____

DATED: January ___, 2005          Steven A. Silvers

                                  By: _____

APPROVED AS TO FORM AND CONTENT:

DATED: January 2\&, 2005          Summers Rubinstein, P.\&.

                                  By: _____

                                  Yano L. Rubinstein, Esq.

                                  Attorneys for Stelor Productions, Inc.

DATED: January ___, 2005          Kozyak, Tropin & Throckmorton, P.A.

                                  By: _____

                                  Gail McQuilkin, Esq.

                                  Attorneys for Steven A. Silvers

