UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Palm Beach Division

STEVEN A. SILVERS, an individual,
    Plaintiff,
v.

CASE NO. 05-80387-CIV

GOOGLES INC., a Delaware corporation,
    Defendant.

(Ryskamp/Vitunac)

---

GOOGLES INC., a Delaware corporation,
    Counterclaimant,
v.

STEVEN A. SILVERS, an individual; STELOR
PRODUCTIONS, INC., a Delaware corporation;
STELOR PRODUCTIONS, LLC; a business
entity of unknown form; and STEVEN ESRIG,
an individual,
    Counterdefendants.

---

# APPENDIX TO
# PLAINTIFF'S OPPOSITION TO MOTION TO
# **BIFURCATE DISCOVERY AND TRIAL**

Respectfully submitted this 2nd day of November, 2005.

                                        _____
Kenneth R. Hartmann (Fla. Bar #664286)
Gail A. McQuilkin (Fla. Bar #969338)
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Miami, Florida 33134
T: 305-372-1800 / F: 305-372-3508

Adam T. Rabin (Fla. Bar #985635)
DIMOND KAPLAN & ROTHSTEIN, P.A.
525 S. Flagler Drive, Trump Plaza - Suite 200
West Palm Beach, Florida 33401
T: 561-671-2110 / F: 561-671-1951

==================================================================

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by e-mail and U.S. mail on this 2nd day of November, 2005 upon:

Jan Douglas Atlas
Adorno & Yoss, LLP
350 East Las Olas Blvd., Suite 1700
Fort Lauderdale, FL 33301-4217
E-mail: jatlas@adorno.com

Andrew P. Bridges
Winston & Strawn, LLP
101 California Street, Suite 3900
San Francisco, CA 94111
E-mail: abridges@winston.com

Kevin C. Kaplan, Daniel F. Blonsky and David Zack
Burlington Weil Schwiep Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse A
Miami, FL 33133
E-mail: kkaplan@bwskb.com

                                        _____

2

## TIMELINE OF EVENTS

### 1979 - 1997: The "Googles" Trademark and Intellectual Property

Over 20 years ago, Silvers began working on an animated character concept called the "Googles From The Planet Goo" designed to appeal to children. *See Exhibit 1*. Throughout the 1980s, Silvers continued to sketch out and develop the "Googles" concept and refine his characters. *See Exhibit 2*. In 1986, Silvers obtained a copyright for the "Googles the Perfect Pet" art work. *See Exhibit 3*. Although his initial use of the "Googles" name appeared in the mid-1980s in connection with his first children's product and merchandising idea - "Googles the Perfect Pet," Silvers continuously worked to develop the "Googles" name into a alien-like character for use in connection with children's entertainment and merchandise.

By 1990, Silvers had developed the "Googles" character concept into a ten-series storyline about the "Googles And The Planet Of Goo" that was intended to both educate and entertain children, something known in the children's market as "edutainment." *See Exhibit 4*. The "Googles" are lovable, friendly four-eyed alien creatures that live on the planet Goo. *Id*. Silvers' idea was to use the "Googles" to communicate to children in non-violent themes social lessons, conceptual awareness and educational values, and give "children of today, visions of tomorrow." *Id*.

In 1991, Silvers obtained a copyright registration for the first of his ten-series stories entitled "Googles & The Planet of Goo." *See Exhibit 5*. Two years later he obtained a copyright on the second story entitled "Googles, The Return Flight To The Planet Of Goo." *See Exhibit 6*.

From 1991 through 1994, Silvers worked to refine the "Googles" characters, and develop the art for the "Googles" stories. *See Exhibit 7*. In 1994, Silvers created the "Googles" logo. *See*

1

*Exhibit 8.* Silvers obtained a copyright registration for the "Googles" logo on July 26, 1994. *See Exhibit 9.*

Shortly after creating the "Googles" logo, Silvers' father, Michael Silvers, formed The Googles Children's Workshop for the benefit of Silvers, and to assist with promoting and marketing the "Googles" concept. The "Googles" name and logo appeared on business cards and letterhead that were distributed across the country in connection with promoting the concept to the children's industry. *See Exhibits 10 and 11.*

