UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Palm Beach Division

STEVEN A. SILVERS, an individual,
     Plaintiff,

v.                                                                    CASE NO. 05-80387-CIV

GOOGLES INC., a Delaware corporation,                    (Ryskamp/Vitunac)
     Defendant.
_____

GOOGLES INC., a Delaware corporation,
     Counterclaimant,

v.

STEVEN A. SILVERS, an individual; STELOR
PRODUCTIONS, INC., a Delaware corporation;
STELOR PRODUCTIONS, LLC; a business
entity of unknown form; and STEVEN ESRIG,
an individual,
     Counterdefendants.
_____

## PLAINTIFF'S OPPOSITION TO MOTION TO BIFURCATE DISCOVERY AND TRIAL

      This is a simple trademark infringement action that should proceed with normal discovery

and as a unitary jury trial. Google offers no reason to bifurcate discovery and the trial other than its

own desire to orchestrate the piecemeal litigation of issues that it prefers, i.e. its "validity" defense to

Silvers' trademark registration. Google's request to carve out one of its defenses for special treatment

would severely prejudice Silvers by the considerable delay that would result in a separate trial with a

separate discovery period on this one small non-dispositive issue, and deprive Silvers of his right to

prove his infringement case to a jury in one complete case. In fact, the issue Google seeks to try first,

namely the validity and ownership of Silvers' trademark registration, is only one factual issue of one

element that the jury will consider in a seven-part test of likelihood of confusion that will be litigated

in Silvers' infringement action. And, more important, Silvers' trademark registration has

incontestable status, which is conclusive evidence of ownership and validity for purposes of proving infringement. *See Ocean Bio-Chem, Inc. v. Turner Network Television, Inc.* 741 F.Supp. 1546 (S.D. Fla. 1990)(district courts should not consider incontestability as separate factor distinct from other factors used to determine likelihood of confusion.)  The incontestable status of Silvers' trademark means that Google is statutorily prohibited from challenging the ownership and validity of Silvers' trademark registration on the grounds of an "invalid assignment" or "inconsistent use," because neither is one of the seven permissible defenses enumerated in 15 U.S.C. § 1115.  Therefore, halting all merits discovery and holding a separate trial to determine ownership or validity of Silvers' trademark registration would be meaningless.

Furthermore, even if Google had a valid defense to the incontestable status of Silvers' trademark registration, that would not obviate the need to try the infringement action.  It would simply reduce at trial the conclusive proof of validity and ownership of Silvers' trademark registration to prima facie proof.  It would be a considerable waste of time to halt this entire litigation solely to determine what burden of proof Silvers has at trial on this one factual issue.  Besides, if at the conclusion of normal discovery (or earlier) Google has undisputed evidence to support a valid defense to Silvers' incontestable trademark registration, it can move pre-trial for partial summary judgment on that issue and if it prevails then the trial on infringement will proceed under the lesser presumption of validity.

While we recognize that an affirmative defense if proven can defeat liability in a case that does not justify bifurcating the case so that all merits discovery is halted while a jury "determines" the defense first.  If that were true every case would proceed in reverse order rather in the traditional manner where the plaintiff has the opportunity to obtain its discovery and prove its case before the jury considers the defendant's defenses. Trademark actions in particular require that the plaintiff

2

prove infringement prior to any consideration by the jury or trial court of affirmative defenses. *See J. Lyons & Co. Ltd v. Republic of Tea, Inc.*, 892 F.Supp. 486, 493 (S.D.N.Y. 1995) (denying bifurcation of issue of validity of trademark before determination of likelihood of confusion).

## THE HISTORY OF THIS DISPUTE

Steven Silvers filed this action against Google to prevent it from expanding its use of the "Google" mark - - which has been used by defendant only since 1999 and almost exclusively in connection with a search engine - - into the children's market where Silvers has used the nearly identical mark "Googles" in connection with children's books and entertainment since 1979, long before Google was founded. In fact, the two founders of Google, Larry Page and Sergey Brin, were barely out of diapers when Silvers began use of his "Googles" mark. Since that time, Silvers through his personal efforts, the work of various licensees, consistent presence on the Web, attendance at international licensing trade shows, and many millions of dollars of capital investment, has developed the "Googles" trademark and concept from a children's story into a potentially successful multi-media children's entertainment project, which by now includes several professional music CDs that are among the top downloaded children's music in the world, merchandise, and an interactive website located as www.googles.com (registered as a domain name in 1997). Silvers now owns dozens of "Googles" related trademarks, including "Oogle" and "Goo," over one hundred domain names that incorporate the "googles" name, numerous copyrights, and a patent. The successful further commercial development of this project, however, depends entirely on Silvers' ability to attract licensees to further develop and merchandise his characters.

The time and effort of Silvers and all the investor money that has been poured into the "Googles" project is now seriously in jeopardy by the reverse confusion created by Google's use of a nearly identical mark. Although Silvers has taken steps to avoid consumer confusion between the

3

marks, Google has rebuffed every request by Silvers to take its own steps to prevent confusion. And now, Google apparently believes that because its mark has become so well-known and its company is so much larger than Silvers, it can simply disregard Silvers' superior trademark rights and expand unfettered into the children's market where Silvers has been for over two decades, and lay claim to all words in all markets that use the "Goo" and "Oogle" formatives. Although Google derides Silvers for not being as successful as it has been, fortunately for Silvers trademark rights are determined by priority of use not by size or fortune.

Google's motion to bifurcate this case is nothing more than an attempt to deflect the Court's attention away from Google's infringing conduct, and taint Silvers as an opportunist hoping for a windfall settlement.[1] Nothing could be further from the truth. Every moment of Silvers' adult life has been devoted to developing the "Googles" project, and it was only after Google refused to take corrective action to resolve the inevitable confusion, started to incorporate the name "googles" into a variety of domain names, and then sought to expand the use of its mark to the children's market and assert exclusive ownership of all similar marks, including all marks using the "Goo" and "Oogle" formative, that Silvers filed this action. Silvers wants to prevent the erosion of his long-standing trademark rights and protect his ability to develop his "Googles" characters into a successful children's entertainment production. Silvers understandably wants -- and is entitled to keep - - Google out of the children's market and to remedy the reverse confusion that is crippling his ability to further commercialize the "Googles" project.

---

[1]  Google continues to gratuitously refer to Silvers' conviction while failing to mention that the conviction was overturned. Silvers past, while interesting and pivotal to the development of the "Googles From The Planet Goo" book, is a red herring that has nothing to do with whether Google is infringing his trademark rights, and is clearly injected here by Google to bias the Court against Silvers. Furthermore, the license granted to Stelor was not based on any need to distance Silvers from the "Googles" project. The license agreement and a separate consulting agreement between Silvers and Stelor Production provided for Silvers direct involvement in the project, including that his name always appear in connection with all "Googles" related products and promotional materials.

4

### The True And Accurate Timeline Of Events

Google's severely truncated timeline of events leading up to this lawsuit is grossly inaccurate and misleading. Google would like the Court to believe that the current fame now associated with its mark existed way back in 1996 when Silvers first registered the name "Googles" as a trademark and internet domain name, and that Silvers was a visionary who concocted some plan to await the commercial success of Google so he could sue them and collect a settlement. The truth is that Google was incorporated only a few years ago, and what is now the heavyweight search engine (and stock market darling) was in 1996 just a relatively unknown experimental academic model that offered free Internet searches under the name "Backrub." Silvers began using the mark "Googles" almost twenty years before then, and could not have foreseen that two 4 year old kids would years later adopt an nearly identical name that would become famous as a search engine, and then expand **that mark into the children's entertainment market providing him an opportunity to conspire with a then unknown licensee to sue Google. If Silvers had such clairvoyant abilities he would be better off** using those talents to make millions on Wall Street. It is ridiculous to even suggest that this is anything other than a legitimate and serious trademark infringement action. We have submitted an Appendix with this Response that contains the true and accurate timeline of the development of the "Googles" characters and trademarks, and ultimate collision with Google that has lead Silvers to this Court.

### <u>ARGUMENT AGAINT BIFURCATION</u>

This straight forward trademark infringement lawsuit will determine whether Google has caused "reverse confusion" through use of a mark that is identical to Silvers' trademark, and should be prevented from expanding its mark into the children's market. The jury will determine these issues based on the well-known seven-part likelihood of confusion test.

5

As stated in its Motion to Bifurcate, Google is defending this action at the onset, not by contesting liability, but by asserting two affirmative defenses that challenge the ownership and validity of Silvers' trademark registration, typical defenses asserted in any trademark infringement action. Google, however, wants to dictate the order of proof in this case, and is requesting that the Court bifurcate the proceedings and stay all discovery and other activity in the case, so that it can take discovery and litigate first the validity of Silvers' trademark registration based on an assignment of the mark to Silvers from his company.    This makes no sense whatsoever because Silvers' trademark registration has reached incontestable status and the defense raised by Google, namely an allegedly invalid assignment, is statutorily prohibited under the Lanham Act. Even if this was a valid defense, the factual issues raised are inextricably intertwined with the facts and issues that will be tried under the likelihood of confusion analysis. Halting all merits discovery so that Google can litigate its pet issue would cause unfair delay to Silvers in bringing his infringement case before a jury and increase, rather than decrease, the time to litigate this case.

A.    **Silvers' Trademark Registration Is Incontestable And Conclusive Evidence Of Validity and Ownership.**

In 2003, The United States Patent and Trademark office granted Silvers' registered trademark incontestable status under 15 U.S.C. § 1065. Under 15 U.S.C. § 1115, an incontestable mark constitutes "conclusive evidence" of the validity and ownership of the registered mark:

> ". . .the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registration's exclusive right to use the registered mark in commerce."

