UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

STEVEN A. SILVERS, an individual,

     Plaintiff,

v.

GOOGLE INC., a Delaware corporation,

     Defendant.

_____/

GOOGLE INC., a Delaware corporation,

     Counterclaimant,

v.

STEVEN A. SILVERS, an individual;
STELOR PRODUCTIONS, INC., a Delaware
Corporation; STELOR PRODUCTIONS, LLC, a
Delaware limited liability company, and
STEVEN ESRIG, an individual,

     Counterdefendants.

_____/

**STELOR PRODUCTIONS, LLC'S MOTION FOR PROTECTIVE ORDER AS TO
PRIVILEGED COMMUNICATIONS WITH STEVEN SILVERS AND
RECONSIDERATION ON THAT BASIS OF SEPTEMBER 11, 2006 ORDER
GRANTING GOOGLE INC'S MOTION TO COMPEL**

Stelor Productions, LLC ("Stelor") hereby moves on the following grounds for entry of

an order preventing Google from obtaining production of privileged communications including

emails between Stelor and Steven Silvers.  For that reason as well, Stelor asks for

reconsideration of the Court's September 11, 2006 Order Granting Google Inc's Motion to

BURLINGTON · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE 2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL INFO@BSKBLAW.COM  WWW.BSKBLAW.COM

Compel (DE # 118), which orders Mr. Silvers to produce these documents that Stelor claims are privileged.

## Introduction

Google seeks production from Stelor of privileged communications with Steven Silvers, including emails. The communications concern the protection of the Googles Trademark and the related intellectual property rights covered by the License Agreement between Stelor and Silvers. Among other issues, the communications address potential actions and strategies – including possible litigation – to protect those rights.

These are communications between a licensor and licensee, and also pursuant to an express written joint privilege agreement, addressing how best to protect their legal rights in the intellectual property in which they share a common interest. As such, the communications are privileged and protected by the work-product doctrine. Google should not be permitted to discover them.

## Background

Silvers is the licensor of the "Googles" trademarks implicated in this litigation, and Stelor is the licensor. A copy of the License, Distribution and Manufacturing Agreement ("License Agreement") between Stelor and Silvers is attached hereto as Exhibit A. The License Agreement expressly addresses the protection of the intellectual property. *See* Articles VIII and XI. Protection of that intellectual property is clearly an important component of the Agreement, and has been a priority for both Stelor and Silvers.

In addition to the License Agreement, Silvers and Stelor entered into a Consulting Agreement (Attached at Exhibit B hereto). The Consulting Agreement, among other provisions,

2

BURLINGTON · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE 2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL INFO@BSKBLAW.COM  WWW.BSKBLAW.COM

addressed Silvers' role "maintain[ing] any intellectual property right under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between the Company and Consultant." (*Id.* at ¶ 3.a.) The Consulting Agreement also requires Silvers to keep confidential and proprietary information secret during the course of the agreement and for two years after termination. (*Id.* at 6.a.)

In September 2004, Stelor and Silvers also entered into a written Joint Privilege Agreement (Exhibit "C" hereto). The purpose of that Joint Privilege Agreement, among other things, was to ensure that communications between Stelor and Silvers related to enforcement of the intellectual property rights remained privileged and protected from disclosure. That was important because of trademark cancellation proceedings involving Google, which had already been brought at that time before the Trademark Trial and Appeal Board. Thus, the agreement acknowledged that Stelor and Silvers have a "common business interest in the conduct and progress of the TTAB Proceedings, the UDRP Proceedings, and the Potential Litigation and in other matters related to the resolution of the dispute with Google concerning the competing claims of right to register and use the Googles Marks and the Google Marks." (*Id.* at 2.) The Joint Privilege Agreement further provides as follows:

> It is the desire, intention, and common understanding of counsel for the Parties (a) that the exchange of Privileged Materials is not intended to, and shall not, waive or diminish in any way the confidentiality of such materials or their continued protection under the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or protection and (b) that all Privileged Materials exchanged hereunder shall, to the extent that they are entitled to protection under the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or protection, remain entitled to such protection under the joint defense doctrine despite the disclosure hereunder to on of the other Parties.

