UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

STEVEN A. SILVERS, an individual,

     Plaintiff,

v.

GOOGLE INC., a Delaware corporation,

     Defendant.

_____/

GOOGLE INC., a Delaware corporation,

     Counterclaimant,

v.

STEVEN A. SILVERS, an individual;
STELOR PRODUCTIONS, INC., a Delaware
Corporation; STELOR PRODUCTIONS, LLC, a
Delaware limited liability company, and
STEVEN ESRIG, an individual,

     Counterdefendants.

_____/

## CROSS-CLAIM PLAINTIFF STELOR PRODUCTIONS, LLC'S
## MOTION FOR SUMMARY JUDGMENT AGAINST SILVERS

     Cross-Claim Plaintiff STELOR PRODUCTIONS, L.L.C. ("Stelor"), by and through

undersigned counsel and pursuant to Rule 51, Fed. R. Civ. P., and the Local Rules of this Court,

hereby moves on the following grounds for entry of summary judgment against Cross-Claim

Defendant Steven Silvers:

## I.  INTRODUCTION

     Silvers improperly terminated his license agreement with Stelor.  He failed to provide the

required notice and opportunity to cure, and his allegations of breach are entirely unfounded.

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

Accordingly, the termination should be declared invalid, and the Agreements deemed to remain in full force and effect.

Stelor initially brought these claims in a case before Judge Hurley.  Although that case was dismissed without prejudice for lack of diversity jurisdiction, a substantial factual record was developed during a preliminary injunction proceeding in that earlier action.  Stelor accordingly refers to that record in this motion,[1] including the Report and Recommendation issued by Magistrate Judge Hopkins in the prior case following an evidentiary hearing on the injunction motion.  *See* A22.[2]

As the Magistrate found, "there is a substantial likelihood that the agreements between the parties were improperly terminated, [and] thus are still in effect" and "[t]here is a substantial likelihood that [Stelor] will succeed on the merits of its breach of contract claim and declaratory action."   Report at 23, 32; A22.  As detailed below, the established facts and applicable law support fully support those conclusions and justify the entry of summary judgment against Silvers.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Silvers is the creator of the Googles from Goo, a set of characters and stories to entertain and educate children.  The characters are featured in a book "Googles and the Planet of Goo", which he published in 1996.  As Silvers admits, he "wrote the book while incarcerated for a conviction on federal charges as a way to stay connected to [his] children".  Silvers obtained a

---

[1] Stelor has filed herewith a request for judicial notice of the relevant filings in the prior action, pursuant to Fed. R. Evid. 201.

[2] Stelor has also filed herewith a Statement of Undisputed Facts pursuant to Local Rule 7.5, containing detailed citations to the record.  The Statement will be cited ***by paragraph number*** in the form "S#".  An Appendix of Exhibits referenced in the Motion and the Statement, also filed herewith, will be cited by tab number in the form "A #".

federal trademark registration in 1997 for the name "Googles" for use with children's books. (S1).

### A.      The License Agreement.

Plaintiff Stelor is the exclusive licensee of the Googles Property, pursuant to a License Agreement executed in 2002 (with a 30 year term, renewable for 10 more years).  (A1 at Sched. A)).   The License Agreement grants to Stelor "the exclusive (even as to LICENSOR), worldwide, sub licensable right and license" with respect to all of the "Googles" intellectual property and trademarks.  (A1 at ¶ 1(A)).  The Agreement also expressly grants to Stelor "all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks", as well as "an irrevocable power of attorney to act for and on LICENSOR's behalf".  (A1 at ¶ VIII(A)).  Article IX of the Agreement titled "INFRINGEMENTS", gives Stelor "the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement." (S2).

Stelor also entered into a separate Letter Agreement with Silvers, dated June 1, 2002, whereby Silvers was to provide certain consulting services to Stelor.  The Letter Agreement had a 30 month term, which expired December 1, 2004.  (S3).

Stelor has paid Silvers hundreds of thousands of dollars in consulting fees and advances against future royalties under the License and Letter Agreements.   (S4).

### B.      The First Prior Action.

The parties' relationship, however, has been contentious.   Silvers' misconduct forced Stelor to file a prior lawsuit for breach of contract in October 2004 ("First Prior Action"), Case No. 04-80954-CIV-HURLEY.  (S5).