By 1994, Silvers refined the "Googles" characters to feature the four eyes of the "Googles" trademark design. *See Exhibit 12.* A key feature of the "Googles" characters are the multi-color tennis shoes worn by each character. Silvers expanded on the tennis shoe feature of the "Googles" characters and developed a "Gooshoe" for children that featured the "Googles" trademark. *See Exhibit 13.* In 1994, Silvers obtained a copyright registration for "The Gooshoe" artwork. *See Exhibit 14.*

By January 1995 Silvers had created the first three-dimensional version of a "Googles" character and was generating local press interest in the "Googles" concept. *See Exhibits 15 and 16.* Silvers' intention always has been to develop the "Googles" concept for commercial exploitation, and in 1995 Silvers developed a prototype to merchandise the "Googles" characters. *See Exhibit 17.* In March 1995, Silvers applied for a design patent for the "Googles" tennis shoe which matured into United States Patent Number 397,543. *See Exhibit 18.*

In late 1995, Silvers contracted Morris Publishing to print 1,000 copies of the "Googles And The Planet Of Goo." *See Exhibit 19.* The book was officially printed in May 1996 and featured the "Googles" trademark and design and the "Googles" characters. *See Composite Exhibit 20.* From June 1996, Silvers sold and shipped copies of the book around the country. *See*

2

*Exhibit 21.* Silvers continued from that time to promote and sell his book and related "Googles" merchandise through direct and consignment sales. *See Composite Exhibit 22 and 23.* In November 1996, Silvers was featured in a newspaper article published in the Washington, D.C. area with a photograph of the "Googles And The Planet Of Goo" book and the "Googles" trademark. *See Exhibit 24.*

In 1996, Silvers applied to register the "Googles" trademark for use in connection with children's books. That application matured into Federal Trademark Registration No. 2,087,590 issued August 12, 1997. *See Exhibit 25.* In August 1997, Silvers also obtained a copyright registration for the first "Googles" song. See Exhibit 26.

### 1997: The "Googles" on the Web

When Silvers published "Googles And The Planet Of Goo" he realized that the Web was fast becoming the marketplace of the future providing a far reaching opportunity to further develop and market the "Googles" to children throughout the world. In July 1997, Silvers registered for and obtained the Internet domain name "googles.com" as the address for his "Googles" Website. *See Exhibit 27.* A few months later, the "Googles" Website was operational, featuring the "Googles" trademark, "Googles" characters, "Googles" merchandise, "Googles" song, "Googles And The Planet Of Goo" book, together with sales and order information. *See Composite Exhibit 28.*

Silvers intended to develop "googles.com" into a highly interactive children's Website to promote and sell children's books, merchandise, and related goods and services. In 1998, Silvers added a new feature called the "FOG" Club meaning "Friends of Googles.' *See Exhibit 29.* As the "googles.com" Website caught on, hundreds of "Googles" fans used the Internet to register on the "Googles" Website as "FOG" Club members. *See Exhibit 30.*

### 1998 - 2005: The "Googles" Concept Becomes Popular On The Internet

By late 1998, Silvers worked with a manufacturer to make the "Googles" characters "Oogle," "Iggle," and "Oggle" into plush toys. *See Exhibits 31 and 32.* In March 1999, Silvers applied for a federal trademark registration for each name, which resulted in Federal Trademark Registration Nos. 2496755, 2496754, 2496753. *See Composite Exhibit 33.*

By 1999, Silvers had entered into a license agreement with The Aurora Collection for the commercial exploitation of the "Googles" characters, trademark, related intellectual property, Website, and products. That agreement was memorialized in July 2000. *See Exhibit 34.* Soon after, the "Googles" characters drawings were further refined for commercial use. *See Composite Exhibits 35 and 36.*

From 2000 - 2001, the "Googles" continued to develop on the Web and were featured in the Internet based educational site called "Fun With Science Club.' *See Exhibit 37.* That Website featured the "Googles" theme song, animated cartoons called "GooToons," and stories about each of the "Googles" characters. *See Composite Exhibit 38.*

To further promote the "Googles," Silvers and Aurora created a "Googles" theater show that played to children around the country. *See Composite Exhibits 38 and 40.* In 2001, the "Googles" performed live on national television during the Jerry Lewis Telethon.