Silvers is entitled to use this conclusive evidence in his case against Google for infringement. In other words, because Silvers' trademark registration is incontestable, "validity, legal protectiblity, and ownership are proved" for purposes of an infringement action. *Park 'N Fly, Inc. v. Dollar Park*

*and Fly, Inc.*, 105 S.Ct. 658, 662-63 (1985); *Dakota Industries, Inc. v. Ever Best Ltd.*, 28 F.3d 910, 912-13 (8th Cir. 1994); *Ford v. Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991). Therefore, as the Eleventh Circuit holds, there is nothing for the jury to decide regarding ownership or the validity of Silvers' trademark until Silvers proves his infringement case under the likelihood of confusion test, which he is entitled to do before Google puts on any of its affirmative defenses. *See Dieter v. B&H Industries*, 880 F.2d 322, 326 (11th Cir. 1989)(Because mark is incontestable, its validity is conclusively presumed, and the only factual issue for the trial court's determination is likelihood of confusion.)

And once Silvers proves infringement, Google's defenses are limited. Silvers' trademark is immune from challenge on any grounds not emmumerated in 15 U.S.C. § 1115. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 105 S.Ct. 658 (1985); *Dieter v.B&H Industries*, 880 F.2d at 328. None of those grounds relate to ownership of the mark, assignments, or the extent of Silvers' use of the mark in commerce, the grounds Google asserts for challenging Silvers' trademark and bifurcating this trial. In fact, any registration existing for over five years may be cancelled only on the specific grounds enumerated in the statute. *Treadwell's Drifter's, Inc. v. Marashak*, 18 U.S.P.Q. 13318, 1320 (T.T.A.B. 1990).

Moreover, even if Google's defense regarding the assignment or use in commerce were somehow construed to be an "abandonment" defense to Silvers' incontestable trademark (permissible under 15 U.S.C. § 1115), that defense does not constitute an absolute defense to infringement. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 105 S.Ct. 658, 664 n.6 (1985) That defense, if proven, merely reduces the evidentiary status of the "Googles" trademark registration from "conclusive proof" to "prima facie proof" of Silvers' exclusive right to use the mark. *Dakota Industries, Inc. v. Ever Best Ltd.*, 28 F.3d 910, 913 (8th Cir. 1994). Google still must rebut this presumption at trial with

7

evidence. *See 20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*, 747 F.2d 81, 89-89 n. 8 (2d Cir. 1984)(defendant has the burden of rebutting the presumption of plaintiff's right to exclusive use of the mark by a preponderance of the evidence.); *Cullman Ventures, Inc. v. Columbian Art Works*, 717 F.Supp. 96, 112 (S.D.N.Y. 1989). And, when abandonment is raised as an affirmative defense to an infringement claim, the burden of proof is even higher: abandonment must be proven by clear and convincining evidence. *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980).[2] Therefore, at best, the only thing that would be accomplished if this case were bifurcated as Google proposes is a determination after months of discovery of the strength of the presumption that Silvers has regarding the validity of his trademark registration during the trial to determine infringement. That is serves no purpose other than to delay the entire case. The proper order to proceed in this case is for discovery to proceed in full, and for Silvers to put on his infringement case. If he proves that Google has infringed, then Google can present to the jury whatever evidence it has to support its permissible affirmative defenses. The jury will determine the rest.

### B.    This Is Not An Exceptional Issue That Warrants Bifurcation

Although the determination to bifurcate a trial is left to the sound discretion of the trial court separation of issues "is not to be routinely ordered." Advisory Committee Note to the 1996 amendment of Rule 42(b). *See Data General Corp. v. Grumman Systems Support Corp.*, 795 F. Supp. 501, 503 (D.Mass. 1992). Bifurcation remains the exception rather than the rule. *Karsaros v. Cody*, 744 F.2d 270, 278 (2d Cir. 1984); *Dallas v. Goldberg*, 143 F.Supp.2d 312, 315 (S.D.N.Y. 2001). The main principle that informs a court's discretion on the issue of bifurcation is particularly important in this case. That is that "[t]he party seeking bifurcation has the burden of showing that bifurcation is

---

[2] As a matter of law Google will not prevail on an abandonment defense on the theory that The Googls Family Workshop was dissolved at the time it conveyed the assignment to Silvers. Under New Jersey law dissolution of a corporation does not deprive it of the power to convey its property. *See Section 14A:12-9(2)*,

proper in light of the general principle that a single trial tends to lessen the delay, expense and inconvenience to all parties." *Lowe v. Philadelphia Newspapers, Inc.*, 594 F. Supp. 123, 125 (E.D.Pa. 1984). As succinctly stated by the District Court for the Southern District of New York:

> "Extending the adjudication into two or more proceedings necessarily implicates additional discovery; more pretrial disputes and motion practice; empanelling another jury or imposing more on the jurors who decide the earlier phase of the litigation; disposing or recalling some of the same witnesses; and potentially engendering new rounds of trial and post-trial motions and appeals. The inconveniences, inefficiencies and harms inherent in the probable consequences – to the parties and third parties, to the courts, and to the prompt administration of justice - - weigh against separation of trials and suggest that, for the probable adverse effects to be overcome, the circumstances justifying bifurcation should be particularly compelling and prevail only in exceptional circumstances."

*Kos Pharmaceuticals, Inc. v. Barr Laboratories, Inc.*, 218 F.R.D. 387, 390-91 (S.D.N.Y. 2003).

Google does not come close to meeting this burden. There is nothing exceptional in Google's challenge to Silvers' trademark registration that warrants staying merits discovery while the parties conduct an entire separate proceeding on that one issue. Similar defenses are raised in just about every trademark infringement action, and are easily understood by the jury when considering the entire case. *See In re Ira* M. *Koger*, 261 B.R. 528, 532 (Bankr. M.D. Fla. 2001) (bifurcation should be ordered solely to alleviate jury confusion). In fact, Silvers is challenging the validity of Google's trademark registration (which has not reached incontestable status) in defense of Google's infringement counterclaim on the grounds that Google was not incorporated at the time it filed its trademark registration, and had not used the mark in interstate commerce as represented in its trademark application. Google's request to litigate <u>its</u> defense to infringement first, of course, would delay discovery and a trial on the validity of <u>its</u> mark, precisely what Google hopes to accomplish. And, Google's request to try this infringement case piecemeal would require a separate discovery phase and trial on Silvers' challenge to Google's trademark before moving on to all other issues.

---

*New Jersey Statutes.*

9

This approach would add years and unwarranted expense to the litigation, perhaps Google's underlying objective here.

Google does not cite to one case where a court has bifurcated the trial in a trademark infringement action to allow the defendant to challenge the validity and ownership of an incontestable trademark registration, or have a jury determine its affirmative defenses before the plaintiff takes merits discovery and proves infringement. The most notable case cited by Google – *City of Newark v. Beasley* -- is primarily a copyright infringement case that required a determination of who as between an employer (plaintiff) and employee (defendant,) owned the copyrights at issue under the work for hire doctrine, and trademarks related to that work. In that case it made sense for the trial court to determine first if the employee who was being sued for infringement actually owned the works at issue, which the court determined he did. But that is not relevant to this dispute. **Google is not laying claim to ownership of Silvers' mark, but simply making a technical challenge to the validity of an assignment between Silvers and his company (which it is statutorily prohibited from doing anyway).** Moreover, Google's focus on the assignment only goes to the force of Silvers' trademark registration for the mark; even without a perfected registration, Silvers still owns the trademark based on his common law rights, and, of course, the claim that Google infringes on that trademark.

Google's reliance on patent cases is similarly misplaced. Patent cases invariably involve major complexities of claims construction, prior art, disclosure, novelty, utility, misuse, and a maze of similar highly technical issues unique to patent litigation. And, even though patent litigation is by nature complex, with the exception of the need to hold the routine "Markman" hearing, courts do not routinely bifurcate patent litigation issue by issue. *See e.g. A.L. Hansen Manufacturing Co. v. Bauer Products, Inc.*, 2004 WL 1125911 (N.D.Ill. 2004(bifurcation of liability for infringement and

willfulness inappropriate); *F&G Scrolling Mouse, LLC v. IBM* Corporation, 190 F.R.D. 385 (M.D. North Carolina 1999) (mere status of being a patent case does not create a presumption or inference in favor of bifurcation and separate trials); *Fuji machine Mfg. Co. Ltd. V. Hover-Davis, Inc.*, 982 F.Supp. 923, 924 (W.D.N.Y. 1997) (bifurcation of trials, even in patent cases, should be the exception, not the rule); *Home Elevators, Inc. v. Millar Elevator Service Company*, 933 F.Supp. 1090 (N.D. Georgia 1996) (no need to bifurcate issue of liability and damages or claim of willfulness from infringement claim.)

In fact, in one patent case cited by Google, *Precision Shooting Equipment, Inc. v. Golden Eagle Industries, LLC*, the district court expressly <u>denied</u> defendant's request to bifurcate the issue of the enforceability and validity of the patent finding that judicial economy would not result because of the overlapping evidence and testimony. *Id. At* 2005 WL 1669120 (M.D. Fla. 2005). *See also Johns Hpokins University v. Celpro*, 160 F.R.D. 30, 32033 (D. Delaware 1995) (normal course of litigation in patent case is for all claims and issue to be tried in one trial); *see also ABB Industrial Systems, Inc. v. Prime Technology, Inc.*, 32 F.Supp.2d 38, 43 (D.Conn. 1998) (bifurcation of issues in complex environmental case denied noting that separation of issues for trial is not routinely ordered).

Google should do what the typical patent infringement defendant does when it champions a validity defense - - conduct discovery in the ordinary course and then move for summary judgment on its defense. Such an approach is consistent with authorities cited by Google, i.e. *Beckman Instruments v. Chemtronics, Inc.*[3] There, the trial court conducted a single trial after full merits discovery and determined the patent in issue to be valid but not infringed. On appeal, the Fifth Circuit found the patent to be invalid, and thus did not have to reach the infringement issue.

---

[3]  439 F.2d 1369 (5th Cir. 1970). While Google notes that prior Fifth Circuit decisions are binding under the *Bonner* doctrine, it fails to mention that today only the Federal Circuit determines substantive and procedural issues arising in patent infringement cases.