3

BURLINGTON · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE 2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL INFO@BSKBLAW.COM   WWW.BSKBLAW.COM

*Id.* at 3.  The agreement provides that it shall remain operative even "if adversity subsequently should arise or be claimed between or among any of the Parties." *Id.* at 4.  A party may withdraw from this agreement only on notice to counsel, *id.* at 4, and is obligated, in that case, to return or destroy privileged materials received form the other party.  *Id.* at 3.  Any withdrawal of the Joint Privilege Agreement is "solely on a prospective basis and such Party shall continue to be subject to the terms of this Agreement." *Id.* at 3.  The parties are also obligated to "assert, and to take all reasonable steps to permit and facilitate the assertion and preservation of, all applicable privileges and protections with regard to the Privileged Materials and [the] Agreement in the appropriate forums." *Id.* at 4.

Pursuant to these agreements, Silvers and Stelor had various communications covered by the work product doctrine and the attorney client privilege.  Google's request for production of all communications between Stelor and Silvers, including their emails, intrudes on these privileges and should not be permitted.  A privilege log, which is *general in nature due to the volume of the documents*, is attached hereto as Exhibit D.

## Argument

The documents Google seeks include protected work product and/or attorney-client communications made pursuant to the License Agreement, the Consulting Agreement and/or the Joint Privilege Agreement.  Therefore, Stelor respectfully requests that this Court enter a protective order prohibiting disclosure of privileged documents by Stelor or Silvers.

Stelor and Silvers had three agreements confirming the confidentiality and privileged nature of this work product.  As described above, these agreements comprehensively address the protection of the covered intellectual property, and confirm the privileged nature of the parties'

4

BURLINGTON · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL INFO@BSKBLAW.COM WWW.BSKBLAW.COM

communications related to the issue of the property's protection. Because of this highly detailed, and scrupulously documented, relationship between Silvers and Stelor, any work product exchanged in the emails is protected from discovery.

Federal Rules of Civil Procedure, Rule 26(b)(3) provides as follows:

a party may obtain discovery of documents and tangible things otherwise discoverable under Subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party **or by or for that other party's representative** (including the other party's attorney, **consultant**, surety, indemnitor, insurer, or **agent**) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering such discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

*Id.* (emphasis added.)

Any emails prepared in anticipation of litigation are, therefore, protected by the work product doctrine. *See* Rule 26(b)(3). Furthermore, discussions about litigation would necessarily entail the mental impressions of Stelor's employees and Silvers. As noted in *Lott v. Seaboard Systems Railroad, Inc.*, 109 F.R.D. 554, 557 (S.D. Ga. 1985), "the material need not be prepared by an attorney since Rule 26(b)(3) expressly extends protection to materials prepared by or for a representative of a party, including his agent." *See also Hayden v. Acadian Gas Pipeline System*, 173 F.R.D. 429 (E.D. La. 1997) (applying the work product protection to employees of a corporation.)

In *Doe v. Autauga County Board of Education v. Doe*, No. 2:04-CV-1155-F, 2006 WL 1223831 (M.D. Ala. May 5, 2006), the court held that a letter written by a school principal to the superintendent of the school system was protected by the work product doctrine because it

5

BURLINGTON · SCHWIEP · KAPLAN ⊗ BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE 2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: INFO@BSKBLAW.COM   WWW.BSKBLAW.COM

appeared "to the court that the letter in question was prepared by a party or its agent in anticipation of litigation, and not in the ordinary course of business." *Id.* at *1. Likewise, in *FDIC v. Cherry, Bekaert & Holland*, 131 F.R.D. 596 (M.D. Fla. 1990), the court held that personal work papers created by the FDIC investigator were protected from discovery by the work product doctrine. And in *Briggs & Stratton Corp., v. Concrete Sales and Services*, 174 F.R.D. 506, 508 (M.D. Ga. 1997), the court stated, "the materials need not be prepared by an attorney, however: work product protection extends to materials prepared by or for a representative of a party including his agent or consultants so long as they are prepared in anticipation of litigation." In *Briggs & Stratton*, the court applied the work product protection to work performed by environmental consultants.