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

Silvers' response was to send written notice on November 12, 2004, claiming that Stelor was in default of various of its obligations under the License Agreement.  The letter was purely a litigation tactic, sent as a pretense for a baseless counterclaim to terminate the License Agreement filed by Silvers three days later.  A "formal" termination letter followed on January 13, 2005.  (S6).

**C.      The Settlement and Reinstatement of the License Agreement.**

Two weeks later, Stelor and Silvers settled the case pursuant to a written settlement agreement ("Settlement Agreement") dated January 28, 2005.  The First Prior Action was accordingly dismissed, and Silvers reinstated the License Agreement.  (S7 ).

Under the Settlement Agreement, Silvers withdrew his notice of termination, and expressly reaffirmed his obligations under the License Agreement.  The parties proceeded to operate under the Agreements, in fact working together through counsel to prepare this trademark infringement action against Google, Inc.  (S8).

In addition, Stelor forwarded various documentation to Silvers, including a Certification dated March 8, 2005 as required pursuant to paragraph 12 of the Settlement Agreement, and checks for payments required under that Agreement.  The checks included reimbursement for domain name registration expenses, insurance payment reimbursements, royalty advances for February, March and April.  All of these checks were cashed.  (S9).

**D.      The Termination Without Prior Notice.**

Then, with no prior notice, Silvers' counsel sent a letter dated April 27, 2005 ("Termination Letter") purporting to terminate the License Agreement.  The letter claimed that Stelor had failed to perform its obligations under the Settlement Agreement to pay monthly

installments on royalty advances, to cooperate in an audit of Stelor's books and records, and to provide samples of licensed products offered for sale.  (S10).

Not only had Silvers given Stelor no prior notice of these claimed breaches; he also allowed Stelor no opportunity to cure them.  As the Termination Letter provided, the License Agreement was terminated "effective immediately."  Silvers, thus, failed to comply with the explicit requirements in the License Agreement (A1 at ¶ IX) that 60 days' notice and opportunity to cure any alleged breaches be provided as an express precondition for any right of termination. (S11).

Counsel for Stelor immediately responded by letter dated April 29, 2005, refuting the specious grounds cited by Silvers for termination, and offering to cure any conceivable breaches (even though none existed).  (S12).

On May 2, 2005, Silvers' counsel responded by letter (erroneously dated "2004"), reiterating his wrongful renunciation of the Agreements and stating that Silvers "intends to go in a different direction to develop his characters and intellectual property".  (S13).

Silvers by his own admission stopped complying with the Agreements ("Silvers is admittedly not complying with the License Agreement because he is no longer bound by it"). His unilateral filing of this action against Google, Inc. – "a right which, under the License Agreement, belongs to Plaintiff" – was clearly a violation of the Agreements.  His efforts to interfere with Stelor's website at the time of termination were also improper, and flatly inconsistent with his previous promise to Stelor and its board that he would never take such drastic action until a court had ruled on the issue.  (S14).

Silvers, moreover, has threatened further litigation against Stelor, unless it "eliminate[s] all reference to the Googles name and 'goo' related words" in the conduct of its business.  (S15).

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

Finally, Silvers has interfered with other action Stelor has continued to take – at substantial expense – to protect and enforce the intellectual property rights under the License Agreement.  Thus, a declaration submitted by Silvers' counsel was used as the basis for a motion to dismiss a trademark infringement action brought by Stelor in the Southern District of Indiana against unauthorized users of the name "OOGLES N GOOGLES".  (S16).

**E.    The Second Prior Action.**

The improper termination forced Stelor to take legal action.  Accordingly, Stelor filed claims for breach of contract and declaratory relief in May of 2005.  Believing that diversity jurisdiction existed, and because the Settlement Agreement specifically provided for exclusive jurisdiction in this court, Stelor filed the action in the Southern District of Florida, as Case No. 05-80393-CIV-HURLEY ("Second Prior Action").  (S17).

In order to ensure its ability to attend an important industry trade show scheduled that Spring in New York, Stelor immediately filed a motion seeking injunctive relief, including a temporary restraining order.  After an evidentiary hearing and review of the extensive papers submitted by the parties, Magistrate Hopkins issued a Report and Recommendation dated June 3, 2005 recommending that Stelor's motion be granted.  He held that "[Silvers] has effectively admitted to breach of the contract" and "it is likely that [Silvers'] April 27, 2005 termination of the License Agreement between Stelor and Silvers was improper."  (A22; Report at 4; S18).