### Meanwhile: A Prototype Search Engine Project Called "BackRub" Is Born

In 1996, Sergey Brin and Larry Page, two graduate students at Stanford University, collaborated on a university research project to develop a prototype search engine for the Web. *See Exhibit 41.* The project was named "BackRub" for its unique ability to analyze the "back links" that point to a given Website. *Id.* While the two students worked on the research project through

4

1997, a demo version of the developing search engine was available through the Internet at backrub.stanford.edu. *See Exhibit 42.*

Sometime in 1997, after giving much thought about a better name for this prototype search engine, Page decided on the name "googol." "Googol" is a word that means the mathematical number 1 followed by one hundred zeros ad denotes the largest finite number short of infinity. The word fit the goal of the research project to organize an almost infinite amount of information on the Web.

Page decided to name the prototype search engine "googol," he searched the Web to determine if he could obtain the domain name "googol.com." That domain name, however, had been registered by Tim Beauchamp in 1995 and thus was unavailable. Page then searched the Web for other domain names similar in spelling to "googol" to determine what was available. Page settled on the word "Google" and registered the domain name "google.com." But Page knew when he registered "google.com" that the domain name "googles.com" had been registered by Silvers three months earlier and was in use, and that Silvers had a federal trademark registration for the "Googles" mark. Undeterred by Silvers' superior trademark rights, sometime in late 1997, Page and Brin changed the name of their research project from "BackRub" to "Google." *See Exhibit 43.* Access to the demo of the research project remained, however, at "backrub.stanford.edu" throughout 1997. *See Exhibit 44.*

Sometime in 1998, Page and Brin began using the domain name "google.stanford.edu" as the Web address of their search engine demo site. *See Exhibit 45.* Throughout most of 1998, however, the "Google" prototype search engine was associated with Stanford University. *See Exhibit 46 at page 2.* The index of information provided through the "Google" prototype search engine was free to anyone with an Internet connection, and there was no intention to sell the

5

services to consumers. In and around August 1998, Page and Brin commissioned a formal trademark and domain name search to determine whether the name "Google" was available for use as a trademark. The search result revealed Silvers' "Googles" trademark, "googles.com" domain name, and picture of the "Googles" Website. *See Exhibit 47.* Sometime in September 1998, a year after Page acquired the "google.com" domain name, Page and Brin adopted the name "Google" as their company name and incorporated Google Technology, Inc. in California. *See Exhibit 48.* Page and Brin decided to adopt the name "Google" rather than "Googol" because "googol.com" was not available as a domain name, and could not be trademarked. *See Exhibit 49 at page 2.*

On September 16, 1998, Google, Inc. (although it was not yet incorporated) filed an Intent-To-Use federal trademark registration application to register the mark "Google" for use in connection with computer hardware (Int'l class 9), and computer services (Int'l class 42). *See Exhibit 50.* An Intent-To-Use application means that the applicant has not yet used the mark in commerce but has a bona fide intent to use the mark in commerce at some future date. This was the appropriate application to file because up through 1998 and into 1999, the "Google" search engine remained free to anyone connected to the Internet and was still a non-commercial experimental academic model. *See Exhibit 51 at page 1, 3, 4, 5 and 10.* In other words, the "Google" mark was not yet being used in interstate commerce, a basic requirement to support trademark registration. Page intended to keep the "Google" search engine in the non-commercial academic realm because it avoided the advertising supported business model of most search engines.

On March 15, 1999, "Google, Inc." (although still not incorporated as a legal entity) filed an Amendment-To-Allege-Use in the pending federal trademark application alleging, in

contradiction to its original declaration that it had only an intent-to-use to mark, stating that it had used the "Google" mark in interstate commerce in connection with Int'l class 42 services since September 1997, a full year before the Intent-To-Use application date. *See Exhibit 52.* The Amendment-To-Allege-Use was filed together with Page's Declaration that based on his own knowledge the "Google" mark was in use in commerce as of March 9, 1999, another contradiction. *See Exhibit 53.* In fact, up until late 1999, the "Google" search engine services and other services listed in trademark application were not actually advertised or offered for sale, and thus were not rendered in interstate commerce.