*Beckman* Instruments, 439 F.2d at 1371-72. In the footnote accompanying this holding, the Fifth Circuit found that a validity defense, if substantial, should be "taken up first and infringement considered only if patent validity is decided in favor of the patentee." Id. This is not a suggestion - - much less a requirement - - that a validity defense be <u>bifurcated</u> into a separate proceeding with its own discovery and separate trial. Rather, the Fifth Circuit stated the obvious: A trial court should not devote its resources to "considering" core liability issues in making its findings if a defense is case dispositive. In the same vein, where a statute of limitations defense is proven at trial, there is no need for the trial court to make extensive findings on the liability issue, which has become moot.

Similarly, in *Kahn v. General Motors Corp.*, 865 F.Supp. 210(S.D.N.Y 1994), a non-jury case cited by Google, the trial court ordered a separate bench trial on the issue of standing, after discovery on all the merits was completed. The issue there involved the plaintiff/patent holder's standing to sue; i.e. whether he owned the patent in suit. *Id.* at 215. **Here, there is no issue as to whether Silvers owns his trademark. Google merely claims Silvers' registration may be invalid due to an allegedly** deficient assignment to Silvers by Silvers' company. At best, Google's defense relates to Silvers' rights based on his registration, but this ignores the basic rule of trademark rights - - that they are based on use of the mark. As explained above and in the accompanying Appendix, Silver has used the mark continuously for over twenty years. There is no standing issue to separate for trial in this case.

Furthermore, Silvers has demanded a trial by jury. Google's bifurcation request raises the practical difficulties in conducting separate trials before one panel of jurors, and the risk of losing jurors between the first and second, or even third phase of this case. In fact, if all other discovery is stayed while the parties litigate this one issue, there could be a year or more hiatus for jurors before proceeding to the next trial, which may then require the selection of a new jury who would consider

12

the same issue again under the likelihood of confusion test. *See Johns Hopkins University v. Cellpro*, 160 F.R.D. 30, 35 (D. Delaware 1995) (bifurcation where there is a demand for jury trial raises risk of lose of jurors making it impractical.)

As single trial is simply the more expedient and efficient procedure for the Court to follow, and is consistent with the goal in every civil litigation to resolve the dispute within a reasonable timeframe.

**C.    Stelor's Cross-Claim Is Irrelevant And Should Be Dismissed**

Google incorrectly argues that bifurcation is necessary because of the cross-claim filed by Stelor against Silvers. Stelor's cross-claim against Silvers has nothing to do with ownership rights or the validity of Silvers' trademark registration; it is strictly a breach of contract action alleging wrongful termination of a license agreement, in which, by the way, Stelor expressly acknowledges **that Silvers is the sole owner of his trademark and all related intellectual property. Silvers has moved to dismiss the cross-claim because it belongs in state court where there is already pending an** action between Silvers and Stelor relating to the termination. *See Exhibit A*. Stelor filed this cross-claim as a "second bite at the apple" after Judge Hurley dismissed the same claims previously brought by Stelor for lack of subject matter jurisdiction. Furthermore, even if Stelor were to prevail on its wrongful termination claim, its remedy is limited to money damages; there is no remedy to "reinstate" the License Agreement, and thus nothing to be determined regarding the validity of Silvers' trademark registration bears on the dispute between Silvers and Stelor. *See Burger King v. Agard*, 911 F. Supp. 1499 (S.D. Fla. 1995); *Burger King v. Majeed*, 805 F. Supp. 994, 1003 (S.D. Fla. 1992); *Burger King v. Hall*, 770 F. Supp. 633, 638-39 (S.D. Fla. 1991); *Burger King v. Austin*, Bus. Fran. Guide CCH ¶9788 (S.D. Fla. 1990); *A.L.K. Corp. v. Columbia Pictures Industries, Inc.*, 440 F.2d 761 (3d Cir. 1971).

13

## CONCLUSION

The Court should deny the motion to bifurcate so that this action – pending now for almost

six months – can rapidly proceed to full discovery and then a single jury trial on all issues.


Respectfully submitted this 2nd day of November, 2005.


Kenneth R. Hartmann  (Fla. Bar #664286)
Gail A. McQuilkin  (Fla. Bar #969338)
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Miami, Florida  33134
T: 305-372-1800 / F: 305-372-3508

Adam T. Rabin  (Fla. Bar #985635)
DIMOND KAPLAN & ROTHSTEIN, P.A.
525 S. Flagler Drive, Trump Plaza - Suite 200
West Palm Beach, Florida  33401
T: 561-671-2110 /  F: 561-671-1951

14

================================================================

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by e-mail and U.S. mail on this 2nd day of November, 2005 upon:

Jan Douglas Atlas
Adorno & Yoss, LLP
350 East Las Olas Blvd., Suite 1700
Fort Lauderdale, FL 33301-4217
E-mail: jatlas@adorno.com

Andrew P. Bridges
Winston & Strawn, LLP
101 California Street, Suite 3900
San Francisco, CA 94111
E-mail: abridges@winston.com

Kevin C. Kaplan, Daniel F. Blonsky and David Zack
Burlington Weil Schwiep Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse A
Miami, FL 33133
E-mail: kkaplan@bwskb.com

3339/102/259051.1

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

# Exhibit A

FILED by _____ _EG_ ___ D.C.
ELECTRONIC

**Oct 3 2005**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Palm Beach Division

STEVEN A. S ILVERS, an individual,
     Plaintiffs,

v.

GOOGLES INC., a Delaware corporation,
     Defendant.

CASE NO. 05-80387-CIV

(Ryskamp/Vitunac)

_____

GOOGLES INC., a Delaware corporation,
     Counterclaimant,

v.

STEVEN A. SILVERS, an individual; STELOR
PRODUCTIONS, INC., a Delaware corporation;
STELOR PRODUCTIONS, LLC; a business
Entity of unknown form; and STEVEN ESRIG,
An individual,
     **Counterdefendants.**

_____

## SILVERS' MOTION TO DISMISS STELOR'S
## CROSS-CLAIM AND SUPPORTING MEMORANDUM

     Plaintiff, Steven A. Silvers ("Silvers"), moves to dismiss the cross-claim brought by

counter-defendant, Stelor Productions, LLC ("Stelor") pursuant to Rule 12, Federal Rules of

Civil Procedure. Stelor is trying to smuggle into this federal trademark infringement action state

law contract claims against Silvers under the pretext of a federal declaratory judgment claim,

which confers no original jurisdiction in this Court. The cross-claim, which is entirely unrelated

to the main case and does not provide a sufficient nexus to support supplemental jurisdiction,

should be asserted in the pending breach of contract action filed against Stelor by Silvers in

Florida Circuit Court.

1

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

# I.
# BACKGROUND

Silvers is the owner of the name "Googles" which he has used as a trademark for over twenty years in connection with goods and services directed to children's education and entertainment. Silvers registered the "Googles" trademark with the United States Patent and Trademark Office in 1997, and by virtue of its long use the trademark has now achieved incontestable status. Silvers also owns and has registered the Internet domain name "googles.com," which he has used since 1997 for his "Googles" Website.

In 2002, Silvers licensed the use of his "Googles" trademark to Stelor Productions, Inc. under a written License Agreement.[1] *See* Exhibit A. The License Agreement gave Stelor the limited right to commercially develop the "Googles" trademark and Silvers' related intellectual property. The licensing relationship with Stelor, unfortunately, did not fare well because Stelor simply ignored most of its contractual obligations.

On January 13, 2005, after three years of Stelor's non-compliance, Silvers terminated the License Agreement. *See* Exhibit B. Stelor immediately sought to negotiate a reinstatement, and hoping to salvage the relationship, Silvers agreed to withdraw his January 13 termination letter under a Settlement Agreement that required Stelor, among other things, to cure its prior breaches under the License Agreement.[2] Silvers retained the right to reinstate the termination if Stelor did not cure its breaches or perform its other obligations imposed by the Settlement Agreement.

Consistent with its prior conduct Stelor failed to cure the breaches or perform under the Settlement Agreement. Therefore, on April 27, 2005 Silvers reinstated the January 13 termination, and reminded Stelor in writing of its post-termination obligations, including

---

[1]  Stelor Productions, Inc. has apparently assigned its rights under the License Agreement (if any) to the cross-claimant, Stelor Productions, LLC.
[2]  The Settlement Agreement also settled a pending federal court action between the parities.

2

providing to Silvers an inventory of licensed products. *See* Exhibit C. Stelor performed none of those post-termination obligations.

On May 5, 2005 Stelor filed a breach of contract claim against Silvers in the district court alleging wrongful termination and requesting the court to enjoin Silvers from terminating the License Agreement (the "License Agreement Action"). On May 27, 2005 Silvers moved to dismiss the License Agreement Action because Stelor failed to list the residence of each of its members on the face of the Complaint as required to establish diversity jurisdiction. In response to Silvers' motion, Stelor filed the sworn declaration of Steve A. Esrig, Stelor's President, in which he stated that none of Stelor's members reside in Florida. Esrig listed the residence of each member but would not identify any member by name.

On August 9, 2005 Judge Hurley dismissed the License Agreement Action for lack of subject matter jurisdiction but gave Stelor until August 29, 2005 to amend its Complaint and file **evidence to support subject matter jurisdiction. Stelor declined the Court's invitation to file an amended complaint and instead filed a "response" to the dismissal Order sheepishly admitting** that in fact diversity does not exist.[3]

### Silvers' State Court Action Against Stelor

On September 6, just a few days after License Agreement Action was dismissed, Silvers filed a breach of contract action against Stelor in Florida Circuit Court for Stelor's failure to perform its post-termination obligations, and seeking to enjoin Stelor from representing itself as Silvers' licensee and using his intellectual property. *See* Exhibit D. Silvers has filed a Motion For Temporary Injunction and requested an evidentiary hearing. Stelor has not yet filed a response to the Complaint.

---

[3]  Prior to the dismissal, on July 5, 2005 the district court denied Stelor's request for preliminary injunctive relief holding that Stelor's only remedy for wrongful termination of the License Agreement is money damages; Stelor is not legally entitled to require Silvers to continue to license his property or to perform under the License Agreement or related Settlement Agreement.