Pursuant to these authorities, communication between Stelor's employees and Silvers is privileged insofar as they constitute work product. Silvers worked as a consultant under the License Agreement, the Consulting Agreement, and the Joint Privilege Agreement for the express purpose of enforcing and perfecting the rights to the intellectual property in the Googles name. These agreements created and confirm Silver's role in defending the intellectual property for the benefit of Stelor as the Licensee. *See, e.g., Arkansas State Police Association, Inc. v. Commissioner of Internal Revenue*, 282 F.3d 556, 559 (8th Cir. 2002) (holding that license agreement created agency relationship). *See also Myers v. Holiday Inns, Inc.*, No. 87-2438, 1987 WL 16887 (E.D. Pa. September 9, 1987) (same).

The e-mails are also privileged because there was a common interest between Silvers and Stelor to protect the marks -- both as a matter of common law and by virtue of the Joint Privilege Agreement. Where the parties have a common interest in litigation, they and their attorneys are

BURLINGTON · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE 2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL INFO@BSKHLAW.COM   WWW.BSKHLAW.COM

free to pool information and resources without waiving the work product and attorney client privilege. *See In re LTV Securities Litig.*, 89 F.R.D. 595, 604 (N.D. Tex. 1981) (citing *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977)).[1] The common interest privilege "enables litigants who share unified interest to exchange…privileged information to adequately prepare their cases without losing the protection afforded by the privilege." *See Visual Scene, Inc. v. Pilkington Bros., PLC*, 508 So. 2d 437, 440 (Fla. 3d DCA 1987) "the common interest privilege relates not only to attorney/client materials,…but also to an attorney's work product"); *see also Tyne v. Time Warner Entertainment Co.*, 212 F.R.D. 596, 600 (M.D. Fla. 2002) (holding that disclosing privilege information to those with common legal interest "does not constitute a waiver of privilege.") The Joint Privilege Agreement buttresses this common interest privilege. *See Old Tampa Bay Enterprises, Inc. v. General Electric Co.*, 745 So. 2d 517, 518 (Fla. 3d DCA 1999) (enforcing joint defense agreement).[2]

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) ( *en banc* ), the Eleventh Circuit Court of Appeals adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

[2] Google may argue that any privilege has been waived because Silvers has taken the position that the License Agreement and other agreements have been terminated. Of course, no judicial determination has been made as to termination, and it is not a matter for Google to decree. Stelor disputes that the License Agreement was properly terminated, and Stelor maintains that its rights continue under the License Agreement, as well as under the Consulting Agreement and the Joint Privilege Agreement. In any event, the termination of even a joint privilege agreement does not waive the attorney client privilege and work product doctrine. *See In re LTV Securities Litig.*, 89 F.R.D. at 604 (holding that a potential controversy between co-litigants did not undermine the common defense privilege) and *Old Tampa Bay Enterprises, Inc.*, 745 So. 2d at 518 (where parties to a joint defense agreement become adverse, order should be issued to prevent disclosure of "confidences gained through the agreement regarding defenses held in common.") The Joint Privilege Agreement expressly provides that it any withdrawal from it is prospective only, and that the Joint Privilege Agreement remains effective in the event of adversity between the parties. (Ex. C at 3 and 4.)

BURLINGTON · SCHWIEP · KAPLAN ⟨&⟩ BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL INFO@BSKBLAW.COM WWW.BSKBLAW.COM

Disclosing work-product and attorney-client communications contained in these communications between Stelor and Silvers would violate the work product doctrine and the attorney-client privilege and should be prohibited.

### Conclusion

Because Google seeks privileged communications exchanged between Silvers and Stelor, Stelor respectfully requests issuance of a protective order prohibiting production of these documents.