The Court then entered a temporary restraining order implementing the injunction recommended by the Magistrate.  (A23).  The Court later extended the duration of the TRO until the end of the trade show in New York (A24), although the Court subsequently declined to extend the TRO beyond that time or otherwise to implement the injunction (A25).  Thus, the Court explained:

> As a threshold matter, the court observes that the preliminary injunctive relief sought by plaintiff has in large part already been satisfied by the court's temporary restraining orders partially implementing the injunction recommended by the Magistrate Judge . . . . Agreeing with the Magistrate Judge's conclusion that interruption of the unique business opportunity posed by the product launch [at the trade show] created the prospect of "irreparable harm," [and] . . . granted the extraordinary prejudgment relief requested on a temporary basis.  However, the court does not find sufficient evidence of "irreparable harm" to justify continuation of preliminary injunctive relief beyond this point . . . .  [2PA DE52 at 2.]

In entering the prior TRO's, therefore, the Court necessarily agreed with the Magistrate's findings regarding Stelor's likelihood of success on the merits, a critical prerequisite for entry of such "extraordinary" relief. *See McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998). (S19).

In or about August of 2005, Stelor learned for the first time that one of its sub-members resided in Florida.  Stelor promptly advised the Court.  Accordingly, the action was dismissed without prejudice for lack of subject matter jurisdiction.  Stelor's complaint was then filed in the form of a cross-claim against Silvers [DE 14], as part of the present trademark infringement action.  (S20 [DE's 21, 51]).

Silvers' moved to dismiss the cross-claims in the present case for lack of jurisdiction. The motion was denied by Order dated February 27, 2006.  (A26 [DE 71]).  In that Order, the Court also rejected Silvers' contention that no authority existed for the Court to reinstate the License Agreement upon a determination that the termination was wrongful.  (S21).

By Order dated October 4, 2006, the Court in the Second Prior Action also denied Silvers' Motion for Attorneys' Fees and Costs.  (S22).

## F.    Stelor's Continued Performance Under the Agreements.

Notwithstanding the improper termination, Stelor has continued fully to comply with its obligations under the Agreements, including tendering payment to Silvers of all amounts when

due.  Thus, Stelor has continued each month to send to Silvers the advances against royalties required under the Settlement Agreement.  Silvers, however, has returned each of those checks, with the exception of the checks sent for August, September and October 2006, which he continues to hold.  (S23).

Stelor has continued to send quarterly royalty reports.  Stelor has remained ready and willing to allow Silvers to conduct an audit of Stelor, and has in fact proposed various dates for the audit to which Silvers never responded.  (S24).

In addition, Stelor has continued to provide samples of its promotional materials.  See June 21st letter.  Stelor has, as well, provided extensive documentation to Silvers pertaining to the prosecution of related trademark applications and other proceedings concerning Stelor's efforts to protect the intellectual property.  (S25).

### III. <u>LEGAL ARGUMENT</u>

### A.      <u>Summary Judgment Standards.</u>

"Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994); *see also, e.g. Fed. R. Civ. P.* 56(c).  While evidence must be viewed in a light most favorable to the nonmoving party, this "does not mean that [the Court is] constrained to accept all the nonmovant's factual characterizations and legal arguments." *Beal*, 20 F.3d at 458.  And "the mere existence of a scintilla of evidence in support of the position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1247 (11th Cir. 1999) (quotation marks and citation omitted).

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

**B.**     **Silvers Failed to Comply with the Agreements' Express Notice Provision.**

The License Agreement contains a termination clause, expressly requiring written notice

in the event of a breach and a 60 day cure period:

> **Right to Terminate on Notice.**  This Agreement may be terminated by either
> party upon sixty (60) days written notice to the other party in the event of a breach
> of a material provision of this Agreement by the other party, provided that, during
> the sixty (60) days period, the breaching party fails to cure such breach.

(A1 at ¶ IX(A)).