On or about September 23, 1999, the "Google" search engine was "commercially" launched by Google Technology. But it was not until the first quarter of 2000 that Google Technology introduced a paid advertising program that generated sales and revenue and which launched the use of the "Google" mark into interstate commerce for computer search engine services. This advertising program was then followed by the "Google AdWords" and "Google AdSense" advertising programs in 2000 and 2002 respectively.

On September 23, 2002, three years after the "Google" federal trademark application was filed, "Google, Inc'" was incorporated as a California corporation. *See Exhibit 54.* On October 11, 2002, Google, Inc. purported to assign federal trademark application Serial Number 75/978469 (for "Google") to Google Technology, Inc. On August 27, 2003, Google, Inc. was reincorporated as a Delaware corporation. On that same date, Google Technology, Inc. purported to assigned federal trademark application Serial No. 75/978469 to Google, Inc., the Delaware corporation. Then, sometime in 2004, Google Technology, Inc. was merged into Google, Inc.

### 1998: Silvers Attempts to Contact Larry Page To Avoid Confusion

7

In or around late 1998, Silvers first became aware that Page had registered a domain name similar to his, and tried to contact him about his intended use of the "Google" name on the Web and to discuss ways to avoid potential confusion with the "Googles" mark and the "googles.com" Website. At this time, Silvers did not know what "Google" was about, and frankly, neither did most of the world. Although he tried to find out what Page intended to do with the mark, Silvers did not receive a response. Silvers continued to monitor the use of the "Google" name on the Web, and in August 2001 upon seeing that it was gaining commercial recognition, again tried to contact Larry Page. *See Exhibit 55.* In his e-mail directed to Page, Silvers noted that confusion had started between the Websites, and simply asked if they could work out a mutual plan to avoid confusion, especially regarding traffic to each other's Websites. Silvers did not receive a response.

A year later, on August 13, 2002, Silvers called Google's Director of Legal Affairs to ask again if they could work out a mutual plan to avoid confusion, and was told Google was not interested in taking steps to avoid confusion.

### 2001 -2004: The "Googles" Continue to Develop Commercially

From 1999- 2002 Silvers and Aurora continued to develop the "Googles" concept with new music, adventures, and improved interactive Website. By 2001, the "Googles" were attracting media attention and were featured in *Kidscreen Magazine. See Exhibit 56.* In 2002, Aurora sold its licensing rights in the Googles trademark and related intellectual property to Stelor Productions for two percent (2%) of the first five hundred million dollars and three (3%) over five hundred million dollars of gross sales (not to exceed $30 million) from the sale and merchandising of "Google" project. *See Exhibit 57.* The value of the project at that time was considered by licensing industry standards to be up to $500 million should the "Googles"

8

characters and music became even somewhat as commercial successful as Barney or then current children's projects. Silvers intention – as it has been from day one - was to attract investors to develop the "Googles" into film, music, television, and theatrical entertainment for children. *See Exhibit 58*. Stelor, as Silvers had many years ago, recognized the value of the Web and continued to develop the "Googles" Website as the focal point for drawing children to the "Googles" characters. *See Composite Exhibit 59*. The Website features the Googles characters in the fictional city of "Gootopia" singing the music from the "Googles" CD in "Goosiucals, educational activities through "Gooter the Computer," and games that earn visitors "Goo Points." *See Composite Exhibit 60*.

By March 2003, however, the "googles.com" Website was being inundated with people looking for the "google.com" Website. To protect the identity of the "Googles" mark and uniqueness of the "Googles" characters, and combat confusion between the "Google" and "Googles" Websites, a feature was added to the googles.com Website that asked the Internet visitor if the "Googles" site was where it intended to be. *See Exhibit 61*. Silvers had no desire to build the "Googles" project through confusion with "Google" as that would only hinder its potential if consumers associated the characters with this commercial search engine. An early business plan shows that the sole focus and goal has always been o develop the "Googles" into a highly successful children's entertainment product.1 *See Exhibit 58*.