3

### This Trademark Infringement Action Against Google, Inc.

On May 5, 2005, a week after Stelor was terminated, Silvers filed this action against Google, Inc. ("Google") for trademark infringement arising from the "reverse confusion" caused by Google's adoption and use of a mark almost identical to Silvers' senior "Googles" mark. The central issue in this case is whether under the Lanham Act, 15 U.S.C. § 1051 *et seq*., Google's use of the "Google" mark for children's goods and services violates Silvers' superior and exclusive rights to use virtually the same mark for the same goods and services. Silvers also challenges the validity of Google's original federal trademark registration because it was fraudulently obtained.

### Google's Counterclaim

In response to the trademark infringement claim, Google filed a trademark infringement counterclaim against Silvers alleging that Silvers use of his "Googles" mark in connection with an alleged "search engine" violates its trademark rights.[4]  Google also filed a counterclaim against Stelor as Silvers' licensee, who up until then was not a party to this action. Google may not have known at the time it filed the counterclaim that Silvers had terminated Stelor's license. The factual allegations against Stelor, however, relate to Stelor's conduct prior to termination of the License Agreement and are not affected in any way by the fact that Stelor has since been terminated.

### Stelor's Cross-Claim

On September 9, three days after Silvers filed the state court action, Stelor filed in this action a cross-claim against Silvers asserting basically the same breach of contract claims Judge Hurley dismissed for lack of subject matter jurisdiction, i.e. seeking to reinstate the License Agreement based on Silvers' alleged wrongful termination. But here, Stelor seeks to assert these

---

[4] Silvers is unaware that his mark is being used in connection with a search engine, nor has he consented to such use.

4

claims under the federal Declaratory Judgment Act. The cross-claim alleges no other basis for original subject matter jurisdiction.

**II.**
**STELOR'S CROSS-CLAIM SHOULD BE DISMISSED**

**A.    There Is No Original Subject Matter Jurisdiction**

Stelor's alleged claim under the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*, does not provide the Court with subject matter jurisdiction. It is hornbook law that a claim under the Act must independently satisfy the subject matter jurisdiction requirements for an action to be brought in federal court. As put by the Eleventh Circuit:

> . . . [T]he Declaratory Judgment Act does not, of itself, confer jurisdiction upon the federal courts; a suit brought under the Act must state some independent source of jurisdiction, such as the existence of diversity or the presentation of a federal question.

*Borden v. Katzman*, 881 F.2d 1035, 1037 (11th Cir. 1989) (citing *Skelly Oil Co. v. Phillips Co.*, 339 U.S. 667 (1950)). *See also, Kunkler v. Fort Lauderdale Housing Authority*, 764 F. Supp 171, 175 (S.D. Fla. 1991) (Act can provide a procedural remedy if, and only if, the court has jurisdiction from another source).

Stelor's willful blindness in attempting to premise jurisdiction on the Act is eerily familiar. In the prior action before Judge Hurley, now dismissed, Stelor matter-of-factly alleged diversity of citizenship without disclosing the citizenship of its LLC members, and, when called on it, sheepishly conceded diversity did not exist.[5]

**B.    The Cross-Claim Is Not Sufficiently Related To Support**
**Supplemental Jurisdiction**

The Court should decline to exercise supplemental jurisdiction because Stelor's state law breach of contract cross-claim against Silvers has no legal or factual connection to any part of the

---

[5]  Stelor had previously filed a sworn declaration from Steven A. Esrig, falsely stating that diversity existed. Stelor Productions is a small closely held company with a handful of shareholders or members; the citizenship of each could have been easily determined.

trademark infringement action against Google. Further, the legal and factual questions unique to Stelor's state law cross-claim against Silvers, if allowed to be brought here, will smother the federal trademark claim with a thick layer of non-relevant issues, witnesses and evidence that will undoubtedly distract or confuse the jury, and extend the trial.

**(1)    There is No Sufficient Nexus To The Main Claim**

There is no question that original jurisdiction is lacking, thus, jurisdiction over Stelor's cross-claim necessarily depends on supplemental jurisdiction. 28 U.S.C. §1367(a) restricts supplemental jurisdiction to " . . .claims that are so related to claims in the action within . . .[the court's] original jurisdiction that they form part of the case or controversy under Article III of the United States Constitution." Here, the Court's original jurisdiction is conferred by the federal trademark statute, 15 U.S.C. §1051, *et seq.*

Section 1367(c) goes on to define circumstances in which a district court may decline to exercise its supplemental jurisdiction. The statute therefore contemplates a two-tiered analysis. The first step is to determine whether the claim comes within the Court's power because it is so related to the original action. If so, the second step requires a determination whether that power should be declined.

To decide whether Stelor's cross-claim against Silvers is part of the same case or controversy as Silvers' federal trademark action against Google, the Court must consider whether Stelor's cross-claim derives from "a nucleus of operative facts common to" the federal trademark claim and if they are such that it would ordinarily be expected to try them all in one judicial proceeding. *See United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130 (1966).* In other words, is the state law claim sufficiently related to the jurisdictionally sufficient claim that it is the "same case or controversy?" *See Hudson v. Delta Air Lines, Inc., 90 F.3d 451, 455 (11ᵗʰ Cir. 1996)*(court should consider whether claims arise from the same facts, or involve similar

6

occurrences, witnesses or evidence); *Harry Winston, Inc. v. Kerr, 72 F. Supp.2d 263, 264 (S.D.N.Y. 1999)*(district court should consider, among other factors, the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims.)

This means that Stelor's breach of contract cross-claim against Silvers must be "so related" to Silvers' trademark infringement claim against Google that it arises from the same operative facts or forms part of the infringement claim. Simply stated, the facts that will determine whether Google has infringed Silvers' mark must also determine if Silvers wrongfully terminated the License Agreement.

Stelor's cross-claim fails the test. The facts that would support – or defeat – the cross-claim are not even remotely related to the facts that will determine whether Google has infringed Silvers' trademark rights or resolve the trademark infringement counterclaim. The main **trademark infringement claim and counterclaim will narrowly focus on these "likelihood of confusion" issues: (1) type of marks; (2) similarity of the marks; (3) similarity of goods and** services; (4) identity of marketing channels and consumers; (5) similarity of advertising; (6) the party's intent; and (7) actual confusion. *See Conagra v. Singleton, 743 F.2d 1508 (11th Cir. 1984)*. Silvers infringement claim also raises legal and factual issues regarding whether Google's original trademark registration was fraudulently obtained. Thus, the core of the trademark infringement claims – the only claims that arise under federal law – will be resolved by a comparison of the trademarks, confusion evidence, and the trademark owners' conduct in adopting, using, and registering the marks.

The resolution of the cross-claim, on the other hand, is governed by the contractual language of the License Agreement and will involve factual determinations regarding Stelor's performance as Silvers' licensee, including whether Stelor: (1) failed to place on all licensed

7

products the phrase "created by Steven A. Silvers;" (2) failed to pay Silvers royalties; (3) failed

to collect revenue from the sale of Licensed Products; (4) diverted revenue to another entity; (5)

failed to provide certified royalty statements; (6) failed to provide to Silvers samples of all

licensed products, and all promotional and advertising materials associated with those products;

(7) failed to include appropriate legal notices with the licensed products; (8) failed to maintain

the requisite level of quality for the licensed products; (9) failed to maintain Silvers' intellectual

property rights; (10) engaged in the unauthorized creation of characters and use of the "Googles"

name; (11) failed to allow Silvers to audit its books and records; (12) failed to provide Silvers

with stock options; and (13) failed to perform under a related consulting agreement and

settlement agreement.    None of these factual issues have any connection to the trademark

infringement claims.

Furthermore, the legal issues involved in the main case differ greatly from those raised in

the cross-claim. The trademark claims assert violations of the Lanham Act, raising questions

regarding trademark registration procedures, and the validity of the parties' federal trademark

registrations.    In contrast, the cross-claim requires application of state contract law to the

interpretation of the provisions in the License Agreement, including Silvers' limitation of

liability to Stelor, as well as state law regarding the licensor/licensee relationship post-

termination.

When one compares the main federal trademark claims to the cross-claim, it is evident

that the claims do not raise similar legal issues or flow from the same factual situation. Simply

put, the facts needed to prove the cross-claim are vastly different from those needed to prove the

main claim. In fact, evidence showing or disproving whether Silvers' wrongfully terminated

Stelor will not offer even the slightest insight into whether Google has infringed Silvers'

trademark rights.    And, contrary to what Stelor wants the Court to believe, even if Stelor

8

prevails on its wrongful termination claim, Stelor has no right to pursue this trademark infringement action against Google. Stelor's only remedy for wrongful termination is money damages, not reinstatement of the license. *See infra, section 2.*

Moreover, inclusion of Stelor's cross-claim will create havoc at trial. The evidence, witness testimony, and proof required to resolve Stelor's cross-claim, and the associated remedy and damages calculations, would be mixed in with the evidence, witness testimony and proof needed to resolve the trademark disputes, and the rather complex damages formula applied in reverse confusion cases. Not only would this distract from the main trademark claim, it would cause serious juror confusion that would prejudice Silvers' case against Google.

The legal and factual issues in the trademark infringement action are complex enough for a jury to determine. Adding unrelated breach of contract claims between Stelor and Silvers will inject literally dozens of factual issues each with its own evidence for the jury to consider in **additional to the seven factor likelihood of confusion issues presented by the main trademark claim. There is no logical relationship between the cross-claim and the main claim; Silvers** should not be expected to try them both in one judicial proceeding. See *Gibbs, 383 U.S. at 725, 86 S.Ct. at 1138.* See also *Hudson v. Delta Air Lines, Inc., 90 F.3d 451, 455 (11th Cir. 1996)*(affirming district court's dismissal of state law breach of contract claim filed with an ERISA claim because of the lack of nexus between the state and federal causes of action.); *Semi-Tech Litigation LLC v. Bankers Trust Company, 234 F.Supp.2d 297 (S.D. N.Y. 2002)*(not reasonable to try claims against company for Trust Indenture Act and claims against officers of company for breach of fiduciary duty relating to the indenture in same case.); *Singh v. The George Washington University, 368 F.Supp.2d 58 (D.D.C. 2005)*(plaintiff's discrimination claim against school for violation of Title III of the ADA had almost no factual overlap with dean of

9

school's counterclaim for defamation for statements plaintiff made about him relating to her dismissal and not sufficiently related to warrant exercise of supplemental jurisdiction.).