Respectfully submitted,

BURLINGTON, SCHWIEP, KAPLAN &
   BLONSKY, P.A.
Counsel for STELOR PRODUCTIONS, LLC,
2699 South Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: 305-858-2900
Fax: 305-858-5261
Email: kkaplan@bskblaw.com

By: /s/

Kevin C. Kaplan
Florida Bar No. 933848
David J. Zack
Florida Bar No. 641685

8

BURLINGTON · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL INFO@BSKBLAW.COM WWW.BSKBLAW.COM

## CERTIFICATE OF SERVICE AND CONFERENCE

I HEREBY CERTIFY that a true copy of the foregoing was served via email and United States Mail on this 15th day of September, 2006 upon the following:

Steven A. Silvers, *pro se*
Suite 202 – PMB 203
8983 Okeechobee Boulevard
West Palm Beach, Florida 33411
Tel: 954-4445-6788
Fax: 561-784-9959
gewrue@hotmail.com

Ramsey Al-Salam, Esq.
William C. Rava, Esq.
PERKINS COIE LLP
Suite 4800
1201 Third Avenue
Seattle, Washington 98101-3099
RAlsalam@perkinscoie.com

Jan Douglas Atlas, Esq.
ADORNO & YOSS LLP
Suite 1700
350 East Las Olas Boulevard
Fort Lauderdale, Florida  33301

Johanna Calabria, Esq.
PERKINS COIE LLP
Suite 2400
Four Embarcadero Center
San Francisco, CA 94111
E-mail: jcalabria@perkinscoie.com

I further certify that pursuant to Local Rules 7.1.A.3 I conferred in good faith with opposing counsel to resolve the issues set forth in this motion and was unable to resolve such issues.

/s/ _____
Kevin C. Kaplan
David J. Zack

9

BURLINGTON · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE   PENTHOUSE 2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: INFO@BSKBLAW.COM   WWW.BSKBLAW.COM



# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

### WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

### 1. LICENSE GRANT

A.    LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

ATTACHMENT / EXHIBIT ___A___

B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement, provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Slivers" or other similar wording.

## II.  TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III.  COMPENSATION

A.    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.



E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.    All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)    LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

(iv)    .......    the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v)    except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B.    LICENSEE represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

(iii)    it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C.    Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D.    LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A.    The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B.    The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C.    Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A.    Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B.    Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

4

## VIII. INTELLECTUAL PROPERTY PROTECTION

A.    LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.    LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.    LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.    LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.    Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A.    Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

B.    LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C.    Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X.  POST TERMINATION RIGHTS

A.    Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B.    Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C.    Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D.    Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI.  INFRINGEMENTS

A.    During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B.    Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII.  INDEMNITY

A.    LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.

6

B.    LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.    With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII.  LIMITATION OF LIABILITY

A.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES.  THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.    EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV.  INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV.  FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.



## XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of LICENSEE and/or with the consent of LICENSOR, which shall not be unreasonably withheld or delayed. By way of example and not limitation, LICENSEE may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1st, 2002, and executed between the above mentioned parties



IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                                    STELOR PRODUCTIONS, INC.

Steven A. Silvers                                    By: _____
Title: Owner/LICENSOR                                Printed Name: _Steven A. Esrib_
Dated: _5/09/02_                                     Title: _President_
                                                     Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including ., but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc.) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term. This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year extended Term on the

same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

*Succession*
*Rights of Survivor*

5/9/02

*In the event of the Death of Licensor all of the Licensor's rights under this agreement shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.*

5/09/02

5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

11

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

This letter agreement ("Agreement") will serve to memorialize the terms of the consultantcy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

1.    Engagement of Consultant.

a.    Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003. All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

2.    Relationship of Parties. The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.    Duties of Consultant.    Consultant's duties hereunder are as follows:

a.    Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

b.    During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

c.    Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and /or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

d.    Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

4.    Duties of Company.

2.

a.    Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.    Term and Termination.

a.    Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.    Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.    Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.    Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.    Proprietary Information; Proprietary Rights.

a.    In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

3

b.     The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.     The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.     Limitations of Liability.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.     Miscellaneous.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida.  This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument.  This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder.  This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

STEVEN A. SILVERS          Date 5/07/02

Stelor Productions, Inc.