Although Silvers had purported to terminate the License Agreement in or about January

of 2005, he expressly withdrew that notice of termination when he entered into the Settlement

Agreement.  Additionally, in the Settlement Agreement Silvers explicitly reaffirmed, without

exception, his obligations under the License Agreement:   "The License, Distribution and

Manufacturing Agreement:   Silvers *withdraws his notice of termination* of the License

Agreement, and *reaffirms his obligations* under the License Agreement." (Emphasis added) (A3

at 6, ¶ 10).    This provision is clear and unambiguous.  One of the obligations that Silvers

thereby expressly reaffirmed was "to provide notice of material breaches and 60 days cure period

prior to termination." (A22; Report at 17).

The inclusion of this notice provision, moreover, was obviously critical for Stelor.

Pursuant to the License Agreement, the parties entered into a complicated, long-term relationship

(a 30 year term, automatically renewable for 10 years (A1 at Schedule A)).  There are numerous

obligations owed by each of the parties to the other, and an obvious risk exists that, at certain

stages of the relationship, the parties may disagree about whether the requirements of the

Agreements are being met.  The notice provision, therefore, imposes a clear obligation on a party

believing that a breach has occurred to provide written notice detailing the alleged breach and

allowing a 60 day period for it to be cured.  The cure period also enables a party to seek judicial

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

intervention in the interim, if a disagreement appears insoluble.  This notice procedure is clearly required to ensure that Silvers as Licensor (Stelor as Licensee can terminate for any reason on 30 days' notice (A1 ¶ IX(B))) cannot trump up a breach, and terminate the license at will whenever it suits him -- which is exactly what Silvers has done.  The provision is plainly designed to protect Stelor, as the licensee, and ensure that the value of the multiple years and many millions of dollars it invests in developing the property under the Agreement is not jeopardized, at least before Stelor has an opportunity to cure an alleged breach.  Supp. Esrig. Decl ¶ 18; A5.

Courts strictly enforce such contractual notice and cure provisions.  The Court's decision in *Florida Recycling Servs. V. Greater Orlando Auto Auction, Inc.,* 898 So. 2d 129 (Fla. 5th DCA 2005), is directly applicable.  There, the parties' contract contained a similar termination provision, "requiring a party wishing to terminate the contract to do so by giving a notice of breach and opportunity to cure in writing, followed by a notice of termination."  *Id.* One of the parties terminated the agreement without satisfying that requirement.  The trial court upheld the termination, finding that it was justified based on the other party's failure to provide adequate services.  On appeal, however, the Court reversed, holding that the contract "clearly required a written notice of breach, and a written notice of termination".  *Id.* As the Court explained:

> If the provisions of a contract are unambiguous, courts may not violate the clear meaning of the words in order to create an ambiguity, and certainly may not rewrite the contract.  If possible, courts should give effect to each provision of a written instrument in order to implement the true meaning of the document.  Here, the language chosen by the parties for their contract clearly required a written notice of breach, and a written notice of termination. . . . There is, therefore, no valid reason that has been brought to our attention why the deal made by [the parties] should not be construed and enforced as written.

*Id.  See also Gaylis v. Caminis,* 445 So. 2d 1063, 1065 (Fla. 3d DCA 1984) (enforcing notice and cure provisions in contract for purchase of townhouse); *Mori v. Matsushita Elec. Corp.,* 380 So. 2d 461, 463 (Fla. 3d DCA 1980) (refusal to allow required cure period constitutes anticipatory

breach); *Alliance Metals, Inc. v. Hinely Indus., Inc.,* 222 F.3d 895, 905 (11th Cir. 2000) (enforcing notice and cure provision in employment contract).

That same rationale applies here.  Silvers has failed to satisfy the License Agreement's explicit notice requirement.  Accordingly, his termination is improper as a matter of law, and Stelor is entitled to summary judgment declaring the termination invalid and the Agreements to be in full force and effect.

Nor could Silvers legitimately argue that the November 2004 default letter (A12) – sent more than five (5) months before the defaults alleged in his April 27, 2005 Termination Letter (A14) – somehow saves him from his failure to provide notice.  First, the argument ignores the Settlement Agreement's provisions confirming Silvers' withdrawal of the prior termination and reaffirmance of the License Agreement.  Second, the November Letter does not provide notice of the defaults that Silvers claimed as the basis for termination in his April 27, 2005 letter.  Rather, the primary defaults specified in the April Termination Letter refer to specific provision of the Settlement Agreement, and obligations on Stelor that did not even exist under the License Agreement.[3]  The specific breaches on which the default is based *must* be specified in the notice; if not, the notice (as here) is invalid and Silvers is barred from asserting any breach.  *See Alliance Metals, Inc., v. Hinely Indus.,* 222 F.3d at 903-04.