**Google Expands The Use Of The "Google" Mark Into Children's Goods and Services**

With full knowledge of Silvers' superior rights to the "Googles" mark, googles.com domain name and Website, Google has expanded the use of its "Google" mark into the market for

---

1 Silvers has since terminated Stelor as his licensee due to the failure of Stelor to perform its contractual obligations, including making scheduled royalty payments, providing Silvers samples of all promotional and marketing material, and refusal to accommodate Silvers' audit demand.

children's goods and services, and in 2004 filed a federal trademark application to expand its right to use the "Google" mark for children's goods, including books and clothing. *See Exhibit 62.*

Then, in complete disregard of Silvers' rights in the "Googels" mark, Google began incorporating the "googles" name into its domain names. For example, despite naming its advertising programs "Google Adwords" and "Google AdSense," Google registered the domain names **googles**adwords.com, **googles**adsense,com, and **googles**-adwords.com. Google also has registered the domain names 20**googles**.com, **googles**c.com, **googles**ms.com, **googles**sms.co.il; **googles**sms.de, and perhaps hundreds of other domain names that have yet to be discovered.

Google now uses the "Google" mark, "google.com" and other domain names incorporating the name "googles," and the "Google" Website to advertise, promote, market and sell children's books, merchandise, and related goods and services, and is obviously undaunted in its desire to overtake Silvers' federal and common law trademark rights. In fact, Google has gone so far as to offers for sale a product it calls "Google Goo." *See Exhibit 63.*

10

### The USPTO Action And Proposal By Google to Negotiate

When Google crossed the line into the children's market, and began to incorporate the "googles" name into domain names, and encroach on Silvers' other trademark rights, on July 13, 2004, Silvers authorized Stelor to file an opposition to Google's federal trademark application to register its mark in International class 16. Stelor also filed a petition with the National Arbitration Forum to challenge Google's domain names. This set off a flurry of counter-actions by Google against Silvers similar to what Google has filed in this action.

In February, 2005, after several months of discussion among the parties, and at Google's urging, the parties agreed to a 30-day stand-down agreement under which Google, Stelor, and Silvers agreed to a withdrawal of the pending actions against each other to allow time to continue negotiations to resolve all pending disputes. The intent of the standoff agreement was that each party would be entitled to re-file its action if a resolution was not reached after 30-days.

### Google Sandbags Silvers

Upon execution of the standoff agreement, Silvers learned that under the Trademark Trial and Appeal Board rules, it would not be entitled to re-file its Opposition at the end of this 30-day standoff period. Therefore, a Motion for Stay Pending Settlement Negotiation to stay the Opposition for the 30-day period was filed in the USPTO action. This protected Silvers from losing the opportunity to oppose Google's trademark application, and was within the spirit of the agreement. In contravention of the intent of the standoff agreement, and Silvers' request, Google refused to agree to the

11

stay and, filed a motion demanding that the Opposition be dismissed. On March 22, 2005, the Opposition was dismissed, and Registration No. 2954071 issued. *See Exhibit 64.* Google then ceased any meaningful negotiations. Based on Google's actions this lawsuit was filed a few weeks later.

In response to the lawsuit, Google raised several affirmative defenses, and filed a counter-claim against Silvers and Stelor alleging they have infringed its right by promoting (but not yet offering) "search engine services" on the "Googles" website. Silvers has denied these allegations.

12

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA



## CASE NO.
## DE# 41

☐ **DUE TO POOR QUALITY, THE ATTACHED DOCUMENT IS NOT SCANNED**

_____

# ATTACHMENT(S) NOT SCANNED

☐ VOLUMINOUS (exceeds 999 pages = 4 inches)
☐ BOUND EXTRADITION PAPERS
☐ ADMINISTRATIVE RECORD (Social Security)
☐ ORIGINAL BANKRUPTCY TRANSCRIPT
☐ STATE COURT RECORD (Habeas Cases)
☐ SOUTHERN DISTRICT TRANSCRIPTS
☐ LEGAL SIZE
☐ DOUBLE SIDED
☐ PHOTOGRAPHS
☒ POOR QUALITY (e.g. light print, dark print, etc.)
☐ SURETY BOND (original or letter of undertaking)
☐ CD's, DVD's, VHS Tapes, Cassette Tapes
☐ OTHER = _____

# PLEASE REFER TO COURT FILE