**2.    State Law Issues Dominate The Cross-Claim**

Even if the Court were to determine that there is enough of a relationship between the trademarks claims and Stelor's breach of contract cross-claim to support supplemental jurisdiction, under the provisions and reasoning of Section 1367(c), the Court should decline that jurisdiction.

First, while Stelor's cross-claim does not raise particularly complex issues of state law, it involves strictly state law issues and contract interpretation, and presents at least one novel question. Stelor seeks by way of its cross-claim to be reinstated as licensee and to use Silvers' intellectual property without his consent. Under current Florida law, a party to a contract is only entitled to damages, not reinstatement by way of injunction, where the contract is allegedly wrongfully terminated. *See Airlines Reporting Corp. v. Incentive Int'l Travel, Inc.,* **566 So.2d 1377, 1379 (5th DCA 1990) (no injunctive relief to reinstate cancelled contract, damages only remedy);** *Shearson Lehman Hutton, Inc. v. Meyer,* 561 So.2d 1331, 1332 (5th DCA 1990) (injunctive relief not available to prevent termination of agreement; remedy is damages); *Jacksonville Elec. Auth. v. Beemik Bldrs. & Const., Inc.,* 487 So.2d 372 (1st DCA 1986) (no injunctive relief to prevent cancellation of contract, remedy is damages). What Stelor seeks will require the court to examine the current case law on this issue, and carve out some sort of novel exception to this established rule.[6]   Whether the facts and circumstances underlying the termination entitle Stelor to that exception is best left to the state court to decide.[7]

---

[6]   Stelor's cross-claim also raises the issue of whether a terminated licensee may continue to use a licensor' intellectual property after it has been terminated. While federal law has dealt extensively with this issue, (*see infra*) in the context of the Lanham Act, we know of no state law cases addressing the issue.

[7]   Likewise, Stelor's "breach of warranty" claim depends entirely upon construction of the warranty provision contained in the License Agreement. In an attempt to paint its cross-claim as "related" to the original claim, Stelor

10

Furthermore, aside from being a distraction, the inclusion of Stelor's cross-claim in this case is simply unfair and prejudicial to Silvers. He should be able to have his day in court with Google without the Stelor sideshow diluting his case. Stelor can readily pursue its state law claims in state court, where a case is now pending that addresses the very issues Stelor wants decided here.

### C.    The Cross-Claim Should Be Asserted In The Pending State Court Action

It makes absolutely no sense to permit Stelor to assert claims in this action that will be litigated and adjudicated at the same time in the pending state court action. In fact, Stelor's claims are so inextricably intertwined with the claims pending in state court that an adjudication of Silvers' claims in that action will encompass the claims asserted by Stelor in its cross-claim. The state action will determine whether Stelor was in breach of the License Agreement prior to termination, whether Silvers properly terminated Stelor, and whether Stelor breached its post-termination obligations. **Stelor's defense to this action is necessarily that Silvers wrongfully terminated the License Agreement, which is the same claim it asserts here in its cross-claim.** The factual issues that will resolve whether Silvers properly terminated are the very same factual issues that will resolve the outcome of Stelor's wrongful termination claim. There is no rational basis to inject this unrelated contract dispute between Stelor and Silvers into this trademark case that will decide the exceedingly narrow issue of whether Google has infringed Silvers' trademark. Whether Stelor breached the License Agreement or Silvers wrongfully terminated the License Agreement will not resolve one issue in this pending trademark dispute. In fact, the resolution of Stelor's contract claims will have **zero** affect on the outcome of the main trademark infringement claim. It makes far more sense to dismiss the cross-claim so that it can be properly asserted and resolved in the Silvers/Stelor action currently pending in state court.

---

contends that Google's counterclaim alleges that Google, rather than Silvers, owns Silver's mark. (Cross-claim, ¶46). But Google alleges no such thing, nor could it. Google simply claims the use of Silvers' mark for search engine services infringes Google's mark.

11

### III.
### THE CROSS-CLAIM FAILS TO STATE A CLAIM FOR INJUNCTIVE RELIEF

Stelor acknowledges in its cross-claim that Silvers has terminated the License Agreement with Stelor. As explained above, while Stelor is free to dispute the termination, its only remedy should the termination be proved wrongful is for money damages.[8] Stelor has no legal basis for a mandatory injunction to compel specific performance. Injunctive relief is typically not a proper remedy for wrongful termination of a license. For example, in *A.L.K. Corp. v. Columbia Pictures Industries, Inc.*, 440 F.2d 761 (3d Cir. 1971) a movie theatre could not, by injunction, compel a film distributor to specifically perform under a license agreement for the distribution of movies. The only remedy - - loss of income from not showing the subject movie - - was recovery of damages. And in *Freeplay Music, Inc. v. Verance Corp.*, 80 Fed. Appx. 137 (2d Cir. 2003) (unpub.) the court rejected the terminated licensee's request for injunctive relief to reinstate the license because the former licensee's injury could only be redressed with damages. This is why Judge Hurley rejected Stelor's request to preliminarily enjoin Silvers from terminating Stelor.

This doctrine is consistent with the long line of *Burger King* cases from this district, in which the courts routinely reject a terminated franchisee's attempt, by way of injunction, to continue using the Burger King trademarks while contending the termination was wrongful. In these cases, the terminated franchisee's license to use the trademarks cannot be reinstated by way of injunction, and the sole remedy is damages for the alleged wrongful termination.[9]

---

[8]   To the extent Stelor contends that it is entitled to injunctive relief under the provisions of the Settlement Agreement, that argument is moot. Stelor's failure to perform under the Settlement Agreement and Silvers' reinstatement of the termination of the License Agreement renders the Settlement Agreement null and void, and the parties are placed back where they were when Stelor was first terminated. That is why the Settlement Agreement has no remedy provision for breach by either party.

[9]   Cf. *Burger King v. Agard*, 911 F. Supp. 1499 (S.D. Fla. 1995); *Burger King v. Majeed*, 805 F. Supp. 994, 1003 (S.D. Fla. 1992); *Burger King v. Hall*, 770 F. Supp. 633, 638-39 (S.D. Fla. 1991); *Burger King v. Austin*, Bus. Fran. Guide CCH ¶9788 (S.D. Fla. 1990)

12

Furthermore, the License Agreement has an express provision that limits Stelor's remedy for wrongful termination to a monetary amount equal to the royalties paid to Silvers during the twelve-month period preceding a breach of contract claim. There is no provision that entitles Stelor to injunctive relief or any other remedy.

## CONCLUSION

Stelor's cross-claim should be dismissed, and the Silvers/Stelor dispute should proceed in state court.

Respectfully submitted,

s/Gail A. McQuilkin

| | |
|---|---|
| Adam T. Rabin  (FL Bar #985635) | Kenneth R. Hartmann  (FL Bar No. 664286) |
| DIMOND KAPLAN & ROTHSTEIN,P.A. | Gail A. McQuilkin  (FL Bar No. 969338) |
| 525 South Flagler Drive, Suite 200 | KOZYAK TROPIN & THROCKMORTON, P.A. |
| West Palm Beach, FL  33401 | 2525 Ponce de Leon, 9th Floor |
| T: 561-671-2110 | Coral Gables, Florida 33134 |
| | T: 305-372-1800 |

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by E-mail and U.S. mail on this 3rd day of October, 2005 upon:

Jan Douglas Atlas
Adorno & Yoss, LLP
350 East Las Olas Blvd., Suite 1700
Fort Lauderdale, FL  33301-4217
E-mail: jatlas@adorno.com

Andrew P. Bridges
Winston & Strawn, LLP
101 California Street, Suite 3900
San Francisco, CA  94111
E-mail:  abridges@winston.com

Kevin C. Kaplan, Daniel F. Blonsky and
   David Zack
Burlington Weil Schwiep Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse A
Miami, FL  33133
E-mail:  kkaplan@bwskb.com

s/Gail A. McQuilkin

13

3339/102/257484.1

14

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

# Exhibit  A



# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163ʳᵈ Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

## WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## 1. LICENSE GRANT

A.    LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

B. LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C. LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement, provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D. No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E. LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording.

## II. TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III. COMPENSATION

A. In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B. The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January; April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C. With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D. If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.

E.      All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.      Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.      LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.      In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.      All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.      In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.      LICENSOR represents and warrants that:

(i)      the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)      the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)      LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

(iv) ......... the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v) except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B. LICENSEE represents and warrants that:

(i) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii) the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

(iii) it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C. Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D. LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A. The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B. The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C. Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A. Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B. Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.



## VIII. INTELLECTUAL PROPERTY PROTECTION

A.    LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.    LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.    LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.    LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waiver and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.    Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A.    Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.



B. LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C. Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X. POST TERMINATION RIGHTS

A. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B. Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C. Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D. Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI. INFRINGEMENTS

A. During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B. Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII. INDEMNITY

A. LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.

B.    LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.    With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII. LIMITATION OF LIABILITY

A.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES. THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.    EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV. INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV. FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.

## XVI.  JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII.  AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII.  WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX.  SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX.  NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI.  ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of LICENSEE and/or with the consent of LICENSOR, which shall not be unreasonably withheld or delayed. By way of example and not limitation, LICENSEE may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

## XXII.  INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII.  RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1st, 2002, and    executed    between    the    above    mentioned    parties

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                          STELOR PRODUCTIONS, INC.