By:                         Date 5/9/02
Name: Steven A. Esrig   Title: President

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
                          5/9/02

4

## JOINT PRIVILEGE AGREEMENT

THIS JOINT PRIVILEGE AGREEMENT ("Agreement"), dated as of September 1, 2004, is entered into by and among Steven A. Silvers ("Silvers"), Stelor Productions, Inc. and its relevant officers, directors and employees ("Stelor"), and their respective attorneys (hereafter sometimes collectively referred to as the "Parties" or individually as a "Party").

WHEREAS, Silvers is the owner, among other things, of the trademark GOOGLES for a variety of goods and services, a federal registration for mark GOOGLES & Design (Registration No. 2,087,590), an application to register the mark GOOGLES (Application Serial No. 78/420,234), and the <googles.com> domain name (collectively, the "GOOGLES Marks); and

WHEREAS, Silvers and Stelor have entered into prior agreements pursuant to which Stelor is the exclusive licensee of the GOOGLES Marks and has the exclusive right to maintain, enforce and defend such marks; and

WHEREAS, Google Inc. ("Google") is the owner, among other things, of a federal registration for the mark GOOGLE (Registration No. 2,806,075), an application to register the mark GOOGLE (Application Serial No. 76,314,783), and the domain name <google.com> (the "GOOGLE Marks:); and

WHEREAS, Stelor has instituted Opposition No. 91161251 to Application Serial No. 76/314,783 and Cancellation No. 92043496 seeking to cancel Registration No. 2,806,075 in the Trademark Trial and Appeal Board (the "TTAB Proceedings"); and

WHEREAS, Silvers is contemplating instituting arbitration proceedings under the Uniform Domain Name Dispute Resolution Policy seeking transfer of the <google.com> domain name to Silvers (the "UDRP Proceeding"); and

ATTACHMENT / EXHIBIT

WHEREAS, the Parties or either of them may become defendants in litigation instituted by Google concerning the competing claims of rights to register and use the GOOGLES Marks and the GOOGLE Marks (the "Potential Litigation"); and

WHEREAS, the Parties have a common business interest in the conduct and progress of the TTAB Proceedings, the UDRP Proceeding, and the Potential Litigation and in other matters related to the resolution of the dispute with Google concerning the competing claims of rights to register and use the GOOGLES Marks and the GOOGLE Marks (collectively, the "Google Dispute"), the Parties have agreed:

1.      The Parties and their respective counsel desire to further their common interests by establishing procedures for cooperation and the exchange and sharing of information between and among them without waiving any privileges that may attach to such information.

2.      This Agreement is intended as the written embodiment of all prior oral or other understandings with regard to the Parties' joint privilege relationship relating to the Google Dispute.

3.      This Agreement applies to all information (whether in written, oral, electronic or any other form) relating in any way to the Google Dispute that is communicated or otherwise exchanged between or among the Parties and/or their counsel pursuant to their joint privilege relationship (the "Privileged Materials").

4.      Nothing in this Agreement shall obligate any Party or counsel for any Party to provide, share or otherwise communicate any information or documents to any other Party or counsel for any other Party.

2

5.    Some or all of the Privileged Materials may be privileged from disclosure to adverse or other persons as a result of the attorney-client privilege, the work product doctrine, and/or other applicable privileges or protections in favor of one of the Parties. It is the desire, intention, and common understanding of counsel for the Parties (a) that the exchange of Privileged Materials is not intended to, and shall not, waive or diminish in any way the confidentiality of such materials or their continued protection under the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or protection and (b) that all Privileged Materials exchanged hereunder shall, to the extent that they are entitled to protection under the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or protection, remain entitled to such protection under the joint defense doctrine despite disclosure hereunder to one of the other Parties.