Third, Silvers' actions in entering into the Settlement Agreement, accepting payments in mid April, and otherwise moving forward with the relationship clearly constitute a waiver of and

---

[3] For example, as addressed in more detail in the next section, although Silvers had a right to receive royalties in the amount of 6% of Stelor's net sales under the License Agreement (A1 at Schedule A), the Settlement Agreement imposed a new obligation on Stelor to pay Silvers a monthly advance against such royalties in the amount of $5,000.00 (plus another approximately $1,000.00 monthly for insurance) (A3 ¶10).

an estoppel to assert the prior notice of default, even if not expressly withdrawn in the Settlement Agreement.   (S9); *see Rissman v. Kilbourne,* 643 So. 2d 1136, 1139 (Fla. 1st DCA 1994) (mortgagee estopped from claiming past due payments); *Smith v. Landy,* 402 So. 2d 441, 441 (Fla. 3d DCA 1981) (acquiescence to late payments estopped mortgagee from accelerating debt and foreclosing).

**C.**      **The Breaches Alleged by Silvers Are Unfounded and Immaterial.**

The allegations of default by Silvers are entirely unfounded in any event – a pretext to justify his wrongful termination of the Agreements.  The defaults set forth in the Termination Letter (A14) are as follows:

- Failure "to provide Silvers with unit interests in Stelor LLC under paragraph 9 [of the Settlement Agreement];

- Failure "to pay Silvers monthly installments on royalty advances . . . under paragraph 10(a) [of the Settlement Agreement];

- Failure "to pay . . . the monthly advance on royalties . . . under paragraph 10(b) [of the Settlement Agreement];

- Failure "to cooperate in the audit of the books and records of Stelor under paragraph 14 [of the Settlement Agreement].

- Failure to provide samples of Licensed Products that are being offered for sale under paragraph 15 [of the Settlement Agreement].

In addition, the Letter charged as false Stelor's certification that it was not offering any products for sale (other than the Googles music on itunes) and that no royalties were due.  Each of the allegations, and the lack of foundation for them, is discussed in turn.  As discussed above, moreover, these obligations – especially the obligation to pay advance royalties in a fixed, monthly amount – were newly imposed on Stelor under the Settlement Agreement.  Stelor had no such obligation to pay royalties *in advance* under the License Agreement.

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

1.    **The Unit Interests Allegation.**

Silvers' allegation that Stelor failed to provide unit interests in Stelor LLC is unfounded for two reasons.  First, as of the date of the Termination Letter, Stelor had only recently converted to an LLC, and the associated documentation was still in progress.  No units had formally been issued to anyone.  (S26).

Second, and more fundamentally, Silvers misconstrues the applicable provision of the Settlement Agreement.  It provides that "[a]ny options granted to Silvers from the Stelor Inc. "C" Corporation will be converted to a like amount of unit interests under the LLC."  (A3 at ¶ 9).  The provision does not specify the number of options, *if any,* that were granted to Silvers, or whether Silvers exercised any option rights.

The fact is that Silvers has refused to execute the required documentation for him to confirm his acceptance of the options.  Thus, Stelor sent Silvers a formal Option Letter dated December 10, 2004, advising that the Board of Directors of Stelor had approved a grant to Silvers of 1000 options at $10.00 a share.  The Letter asked Silvers to execute the Letter and return it to Stelor to confirm his agreement with the stated terms and his acceptance of the options.  (S27).

Silvers, however, never returned the signed letter.  Stelor has repeatedly reminded Silvers about the Letter, and asked him to provide an executed copy, including in the April 29, 2005 letter to his counsel.  Neither Silvers nor his lawyers even bothered to respond to that issue, though, choosing instead to try and preserve a totally unfounded claim of breach.  (S28).