Steven A. Silvers                          By: _____
Title: Owner/LICENSOR                      Printed Name: _Steven A. Esrib_
Dated: _5/09/02_                           Title: _President_
                                           Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

## "SCHEDULE A"

## LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

## LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including., but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

## LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

## DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc.) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

## TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

## TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term. This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year extended Term on the

same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

5/9/0:

*Succession*
Rights of Survivor

1, In the event of the Death of Licensor all of the Licensor's rights under this agreement Shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing

_Steven A. Silvers_
5/09/02

5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

# Exhibit  B

LAW OFFICES

KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON · 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0856
gam@ktlaw.com

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

As you know, we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2

Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

c:     Steven A. Silvers
       Laurence Hefter
       Yano A. Rubinstein
       William Borchard

B48587.1

# Exhibit  C

Page 2

Furthermore, although Stelor has provided a written statement that it is not offering any products for sale, and no royalties due, that statement has proven to be false.

Stelor continues to be in breach of the License Agreement as outlined in our letter of November 12, 2004. This is to provide notice to you that due to Stelor's failure to perform its obligations under the Settlement Agreement, and failure to cure the breaches under the License Agreement, Silvers is reinstating his notice of termination of the License Agreement effective immediately.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory, if any, in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising, web site, and anything else that might make it appear that it is still handling the articles and products relating to the Googles IP. Further, Stelor must return to Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees and those selling Googles related merchandise of the termination of the License Agreement.

Because the License Agreement is now terminated, Stelor may not represent Silvers' interest in any legal proceeding or action.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Kevin Kaplan

251939.1

# Exhibit  D

34 of 53

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.

**05 18038 CA 08**

STEVEN A. SILVERS,

    Plaintiff,

vs.

STELOR PRODUCTIONS, LLC,

    Defendant,

_____/

## COMPLAINT

Plaintiff, Steven A. Silvers, sues Stelor Productions, LLC and alleges:

1. This is an action for declaratory, supplementary and injunctive relief brought pursuant to Florida's Declaratory Judgment Act, Florida Statutes Section 86.011, et seq., and for breach of contract.

2. Silvers is an individual residing in Palm Beach County, Florida with a business address at 8983 Okeechobee Blvd., #202, West Palm Beach, FL 33411.

3. Defendant Stelor Productions, LLC is, upon information and belief, a limited liability company organized under Delaware law, with a place of business at 14701 Mockingbird Drive, Darnestown, Maryland. Defendant is, on information and belief, the successor in interest to Stelor Productions, Inc., a corporation organized under Delaware law. Both entities are referred to here as "Stelor."

4. Silvers is the author of the children's book "GOOGLES and the Planet of Goo" and creator of numerous characters, illustrations and concepts based on the GOOGLES family of characters.

5. Silvers is the owner of 25 "GOOGLES" related trademarks, including "The GOOGLES and Design" mark, and "GOOGLES.com" domain name.

6. Silvers has registered and owns more than 120 domain names related to the GOOGLES concept and characters, including "GOOGLES.com."

7. Silvers also owns numerous copyrights and patents for the characters, illustrations, music and designs encompassed by the GOOGLES concept. The trademarks, copyrights, patents, domain name registrations and related derivative intellectual property are collectively referred to as "GOOGLES Intellectual Property."

8. Effective June 1, 2002, Silvers entered into a License, Distribution and Manufacturing Agreement ("License Agreement") with Stelor by which he granted Stelor a license to use the GOOGLES Intellectual Property, and to manufacture and promote products and services based on the GOOGLES Intellectual Property ("Licensed Products"). Exhibit A.

9. Effective June 1, 2002, Silvers entered into a Consulting Agreement with Stelor which provided, among other things, that Silvers could terminate the License Agreement if Stelor breached the Consulting Agreement's compensation provisions. Exhibit B.

10. On November 12, 2004, Silvers sent a Notice of Termination, advising Stelor it had sixty (60) days to cure numerous breaches under the License Agreement or face termination as Silvers' licensee. Exhibit C. Silvers also invoked Stelor's breaches of the Consulting Agreement as a basis for termination.

11. On January 13, 2005, Silvers terminated the License Agreement for Stelor's failure to cure its numerous breaches. A copy of the termination letter is attached as Exhibit D.

12. On January 28, 2005, Silvers and Stelor entered into a Settlement Agreement under which Silvers agreed to withdraw the January 13, 2005 termination letter, but not the Notice of

2

Termination, provided Stelor fully cured the breaches by its performance under the Settlement Agreement.

13. On April 27, 2005 Silvers reinstated his termination because Stelor had not performed its obligations under the Settlement Agreement. See Exhibit E.

14. The License Agreement provides, at ¶X(C):

> Upon the expiration or termination of this Agreement, all the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

15. Silvers has advised Stelor on numerous occasions that the License Agreement is terminated, and demanded that Stelor comply with the post-termination provisions of the License Agreement. Copies of Silvers' letters to that effect are attached as Exhibit F.

16. The License Agreement, ¶X, sets out Stelor's rights and obligations upon termination. Stelor is allowed to continue using the GOOGLES Intellectual Property on a limited basis for a limited period, but only if it meets certain requirements. The key requirement for Stelor to use the GOOGLES Intellectual Property post-termination is the submission of an inventory of Licensed Product on hand. License Agreement, ¶X(B).

17. Stelor has failed to provide an inventory of Licensed Products. The 30 day period for Stelor to comply with this requirement expired on May 27, 2005.

18. Stelor has also failed to actively sell Licensed Products post-termination, according to the purported royalty statements Stelor has provided to Silvers.

3

19. Because Stelor has not complied with its post-termination requirements under the License Agreement, it has no right to use the GOOGLES Intellectual Property for any purpose, even for a limited period.

20. Notwithstanding the termination, the reversion of all rights to Silvers, and Stelor's loss of any limited right to use the GOOGLES Intellectual Property, Stelor continues to do. Upon information and belief, Stelor used the GOOGLES Intellectual Property at the Licensing Exhibition in New York City in July, 2005, to promote its own (non-licensed) website services. Stelor's website (stelorproductions.com) continues to feature the GOOGLES trademarks, characters and concept, GOOGLES graphics and illustrations, GOOGLES music, and GOOGLES.com domain name.

21. Stelor' use of the GOOGLES Intellectual Property is without Silvers' authority or consent.

22. Silvers has repeatedly demanded that Stelor cease and desist from its unauthorized use of the GOOGLES Intellectual Property.

23. Stelor has refused to comply with Silvers' demand to cease and desist, and continues to use the GOOGLES Intellectual Property without Silvers' authorization.

24. Silvers has retained the undersigned attorneys and agreed to pay them a reasonable fee.

## COUNT ONE - DECLARATORY RELIEF

25. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 24 as though fully set forth.

26. Up until April 27, 2005, Silvers licensed his GOOGLES Intellectual Property to Stelor, pursuant to the License Agreement. On April 27, 2005, Silvers reinstated his prior termination of the License Agreement.

4

27. Pursuant to the License Agreement, ¶X, upon termination all licensed rights revert to Silvers, and Stelor is required to cease and desist from using the GOOGLES Intellectual Property.

28. Since April 27, 2005, Stelor has disregarded the termination of the License Agreement and continues to hold itself as Silvers' licensee. Stelor continues to use Silvers' GOOGLES Intellectual Property, without Silvers' authority or consent.

29. An actual and ripe controversy exists as to the effect of the termination of the License Agreement and Stelor's rights, or lack thereof, to use the GOOGLES Intellectual Property.

WHEREFORE, Silvers requests that this Court declare the rights of the parties and provide the following relief:

A. A declaration that the License Agreement is terminated, and that Stelor is no longer a licensee of Silvers.

B. An order enjoining Stelor from:

1. Using the GOOGLES Intellectual Property (including but not limited to Silvers' trademarks, domain names, copyrights, patents, and derivatives);

2. Representing to others that it is Silvers' licensee, or that it is authorized to use or sublicense the GOOGLES Intellectual Property; and

3. Selling or promoting any Licensed Product.

C. A full accounting from Stelor of the commercialization of the GOOGLES Intellectual Property during the period the License Agreement was in effect, i.e. June 1, 2002 to April 27, 2005;

D. Attorneys fees pursuant to contract and Florida Statutes Section 57.105;

E. Costs; and

F. Such other relief as the Court deems equitable.

5

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | ktlaw.com

## COUNT II

### BREACH OF CONTRACT

30. Plaintiff realleges and incorporates by reference the allegations of paragraphs 1 through 24 as though fully set forth.

31. This is an action for breach of the post-termination provisions of the License Agreement.

32. On April 27, 2005, Silvers duly terminated the License Agreement.

33. Pursuant to the License Agreement, ¶X, Stelor is required, upon termination, to cease and desist using the GOOGLES Intellectual Property or selling any Licensed Property.

34. While Paragraph X of the License Agreement affords Stelor a limited period of time to use the GOOGLES Intellectual Property, such use is conditioned on Stelor (i) providing an inventory of Licensed Product; and (ii) actively selling Licensed Product. Stelor has done neither, and therefore its right to use the GOOGLES Intellectual Property has been extinguished.

35. Notwithstanding the termination of the License Agreement, Stelor continues to use the GOOGLES Intellectual Property. Such use is without Silvers' authority or consent.

36. Stelor has breached Paragraph X of the License Agreement.

37. As a result of Stelor's breach, and unauthorized use of the GOOGLES Intellectual Property, Silvers has been denied the exclusive use of and control over his own trademarks, copyrights, patents and domain names, as well as derivative products.

WHEREFORE, Silvers requests that this Court enter judgment in his favor and against Stelor and award the following relief:

A. Enjoining Stelor from using the GOOGLES Intellectual Property, including but not limited to Silvers' trademarks, domain names, copyrights and patents;

6

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | ktlaw.com

B.    Requiring Stelor to account to Silvers for commercializing the GOOGLES Intellectual Property from April 27, 2005 to the present, including all sales of Licensed Product and Derivatives, and to disgorge all revenues gained from such unauthorized conduct; and

C.    Requiring Stelor, consistent with Paragraph X of the License Agreement, to return to Silvers all material relating to the GOOGLES Intellectual Property and derivatives, and to any inform sublicensees of the termination.