6.    The Parties and their respective counsel agree that they will not disclose any exchanged Privileged Materials received by them from another Party or from counsel for another Party to anyone other than a Party or counsel for a Party, and will not use such exchanged Materials except in connection with the Google Dispute or in their other mutual interests.

7.    If any Party withdraws from this Agreement, such withdrawal will be solely on a prospective basis and such Party shall continue to be subject to the terms of this Agreement with regard to any Privileged Materials exchanged prior to such withdrawal. Upon withdrawal from the Agreement by a Party, the withdrawing Party shall, within ten (10) business days, return or provide a written certification of the destruction of all Privileged Materials received from another Party, and all records, photocopies, summaries, notes and extracts thereof to the extent they contain or reveal any such Privileged Materials, to the person who provided such Privileged Materials.

3

8.    If any person or entity requests or demands access to exchanged Privileged Materials, by subpoena or otherwise, the recipient of the demand or subpoena shall immediately notify counsel for the Party who supplied those Privileged Materials.  If any person or entity requests or demands access to this Agreement, by subpoena or otherwise, the recipient of the demand or subpoena shall immediately notify all of the undersigned counsel. The Parties and their respective counsel agree that each of them shall assert, and take all reasonable steps to permit and facilitate the assertion and preservation of, all applicable privileges and protections with regard to said Privileged Materials and this Agreement in the appropriate forums.

9.    This Agreement will remain operative as to all Privileged Materials furnished pursuant to this Agreement if adversity subsequently should arise or be claimed between or among any of the Parties, irrespective of any claim that the joint defense privilege may become inoperative by virtue of such adversity.  Any Party may at any time withdraw from this Agreement on written notice to all of the undersigned counsel.

10.    The Parties agree that the existence of this Agreement and their joint defense arrangement shall not be used by them in any litigation or otherwise except to enforce the terms thereof or to support the assertion of any claim of any privilege or protection and neither the existence of this Agreement nor the exchange of Privileged Materials pursuant hereto shall constitute waiver of the attorney-client privilege, work product doctrine or any other applicable privilege or protection in any dispute between the Parties.

4

11.    Nothing in this Agreement shall limit or affect in any manner the rights or discretion of a Party or its counsel to dispose of, disclose to others or otherwise use (a) Privileged Materials originating with that Party; (b) information contained in Privileged Materials that is obtained or obtainable outside of the Parties' joint defense relationship; or (c) information that does not otherwise properly constitute Privileged Materials as defined hereunder.

12.    Except as may otherwise be agreed in writing, within thirty (30) calendar days after final resolution of the Google Dispute, including the TTAB Proceedings, the UDRP Proceeding, the Potential Litigation and all appeals, counsel for each Party shall return or provide a written certification of the destruction of all Privileged Materials received from another Party, and all records, photocopies, summaries, notes and extracts thereof to the extent they contain or reveal any such Privileged Materials, to the person who provided such Privileged Materials.

13.    The provisions of this Agreement may be altered, amended or modified only by written agreement of counsel for all Parties.

14.    This Agreement shall be governed by, and construed in accordance with, the substantive laws of the State of Maryland.

SUMMERS RUBINSTEIN *PC*

By: _____
Yand L. Rubinstein
580 California Street
16th Floor
San Francisco, California 94104
(415) 439-4816

Attorneys for Steven A. Silvers

COWAN, LIEBOWITZ & LATMAN, P.C.

By: _____
William M. Borchard
1133 Avenue of the Americas
New York, New York 10036-6799
(212) 790-9200

Attorneys for Stelor Productions, Inc.

5

## Privilege Log of Emails Exchanged Between Steven Silvers and Stelor Productions

| DESCRIPTION | PRIVLEGE(S) ASSERTED |
|---|---|
| Between November 2001 and December 2004, 132 emails were exchanged between Steven Silvers and Steve Esrig that involved or discussed legal related issues with respect to various intellectual properties and the subject matter of the agreements between the parties. | Attorney - Client and Work Product |

ATTACHMENT / EXHIBIT _____

BURLINGTON · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL INFO@BSKBLAW.COM  WWW.BSKBLAW.COM