2.    **Royalties and Statements.**  Equally unfounded are the claims in the Termination Letter that Stelor failed to pay monthly royalty advances pursuant to the Settlement Agreement,

and that Stelor falsely stated in March 2005 that it was not offering any products (other than its music) for sale, and no past royalties were due.

Paragraph 12 of the Settlement Agreement (A3), titled <u>Royalty Statements</u>, provides that "Stelor shall confirm in writing that no royalty payments are outstanding, and thus no royalty statements are due."  Stelor provided that certification.  (S29).  Accordingly, royalty statements were only required, pursuant to paragraph III of the License Agreement (A1), beginning with the first quarter of 2005.  Nevertheless, to put an end to the unfounded issue Silvers has attempted to raised about missing royalty statements, Stelor went ahead and provided royalty statements for the last two quarters of 2004, which confirm no royalties were due.  (S29).

The confirmation of no royalties was also correct.  Although Stelor has had revenue from the sale of its Googles music on itunes, the first statement that Stelor received showing revenue from the itunes downloads was dated February 25, 2005.  Since Stelor was required to report royalties to Silvers on a quarterly basis, within 30 days of the expiration of each quarter (A1 ¶ III(B)), Stelor properly included those revenues in the royalty statement provided to Silvers on April 29, 2005 for the first quarter of 2005.  That was (as the Magistrate confirmed (A22; Report at 20)) timely.  (S30).

Nor can Mr. Silvers legitimately claim that approximately $2.00 worth of "commissions" from the sale of rogue merchandise bearing the Googles name by an unauthorized internet "store" somehow puts Stelor in breach of the Agreements.  Unbeknownst to Stelor, an on-line shop located at www.cafepress.com was apparently selling coffee mugs and t-shirts with the "Googles" name and design on them.  (S31).

The entire Cafepress.com issue, however, is a sidelight at best, since the only completed order as of April 2005 was of a single coffee mug priced at $10.99, allegedly generating a

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

commission *to Stelor* of $2.00, no share of which was ever remitted to Stelor.    Of that $2.00 commission, moreover, Silvers would only be entitled to 6%, *or 12 cents!* (assuming $2.00 is the "net" amount as defined in the License).   Since Silvers' only concern is whether or not he received the commissions to which he was entitled, he is literally raising a "12 cent" issue.  In any event, since Stelor never received these revenues – unauthorized and totally nominal as they were – Silvers has no legitimate complaint.  (S32).

The underlying facts also confirm the utter baselessness of Silvers' argument.  Stelor first became aware of the issue when it surfaced in Silvers' court papers.  Of course, had Silvers bothered to provide notice of his concern to Stelor rather than first identifying the issue in court papers filed *after* his Termination Letter, Stelor could have addressed the issue with him directly. The facts of the matter are that the consultant on whose affidavit Silvers would rely to support these unfounded allegations is himself the culprit, having apparently set up the CafePress "Googles" store without authorization from Stelor and against Stelor's direction. (S33).

The consultant, Paul Worsham, had worked with Stelor in 2002, in connection with the development of Stelor's technology infrastructure.  During that work, Mr. Worsham at one point advised Stelor that he had set up an online store at Cafepress, and wanted to sell Googles merchandise through it.  Stelor was not interested, and told Mr. Worsham not to maintain the store.  Indeed, Stelor had received an email on September 30, 2002 advising of fraudulent activity with the Cafepress account.   (A5 at Ex. C).   By that time, moreover, Stelor had concluded that Mr. Worsham was unreliable and untrustworthy, and refused to have any further dealings with him of any type.  Accordingly, Stelor explicitly advised Mr. Worsham in writing to take no action whatsoever on Stelor's behalf, including maintaining any Cafepress account for Googles.  Apparently, Mr. Worsham did not follow the instruction, and the Cafepress account

improperly remained without Stelor's authorization, and in fact against Stelor's instructions. (S33).

Nor can Silvers properly rely on his own refusal to accept Stelor's tenders of performance – including making the royalty advances – as a basis for termination.  Stelor's April 29 letter clearly tendered performance (A15).  *See Bowers v. Medina,* 418 So. 2d 1068, 1069 (Fla. 3d DCA 1982) ("requirement of tender . . . means a readiness, willingness and ability in good faith to perform").  Silvers' counsel unequivocally rejected that tender in her May 2, 2005 letter. (A16) ("Mr. Silvers has terminated the License and intends to go in a different direction.").  And, Stelor has continued to send the required payments every single month, since the inception of this lawsuit.  (S23).