D.    Attorneys' fees pursuant to contract and Florida Statutes Section 57.105.

E.    Costs; and

F.    Such other relief as the Court deems equitable.

DATED this 6th day of September, 2005.

Respectfully submitted,

DIMOND, KAPLAN & ROTHSTEIN, P.A.        KOZYAK TROPIN & THROCKMORTON, P.A.
Co-Counsel for Plaintiff                Counsel for Plaintiff
525 S. Flagler Drive, Suite 200         2525 Ponce de Leon, 9th Floor
West Palm Beach, FL 33401               Coral Gables, Florida 33134
Telephone: (561) 671-2110               Telephone: (305) 372-1800
Adam T. Rabin, Esq.                     Fax: (305) 372-3508

                                        By: _____
                                            Kenneth R. Hartmann
                                            Florida Bar No: 664286
                                            Gail M. McQuilkin
                                            Florida Bar No. 969338

323919020711HJ

7

**EXHIBIT "A"**

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | ktmlaw.com

# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (LICENSOR), an individual, whose official address is 3741 NE 163rd Street, PMB #323, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

## WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademark/s");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use its/our Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR[s]; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## LICENSE GRANT

A.   LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub-licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory, including a license under any and all intellectual property rights and interests therein, including by way of explanation, those which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which comprise those characters, likenesses, which include iggle, Oogle, Oggle, Ooorox, Oroden(s), the planet Goo, glade, computer web site(s), trademarks, membership clubs, stories, picture, prototype, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

---

D.   LICENSOR hereby grants to LICENSEE, for the term of this Agreement as recited in license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.   LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement; provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.   No license will be deemed to have been granted by either party to any of its intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E.   "marked by Steven A. Silvers" or other similar wording.

## II. TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III. COMPENSATION

A.   In consideration for the license granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenue actually received by LICENSEE on a cash basis (i.e., actually collected by LICENSEE) but without counting any gross revenue (twice) including shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoices (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by concurrent actually issued to the customer), (iv) sales of transferable inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or clearance, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.   The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.   For each Royalty Payment, LICENSEE shall provide LICENSEE with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.   If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the average weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.

E. All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties, and may offset or be offset from any other payments due to LICENSOR under this or any other agreement between the parties.

F. Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A. LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all relevant documents and material within the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B. In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have this opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1.5%) per month. Upon settlement of any underpayment discrepancy, and further audit by LICENSOR shall be requested that year. That period and data shall represent the new period start date for term audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C. All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for at least three (3) years after the expiration of the initial or any subsequent term.

D. In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written consent of LICENSEE unless required by law, except LICENSEE may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A. LICENSOR represents and warrants that:

   (i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

   (ii)   the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR; and

   (iii)  LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

---

   (iv)   _____ the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

   (v)    except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Grant litigation which has been resolved.

B. LICENSEE represents and warrants that:

   (i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

   (ii)   the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

   (iii)  it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C. Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D. LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL AND SAMPLES

A. The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B. The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE, and in conformity with a standard sample provided by LICENSEE.

C. Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR, for his inspect, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A. Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B. Either party may change this address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

## VII. INTELLECTUAL PROPERTY PROTECTION

A. LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Property Rights granted herein. LICENSOR further agrees to assist LICENSEE where required to apply for and obtain recordation of and from such Intellectual Property Rights. LICENSOR hereby grants and defends such Intellectual Property Rights. LICENSOR hereby grants unto LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to execute and act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and act for and on LICENSOR's behalf and as lawfully permitted unto to further the purposes of this file any such document(s) and to do all other lawfully permitted and to execute and act for and on of the foregoing with the same legal force and effect as if executed by LICENSOR.

B. LICENSEE shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the Term of this Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademark(s) or the validity thereof.

C. LICENSEE agrees that the use of the Licensed Intellectual Property and/or the Licensed Trademark(s) inures to the benefit of LICENSOR and that LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademark(s) except for the license granted herein.

D. LICENSEE shall retain all rights, title and interest in and to the Licensed Intellectual Property. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by hereby waives and releases LICENSEE, known or unknown, arising out of or relating to and Licensed Intellectual Property including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

## IX. TERMINATION

A. **Right to Terminate on Notice.** This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach;

B. Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the options under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute, LICENSEE shall not requested by this other party. Furthermore, during the term which LICENSEE's current or prospective inhibit or maintain any relationship or conversations with LICENSEE's current or prospective objects, vendors, any Company relationships with the third-parties etc., without the prior express written request by LICENSEE.

---

B. LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C. Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X. POST TERMINATION RIGHTS

A. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide to LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B. Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and made at thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the mark(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE's efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C. Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as identified above in Section (B) of the "Post Termination Rights" Section, shall discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D. Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agreed to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI. INFRINGEMENTS

A. During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole and exclusive right, in its discretion and at its own expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B. Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for its prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII. INDEMNITY

A. LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through or made a part of any claims or judgments or liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.



B. LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other action involving the Licensed Intellectual Property or Licensed Trademark; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C. With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII. LIMITATION OF LIABILITY

A. IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES. THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN THE PARTIES, AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B. EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OR CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XV. INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business and as required by state and federal level(s), standard Product Liability insurance covering LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within thirty (90) days upon execution of this Agreement, and, in event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XVI. FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to cause beyond its reasonable control, including but not limited to, acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failure, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.



## XVII. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such court, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVIII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XIX. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign, by any act or operation of law, the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of LICENSEE and/or with the consent of LICENSOR, which shall not be unreasonably withheld or delayed. By way of example and limitation, LICENSEE may freely assign its rights and obligations under this Agreement to Sailor Production, Inc.

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc) to Sailor Productions, Inc, as contemplated by the Asset & Purchase Agreement, dated May 1st, 2002, executed between the above mentioned parties and



**"SCHEDULE A"**

## LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property rights form part of this Agreement: A Licensee under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or (lower case), together with any and all products, which comprise and which will comprise these characters, likenesses, which include logos, Oogle, Oggle, Gooroo, Goolum(s), the Planet Goo, slides, computer web site(s), membership lists, data, materials, content, services, logos, trademarks, service marks, clothing, merchandise, authorized products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

## LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademark in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademark License Agreement with Oram, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "Goolula", (viii) "GooScout", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" nearly in existence.

## LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, marks, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figures, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and data, and any other products.

## DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other that the LICENSOR but is used in conjunction with licensed products, articles and/or services. If such a product or service produced by the LICENSEE or a third party (including, with licensee use), that is in use enhances the value of the Google Universe but does not have a conflict with an already existing Google product idea or concept as outlined in the agreements. If any product comes the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

## TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

## TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term. This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year extended Term on the

---

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto or his/her hand and seal the day indicated.

**STEVEN A. SILVERS**

STELOR PRODUCTIONS, INC.

By: _____
Printed Name: _____
Title: Owner/_____
Dated: 5/4/02

Steven A. Silvers
Title: Owner/LICENSOR
Dated: 5/4/02

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LIM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/4/02

# EXHIBIT "B"

terms, terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of this Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) in the case of Sub License royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

_SUCCESSION_
_Rights of Survivor_

"In the event of the Death of Licensor all
of the Licensors rights under this agreement
Shall go to his heirs, assigns or legal representatives
as he has lawfully designated in writing

5/9/12

5/9/12

MICHAEL LINN
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003      5/9/02

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB #324
North Miami Beach, FL 33160

Dear Steven:

This letter agreement ("Agreement") will serve to memorialize the terms of the consultancy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

1.  **Engagement of Consultant.**

    a.  Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Google's" and continue to offer his creative input to the Company.

    b.  In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consulting fee of five thousand dollars ($5,000) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003. All payments made to Consultant will not be offset against any royalties paid by Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc. for insurance coverage. Consultant agrees to pay all costs of assistance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000).

    c.  It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement, in accordance with the scope of this Agreement (including all option periods annually) for two consecutive months and if after thirty (30) days fails to cure alleged breach, Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) of this Agreement.

2.  **Relationship of Parties.** The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party thereto or cause to create any power, duties or rights of any of the other parties. None of the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

---

--- this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.  **Duties of Consultant.** Consultant's duties hereunder are as follows:

    a.  Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and advisable to enable Company to maintain any intellectual property rights granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be mail if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

    b.  During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually, or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

    c.  Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea it either relating to The Googles as well as anything ~~solely now that not relate to the current universe of characters and/or idea's, that upon submission~~ of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement that said property.

4.  **Duties of Company.**

    a.  Company agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

a.   ...that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.   **Term and Termination.**

a.   Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.   Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or permission by Consultant of any illegal drug or controlled substance that is proscribable under the US Federal Level. Written notice as mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.   Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that such material has been returned.

d.   Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.   **Proprietary Information; Proprietary Rights.**

a.   In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall at all times, both during the term of this Agreement and for a period of two (2) years thereafter the termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

b.   The Company acknowledge that the Consultant is not being hired as a 'work for hire' but rather is being compensated, pursuant to this Consulting Agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.   The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of such Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.   **Limitations of Liability.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.   **Miscellaneous.**

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument. This Agreement may not be assigned by Consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder. This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

STEVEN SILVERS                          Date: 5/9/02

_____                          Date: 5/9/02
                                         Date: ____

Received One Thousand Dollar signed ($19,000.00)

MICHAEL KIM

LAW OFFICES

KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON · 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

November 12, 2004

Via Federal Express
AWB#7921-7741-7745

Steven A. Heeig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:   Silver/Stelor License Agreement

Dear Mr. Heeig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A. of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

a.   Failure to pay royalties under paragraph III (A);

b.   Failure to provide a written certified royalty statement under paragraph III (C);

c.   Failure to provide a list of all sub licenses under paragraph III (C);

d.   Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

e.   Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

f.   Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

g.   Failure to include appropriate legal notices with the Licensed Products under paragraph VI (A);

h.   Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

# EXHIBIT "C"

EXHIBIT "D"

Page 2

    i.   Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegrms.com, googlegumms.com, and googlegrmms.com, under paragraph VIII;

    j.   Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

    k.   Failure to oppose trademark application for the name Googles, and the domain names registration google.org, and otherwise protect the Licensed Intellectual Property; and

    l.   Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached this Letter Agreement by its:

    a.  Failure to pay Mr. Silvers consultancy fees and expenses;

    b.  Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

    c.  Making unauthorized statements and representations on behalf of Mr. Silvers; and

    d.  Attempting to transfer, release and waive Mr. Silvers right, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuilkin

Steven A. Silvers
Lawrence Hadar

cc:

FAH66.1

LAW OFFICES
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON · 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

HARLEY S. TROPIN
DIRECT DIAL (305) 377-0651
kst@kttlaw.com

TELEPHONE (305) 377-0700
TELECOPIER (305) 372-3508

January 13, 2005

Via Federal Express
AWB# 7914-5066-9106

Steven A. Emig
Shaker Productions, Inc.
14701 Mountfield Drive
Darnestown, Maryland 20874

Re:    Silvers/Shaker License Agreement

Dear Mr. Emig:

As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Shaker that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX.A of the License Agreement, this served as notice that Mr. Silvers is exercising his option to terminate the License Agreement, unless Shaker cured its failure to cure its breach of the Letter Agreement within thirty (30) days, and Shaker's failure to cure its failure to cure its breach of the License Agreement within sixty (60) days.