3. **The Audit Allegation.**  Silvers claims his termination – without notice – was justified by Stelor's failure to provide dates for an audit.  In fact, Silvers' counsel agreed in late March of 2005 to defer the audit.  She confirmed that in an email dated March 23, 2005, referring to the parties "agreeing to postpone the audit" (A5 at Ex. E).  Silvers subsequently renewed his request for the audit, but not until late April, when his lawyer sent an email dated April 22, 2005 – just *5 days before the termination letter!*"  (A5 at Ex. H).  That email, moreover, asks for a date "in the next two weeks, other than April 28th and 29th which are not good for [the auditor]."  By April 27th, of course, Silvers had already sent the Termination Letter, disingenuously citing Stelor's failure to schedule the audit as a basis for that termination.  (S34).

This is an egregious example of Silvers' improper attempts to manufacture a default.  It highlights the appropriateness of entry of summary judgment for Stelor.

4. **Samples.**  Finally, Silvers claims Stelor failed to provide him with samples of Licensed Products that are being offered for sale.  That charge as well is bogus.  First, as of April

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

2005, Stelor was not selling any Licensed Products, with the exception of the Googles music on itunes (and Stelor had long ago provided a sample CD to Silvers, who by his own admission downloaded the music from itunes himself anyway).  Accordingly, no other samples had to be provided.  Second, samples of Stelor's promotional materials had already been provided to Silvers.  Thus, Silvers' lawyer, Gail McQuilkin, herself visited Stelor's offices in February 2005, reviewed samples and promotional materials, and even took some back to Florida with her. (S35).

In addition, Stelor again made samples of promotional materials available for inspection at its counsel's offices in April 2005.  Silvers' counsel never bothered to come and look.  And, in June 2005, Silvers' counsel was invited to the offices of Stelor's counsel to review samples of promotional materials for the then-upcoming New York trade show.  When Silvers' counsel refused to come, Stelor went ahead and sent the samples nevertheless.  (S36).

Again, Silvers is mischaracterizing the facts in order to manufacture a claim of default. Tellingly, Silvers' former counsel herself has acknowledged that her requests for samples were merely to appease Mr. Silvers.  As she wrote:  "According to the license agreement Stelor is to provide these to Silvers for his 'input.'  ***There is nothing in the agreement that says Stelor has to listen or do anything with his input but this keeps Silvers happy.  Silvers will communicate his "input" only to me.***"  (A5 at Ex. E) (emphasis added).  Accordingly, as this candid email confirms, Silvers' counsel just wanted to keep her client appeased!  Silvers' claim is an utter sham.  (S37).

**4.    The Alleged Breaches Are Clearly Not Material.**  As the Magistrate's Report emphasizes, moreover, the breaches alleged by Silvers are not material in any event.  (A22; Report at 17-23).  Silvers' own counsel acknowledged as much in her email of April 12, 2005,

when she labeled the issues "silly" and recognized that the parties should be focusing "on the upcoming launch and trade show [rather] than obsessing over *these rather small advances to my client.*" (A4 at Ex. B) (emphasis added).

Thus, Silvers is attempting to terminate the License Agreement – after Stelor has invested millions of dollars in developing the property (Esrig Decl ¶4; A4) – based on (1) his own failure to sign and return an Option Letter; (2) payments he received but refused to accept; (3) scheduling of an audit he himself postponed; and (4) samples requested, as his own lawyer admitted, merely to appease him, and which were provided by Stelor in any event.  These claims are clearly not sufficient to justify the termination of this License Agreement.  The CaféPress allegations highlight this:  the single alleged sale through CafePress – even if it did trigger a $2.00 commission (never received by Stelor) of which Silvers would be entitled to $.12 in royalties – is so de minimis as to prevent any legitimate claim of a material breach.

The applicable law, on which the Magistrate relied in his Report (A22), confirms no *material* breach occurred here, let alone any breach at all.  *See Atlanta Jet v. Liberty Aircraft Servs., LLC,* 866 So. 2d 148, 150 (Fla. 4th DCA 2004); *Sublime, Inc. v. Boardman's Inc.,* 849 So. 2d 471 (Fla. 4th DCA 2003).