Pursuant to paragraph X of the License Agreement, Shaker must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Shaker has six (6) months to continue to sell this inventory of Licensed Products, if any, confirms this use of the term as Shaker is actively selling its inventory of Licensed Products for this period. Outside the scope of the Licensed Intellectual Property associated with the Licensed Products, Shaker must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might enable it to sell its inventory of Licensed Products, Trademark, sign, advertising and products of Mr. Silvers. Further, Shaker must make it appear that it is still handling or relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of this License Agreement.

Because the License Agreement is terminated, Shaker may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Consolidation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Emig
Page 2

Arbitration Forum, or participate in TTAB Consolidation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six-month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

Steven A. Silvers
Lawrence Zucker
Yvon A. Rubinstein
William Burchard

369821.1

LAW OFFICES

KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON · 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

GAIL A. McQUILKIN
DIRECT DIAL (305) 377-0658
gm@kttlaw.com

April 27, 2005

Via Federal Express
AWB# 7922-0844-8480

Steven A. Essig
Stalor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silver/Stalor License Agreement

Dear Mr. Essig:

On November 12, 2004, we served notice on Stalor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached. Because Stalor did not cure those breaches, on January 13, 2005 we served on Stalor a notice of termination of the License Agreement, a copy of which is attached.

On January 28, 2005, Stalor and Silver entered into a Settlement Agreement in which Silver agreed to withdraw this notice of termination provided Stalor perform its obligations under the Settlement Agreement. Stalor, however, has:

    failed to provide Silver with unit interests in Stalor LLC under paragraph 9;

    failed to pay Silver monthly installments on royalty advances on the first of every month under paragraph 10 (a);

    failed to pay on April 1, 2005 the monthly advance on royalties required by Silver to maintain its minimum coverage through the Aurora Collection under paragraph 10 (b);

    failed to cooperate in the audit of the books and records of Stalor under paragraph 14; and

    failed to provide Silver samples of Licensed Products that are being offered for sale under paragraph 15.

Furthermore, although Stalor has provided a written statement that it is not offering any

# EXHIBIT "E"

Page 2

Furthermore, although Stelor has provided a written statement that it is not offering any products for sale, and no royalties due, that statement has proven to be false.

Stelor continues to be in breach of the License Agreement as outlined in our letter of November 13, 2004. This is to provide notice to you that due to Stelor's failure to perform its obligations under the Settlement Agreement, and failure to cure the breaches under the License Agreement, Silvers is reinstating his notice of termination of the License Agreement effective immediately.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Silvers with a complete schedule of all inventory of Licensed Products on hand or on order.  Stelor has six (6) months to continue to sell this inventory, if any, in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period.  Outside the scope of the efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising, web site, and anything else that might make it appear that it is still handling the articles and products relating to the Googles IP. Further, Stelor must return to Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees and those selling Googles related merchantize of the termination of the License Agreement.

Because the License Agreement is now terminated, Stelor may not represent Silvers' interest in any legal proceeding or action.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Kevin Kaplan

451928.1

EXHIBIT "F"

KOZYAK · TROPIN
THROCKMORTON
ATTORNEYS AT LAW

yak, Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Telephone (305) 372-1800
Fax (305) 372-3508

Gail A. McQuilkin
gam@kttlaw.com

May 2, 2004

Via e-mail

Daniel Blonsky, Esq.
Burlington Weil Schwiep Kaplan & Blonsky, P.A.
2699 South Bayshore Drive
Miami, Florida 33133

Re:   Stelor Productions, Inc. v. Steven A. Silvers

Dear Dan:

This is in response to your letter of April 29, 2005. My client is not interested in Stelor's offer of late compliance with the terms of the Settlement Agreement or its obligations under the License Agreement. Mr. Silvers has terminated the License Agreement and intends to go in a different direction to develop his characters and intellectual property. We expect Stelor to honor its obligations under the termination provisions of the License Agreement.

Sincerely,

Gail A. McQuilkin

---

Gail A. McQuilkin, Esq.
gam@ktlaw.com 1.305.377.8654

June 21, 2005

Via e-mail

Kevin C. Kaplan, Esq.
Burlington Weil Schwiep Kaplan & Blonsky, P.A.
2699 South Bayshore Drive, Penthouse A
Miami, Florida 33133

Re:   Stelor Productions, Inc. v. Steven A. Silvers

Dear Kevin:

This is in response to your June 21, 2005 letter. As you know, our position is that the Settlement Agreement and License Agreement have been terminated due to Stelor's failure to perform under both. Your letter once again confirms that Stelor did not perform, and is simply another attempt post-termination to cure some but not all of Stelor's breaches. This is not acceptable to Mr. Silvers.

Your statement about tending checks is wrong. The late checks were never tendered. You sent us copies of checks post-termination. Besides, tendering checks post-termination does nothing to cure breaches that occur pre-termination.

Further, even if the Settlement Agreement were in effect – which it is not because Stelor did not perform – Stelor is once again trying to impose conditions. There is no requirement that Silvers provide proof of payment for the $1000 royalty advance. It is Silvers' option to take up to $1000 per month against his future royalties. And, let me remind you that Silvers has already provide a declaration that he requires the $1000 to cover his health insurance premium payments, despite that he had no obligation to so (another condition you imposed before Stelor would honor its obligations).

Also, there is no condition on Silvers' right to audit Stelor that his auditor provide Stelor a list of information needed for the audit. The License Agreement states that he is entitled to see all the books and records and all documents and material related to the License Agreement.

As for the options, we will determine the status of the LLC certificates when we conduct discovery. On the topic of discovery, two weeks ago I offered to have a Rule 26 conference. That offer was met with stone cold silence. I am again offering to hold a

Page 2

Rule 26 conference so we can get this matter set for trial on an expedited track (assuming the Court does not dismiss the action). I am available this Friday to hold that conference.

Finally, this is to advise you that the federal discovery rules require that Stelor maintain all electronic documents and communications, including email sent and received. This means that *all* electronic materials must be maintained and preserved to avoid spoliation of evidence.

Sincerely,

Gail A. McQuilkin

329901/0254434.1

---

**KOZYAK · TROPIN THROCKMORTON**
ATTORNEYS AT LAW

Gail A. McQuilkin, Esq.
gam@ktmt.com | 305.377.0656

Via Federal Express
And Email

August 10, 2005

Kevin C. Kaplan, Esq.
Burlington Weil Schwiep Kaplan & Blonsky, P.A.
2699 South Bayshore Drive, Penthouse A
Miami, Florida 33133

Re:    Stelor Productions, LLC v. Steven A. Silvers

Dear Kevin:

Enclosed are checks sent to Mr. Silvers by Stelor. While Mr. Silvers appreciated Mr. Esrig's kind wishes for a speedy recovery, the checks are being returned because the License Agreement has been terminated. Please inform Mr. Esrig that he is not to communicate directly with Mr. Silvers.

Sincerely,

Gail A. McQuilkin

329901/0254394.1

2525 Ponce de Leon, 9th Floor  Miami, Florida 33134 | Phone 305 372 1800 | Fax 305 372 3508 | ktmt.com

SILVERS - ISSUE

**KOZYAK · TROPIN**
**THROCKMORTON**
ATTORNEYS AT LAW

Kenneth R. Hartmann, Esq.
krh@kttlaw.com | 800.577.8677

July 27, 2005

Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
Kaplan & Blonsky, P.A.
2699 South Bayshore Drive
Penthouse
Miami, Fl. 33133

Re:    License Termination.

Dear Kevin:

Based on Mr. Rarig's recent declaration, it appears that Stelor is continuing to engage in the unauthorized use of Mr. Silvers' intellectual property and may be misrepresenting its status as a licensee. Because the License Agreement has been terminated, Stelor no longer has authority to act as Mr. Silvers' licensee, and must cease and desist from conducting business that relates in any way to the License Agreement. In fact, the post-termination provisions in the License Agreement require Stelor to immediately inform all sublicensees, or in this instance potential sublicensees, that its license has been terminated. Stelor's apparent concealment of its termination is misleading as to these persons.

If Stelor persists in the unauthorized exploitation of Mr. Silvers' intellectual property, we will have no choice but to seek injunctive relief. To the extent Stelor incurs liability to third parties, based on its unauthorized conduct, or suffers "damages," Stelor obviously bears sole responsibility.

Furthermore, Stelor must make the necessary changes to eliminate all reference to the Googles name and "goo" related words. While we have tried in good faith and as a courtesy to give Stelor enough time to make this transition, it appears that Stelor has taken no action. If Stelor fails to make these changes we will file an action for trademark infringement.

Very truly yours,

Kenneth R. Hartmann

KRH/lmm
cc:    Steven Silvers