**C.     Stelor's Requested Relief.**

Accordingly, Stelor requests entry of an order granting it summary judgment on the Cross-Claims, declaring

      a.  That Silvers' purported termination of the License and Settlement Agreements is wrongful and invalid, and thus, the Agreements remain in full force and effect; and

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

> b. Stelor's continued use of the Googles trademarks does not infringe Silvers' rights in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a), does not constitute unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), and does not infringe Silvers' common law rights; and

As this Court clearly stated in its Order Denying Motion to Dismiss Amended Cross-Claim, Florida law authorizes a court "to reinstate a contract after its wrongful termination." Order at 9 (A26 [DE71]) (citing *Vela v. Kendall,* 905 So. 2d 1033, 1035 (Fla. 5th DCA 2005). "[W]here a contract has been improperly terminated, a court can find the termination ineffective and order specific performance thereunder. *See, e.g., Adrian Developers Corp. v. de la Fuente,* 905 So. 2d 155, 156 (Fla. 3d DCA 2004)." Order at 9-10 (A26 [DE71]).

The ruling in *Ron Matusalem & Matusa, Inc. v. Ron Matusalem, Inc.,* 872 F.2d 1547, 1550, 1553 (11th Cir. 1989) also supports this position. There, the Court upheld the trial court's decision that a termination of a sub-franchise agreement including trademarks was unwarranted, and that the franchise "is still in existence and . . . should be strictly enforced." As the Eleventh Circuit emphasized, the trial court had properly recognized that "termination of a franchise is a drastic remedy" and that such franchise rights "should not be set aside lightly". Clearly, the Court in this case has the authority to determine that Silvers' termination was wrongful and that the License remains in existence.

This is especially appropriate here, where Stelor has continued to perform its obligations under the Agreements, including tendering all payments to Silvers on a monthly basis. *See S&R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 376 (3d Cir. 1992) (non-breaching party preserves rights under the contract by continuing to perform, notwithstanding a breach). By continuing to

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

perform under the Agreements, Stelor – the non-breaching party – has clearly preserved its right to continue to use the trademark should the termination prove to be wrongful. *See Matusa,* 872 F.2d at 1550, 1553.

Under the Agreements, moreover, Stelor is entitled to recover from Silvers its attorneys' fees and costs, as the prevailing party.

## VI.  CONCLUSION

For these reasons, Stelor respectfully requests that summary judgment be granted on its Cross-Claims against Steven Silvers, declaring his termination wrongful and invalid, and that the Agreement are reinstated and in full force and effect, along with such other and further relief the Court deems appropriate.  Stelor further requests that the Court reserve jurisdiction to award attorneys' fees and costs to Stelor as the prevailing party.

Respectfully submitted,

BURLINGTON, SCHWIEP, KAPLAN &
   BLONSKY, P.A.
Counsel for STELOR PRODUCTIONS, LLC,
2699 South Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: 305-858-2900
Fax: 305-858-5261
Email:  kkaplan@bskblaw.com


By: _____
                   Kevin C. Kaplan
                   Florida Bar No. 933848
                   David J. Zack
                   Florida Bar No. 641685

CASE NO.  05-80387 CIV RYSKAMP/VITUNAC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was served via U.S. Mail on this _____ day of October, 2006 upon the following:

Steven A. Silvers, *pro se*
Suite 202 – PMB 203
8983 Okeechobee Boulevard
West Palm Beach, Florida 33411
Tel: 954-4445-6788
Fax: 561-784-9959
gewrue@hotmail.com

Ramsey Al-Salam, Esq.
William C. Rava, Esq.
PERKINS COIE LLP
Suite 4800
1201 Third Avenue
Seattle, Washington 98101-3099
RAlsalam@perkinscoie.com

Jan Douglas Atlas, Esq.
ADORNO & YOSS LLP
Suite 1700
350 East Las Olas Boulevard
Fort Lauderdale, Florida  33301

Johanna Calabria, Esq.
PERKINS COIE LLP
Suite 2400
Four Embarcadero Center
San Francisco, CA 94111
E-mail: jcalabria@perkinscole.com

_____
Kevin C. Kaplan
David J. Zack