# EXHIBIT A

Dockets.Justia.com

UNITED STATES DISTRICT CIRCUIT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80387 CIV RYSKAMP/VITUNIC

STEVEN A. SILVERS, an individual,
        Plaintiff,
v.
GOOGLE INC., a Delaware corporation,
        Defendant.

_____

GOOGLE INC., a Delaware corporation,
        Counterclaimant,
v.
STEVEN A. SILVERS, an individual;
STELOR PRODUCTIONS, INC., a Delaware
Corporation; STELOR PRODUCTIONS, LLC, a
Delaware limited liability company,
        Counterdefendants.

_____

DEPOSITION OF STEVEN SILVERS
VOLUME I

Tuesday, October 10, 2006
1:00 p.m. - 8:00 p.m.
2699 South Bayshore Drive
Miami, Florida 33133

Reported By:
Thomas R. Neumann
Notary Public, State of Florida
Network Reporting Corporation
Phone:  888.358.8188
        305.358.8188

— — —

## Page 2

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
 3      ROBERT H. COOPER, ESQUIRE
         ROBERT H. COOPER, P.A.
 4      2999 N.E. 191 Street
         Suite 704
 5      Aventura, Florida 33180
 6
         On behalf of the defendant Google:
 7
         JOHANNA CALABRIA, ESQUIRE  (By telephone.)
 8      PERKINS COIE LLP
         Suite 2400
 9      Four Embarcadero Center
         San Francisco, California 94111
10
11   On behalf of defendant Stelor:
12      KEVIN C. KAPLAN, ESQUIRE
         BURLINGTON, SCHWIEP, KAPLAN & BLONSKY, P.A.
13      2699 South Bayshore Drive
         Penthouse
14      Miami, Florida 33133
15
16   ALSO PRESENT: STEVEN ESRIG
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2
 3              I N D E X
 4          DIRECT CROSS
     WITNESS
 5   STEVEN SILVERS
     By Mr. Kaplan
 6
 7
 8            E X H I B I T S
 9   NUMBER   PAGE   NUMBER  PAGE
       102     24     110    169
10     103     41     111    203
       104    138     112    223
11     105    147     113    230
       106    154     117    241
12     107    154     114    243
       108    155     116    256
13     109    166     115    257
              117     262
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1           P R O C E E D I N G S
 2                - - -
 3      Deposition taken before Thomas R. Neumann,
 4   Registered Reporter and Notary Public in and for the
 5   State of Florida at Large, in the above cause.
 6                - - -
 7      VIDEO OPERATOR:  This is the videotape
 8   deposition of Steven Silvers taken in the
 9   matter of Steven S. Silvers versus Google, Inc.
10   This deposition is being held at 2699 South
11   Bayshore Drive, Miami, Florida.  Today's date
12   is October 10, 2006.  The time is 1:16 p.m.
13   The court reporter's name is Tom Neumann with
14   the firm of Network Reporting.  The
15   videographer is David Zeber with the firm of
16   Action Video.  Will counsel now please
17   introduce themselves.
18      MR. KAPLAN:  I'm Kevin Kaplan for the
19   crossplaintiff, Stelor Productions, LLC.
20      MR. COOPER:  Robert Cooper, I'm making a
21   limited appearance for the purpose of this
22   deposition on behalf of Steven Silvers.
23      MS. CALABRIA:  Johanna Calabria for
24   Google, Inc.
25      MR. KAPLAN:  Also with me is Steven Esrig
```

## Page 5

```
 1   representative of Stelor.
 2   Thereupon,
 3      (STEVEN SILVERS)
 4   Having been first duly sworn or affirmed, was
 5   examined and testified as follows:
 6           DIRECT EXAMINATION
 7      MR. KAPLAN:  Before we get going, I don't
 8   mean to quibble with you today, Robert, I'm
 9   actually glad you are here, but I just want to
10   make sure you know we don't -- we are not
11   agreeing that your appearance is limited.  Our
12   view is that you are appearing as counsel in
13   the case for Mr. Silvers and whatever the
14   consequences of that are they are.
15      MR. COOPER:  I understand your position.
16   BY MR. KAPLAN:
17      Q   Mr. Silvers, you understand that you are
18   under oath today, correct?
19      A   Yes.
20      Q   What does it mean to you to be under oath?
21      A   Testify truthfully to the best that I may
22   be aware of.
23      Q   You have been deposed before; is that
24   correct?
25      A   Yes.
```

Page 6

1    Q   In fact, you were deposed once before in
2  this case by Ms. Calabria, Google's lawyer who is on
3  the phone with us today, right?
4    A   Yes.
5    Q   You have been deposed before in other
6  cases as well?
7    A   I believe so.
8    Q   About how many times have you been
9  deposed?
10   A   I can't recall, maybe one or two other
11 times.
12   Q   Couple of times, less than five?
13   A   Yes.
14   Q   Have you been a party to other lawsuits
15 other than the lawsuits you've had with Stelor
16 Productions?
17   A   Not that I can recall.
18   Q   You have never been sued yourself?
19   A   I don't believe so.
20   Q   Have you ever testified as a witness in
21 any lawsuit involving anybody other than yourself?
22   A   I don't recall.
23   Q   What does it mean to you, Mr. Silvers,
24 when you sign your name on a document, like a
25 contract?

Page 7

1      MR. COOPER:  Object to the form.
2      THE WITNESS:  I'm acknowledging the
3    contents of the contract.
4  BY MR. KAPLAN:
5    Q   When you say you are acknowledging, does
6  that mean that you are confirming the contents of
7  the contract are correct and you are in agreement
8  with them?
9    A   I believe so.
10   Q   Is it important to you when you sign a
11 document like a contract that the contents of it are
12 correct?
13   A   Yes.
14   Q   You understand when you sign a document
15 like a contract that means that you are going to
16 abide by the terms of the contract, right?
17   A   So long as the other parties to the
18 contract abide by the contract as well.
19   Q   Is it important to you as a matter of
20 principle that you stand by the promises that you
21 make?
22   A   Yes.
23   Q   Now, do you have any medical condition
24 that prevents you from testifying accurately here
25 today?

Page 8

1    A   I don't believe so.
2    Q   Are you taking any medication that you
3  believe prevents you from testifying accurately
4  today?
5    A   No.
6    Q   Do you have any conditions or are you
7  taking any medication that affects your memory or
8  recollection?
9    A   No.
10   Q   Now, you understand that I'm the lawyer
11 for Stelor Productions, right?
12   A   Yes.
13   Q   You understand I'm going to be asking you
14 questions today in connection primarily with the
15 claim that Stelor has brought against you in the
16 lawsuit that's pending here in Florida, correct?
17   A   Yes.
18   Q   And I know you have been through the rules
19 of the road before, but let me go over them again
20 just to make sure we are crystal clear we are on the
21 same page.
22      I'm going to be asking you questions out
23 loud and it's important for you to give your
24 answers out loud as well so the court reporter who
25 is sitting next to us can take them down.  Do you

Page 9

1  understands that?
2    A   Yes.
3    Q   It's also important that you give verbal
4  answers like yes or nos as opposed to shakes of the
5  head or nods, do you understand that?
6    A   Yes.
7    Q   And also this is really important.  I want
8  to make sure that when I ask you a question you
9  understand it before you answer it, is that
10 agreeable to you?
11   A   Yes.
12   Q   Because when you answer a question I'm
13 going to assume that you understand it, is that
14 fair?
15   A   Yes.
16   Q   If you don't understand it will you tell
17 me?
18   A   Yes.
19   Q   If you want to take a break at any time
20 too just let me know.  I understand we have agreed
21 we can go late tonight; is that correct?
22   A   I believe so.
23   Q   Is there any time by which you need to be
24 done?
25   A   No.

(Pages 6 to 9)

| Page 10 | Page 12 |
|---|---|
| 1    MS. CALABRIA: What was the answer to<br>2  that?<br>3    THE WITNESS: No.<br>4    MS. CALABRIA: Okay, thanks.<br>5  BY MR. KAPLAN:<br>6    Q  Now, you are represented by counsel here<br>7  today; is that correct?<br>8    A  Yes.<br>9    Q  Your counsel is Mr. Cooper, right?<br>10    A  Yes.<br>11    Q  When did you retain Mr. Cooper?<br>12    A  Last evening.<br>13    Q  Have you agreed to pay Mr. Cooper for his<br>14  time in connection with his representation of you in<br>15  this case?<br>16    MR. COOPER: I'm going to object to the<br>17  question and instruct him not to answer on the<br>18  basis of attorney-client privilege.<br>19    MR. KAPLAN: Just calls for a yes or no<br>20  answer. I don't think that's privileged.<br>21    MR. COOPER: I understand.<br>22  BY MR. KAPLAN:<br>23    Q  Have you signed a written agreement with<br>24  Mr. Cooper?<br>25    A  Yes. | 1  to pay them any money?<br>2    MR. COOPER: Same objection,<br>3  attorney-client privilege. Don't answer.<br>4  BY MR. KAPLAN:<br>5    Q  Were you also represented in this case by<br>6  a lawyer named Adam Rabin?<br>7    A  Yes.<br>8    Q  Is Mr. Rabin still representing you?<br>9    A  No.<br>10    Q  Did you enter into a fee or retainer<br>11  agreement with Mr. Rabin?<br>12    A  Yes.<br>13    Q  Written agreement?<br>14    A  Yes.<br>15    Q  Did you pay Mr. Rabin any money?<br>16    MR. COOPER: Again, attorney-client<br>17  privilege, objection, don't answer.<br>18  BY MR. KAPLAN:<br>19    Q  Do you owe Mr. Rabin any money?<br>20    MR. COOPER: Same objection, same<br>21  instructions.<br>22  BY MR. KAPLAN:<br>23    Q  Were you represented at any time by any<br>24  lawyers in this case other than Cozyak Tropin,<br>25  Mr. Rabin and/or his firm and Mr. Cooper who is here |
| **Page 11** | **Page 13** |
| 1    Q  Have you paid any money to Mr. Cooper?<br>2    MR. COOPER: Again, don't answer that<br>3  question, attorney-client privilege objection.<br>4  BY MR. KAPLAN:<br>5    Q  Do you have any ongoing payment<br>6  obligations to any other lawyers in connection with<br>7  this case?<br>8    MR. COOPER: Same objection,<br>9  attorney-client privilege. At this stage don't<br>10  answer that.<br>11  BY MR. KAPLAN:<br>12    Q  Do you have any ongoing -- let me ask you<br>13  the question this way. Is the firm of Cozyak Tropin<br>14  & Throckmorton or any of the lawyers there still<br>15  representing you?<br>16    A  No.<br>17    Q  Do you owe that firm any money?<br>18    MR. COOPER: Again, attorney-client<br>19  privilege. At this point don't answer that.<br>20  BY MR. KAPLAN:<br>21    Q  Did you enter into a fee or retainer<br>22  agreement with the firm of Cozyak Tropin at any time<br>23  in connection with this case?<br>24    A  Yes.<br>25    Q  And under that agreement were you required | 1  today?<br>2    A  Yes.<br>3    Q  Who?<br>4    A  I believe the law firm was Roy Black.<br>5    Q  At what point in time were you represented<br>6  in connection with this case by Mr. Black or his<br>7  firm?<br>8    A  I don't recall.<br>9    Q  Did they ever formally appear, to your<br>10  knowledge, in this case?<br>11    A  I believe so.<br>12    Q  Are you still represented by them?<br>13    A  No.<br>14    Q  Did you sign a written fee or retainer<br>15  agreement with Mr. Black or his firm?<br>16    A  I believe so.<br>17    Q  Did you pay them any money?<br>18    MR. COOPER: Same objection,<br>19  attorney-client privilege, don't answer.<br>20  BY MR. KAPLAN:<br>21    Q  Do you owe them any money?<br>22    MR. COOPER: Same objection. Don't<br>23  answer.<br>24  BY MR. KAPLAN:<br>25    Q  Were you represented in connection with |

(Pages 10 to 13)

5

### Page 14

1  this case by a lawyer name Roy Stumpf, STUMPF?
2      A   No.  It's Larry Stumpf.
3      Q   Larry Stumpf, thank you.
4          Were you represented by him?
5      A   Yes.
6      Q   In connection with this case?
7      A   Yes, I believe so.
8      Q   Was it the prior litigation with Stelor or
9  this case?
10     A   I'm unclear.  I believe it would be this
11  case.
12     Q   Did you sign a written retainer agreement
13  with Mr. Stumpf or his firm?
14     A   Yes.
15     Q   Are you still represented by him?
16     A   No.
17     Q   Do you owe him or his firm any money?
18         MR. COOPER:  Objection, attorney-client
19     privilege.  Don't answer.
20  BY MR. KAPLAN:
21     Q   Did you pay them any money?
22         MR. COOPER:  Same objection, same
23     instructions.
24  BY MR. KAPLAN:
25     Q   Were you represented in connection with

### Page 15

1  this case by a lawyer named Jeff Robinson?
2      A   The name rings a bell.  I don't know if he
3  formally entered his appearance in this case.  I'm
4  not sure on that.
5      Q   In connection with what matters, just
6  generally, I'm not trying to find out any privilege.
7      A   Stelor -- possibly the Stelor matter.
8      Q   What aspect of the Stelor matter?
9      A   The initial termination of Stelor
10  Productions.
11     Q   That was in November of 2004 or January
12  2005?
13     A   Sounds about right, but I'm not sure one
14  hundred percent.
15     Q   What about Inger Garcia, did she ever
16  represent you?
17     A   Yes.
18     Q   In connection with what?
19     A   Litigation involving Gantz.
20     Q   Did she represent you with respect to any
21  other matters?
22     A   Not that I can recall.
23     Q   Have any other lawyers represented you at
24  any time with respect to any matter involving
25  Stelor?

### Page 16

1      A   Not that I believe.
2      Q   Now, Mr. Silvers, what is your present
3  residential address?
4      A   2495 Sailfish Cove, COVE, Drive, West Palm
5  Beach, Florida, 33411.
6      Q   Is that a house or an apartment?
7      A   Home.
8      Q   By home you mean house?
9      A   Yes.
10     Q   How long have you lived at that address?
11     A   Since November 2003.
12     Q   Do you have any other residential
13  addresses?
14     A   Clarify residential addresses.
15     Q   Are there any other apartments or houses
16  or condominiums or anything that you own?
17     A   Yes.
18     Q   What are those addresses, please?
19     A   1222 Imperial Lake Drive in West Palm
20  Beach, Florida.  That's it.
21     Q   Is that a house?
22     A   Townhouse.
23     Q   Townhouse.  Do you live there?
24     A   No.
25     Q   Who lives there?

### Page 17

1      A   My son.
2      Q   Are there any other residential properties
3  that you own?
4      A   No.
5      Q   Any other residential properties you are
6  in the process of buying?
7      A   Yes.
8      Q   What's that?
9      A   I'm not sure of the address, but it would
10  be Emerald Dunes Villas in West Palm Beach, Florida.
11     Q   Is that an apartment complex?
12     A   Condo.
13     Q   You are buying a condo in that complex?
14     A   I'm not sure whether I'm going through
15  with the sale or not, it's pending.
16     Q   You are a party to a pending purchase and
17  sale of a condo at that project?
18     A   Yes.
19     Q   Is there a contract, written purchase and
20  sale agreement?
21     A   I believe -- yes.
22     Q   Do you know who the seller is?
23     A   No.
24     Q   You individually are the purchaser?
25     A   My son, I think, is on the contract.

(Pages 14 to 17)

Page 18

```
1      Q   Do you have a lawyer representing you in
2    that transaction?
3      A   No.
4      Q   Do you have a realtor working with you?
5      A   No.
6      Q   Anybody working with you or assisting you
7    in that transaction?
8      A   No.
9      Q   Any other residential addresses other than
10   what you've just described for me?
11     A   No.
12     Q   What is your current business address?
13     A   8983 Okeechobee Boulevard, West Palm
14   Beach, Florida, 33411.
15     Q   Is there an office or suite number there?
16     A   Suite 202.
17     Q   That's an office building?
18     A   No, it's a mail drop where I get all my
19   mail.
20     Q   Is that address anything other than a mail
21   drop?
22     A   It's a -- I believe it's called pack mail.
23   It's a pack mail facility.
24     Q   Do you have any office of any type there?
25     A   No.
```

Page 19

```
1      Q   Do you spend any time at that location
2    other than to collect your mail?
3      A   I have been known to spend some time there
4    with the owners from time to time but not conducting
5    business of my own.
6      Q   Just visiting with the owners?
7      A   Yes.
8      Q   Who are the owners?
9      A   I don't recall their names.  They sold the
10   business.
11     Q   Do you have an office at your home?
12     A   I keep a portion of my home that I conduct
13   my business at.
14     Q   Is it fair to say you have a home office?
15     A   Yes.  I conduct my business affairs in one
16   of the rooms of the house which could be construed
17   as a home office.
18     Q   Do you keep files in that home office?
19     A   Yes.
20     Q   Do you keep files anywhere else at this
21   time?
22     A   No.
23     Q   Do any of the lawyers who have represented
24   you in connection with Stelor matters still have
25   files of yours?
```

Page 20

```
1      A   I don't believe so.  I could be mistaken
2    about that, but I don't believe so.  Maybe attorney
3    privileged documents, it could be work-product, but
4    I don't believe so.
5      Q   Did any of those lawyers at one time have
6    files of yours?
7      A   Yes.
8      Q   Were those files returned to you?
9      A   Some of them I believe were, yes.
10     Q   Were files returned to you by the lawyers
11   at Cozyak Tropin?
12     A   Yes.
13     Q   When?
14     A   Several weeks ago.
15     Q   More than a month ago?
16     A   No, less than a month.
17     Q   Can you describe for me without divulging
18   any attorney-client information what the general
19   content of those files is?
20     A   My personal files I presented to them for
21   their consideration to take the case.
22     Q   What was in your personal files?
23     A   All my copyrights, probably trademark
24   papers, samples of my book, some of my plush toys,
25   CD music, things of that nature.
```

Page 21

```
1      Q   The files that you keep in your house, do
2    they contain any other materials that you believe
3    are relevant to this case?
4          MR. COOPER:  Could you repeat the
5          question, please.
6             (Thereupon, a portion of the record
7             was read by the reporter.)
8          THE WITNESS:  I would say yes.
9    BY MR. KAPLAN:
10     Q   Describe for me what's in the files you
11   have at your house that you think are relevant to
12   the case?
13     A   I have my contracts, I have the pleadings
14   from what I was sent from the court or from my
15   lawyers.  That's basically what I can recall at this
16   time.
17     Q   By the contracts you mean the license
18   agreements and the other agreements with Stelor?
19     A   Composer agreement, settlement agreement,
20   agreement from Aurora, the Aurora days.
21     Q   And then the pleadings from the court,
22   correct?
23     A   Correct.
24     Q   The pleadings from the court in this case
25   as well as in the prior lawsuit before Judge Hurley?
```

(Pages 18 to 21)

**Page 22**

1    A    Yes.
2    Q    Do you have any documents that you believe
3    are relevant to the case other than the contracts
4    and the pleadings from the court including the
5    exhibits that the pleadings have?
6    A    I have probably notes that I have sent to
7    Mr. Esrig about breaches that I alleged he had
8    perfected during the course of our relationship.
9    I'm sure there is some other documents
10    pertinent to that effect, and at this time that's
11    basically all I can remember.
12    Q    Please describe with more specificity what
13    you mean by some other documents?
14    A    I could have some documents involving
15    copyrights from way back when I first started my
16    project in the '70s and '80s that were introduced
17    previously into evidence during some depositions by
18    my lawyers were involved with, and probably some
19    other files involving those aspects of the case.
20    But I don't know specifically what they are. I
21    haven't looked at them for a while.
22    Q    Other than the contracts and the pleadings
23    from the court, including the exhibits attached to
24    those pleadings, what other documents do you intend
25    to introduce into evidence at the trial in December?

**Page 23**

1    A    I couldn't give you that answer right now
2    without having had a chance to speak to my attorney
3    about that, and I would not be able to give you a
4    definitive answer about that at this time.
5    Q    As you sit here today do you think there
6    are any other documents that you will use besides
7    the contracts and the pleadings from the court?
8    A    I'm sure there will be.
9    Q    And what do you think they are?
10    A    Communications between me and Mr. Esrig
11    involving the breaches -- the alleged breaches.
12    Q    What else?
13    A    Probably some letters that were
14    disseminated to him by me. Letters my lawyer
15    disseminated to Stelor and Mr. Esrig on my behalf.
16    To the best of my knowledge at this time
17    what I can recall. There may be other items, I'm
18    sure, but like I said, I haven't looked in the
19    boxes in months.
20    Q    Now, you or your lawyers provided a set of
21    initial disclosures under the rules in this case, do
22    you recall that?
23    A    No.
24    Q    Let me go ahead and show you what I'm
25    marking as Exhibit 102. As long as no one has any

**Page 24**

1    objection I would like to continue with the sequence
2    we have already set.
3    MR. COOPER: That's fine.
4    MR. KAPLAN: Johanna is, that agreeable to
5    you?
6    MS. CALABRIA: Yes, that's fine. Give me
7    just a minute to find the document that you
8    just introduced from my own file.
9    (Deposition Exhibit No. 102 was
10    marked for identification.)
11    BY MR. KAPLAN:
12    Q    While she is looking, Mr. Silvers, go to
13    page 3 where it says, documents supporting claims.
14    MS. CALABRIA: Kevin, give me just a
15    minute, please?
16    THE WITNESS: Let me look at this, please.
17    MS. CALABRIA: Okay, I'm ready.
18    BY MR. KAPLAN:
19    Q    First, Mr. Silvers, do you recall ever
20    having seen this document?
21    A    No.
22    Q    Did you see this document before it was
23    filed by your lawyers?
24    A    I don't believe so.
25    Q    Well, let's go through it then. Look at

**Page 25**

1    the first page. Let's start at the beginning.
2    A    Okay.
3    Q    There is a heading that says, "Individuals
4    likely to have discoverable information." Do you
5    see that?
6    A    Okay.
7    Q    Do you know what that means?
8    A    Uh-huh.
9    Q    What does that mean to you?
10    A    Information that could be helpful in
11    making my case before the court, the jury or judge,
12    and information that's likely to prove my claims.
13    Q    Alright. Now, you understand in broad
14    terms there is two disputes in this case, right?
15    MR. COOPER: I object to the form.
16    BY MR. KAPLAN:
17    Q    Let me tell you what I mean.
18    MS. CALABRIA: I object to the form as
19    well.
20    BY MR. KAPLAN:
21    Q    There is a set of claims that you have
22    brought against Google for trademark infringement,
23    right?
24    A    I believe so.
25    Q    And Stelor has also filed claims against

(Pages 22 to 25)

Page 26

1  Google for trademark infringement, right?
2     A   I believe so.
3     Q   And Google has filed counterclaims back
4  against you as well as Stelor, right?
5     A   Yes.
6     Q   Can we agree for purposes of today's
7  deposition to call those the Google infringement
8  claims?
9     A   Okay.
10    Q   And you know what we are talking about
11 when we use that term, is that clear to you?
12    A   Sure.
13    Q   Can we agree that that's one part of your
14 case that's pending before Judge Ryskamp?
15    A   Okay.
16    Q   In addition to that there is a set of
17 claims that Stelor has brought against you, correct?
18    A   Yes.
19    Q   Those claims are essentially to confirm
20 that your alleged termination of the license
21 agreement between you and Stelor is improper and
22 that agreement remains in effect, is that a fair
23 description as you understand those claims?
24    A   Yes.
25    Q   And can we refer to those as -- what shall

Page 27

1  we call them the crossclaims or contract claims?
2     A   Okay.
3     Q   And do you understand the contract claims
4  to be a second part of the case that's pending in
5  front of Judge Ryskamp?
6     A   That's a fair statement.
7     Q   Alright.  Let's do this.  Let's try to
8  make things easy, as easy as things can be for
9  purposes of today's deposition.
10       I want you to assume that all the
11 questions I'm asking you relate to the contract
12 claims, okay?
13    A   Yes.
14    Q   Alright.  So answer all of the questions
15 with that assumption in mind, and if I want to ask
16 you about the infringement claims at any point in
17 time I'll make sure that I sort of highlight that,
18 okay?
19    A   Fine.
20    Q   So let's look through these initial
21 disclosures with respect to the contract claims.
22       There is a list here of 14 individuals
23 likely to have discoverable information, correct?
24    A   That's what's on this document.
25    Q   Just go through that list for you -- for

Page 28

1  me, and tell me which of those people are likely to
2  have discoverable information about the contract
3  claims.
4     A   Of course myself, Mr. Esrig.
5  Mr. Jeffries, Mr. Maitland, possibly Mr. Farrington,
6  certainly many of the employees that are at Stelor
7  Productions, perhaps some employees of Aurora
8  Collection, and that's it from this list.
9     Q   You said from this list.  What do you mean
10 by that?
11    A   I mean there may be other people that have
12 discoverable information that's not on this list.
13    Q   Have you provided any other lists
14 disclosing who you think has discoverable
15 information?
16    A   Not that I know of, not that I'm aware of.
17    Q   Who else do you think is likely to have
18 discoverable information relating to the contract
19 claims?
20    A   Possibly Elon Eisenberg, Paul Worsham.
21    Q   Can you spell those names for us?
22    A   ELON, EISENBERG, Eisenberg, Paul Worsham,
23 WORSHAM, Lindsay Miller, Michael Sagan, Biju Pandit,
24 BIJU, PANDIT, Dr. Pandit, PANDIT, Amy Warren --
25 sorry, these are people that may be under all

Page 29

1  employees of Stelor Productions.  They may also be
2  former employees of Stelor Productions so there is
3  no need for me to give you a list of those people
4  right now.  They would be encompassed on number 7,
5  all employees at Stelor Productions former as well
6  as current employees.
7     Q   Anybody other than employees of Stelor
8  Productions?
9     A   At this time I cannot recall other names.
10 There may be, but at this time as I sit here at this
11 deposition I can't recall.
12    Q   Now, the list that you just gave me of
13 specific names, are any of them current employees of
14 Stelor Productions, to your knowledge?
15    A   I would not have a clue about that.  I
16 have no idea as to whether or not they are still
17 working for Stelor Productions or not, to be honest
18 with you.
19    Q   Give me, if you would, the specific names
20 of the other people that you believe fall under the
21 category of employees of Stelor Productions covered
22 by your list?
23    A   Mannell Nunez.
24    Q   Spell that?
25    A   MANNELL, Mannell Nunez, NUNEZ.  Fred

(Pages 26 to 29)

Page 30

1  Hildabrand, Rebecca Gardner, Sachi --
2    Q   Can you spell Gardner?
3    A   GARDNER. Sachi Soog, SACHI, Soog, SOOG, I
4  believe. Kevin I don't believe -- I don't recall
5  his last name, it will come to me.
6    Q   Not Kaplan?
7    A   No. Kevin -- I have to remember the last
8  name is unknown at this time. Greg Lamford, Julie
9  Depue, Dean Depue.
10   Q   DEPUE?
11   A   Yes. I gave you Amy Warren, right?
12   Q   Yes.
13   A   There are several others that I just
14 can't -- there is only so much I can keep in my head
15 at this time. But there are several others that I'm
16 pretty certain have discoverable information.
17   Q   That are employees of Stelor?
18   A   Or employees or currently may be
19 employees. I'll need to refresh my memory after a
20 break and give you some additional names.
21   Q   How will you refresh your memory?
22   A   Taking the time to think about it more.
23   Q   How did you get that list of names? On
24 what information did you rely?
25   A   From different aspect of people I may have

Page 31

1  spoken to or people that I have heard Mr. Esrig
2  speak about at depositions that he spoke about back
3  in 2004, as well as the recent deposition that was
4  given by -- taken by Ms. Calabria and his deposition
5  and employees and former employees and people of
6  that nature.
7    Q   What people have you spoken to to generate
8  that list?
9    A   Biju Pandit, Michael Sagan, Mannel Nunez,
10 Sachi Soog, Kevin I forgot the last name,
11 Dr. Pandit, Elon Eisenberg, Paul Worsham. I'm sure
12 there is others.
13   Q   During what general period of time did
14 those conversation take place?
15   A   Past six months.
16   Q   Let me go through the list. I want to ask
17 you some questions about each of the names you
18 identified. What's Mr. Eisenberg's address?
19   A   I don't know.
20   Q   Where does he live?
21   A   In Fredrick, Maryland, I believe.
22   Q   When were you first in contact with
23 Mr. Eisenberg?
24   A   I knew Mr. Eisenberg probably two years
25 before I was introduced to Mr. Esrig. So I would

Page 32

1  say the year 2000 thereabouts.
2    Q   How did you know him?
3    A   We had music relationship at that time
4  where we basically were thinking about doing
5  something in the music business. It's never
6  culminated.
7    Q   What relationship do you understand
8  Mr. Eisenberg to have had or to have with Stelor?
9    A   I introduced Elon Eisenberg to Stelor
10 Productions, namely Steven Esrig, when Steven Esrig
11 had inquired about the music that was published by
12 Aurora Collections when Elon was working for Aurora
13 under a contract with Aurora to produce music.
14 That's it.
15   Q   Was Mr. Eisenberg, to your knowledge, ever
16 an employee of Stelor?
17   A   I wouldn't know that answer. I don't
18 believe so.
19   Q   Did Mr. Eisenberg ever do any work for
20 Stelor?
21   A   I believe so.
22   Q   What?
23   A   Produced some music.
24   Q   What information do you believe
25 Mr. Eisenberg has related to the contract claims?

Page 33

1    A   I think he can provide information about
2  some of his dealings with Mr. Esrig and Stelor
3  Productions and some of the possible breaches that I
4  endured during my relationship with Mr. Esrig and
5  Stelor Productions.
6    Q   Specifically which breaches?
7    A   The nonpayment of my royalties which
8  Mr. Eisenberg also shared a common scenario of him
9  not getting paid on timely basis from Stelor
10 Productions.
11       MR. KAPLAN: Johanna your typing is coming
12   through. Johanna. Johanna, are you there?
13       MS. CALABRIA: Yes.
14       MR. KAPLAN: Your typing is appearing on
15   our video record here.
16       MS. CALABRIA: My apologies. I thought I
17   muted you.
18       MR. KAPLAN: No problem.
19 BY MR. KAPLAN:
20   Q   Specifically what royalty payments do you
21 think Mr. Eisenberg would have knowledge of, what
22 period of time?
23   A   I wouldn't recall -- I wouldn't remember
24 that.
25   Q   The royalties that you are complaining

(Pages 30 to 33)

Page 34

1  about in this case are all since January 2005,
2  right?
3      A   I don't believe that's the case.  I think
4  that the royalties are from the inception of the
5  contract.
6      Q   How do you believe Mr. Eisenberg has
7  knowledge about the alleged nonpayment of royalties
8  to you by Stelor?
9      A   Mr. Eisenberg along with Mr. Elkins who
10 were the producers of the music for Stelor
11 Productions have a composer agreement that I'm also
12 a part of or I have a composer agreement as well,
13 and we share a common interest as to royalties that
14 were paid to Mr. Eisenberg or supposed to be paid to
15 Mr. Eisenberg and Mr. Elkins there was also due to
16 be paid to me as well.  So in that regard he would
17 have that information.
18     Q   Any other regard?
19     A   Not that I can recall at this time.  I'm
20 sure there is other things I'm not able to think
21 about at this time.
22     Q   So as you sit here today the only
23 information you think Mr. Eisenberg can have that
24 you think is related to the case has to do with
25 royalty payments owed to you, you say, under the

Page 35

1  composer's agreement, right?
2      A   No.  That's not what I'm saying.
3      Q   What else?
4      A   Mr. Eisenberg would provide testimony in
5  detail from the inception of Stelor Productions
6  taking over the company, the company meaning the
7  asset as early as May of 2002 when there was a
8  voters meeting there at that time, a stockholder
9  meeting, and he would have information throughout
10 the term of my turmoil at Stelor Productions,
11 personal knowledge of his content with the way
12 business was run from his standpoint in trying to
13 secure funds from Mr. Esrig and Stelor Productions
14 for his payments and so on and so forth.
15     Q   Anything else you think he knows?
16     A   He has been made privy to
17 information about the company from meetings with
18 Mr. Esrig, promises that were never kept, things
19 that were discerned to him that never came to
20 fruition, promises that were made and that nature.
21     Q   Specifically what promises that were made
22 by Stelor do you think Mr. Eisenberg has information
23 about that you believe relate to the contract
24 claims?
25     A   Stock options that he was promised and

Page 36

1  never received.  The promise that Mr. Esrig said in
2  a short period of time his stock would be worth over
3  a million dollars based upon a $1,000 a share that
4  he told Mr. Eisenberg that he would be reaping.
5          Promises involving royalties that he
6  would be receiving from the i-Tunes downloads,
7  promises involving his involvement with producing
8  more material, shows, a lot of things that never
9  came to fruition that were promised.
10     Q   You said he and his in the course of that
11 answer.  I understood you to be referring to
12 Mr. Eisenberg, correct?
13     A   Yes.
14     Q   Any promises that related to you
15 Mr. Silvers?
16     A   I think Mr. Eisenberg would have testimony
17 that things may have been communicated to him by
18 Mr. Esrig that never were fulfilled and that
19 Mr. Esrig boasted about certain things that he let
20 Mr. Eisenberg know and Mr. Elkins know which kind of
21 got me all excited and never came to fruition as
22 well, things of that nature and other things that
23 I'm sure he would be willing to talk about.
24     Q   Tell me specifically what has
25 Mr. Eisenberg told you about promises that were made

Page 37

1  and not kept related to you?
2      A   The most recent one of all I can share
3  with you is that about three weeks ago on the Stelor
4  Productions Web site there was a boasting of 1
5  million downloads of One Goo World that was placed
6  on the Web site that would have otherwise netted
7  both Mr. Eisenberg and myself quite a substantial
8  amount of royalties if that information was true and
9  accurate, which it was not.  And at that point I
10 brought that to your attention, if you recall,
11 during the mediation --
12         MR. COOPER:  Whatever happened during
13     mediation is privileged.  Let's not get into
14     that, okay.
15         THE WITNESS:  Okay.  And the following day
16     that was taken off the Web site.  I shared some
17     concern about that.
18         And another likely scenario took place
19     with reference to the album One Goo World which
20     was supposedly nominated for a Grammy award.
21     After my investigation that was found to be
22     false and not true as well.  And that concerned
23     me because that was something that I would have
24     related to have learned about, and many other
25     aspects of the relationship with Mr. Eisenberg

(Pages 34 to 37)

Page 38

```
 1   and Mr. Esrig and Stelor Productions that I
 2   believe were wrongfully boasted about or, you
 3   know, talked about.
 4   BY MR. KAPLAN:
 5       Q   Other than the issue about the downloads
 6   from i-Tunes and the Grammy award, what specifically
 7   has Mr. Eisenberg told you?
 8       A   Told me about what?
 9       Q   About promises that Stelor made and didn't
10   keep?
11       A   I thought I went over that with reference
12   to the stock shares that he was promised, the amount
13   of money he would make from the stock shares, music
14   contracts that he was promised in the way of X
15   number of albums per year.
16           There were -- I'm trying to remember
17   some other things that he talked to me about.  I
18   can't at this time recall.  I'm sure there was
19   other things at this time I can't recall.
20       Q   Now, the issue with respect to the
21   downloads, the information on the Web site --
22       A   Yes.
23       Q   -- you said you confirmed that was
24   inaccurate, correct?
25       A   No.  What I confirmed was -- don't put
```

Page 39

```
 1   words in my mouth, Kevin.
 2           MR. COOPER:  Just answer his question.
 3           THE WITNESS:  What I stated was, when I
 4   brought that to the attention of Stelor
 5   Productions strangely enough the very next day
 6   that verbiage was removed from the Web site.
 7   It was on there for several weeks, perhaps
 8   several months.  One million downloads.  World
 9   renowned CD.
10   BY MR. KAPLAN:
11       Q   I think I heard you say previously that
12   the claim to have had one million downloads was
13   according to your understanding incorrect?
14       A   What my understanding is that it was
15   not placed on the Web site.  It was inaccurately
16   placed on the Web site because if there was one
17   million downloads I would have reaped a royalty
18   check in excess of a million dollars.
19       Q   There is information on the Web site that
20   was removed, correct?
21       A   After I brought it to the attention of
22   Stelor Productions they took the initiative to
23   remove that from their Web site.
24       Q   You gave Stelor notice, they cured what
25   you contended was a problem, correct?
```

Page 40

```
 1           MR. COOPER:  Objection to the form.
 2           THE WITNESS:  No, I don't think that's
 3   accurate.  What it was was that I inquired as
 4   to whether or not that information was accurate
 5   and if it was why did my royalty statement only
 6   show me receiving 12 cents or 18 cents, some
 7   ridiculous number, when in fact at 9.99 a
 8   download for an album times a million downloads
 9   and counting would have been over $10 million
10   dollars, which would have reaped me 10% or
11   otherwise $1 million which if it was brought to
12   my attention by Mr. Eisenberg when he visited
13   the Web site and told me what was on the Web
14   site.
15   BY MR. KAPLAN:
16       Q   What's your understanding of the number of
17   downloads there have been of the i-Tunes music?
18       A   I'm not privileged to that contract or any
19   knowledge whatsoever of that relationship between
20   Mr. Esrig's company, Stelor Productions, and
21   i-Tunes.  I only know what I read at the Web site.
22   One million downloads and counting of One Goo World
23   at $9.99 a download.
24       Q   Do you contend that the posting of that
25   information on the Web site and the subsequent
```

Page 41

```
 1   removal of it in any way is a breach of the license
 2   agreement?
 3           MR. COOPER:  Object to the form.
 4           THE WITNESS:  I think it could be in some
 5   regards because I believe it was deceitful that
 6   that was placed on the Web site to begin with.
 7           I believe it was fraudulent inducement,
 8   fraudulently placed on there.  If it was not
 9   accurate it should never have been placed on
10   there.
11           Same thing with Grammy nominated album.
12   To me that just was hype that was
13   unsubstantiated and I think it was wrong and as
14   the licensor I believe that is a breach.  It
15   tarnishes my name, my characters.
16           MR. KAPLAN:  I'm going to go ahead and
17   mark as Exhibit 103 a copy of the license
18   agreement.  It has already been marked, but
19   this is a cleaner copy.  Take a look at it.
20           (Deposition Exhibit No. 103 was
21           marked for identification.)
22   BY MR. KAPLAN:
23       Q   I'm handing a copy to your counsel.
24           Which provision of the license
25   agreement, Mr. Silvers, do you believe is breached
```

(Pages 38 to 41)

Page 42

1  by that conduct?
2      MR. COOPER: Objection to the form.
3      THE WITNESS: The portion of the license
4  agreement which I'm not sure where it is at
5  this point for Stelor Productions to
6  commercially -- excuse me, to reasonably
7  commercialize my property. Reasonably
8  commercialize my property.
9  BY MR. KAPLAN:
10  Q    Any other portion?
11      MR. COOPER: Same objection.
12      THE WITNESS: Without taking about an hour
13  to read all of this over, I would not be able
14  to go specifically to a specific area here and
15  tell you that with specificity.
16      I believe common sense would dictate that
17  if somebody licenses a property to somebody and
18  disregard myself -- to Stelor Productions,
19  excuse me, and then it's brought to my
20  attention as the licensor that there is
21  erroneous, false and misrepresentation placed
22  on the Web site characterizing my characters as
23  having a Grammy nominated album, having over
24  one million downloads and counting, that that
25  would be in and of itself enough. That is I

Page 43

1  intimated to Mr. Esrig in a lengthy letter that
2  I sent him for additional breach of the license
3  agreement. I believe that that's accurate.
4  BY MR. KAPLAN:
5  Q    But the only provision -- specific
6  provision of the license agreement that you can
7  point me to is the one dealing with using
8  commercially reasonable efforts, I think as you put
9  it, to promote the products, right?
10      MR. COOPER: Object to the form.
11      THE WITNESS: If you want me to spend an
12  hour to read this contract over so I can give
13  you more specifics I'll be happy to do that.
14  At this time I'm going to reserve the right the
15  fact that the contract, in my opinion, was
16  additionally breached based upon Mr. Esrig's
17  company not reasonably commercializing the
18  property by placing false information on the
19  Web site to misrepresent to potential
20  sub-licensees --
21      VIDEO OPERATOR: Hold on. Hold on.
22      (Discussion held off the
23      record.)
24      VIDEO OPERATOR: Go ahead.
25      THE WITNESS: Sub-licensees, potential

Page 44

1  investors, even myself to go on the Web site
2  and to see, you know, that my album or the
3  album of the music involving my characters was
4  Grammy nominated and to find out that that was
5  basically a lie and it was not accurate
6  whatsoever that I have quantified proof of and
7  then to turn around and inquire about the
8  downloads, a million plus downloads and
9  counting of 9.99 and that was also a lie is
10  preposterous. So that's my position.
11  BY MR. KAPLAN:
12  Q    Look, Mr. Silvers, we are going to be a
13  long day today. I'm going to try to ask you narrow
14  questions.
15  A    Okay.
16  Q    I need you to give me narrow answers to
17  the questions. You don't need to repeat and restate
18  everything you have said before, okay. So let me
19  ask you the question again and please try and answer
20  the specific question that I'm asking.
21      As you sit here right now, can you point
22  to any other provision of the license agreement
23  that you believe that conduct breached, yes or no?
24  A    Without reading the contract in specific
25  detail I'm not able to give you a definitive answer

Page 45

1  on that yes or no.
2  Q    Thank you. Have you put Stelor on written
3  notice of what provision of the contract you believe
4  that conduct breaches?
5  A    Have I? I believe I sent them a letter.
6  Q    Does the letter indicate what provision of
7  the license agreement you believe was breached, yes
8  or no?
9  A    I don't believe so. I have not taken the
10  time to read the letter recently.
11  Q    Do you intend to put Stelor on written
12  notice of what specific provision of the contract
13  you believe was breached?
14  A    Having hired new counsel that would be a
15  decision that my counsel would decide.
16  Q    Would you hand me that exhibit black,
17  please?
18  A    (Witness complies.)
19  Q    What if any documents have you gotten from
20  Mr. Eisenberg?
21  A    I don't believe I have gotten any
22  documents from Mr. Eisenberg.
23  Q    What if any documents have you provided to
24  Mr. Eisenberg?
25  A    I provided him a copy of the recording art

(Pages 42 to 45)

Page 46

1  institute's letter to me emphatically stating that
2  under no circumstances was the One Goo World album
3  ever nominated for a Grammy award and basically them
4  asking me where I got this information from.
5      Q   Any other documents?
6      A   Not that I can recall at this time.
7      Q   What conversations have you -- let me ask
8  you the questions this way.
9          Have you had conversations with
10  Mr. Eisenberg about the litigation that's pending
11  in Maryland?
12      A   I believe we have had some conversations
13  about that since we share a common goal.
14      Q   Did you at any time discuss with
15  Mr. Eisenberg bringing litigation against Stelor?
16          MR. COOPER: Object to the form. Who is
17      bringing litigation against Stelor?
18  BY MR. KAPLAN:
19      Q   Mr. Eisenberg.
20      A   Repeat the question again.
21      Q   Yes. Did you ever talk to Mr. Eisnberg
22  about him suing Stelor?
23      A   I don't believe so. Not that I can
24  recall, no.
25      Q   Did you ever offer to pay Mr. Eisenberg

Page 47

1  anything in connection with his assistance regarding
2  your case against Stelor?
3      A   Absolutely not.
4      Q   Did you ever pay Mr. Eisenberg anything?
5      A   Absolutely not.
6      Q   Now, a moment ago in an answer to one of
7  my questions you said that you and Mr. Eisenberg
8  share a common goal. Did I hear that correctly?
9      A   That's a fair statement.
10      Q   What goal is that?
11      A   To see him successful in his recording
12  endeavors with his voice and his music.
13      Q   Any other common goals you shared?
14      A   Not that I can recall.
15      Q   Who is Paul Worsham?
16      A   A friend of mine.
17      Q   How do you know Paul Worsham?
18      A   Introduced to him by Elon Eisenberg.
19      Q   When?
20      A   Probably just prior to the summit meeting
21  with Stelor Productions, shortly after the June 2002
22  execution of the settlement agreement.
23      Q   You said summit meeting. What do you mean
24  by that?
25      A   We had a summit meeting at Mr. Esrig's

Page 48

1  home where there was a number of people that were
2  going to be involved in the setting up of Stelor
3  Productions and taking the company to where I was
4  lead to believe it was going to go.
5      Q   What is Mr. Worsham's residence address?
6      A   I don't know.
7      Q   Where is it?
8      A   I believe in Rockville, Maryland.
9      Q   What information do you have access to
10  regarding his address?
11      A   His address, I'm sure, is probably on the
12  pleadings of the Maryland case.
13      Q   Is the address on the pleadings in the
14  Maryland case accurate to your knowledge?
15      A   I wouldn't know that.
16      Q   Do you know if he has a business?
17      A   No, he has no business that I know of.
18      Q   What does he do?
19      A   He works for the government.
20      Q   What does he do for the government?
21      A   I do not know. He is involved with TSA as
22  I understand, high security clearance.
23      Q   He works for the government in Washington
24  DC?
25      A   Uh-huh.

Page 49

1      Q   You have to answer yes or no.
2      A   Yes.
3      Q   Do you understand him to be an employee of
4  the TSA?
5      A   That's what he is.
6      Q   How long has he been and employee of TSA?
7      A   I don't know.
8      Q   Do you know what his job was before that?
9      A   I believe he worked for Sprint some time.
10  I'm not sure.
11      Q   About when did he become an employee of
12  the TSA?
13      A   I do not know.
14      Q   By TSA you mean Transportation Safety
15  Administration?
16      A   I believe so.
17      Q   Administration or Agency, which is it?
18      A   I think it may be agency.
19      Q   Does he work at an airport?
20      A   I do not know.
21      Q   Those are the people who man the x-ray
22  machines there?
23      A   Those are the people that take care of all
24  security for all airports and government
25  installations any and everything else.

(Pages 46 to 49)

Page 50

1    Q   What do you understand Mr. Worsham's
2  expertise to be?
3    A   He is in computer science.  I think he has
4  a degree in computer science, I believe, I'm not
5  sure.
6        MR. KAPLAN:  Alright.  Let's go off the
7  record for a second because we need to change
8  the tape.
9        VIDEO OPERATOR:  We are off the record.
10       (Thereupon, a brief recess was
11       taken.)
12       VIDEO OPERATOR:  We are on the record.
13       MR. KAPLAN:  We are on the record.  You
14  had a statement to make, Robert.
15       MR. COOPER:  Yes.  You had asked me
16  regarding the letter from my client to Stelor
17  Productions dated August 27, 2006, whether this
18  was a notice of additional breaches or whether
19  this was in the nature of settlement, because
20  there was inadvertently confidential
21  communication notice put on the end of that
22  letter that should not have been there.  This
23  is a breach letter not a settlement
24  communication and it's not privileged.
25       MR. KAPLAN:  Johanna, we will provide you

Page 51

1  with a copy of that letter during the break in
2  light of the clarification.
3        MS. CALABRIA:  Okay.  Thanks.
4  BY MR. KAPLAN:
5    Q   Did you ever talk to Mr. Eisenberg about
6  testifying in this case?
7    A   Which case are you talking about?
8    Q   The present case.
9    A   I did.
10   Q   When?
11   A   I don't recall, probably a week or so ago.
12   Q   What did you say to him?
13   A   I basically asked him if he would be
14  willing to testify on my behalf to some of the
15  things that he was aware of at Stelor and some of
16  the things that he knew that we shared common
17  interest on, and he said if I needed him he would be
18  here.
19   Q   Did you offer to pay to bring him down?
20   A   Absolutely not.
21   Q   Any other discussions with Mr. Eisenberg
22  at any time about him testifying in this case?
23   A   Not that I can recall, no.
24   Q   What about Mr. Worsham, have you talked to
25  him at any time since August of 2005 about

Page 52

1  testifying in this case?
2    A   Yes.
3    Q   When?
4    A   Probably around the same time.
5    Q   How many conversations have you had with
6  Mr. Worsham since August of 2005?
7    A   I would not be able to recall that.  We
8  talk often about family matters and just friendship
9  situations and what he is doing with his life and my
10  life and be concerned about my health issues and so
11  on and so forth.
12   Q   About how often do you talk to him?
13   A   Once a week, twice a week perhaps.
14   Q   You consider Mr. Worsham to be a friend of
15  yours, correct?
16   A   Yes.
17   Q   Close friend, right?
18   A   I wouldn't say close friend.  I don't live
19  in that area.  So I wouldn't say close friend.  I
20  would say he is a friend.
21   Q   Close enough friend for you to talk to him
22  on the phone a couple of times a week, right?
23   A   It has not been a couple of times a week
24  every week.  I would say once a week, possibly
25  sometimes twice a week, sometimes he would call me.

Page 53

1    Q   And those conversations are primarily
2  about nonbusiness issues is that fair to say?
3    A   We don't have business between us.  We
4  basically talk about some of his future goals in
5  life, my situation with my future goals and also we
6  talked about the pending litigation in Maryland that
7  he and I are defendants in.
8    Q   Alright.  And those calls on a weekly
9  basis or more those calls have continued since
10  August of 2005 to date?
11   A   I would think so.  I can't say every week
12  two times a week, sometimes two or three weeks go by
13  and we don't talk, then we will talk a couple of
14  times.
15   Q   Now, during the course of those calls have
16  you talked about the litigation here in Florida?
17   A   I'm sure we have had some discussions
18  about that.
19   Q   Approximately how many discussions have
20  you had with Mr. Worsham about the litigation in
21  Florida?
22   A   I could not give you that answer.
23   Q   More than five?
24   A   Perhaps.
25   Q   More than ten?

(Pages 50 to 53)

15

**Page 54**

1   A  Doubtful.
2   Q  And what's been the general subject of the
3   five to ten discussions you've had with him?
4   A  Frustration I have had with the
5   litigation, the situation of some of the things that
6   he has been subjected to with reference to things
7   that have happened between him and Stelor, between
8   him and Mr. Esrig, asking him if he would be willing
9   to also testify on my behalf and those kinds of
10  things.
11  Q  Other than Cafe Press which I'm going to
12  come to a little bit later, what information do you
13  think Mr. Worsham has that relates to this case?
14  A  I think that he was also part of the early
15  summit meeting back in June of 2002. He was brought
16  in there by Mr. Esrig -- excuse me. He was brought
17  in there by Mr. Eisenberg after Mr. Esrig was made
18  aware of Paul's credentials. And then there were
19  some materials involving things that I have found
20  out later on that Mr. Worsham was involved with
21  Mr. Esrig, doing it at Mr. Esrig's request.
22  Q  Related to Cafe Press?
23  A  I believe so.
24  Q  Anything other than Cafe Press?
25  A  There was an incident that got Paul very

**Page 55**

1   disturbed in reference to Stelor Productions
2   infringing on a trademark of his that was being
3   shown at a --
4   Q  That's the Jabbles?
5   A  -- trade show that had to do with the
6   Jabbles trademark that was owned by Mr. Worsham and
7   that Mr. Esrig took the liberty of supposedly having
8   that on some literature at a trade show claiming
9   that he was the one that had the rights to that
10  name.
11  Q  JABBLES?
12  A  Correct.
13  Q  Was this the trade show in New York in
14  2005?
15  A  I'm not sure which trade show it was.
16  Perhaps it might have been that trade show. There
17  was a pamphlet that was disseminated with that name
18  on it that Mr. Worsham got ahold of, and I guess he
19  was very upset about that.
20  Q  How did -- Mr. Worsham ended up having a
21  relationship with Cozyak Tropin, attorney-client,
22  correct?
23  A  I'm not aware of that relationship.
24  Q  You are not aware of that relationship?
25  A  No.

**Page 56**

1   Q  Did you know that Cozyak Tropin sent a
2   letter to us on Mr. Worsham's behalf?
3   A  Yes. I'm aware of that, but I'm not aware
4   there was an actual relationship that was had
5   between the two of them. There may have been.
6   Q  Certainly Cozyak Tropin was acting as
7   Mr. Worsham's lawyer in connection with the sending
8   of that letter, right?
9   A  I have no knowledge of that. If she
10  was -- if Cozyak Tropin was then that's between
11  Mr. Worsham and KTT law, Cozyak Tropin.
12  Q  Well, you put Mr. Worsham in touch with
13  KTT law, right?
14  A  I believe I suggested that Paul contact
15  Gail McQuilkin who works for KTT law in reference to
16  Mr. Worsham's concerns about a possible trademark
17  infringement by Stelor using the Jabbles trademark.
18  Q  Was that before or after you got an
19  affidavit from Mr. Worsham that was filed in the
20  action that was pending before Judge Hurley?
21  A  Before or after?  I am not sure about
22  that. I can't recall whether it was before or
23  after.
24  Q  What information -- what documents have
25  you gotten from Mr. Worsham since he filed that

**Page 57**

1   declaration?
2   MR. COOPER: Object to the form.
3   THE WITNESS: I don't feel that I have
4   received any documents per say. I do believe
5   that I might have received some of the
6   paraphernalia or some of the material that was
7   presented at the Stelor Productions exhibit
8   that I basically believe I was in receipt of
9   because I did not attend the show.
10  BY MR. KAPLAN:
11  Q  How did Mr. Worsham get that?
12  A  I think his brother might have attended
13  the show. I think he goes there quite regularly and
14  I believe he might have gotten the documents that --
15  not documents but paraphernalia.
16  Q  What's the name of Mr. Worsham's brother?
17  A  I don't even know the brother that's an
18  attorney. I don't remember the brother's name --
19  Q  BJ?
20  A  Might be BJ. I think that's correct,
21  correct.
22  Q  Did you or anybody ask B.J. Worsham to go
23  to the trade show in New York in 2005 and get
24  information from Stelor's booth?
25  A  Not that I can recall. I mean I know that

(Pages 54 to 57)

16

```
                                    Page 58
 1  he goes every year.  He has been there before, I'm
 2  not sure.
 3      Q   Is it your testimony that B.J. Worsham got
 4  the information from Stelor's booth independently?
 5      A   I wouldn't know.
 6      Q   Did you ever talk -- did you or your
 7  lawyers, to your knowledge, ever talk to B.J.
 8  Worsham?
 9      A   I think I had dinner with him once in New
10  York, but I'm not sure.
11      Q   What time period?
12      A   During one of the shows, 2003 or 2004 I
13  think he was up there.
14      Q   Any time after that did you ever talk to
15  him?
16      A   No, not that I can recall.
17      Q   Who is Lindsay Miller?
18      A   Lindsay Miller is a former employee of
19  Stelor Productions.
20      Q   How do you know her?
21      A   I was introduced to her through her
22  fiancee whose name was Drew.  I don't remember his
23  last name.  His last name may be Tu, TU.
24      Q   Drew Tu?
25      A   I think so.  And he was introduced to me
```

```
                                    Page 59
 1  through Mr. Eisenberg.
 2      Q   What's the relationship or connection
 3  between Drew Tu and Mr. Eisenberg?
 4      A   There is no connection.  They happened to
 5  have met at this karaoke club not too long ago and
 6  there was some conversation that was overheard and
 7  then it was told to me that I should speak to
 8  Ms. Miller.
 9      Q   Told to you by who?
10      A   Mr. Eisenberg.
11      Q   What's the connection between
12  Mr. Eisenberg and Ms. Miller?
13      A   There is no connection.
14      Q   Was that the first time you spoke to
15  Ms. Miller?
16      A   Yes.
17      Q   About when was that?
18      A   Four months ago, perhaps maybe five months
19  ago.
20      Q   What did you talk about?
21      A   She had communicated to me about Mr. Esrig
22  and improprieties that he had foisted upon her in
23  reference to sexual harassment issues and also there
24  were some issues involved in her employment that she
25  had personally witnessed during the employment with
```

```
                                    Page 60
 1  Mr. Esrig, and that's about all I can recall.
 2      Q   What does that have to do with the case
 3  down here, our contract claims as you understand it?
 4      A   At that point the initial conversation
 5  absolutely nothing.
 6      Q   What information do you think she has got
 7  that relates in any way to the contract claims?
 8      A   She was told certain things by Mr. Esrig
 9  in confidence that she basically had shared with me.
10          When I say confidence there was things
11  that were suggested to her by Mr. Esrig that could
12  relate to some specific things that I feel could
13  be responsive to breaches with reference to the
14  contract claim.
15      Q   What?
16      A   One specific comment that was made to her
17  by Mr. Esrig that I was made privy to had to do with
18  some monies that she was promised by Mr. Esrig for a
19  vehicle that Mr. Esrig had promised to help her
20  with.  And in a conversation that took place
21  supposedly I was not privy to the conversation but
22  this is what she had mentioned to me that Mr. Esrig
23  mentioned to her that he could easily get that money
24  for her, and her quote was to me that's what he does
25  for a living.  He takes money from people.  He cons
```

```
                                    Page 61
 1  people out of their money.  He gets money from
 2  people for his project.  Something to that effect.
 3  I was quite shocked to hear that.
 4      Q   Let me make sure I'm clear about
 5  something.  As I understand your relationship with
 6  Stelor, Stelor has given you money, right?
 7      A   Stelor has paid me money, that's correct.
 8      Q   You have been paid in excess of or in the
 9  area of $200,000 already by Stelor, correct?
10          MR. COOPER:  Object to the form.
11          THE WITNESS:  I do not know that number to
12  be correct.  I know they paid me substantial
13  money for royalty advances and consulting fees,
14  that's correct.
15  BY MR. KAPLAN:
16      Q   Have you given any money to Stelor at any
17  time?
18      A   I don't believe so.
19      Q   What else did she tell you?  What other
20  certain things did Mr. Esrig allegedly tell
21  Ms. Miller in confidence that you believe have any
22  relation at all to the issues in this case or
23  contract claims?
24      A   There was a number of things that were
25  mentioned to me by Ms. Miller in reference to
```

(Pages 58 to 61)

Page 62

1    improprieties of Mr. Esrig, probably none of which
2    falls in the contract scenario, but it certainly
3    falls to the credibility of Mr. Esrig as the CEO of
4    the company.
5        MR. COOPER:  Just answer the question he
6    is asking.  If he wants to ask a different
7    question he will ask you a different question.
8    Listen to his questions and just answer the
9    question asked you.
10   BY MR. KAPLAN:
11       Q    Anything else?
12       A    Not that I can recall at this time.
13       Q    Did you get any documents from Ms. Miller?
14       A    No.
15       Q    Did you give any documents to Ms. Miller?
16       A    Yes.
17       Q    What?
18       A    I forwarded her some documents that I was
19   made privy to from my attorney in reference to some
20   motion to dismiss for a claim that's involved up in
21   Maryland she is a defendant in.
22       Q    What documents specifically did you give
23   to Ms. Miller?
24       A    It was a motion to dismiss and an
25   extension of time or enlargement of time to file the

Page 63

1    motion to dismiss.
2        Q    So your lawyer prepared a motion to
3    dismiss for Ms. Miller to file in an action pending
4    in Maryland; is that correct?
5        A    She assisted as a favor to do that.
6        Q    Which lawyer?
7        A    Ms. McQuilkin.
8        Q    Ms. McQuilkin did that at your request?
9        A    Ms. McQuilkin assisted Ms. Miller as a
10   favor since she had no attorney to basically give
11   her a boilerplate of a motion to dismiss and of a
12   motion for enlargement of time to be able to assist
13   her since she had no counsel at the time.
14       Q    Mr. Silvers, please listen to my question.
15   Did Ms. McQuilkin do that at your request?
16       MR. COOPER:  Hang on a second.
17       I'm going to object on attorney-client
18       privilege and instruct him not to answer.
19   BY MR. KAPLAN:
20       Q    When did Ms. McQuilkin do that?
21       A    I don't recall.
22       Q    Was it before or after she withdrew as
23   your counsel in this case?
24       A    I can't recall.
25       Q    Was that something Ms. McQuilkin did as

Page 64

1    your lawyer?
2        A    I'm not sure.  No, I don't believe so, not
3    as my lawyer.
4        Q    Okay.  Is that something Ms. McQuilkin did
5    at your request?
6        A    I think I might have inquired with her to
7    assist me with trying to help Ms. Miller so that she
8    would not be in default because she had no means to
9    hire and attorney at the time, and basically I think
10   that's how that was presented to Ms. McQuilkin.
11       Q    So you have assisted Ms. Miller in
12   connection with her litigation against Stelor in
13   Maryland, correct?
14       A    No, that's not correct.
15       Q    You assisted here by getting the lawyer
16   who formerly represented you in this case to prepare
17   some draft pleadings for Ms. Miller, correct?
18       A    That may be correct, yes.
19       Q    What other assistance have you provided
20   Ms. Miller in connection with the pending lawsuit in
21   Maryland?
22       A    Nothing else.
23       Q    Have you talked to her about the pending
24   lawsuit in Maryland?
25       A    We had some conversations, nothing having

Page 65

1    to do with reference to her pending litigation
2    because she had retained a lawyer.
3        Q    Have you suggested to Ms. Miller that she
4    could get rich by suing Stelor?
5        A    Absolutely not.
6        Q    Have you made any suggestions to
7    Ms. Miller at all about what she might recover or
8    achieve by suing Stelor?
9        A    There was no communication whatsoever of
10   Lindsay Miller ever breathing a word suing Stelor
11   Productions for anything at any time.
12       Q    Did you tell Ms. Miller anything about
13   your pending case against Stelor down here?
14       A    I might have communicated to her that I'm
15   involved in litigation with Stelor Productions.
16       Q    Did you discuss with her in any way any of
17   the substance of the case, the merits of the case
18   down here?
19       A    I don't believe so.  I only had asked her
20   if she would be willing to testify on my behalf and
21   I have not gotten an affirmative answer in that
22   regard.
23       Q    By the way, other than your lawyers, have
24   you talked to any people about the substance of your
25   case against Stelor down here, the contract claims?

(Pages 62 to 65)

Page 66

```
 1    A   Substance of the case, I don't believe so.
 2    Q   The merits of the case?
 3    A   I don't believe so.
 4    Q   What about with representatives of Stelor,
 5   have you had any discussions with them?  I'm not
 6   talking about settlement discussions now.
 7   Discussions with Mr. Esrig or Mr. Jeffrey about the
 8   merits of the case down here?
 9        MS. CALABRIA:  At what time, Kevin?
10   BY MR. KAPLAN:
11    Q   At any time.  Since it was filed April
12   2005.
13    A   When you say substance I don't know if you
14   can quantify that for me.
15    Q   For example, whether your notice was
16   valid, your notice of default or termination?
17    A   I don't believe so.  I mean I don't
18   recall.
19    Q   Did you ever express the view to Mr. Esrig
20   that the notice Ms. McQuilkin served, the notice of
21   termination in April 2005 was inadequate?
22    A   I don't recall.  I might have had
23   conversation with him about what he had communicated
24   to me that his lawyers believed.  I don't believe
25   that I would have brought that up to him.
```

Page 67

```
 1    Q   Did you ever mention to Mr. Esrig your
 2   view that Ms. McQuilkin blew it in terms of the
 3   notice.
 4    A   I might have mentioned to him that I
 5   thought perhaps there might have been a possibility
 6   of that, but nothing definitive because as far as
 7   Gail was concerned the notice was properly --
 8        MR. COOPER:  Let's not -- please don't go
 9     into attorney client communications, and if
10     these communications were part of your
11     communications with him regarding settlement
12     that's also not fair game and please tell him
13     that's part of our settlement discussions and
14     don't answer the question.
15        I wasn't privy to those.  I'm not sure --
16     I mean he is prefacing his question telling you
17     I'm not asking for settlement discussions, but
18     then he is asking you for them.  So you need to
19     be able to draw the line here and I can't help
20     you with that.  Please keep a close eye on not
21     revealing attorney-client privilege and if
22     these communications had to do with settlement
23     tell him so and don't answer.
24        THE WITNESS:  Okay.
25
```

Page 68

```
 1   BY MR. KAPLAN:
 2    Q   If Mr. Esrig says that you told him,
 3   Ms. McQuilkin blew the notice requirement, do you
 4   dispute that?
 5    A   I don't recall ever saying that to him and
 6   if it was it was probably during -- and if it was it
 7   was during the settlement negotiations.  I don't
 8   believe I ever said that to him.
 9    Q   Are you sure it was during the settlement
10   negotiation?
11    A   I'm not sure.  I can't be a hundred
12   percent positive.
13    Q   When did the discussion -- where did the
14   discussion take place in which you recall mentioning
15   to Mr. Esrig the possibility, as you put it, that
16   Ms. McQuilkin blew the notice requirement?
17    A   First of all, I don't recall mentioning
18   that ever.  So if that's something that Mr. Esrig
19   has communicated, I don't have any knowledge of
20   that.  The only time that I met Mr. Esrig was when I
21   spoke to him up in Maryland when we tried to
22   negotiate a possible settlement and then I met him
23   and Mr. Jeffrey in a restaurant a day or two later.
24   There was a number of communications going back and
25   forth that they were basically trying to persuade me
```

Page 69

```
 1   that Ms. McQuilkin, you know, basically blew it.  I
 2   remember that conversation.  But I don't know at any
 3   time I agreed to that.
 4        MR. COOPER:  I need to take a break now
 5     because it's 2:45.  I need to call on the phone
 6     here.
 7   BY MR. KAPLAN:
 8    Q   Let me just ask one question before we
 9   break.
10        Did you ever tell anybody other than
11   your lawyers that you were contemplating bringing
12   a malpractice claim against Gail McQuilkin or
13   Kozyak Tropin?
14    A   Once again.
15    Q   Did you ever tell anybody other than a
16   lawyer of yours that you were contemplating bringing
17   a malpractice claim against Gail McQuilkin or Cozyak
18   Tropin?
19    A   No.  What I was --
20        MR. COOPER:  It's a yes or no question.
21     Did you ever tell anybody?  If you didn't tell
22     anybody --
23        THE WITNESS:  Not that I can recall.
24        MR. KAPLAN:  Don't do that.  The witness
25     wasn't finished answering.
```

(Pages 66 to 69)

19

**Page 70**

1      MR. COOPER: I don't want any
2   attorney-client communication to be revealed.
3      THE WITNESS: Not that I can recall.
4   BY MR. KAPLAN:
5      Q   Finish your answer. You were going to
6   describe something you said, Mr. Silvers?
7      A   I was informed by Mr. Esrig and
8   Mr. Jeffries at one point during a meeting that they
9   had information that they could provide me with that
10  could certainly warrant a malpractice claim against
11  my attorneys.
12      I at no time, to my knowledge, agreed
13  with that because I was never shown the
14  information that I was going to be made privy to
15  by Mr. Esrig or Mr. Jeffries that would give me
16  that indication.
17      I think there were some documents that
18  provided me one or two, some e-mails, but I do not
19  believe that I was the one that mentioned anything
20  about malpractice. I think it had to do with them
21  mentioning it to me that I had a malpractice case.
22      MR. KAPLAN: Alright. Let's take the
23  break. Off the record.
24      VIDEO OPERATOR: Off the record.
25      (Thereupon, a brief recess was

**Page 71**

1   taken.)
2      VIDEO OPERATOR: We are on the record.
3   BY MR. KAPLAN:
4      Q   Mr. Silvers, I want to ask you -- try to
5   ask you quickly about -- find out what information
6   the other folks you identified have. I don't want
7   to spend all day doing this. So will you work with
8   me to try and answer my questions concisely and tell
9   me what these people know relative to the contract
10  claims, can you work with me to do that?
11      A   Yes.
12      Q   Michael Sagan. Let me ask you first, have
13  you received or obtained any documents from
14  Mr. Sagan?
15      A   Not to my knowledge.
16      Q   Has anybody that you are working with in
17  this case including your lawyers gotten any
18  documents from Mr. Sagan?
19      A   Possibly.
20      Q   What documents do you think your lawyers
21  have gotten from Mr. Sagan?
22      A   I'm not sure. It might have been one
23  specific document to refute an allegation of a
24  jurisdictional issue involving an address of a
25  Stelor employee or a Stelor member.

**Page 72**

1      Q   When did you first talk to Mr. Sagan about
2   this case?
3      A   I don't recall, maybe 7 or 8 months ago.
4      Q   Had your lawyers talked to him about the
5   case previously?
6      A   I'm not sure.
7      Q   What information, if any, do you think
8   that Michael Sagan has that you believe to be
9   related to the contract claims?
10      A   Other than some of the inner goings on at
11  the company at the time of his employment there
12  perhaps some improprieties, there may be not any.
13      Q   When was he at the company as you
14  understand it?
15      A   I don't recall when he worked for the
16  company.
17      Q   What improprieties do you think he knows
18  about?
19      A   Misappropriation of funds, some perjury
20  allegations, I believe, involving some kind of
21  dispute Mr. Esrig involving unemployment claims or
22  something to that effect.
23      Q   Anything else?
24      A   The issue of the address or addresses of
25  specific employees of the company.

**Page 73**

1      Q   But that had to do with jurisdiction in
2   the case before Judge Hurley, right?
3      A   Right.
4      Q   Did it have to do with anything else?
5      A   I don't believe so.
6      Q   Who is Biju Pandit?
7      A   I believe he was an employee or a former
8   employee of Stelor Productions involving their
9   animation or art direction.
10      Q   When?
11      A   I don't recall.
12      Q   By the way, have you given any documents
13  to Mr. Sagan?
14      A   No.
15      Q   What information do you think Mr. Pandit
16  has that's relevant to your crossclaims -- or rather
17  to our crossclaims?
18      A   Again, improprieties involving his
19  employment experience.
20      Q   Improprieties -- his dispute with Stelor
21  you mean?
22      A   No, not necessarily his dispute with
23  Stelor. There was an incident where he was alleged
24  to have given me $10,000 in cash for documents that
25  he was supposedly have providing me and that's an

(Pages 70 to 73)

20

Page 74

1   outright lie. I never met the man before in my life
2   prior to that information being disseminated, and I
3   never received $10,000 from Biju Pandit or anybody
4   else at Stelor Productions as was told by Mr. Pandit
5   to me. That was one of the reasons why he was let
6   go.
7       Q    When was that?
8       A    When was what?
9       Q    When was he let go?
10      A    I don't know.
11      Q    But it was before April of 2005?
12      A    I don't know.
13      Q    Dr. Pandit, who is he?
14      A    He was an investor at one time of Stelor
15  Productions involving an LLC who had uncovered some
16  improprieties of Stelor Productions, made them known
17  to me and my attorney and then basically when we had
18  put some pressure on he got his money back and
19  everything was back to status quo.
20      Q    What does that have to do with the
21  contract claims?
22      A    I think he would testify to credibility of
23  Stelor Productions and Mr. Esrig.
24      Q    Anything else?
25      A    Not that I can recall.

Page 75

1       Q    What about Amy Warren, who is she?
2       A    She was at one point, I believe,
3   Mr. Esrig's personal assistant.
4       Q    And what information does she have that
5   you believe is relevant to the contract claims?
6       A    I have not personally spoken with her.
7       Q    Who has spoken to her?
8       A    I believe Mr. Biju Pandit if I'm not
9   mistaken. I'm not a hundred percent sure about
10  that. But somebody had mentioned to me, and I can't
11  recall just now who it was about her discontent with
12  the company, some things that she witnessed, some
13  improprieties as well.
14      Q    Your testimony is you have never spoken
15  with Amy Warren, is that correct?
16      A    That's correct.
17      Q    Did you get any documents from the
18  Pandits?
19      A    Not that I can recall.
20      Q    Did your lawyers?
21      A    Possibly.
22      Q    Do you have those documents?
23      A    Do I have the documents? One single
24  document, and that was introduced into evidence by
25  my lawyer.

Page 76

1       Q    What document?
2       A    Had to do with the address or addresses of
3   employees that worked for Stelor Productions.
4       Q    And that document was given to you by Biju
5   Pandit?
6       A    It was not given to me at all. It was
7   provided to my counsel.
8       Q    Do you know where Mr. Pandit got the
9   document?
10      A    No, I don't.
11      Q    Was your lawyer talking to Mr. Pandit
12  while Mr. Pandit was still an employee at Stelor?
13      A    No.
14          MR. COOPER: Hang on -- go ahead.
15  BY MR. KAPLAN:
16      Q    Did you ask Mr. Pandit to provide you with
17  internal documents from Stelor?
18      A    Absolutely not.
19      Q    Do you know if your lawyers asked
20  Mr. Pandit to provide them with internal documents
21  from Stelor?
22      A    Absolutely not.
23      Q    How did that document come to be provided
24  by Mr. Pandit?
25      A    I don't recall.

Page 77

1       Q    Did you know at one time?
2       A    No.
3       Q    Have you gotten any documents from Amy
4   Warren?
5       A    No.
6       Q    Provided any documents to Amy Warren?
7       A    No.
8       Q    Who is Mannel Nunez?
9       A    A former Stelor employee. I'm not sure
10  what her position was. She worked there. I don't
11  know when for Stelor Productions in some capacity
12  involving marketing or something to that effect.
13      Q    What information do you believe that she
14  has that's relevant to your contract claims?
15      A    I had one conversation with her, I
16  believe, involving some improprieties that she
17  personally witnessed, and I don't think I spoke to
18  her again after that.
19      Q    Have you gained any documents or given any
20  documents from her, to her?
21      A    No.
22      Q    When did you speak to her?
23      A    Many, many months ago.
24      Q    More than a year?
25      A    No, less than a year.

(Pages 74 to 77)

Page 78

1   Q   What improprieties?
2   A   Some sexual harassment claims that she had
3   mentioned to me, improprieties involving Mr. Esrig.
4   Q   Improprieties relating to sexual
5   harassment?
6   A   Correct.
7   Q   Anything else?
8   A   Not that I can recall at this time.
9   Q   Did you discuss her bringing this suit
10  against Stelor?
11  A   No, I don't believe so.
12  Q   Are you sure?
13  A   I'm pretty sure. Not that I can recall.
14  When you say bringing what suit against Stelor.
15  Q   Any suit.
16  A   To sue Stelor Productions?
17  Q   What about Esrig, did you discuss with
18  Mannel Nunez her bringing any kind of a lawsuit
19  against Stelor or Mr. Esrig?
20  A   Not that I can recall.
21  Q   Who is Fred Hildabrand?
22  A   He was a business manager of Mr. Esrig's
23  former employee.
24  Q   Did you speak to him?
25  A   Many times.

Page 79

1   Q   What information do you believe he has?
2   A   He was the assistant who worked with
3   Mr. Esrig's assistant or some official capacity at
4   Stelor Productions. He was assigned to working with
5   me on several projects. I have not spoken to him
6   since he left his employment.
7   Q   Which was when?
8   A   I don't know.
9   Q   Approximately? Can you give me a year?
10  A   Yes, a year ago probably.
11  Q   Before or after you terminated the
12  agreement?
13  A   I don't know that answer.
14  Q   What specifically do you think
15  Mr. Hildabrand knows that relates to the contract
16  claims?
17  A   I have not spoken to him about any of that
18  at this point.
19  Q   As you sit here today do you think
20  Mr. Hildabrand has any information that specifically
21  relates to the contract claims?
22  A   Absolutely.
23  Q   What?
24  A   The lack of Stelor Productions' reasonably
25  commercializing the Google's intellectual property.

Page 80

1   Q   Anything else?
2   A   Not that I can recall.
3   Q   What do you mean by that?
4   A   I think Mr. Hildabrand, if he was put
5   under oath and testified truthfully, could share
6   with the court and the jury a number of
7   improprieties that were done that he witnessed
8   personally while he was working for Stelor
9   Productions.
10  Q   Have you ever put Stelor on notice that
11  those so-called improprieties are a basis for you
12  terminating the contract?
13  A   No.
14  Q   Have you gotten any documents from
15  Mr. Hildabrand?
16  A   Not that I can recall.
17  Q   Have your lawyers gotten any documents
18  from Mr. Hildabrand?
19  A   Not that I can recall.
20  Q   As you sit here today can you confirm that
21  no documents were provided to you or your lawyer by
22  Mr. Hildabrand?
23  A   I don't believe there were, I mean aside
24  from him sending me e-mails.
25  Q   Have you provided Mr. Hildabrand with any

Page 81

1   documents?
2   A   No, I have not.
3   Q   Who is Rebecca Gardner?
4   A   Rebecca Gardner was also a former employee
5   of Stelor Productions. I don't know what her
6   capacity was. She is an ex-employee.
7   Q   If you call her to testify in this case
8   what do you expect her to say?
9   A   Since I have not spoken to her personally
10  at this point I cannot give you a definitive answer
11  on that.
12  Q   What information do you believe she has?
13  A   Possibly improprieties, again, consistent
14  with the rest of the names I have given you of
15  failure to commercially and reasonably commercialize
16  my intellectual property, and also some
17  improprieties involving her personal involvement
18  with Mr. Esrig.
19  Q   The improprieties that you believe all of
20  these people you've identified may have information
21  about, have you put Stelor on notice of the nature
22  of any of those improprieties?
23  A   I'm not sure what my former attorneys did
24  in that regard.
25  Q   As you sit here today can you think of any

(Pages 78 to 81)

Page 82

1 notice that was provided to Stelor of the
2 improprieties about which these people are believed
3 to have knowledge?
4    A    Well, according to this document
5 individuals likely to have discoverable information
6 it lists all employees of Stelor Productions. I
7 assume that covers those employees. As far as
8 notice --
9    Q    Notice.
10   A    I'm not sure. I don't know how to answer
11 for you.
12   Q    Have you gotten any documents from
13 Ms. Gardner?
14   A    No.
15   Q    Have you provided any documents to
16 Ms. Gardner?
17   A    No.
18   Q    Who is Sachi Soog?
19   A    Another former employee of Stelor
20 Productions.
21   Q    Have you exchanged any documents with
22 Sachi Soog?
23   A    No.
24   Q    What do you think Sachi Soog knows that's
25 relevant to your contract claims?

Page 83

1    A    Probably -- I had one conversation with
2 her, I believe. Again, improprieties in reference
3 to reasonable commercializing of the project, what
4 she witnessed there during the time that she was
5 employed and also mentioned about sexual harassment
6 allegations with Mr. Esrig.
7    Q    Is that a basis for your termination of
8 the contract, any of those things?
9         MR. COOPER: Object to the form.
10        THE WITNESS: I cannot give you that
11 answer definitive. I had one conversation with
12 her.
13 BY MR. KAPLAN:
14   Q    Have you put Stelor on notice of any of
15 the so-called improprieties that Ms. Soog told you
16 about?
17   A    I don't believe so.
18   Q    Kevin, recall the last name yet?
19   A    No. I think Kevin was a fiancee of
20 Rebecca Gardner at one point, I believe.
21   Q    Does Burr Sunday right, BURR?
22   A    Yes.
23   Q    Other than being Ms. Gardner's fiancee,
24 did he have any relationship to Stelor?
25   A    He worked there. We had, I believe, one

Page 84

1 or two conversations in the past 6 or 7 months.
2    Q    What information do you believe he has
3 that's relevant to your contract claims --
4    A    He had given me a lot of substance about
5 what he witnessed while he was at Stelor
6 Productions. Would not testify unless he was
7 subpoenaed, but I think he would have some valuable
8 information to share with the court about what he
9 witnessed when he worked for Stelor Productions and
10 lived in the house of Mr. Esrig.
11   Q    Have you put Stelor on notice of any of
12 the information that you think Mr. Burr testified
13 about?
14   A    Not that I believe so. I don't believe
15 so.
16   Q    Greg Langford is a current employee of
17 Stelor, correct?
18   A    I don't know that to be a fact.
19   Q    When have you spoken to Mr. Langford?
20   A    I have not spoken to Mr. Langford.
21   Q    What information do you believe he has
22 relevant to the contract claims?
23   A    I was informed that there was a
24 conversation between him and Mr. Sagan not too long
25 ago, and I understand that he has worked for Stelor

Page 85

1 Productions or I believe he was former employee
2 still working for them. I'm not privy to that, and
3 that he perhaps would testify, would have
4 significant information to share in reference to the
5 improprieties that he personally witnessed at Stelor
6 Productions or perhaps personally witnessed, and
7 that's it.
8    Q    Have you gotten any documents, you or your
9 lawyers gotten any documents from Greg Langford?
10   A    No.
11   Q    Have you or your lawyers gotten any
12 documents from Kevin Burr?
13   A    I don't believe so.
14   Q    Have you or your lawyers hired a private
15 investigator at any time in connection with Stelor?
16   A    I believe my lawyers did do so.
17   Q    When?
18   A    I don't recall.
19   Q    During what period -- is that private
20 investigator still retained on your behalf?
21   A    No.
22   Q    Was it prior to your termination of the
23 contract?
24   A    I believe so.
25   Q    Who was the private investigator --

(Pages 82 to 85)

Page 86

1    A    Excuse me, let me correct that.
2         I'm not sure about that answer whether
3    they were prior or during or after the
4    termination.
5    Q    What was the name of the private
6    investigator?
7    A    Never met the private investigator.
8    Q    Did you pay for that private investigator?
9    A    No.
10   Q    Did you he ever talk to the private
11   investigator?
12   A    No.
13   Q    Did you ever see any information from the
14   private investigator?
15   A    No.
16   Q    What information, if any, do you
17   understand the private investigator to have
18   provided?
19        MR. COOPER: To the extent that you would
20   have received that information from your
21   communications with your attorneys that's
22   attorney-client privilege and don't answer. If
23   you can answer that outside of that
24   communication then you can answer.
25        THE WITNESS: Right. The answer is I

Page 87

1    received information from my attorney, that's
2    attorney-client privileged.
3    BY MR. KAPLAN:
4    Q    To your knowledge was any of the
5    documentation filed in connection with the lawsuits,
6    either the present one or the prior one in front of
7    Judge Hurley obtained from this private
8    investigator?
9         MR. COOPER: Same objection, same
10   instructions. If you can answer that without
11   revealing attorney-client privileged
12   communication then go ahead.
13        THE WITNESS: Cannot.
14   BY MR. KAPLAN:
15   Q    Let me ask you this question, yes or no.
16   Do you know whether or not filings in the lawsuits
17   were obtained from that private investigator?
18   A    I don't know.
19   Q    Have you gotten any information -- have
20   you gotten any documents from Julie or Dean Depeu?
21   A    No.
22   Q    Have you spoken to them since the
23   commencement of the litigation?
24   A    No.
25   Q    What information do you think they will

Page 88

1    have relevant to the contract claims?
2    A    Until I speak to them I would not have any
3    knowledge other than they worked for Mr. Esrig and
4    Stelor Productions as basically his right and left
5    hands, and I'm sure that if they were testifying
6    under oath that they would provide information to
7    substantiate, again, the lack of reasonable
8    commercializing the property and the improprieties
9    they personally witnessed while working for Stelor
10   Productions.
11   Q    Have you provided Stelor notice of any of
12   the alleged improprieties about which you think the
13   Depues might testify?
14   A    Not at this time.
15   Q    Who is James Maitland?
16   A    Jack Maitland, that's the name that I know
17   him to go by. He was the person initially
18   responsible for bringing Mr. Esrig to Aurora
19   Collections.
20   Q    What do you think Jack Maitland knows
21   that's relevant to the contract claims?
22   A    I think Jack Maitland would be able to
23   provide testimony that would be able to prove a
24   substantial amount of deceit on behalf of Stelor
25   Productions and Mr. Esrig personally with reference

Page 89

1    to what promises were made even to Jack himself that
2    were never kept. Also with reference to the
3    contract claims of making promises to Aurora
4    productions, that Google would be a huge success,
5    and to this date they have not received a penny from
6    those promises. And I believe Mr. Maitland would be
7    a material witness on my behalf testifying to
8    Mr. Esrig's credibility and his lack of being able
9    to substantiate many things that he promised
10   Mr. Maitland and also promised me to Mr. Maitland
11   that would take place.
12   Q    What promises were made to you that
13   Mr. Maitland may have knowledge about?
14   A    That I be made a multimillionaire in a
15   short period of time with reference to my project
16   and my characters, and that the stock options I was
17   promised and I have never received would be worth
18   $1,000 a share in a short period of time. And a lot
19   of other things that nothing ever came from.
20   Q    Anything else?
21   A    Not that I can recall at this time.
22   Q    Have you put Stelor on notice of any of
23   those things that you think Mr. Maitland may testify
24   about?
25   A    Not that I can recall -- I don't believe

(Pages 86 to 89)

Page 90

1   so, I'm not sure.
2      Q   Who is Chris Farrington?
3      A   Chris Farrington was the former president
4   of Aurora Collections Incorporated, the company
5   that's Stelor Productions eventually acquired the
6   asset purchase of the Google.
7      Q   What information do you think
8   Mr. Farrington has related to the contract claims?
9      A   I think he would make a character witness
10  on my behalf in reference to conversations and
11  promises he was made by Mr. Esrig or on behalf of
12  Stelor Productions, and also the fact that up until
13  this date there has not been a penny paid to Aurora,
14  promises that were not kept, things of that nature.
15     Q   Anything else?
16     A   Not that I can recall at this time.
17     Q   Who is Brian Blomquist?
18     A   CEO of Aurora collections and past
19  president or perhaps still the president.
20     Q   Did you intend Mr. Blomquist to be on your
21  list of people who may have discoverable
22  information?
23     A   I believe so.
24     Q   And what would that be?
25     A   His personal dealings with Mr. Esrig

Page 91

1   during the course of the asset purchase, promises
2   made to him as well, and the fact that as a CEO of
3   the company there has been certain allegations that
4   were unsubstantiated about me personally, some
5   disparaging comments made about me by Mr. Esrig and
6   so forth from Mr. Blumquist.
7      Q   Anything else?
8      A   I believe there was some controversy
9   involving the asset purchase between Mr. Esrig and
10  Mr. Blumquist and some possible improprieties
11  involving the actual assignment or the actual
12  contract between Aurora and Stelor Productions.
13     Q   Anything else?
14     A   Not that I can think of.
15     Q   Have you put Stelor on notice that any of
16  those things are a basis for your alleged
17  termination of the contract?
18         MR. COOPER:  Object to the form.
19         THE WITNESS:  I'm not sure if my lawyer
20     did so or not.
21  BY MR. KAPLAN:
22     Q   As you sit here today are you aware of any
23  notice of those things to Stelor?
24     A   No.
25     Q   Other than the people who we have just

Page 92

1   discussed as listed on your initial disclosures and
2   the other names you provided me, is there anybody
3   else you think is likely to have discoverable
4   information relative to the contract claims?
5      A   Not that I can recall at this time.
6      Q   Take a look at the list of documents
7   that's on the third page of Exhibit 103 -- I'm
8   sorry, Exhibit 102.
9      A   Okay.
10     Q   Are there any other documents that you
11  believe relate to the contract claims other than
12  what you told me before the contracts themselves and
13  the pleadings that have been filed in the cases?
14         MS. CALABRIA:  Objection to form.
15         MR. COOPER:  Same objection.
16  BY MR. KAPLAN:
17     Q   You can answer.
18     A   I'm reading the list.
19         (Pause.)
20     A   I'm going to want to add to some of this
21  list the documents that I was provided by the
22  recording artist in reference to the fact that the
23  Grammy awards information that was erroneously
24  placed on the Web site.  I'm going to want to add
25  the printouts that I made of the Web site with the

Page 93

1   one million downloads.
2         I am going to want to add to the list of
3   printouts of the Go Goos that Mr. Esrig and Stelor
4   Productions were put on notice about changing the
5   name of the characters.  I'm going to want to
6   want to put on there some of the letters I believe
7   that I'm not sure if they were introduced into
8   evidence or not between myself and Mr. Esrig
9   involving my putting them on notice of certain
10  things that he has not done as he had promised and
11  things of that nature.
12     Q   Anything else?
13     A   Not that I can think of at this time.
14     Q   What's the date of your letters with
15  Mr. Esrig?
16     A   I don't know that answer.
17     Q   Give me an approximate time period, the
18  last six months?
19         MS. CALABRIA:  Object to form.
20         THE WITNESS:  I can't give you that
21     answer.  It could be from the very inception of
22     our dispute.  I have to go and search the file.
23  BY MR. KAPLAN:
24     Q   About how many letters are there?
25     A   Quite a few.

(Pages 90 to 93)

Page 94

```
 1      Q    Would you hand me that exhibit back.
 2           What's your current business,
 3   Mr. Silvers?
 4      A    My current business?  I'm currently
 5   working as a roof tile consultant.
 6      Q    Are you working with a company?
 7      A    No, independent.
 8      Q    Is there a name under which you do that
 9   business?
10      A    Roof Tile Finders.
11      Q    How long have you been doing that?
12      A    Probably since shortly after October 2005.
13      Q    Have you had any other jobs since October
14   2005?
15      A    Not that I can remember.  Not that I can
16   recall.
17      Q    What do you do as a roof tile consultant
18   try and sell roof tiles?
19      A    That's one of the areas of my business
20   model.
21      Q    What else?
22      A    What else what?
23      Q    What else do you do other than try to sell
24   roof tiles?
25      A    I consult with contractors from time to
```

Page 95

```
 1   time about their roof tile needs with homeowners.
 2   That's basically it.
 3      Q    Do you have any employees?
 4      A    No.
 5      Q    What was your position or employment
 6   before October 2005?
 7      A    I worked as a consultant for Stelor
 8   Productions.
 9      Q    That was from June of 2002 to December
10   2004, right?
11      A    That sounds about right.
12      Q    What did you do from December 2004 to
13   October 2005?
14      A    I believe I had a settlement agreement
15   with Stelor Productions that provided me a monthly
16   income.
17      Q    Did you have any work at that time other
18   than obtaining the income under the settlement
19   agreement?
20      A    No, I don't believe so.
21      Q    From June of 2002 to December 2004, did
22   you do anything other than consulting for Stelor?
23           MR. COOPER:  Object to the form.
24           THE WITNESS:  What's the date again?
25
```

Page 96

```
 1   BY MR. KAPLAN:
 2      Q    June 2002 to December 2004?
 3           MR. COOPER:  Same objection.
 4           THE WITNESS:  Not that I can recall.  That
 5   was my sole source of income if I recall
 6   properly.  Wait a minute now.  I think I was
 7   involved with Melaleuca.  I did some small
 8   sales with Melaleuca, which is an MLS company,
 9   multiple -- what's it called, multilevel
10   marketing company.
11   BY MR. KAPLAN:
12      Q    Melaleuca, like the plant?
13      A    Yes.
14           MR. KAPLAN:  We are going to take a short
15   pause while we change the tape.
16           VIDEO OPERATOR:  We are off the record.
17           (Thereupon, a brief recess was
18           taken.)
19           VIDEO OPERATOR:  We are on the record.
20   BY MR. KAPLAN:
21      Q    What was your employment before June of
22   2002, Mr. Silvers?
23      A    Before June of 2002, I think I was working
24   for a company called Ameristaff, if I'm not
25   mistaken.  It was an employment compensation
```

Page 97

```
 1   company.
 2      Q    How long did you work for Ameristaff?
 3      A    I think a year or so.
 4      Q    What was your position there?
 5      A    I was involved in sales.
 6      Q    What was your job before approximately
 7   June of 2001 when you started working with
 8   Ameristaff?
 9      A    I don't recall.  Let's see, 2001 --
10      Q    What job do you recall having before
11   Ameristaff?
12      A    I was self-employed in the music business.
13   I had done recording studio projects.  I was
14   involved with producing music, things of that
15   nature.
16      Q    During what period of time were you
17   involved in the music business?
18      A    From 1972 until probably right through the
19   Aurora days when I was involved in producing that
20   music for Aurora.
21      Q    Did you have any specific employment --
22      A    Excuse me, let me refresh my memory.  You
23   said before 2002.  Before 2002 I was working as a
24   creative consultant for Aurora productions from 1999
25   to 2002.  Prior to 1999, 2002 I was involved with
```

(Pages 94 to 97)

Page 98

1  promoting my characters and licensing my characters
2  to SKM Productions in 1999. Prior to 1999 somewhere
3  in the 1996, 1997 area I was involved with
4  Ameristaff, and all of the years prior to that I was
5  involved in some capacity one way or the other in
6  the music business.
7      Q   What was your -- so the date you worked
8  for Ameristaff were '96 to '97, correct?
9      A   No. I think '97, '98, I'm not sure.
10  Maybe '96, and of '96 to the middle of '97 it was a
11  year contract.
12     Q   Alright. And what job, if any, did you
13  have before Ameristaff?
14         MR. COOPER: Objection, asked and
15  answered.
16         THE WITNESS: Before Ameristaff, 1996 back
17  to 1997 I was incarcerated.
18  BY MR. KAPLAN:
19     Q   What were the dates of your incarceration?
20         MR. COOPER: Object to the form.
21         THE WITNESS: I don't recall.
22         MR. KAPLAN: What's your objection to the
23  form?
24         MR. COOPER: Preserving my objections to
25  admissibility of the incarceration.

Page 99

1          MR. KAPLAN: You don't need to object to
2  admissibility just form. If there is a form
3  tell me what it is so I can correct it,
4  otherwise you don't need to make it.
5          MS. CALABRIA: Kevin, I'm also going to
6  object to form in that all these questions were
7  asked of Mr. Silvers during my deposition, or
8  at least the question of incarceration.
9          MR. KAPLAN: That's not a form objection.
10         MS. CALABRIA: So asked and answered, I
11  guess, is my objection.
12         MR. COOPER: That's the form objection.
13         MR. KAPLAN: Asked by you but not by me.
14         MS. CALABRIA: Okay.
15  BY MR. KAPLAN:
16     Q   About how long were you incarcerated?
17         MR. COOPER: Same objection.
18         THE WITNESS: Nine years and six months.
19  BY MR. KAPLAN:
20     Q   So that was about 19 --
21     A   '87 through 1996.
22     Q   What was -- do you recall your employment
23  history before '87?
24         MR. COOPER: Objection, asked and
25  answered.

Page 100

1          THE WITNESS: I had my own recording
2  studios, record companies and production
3  company.
4  BY MR. KAPLAN:
5      Q   What's your education background,
6  Mr. Silvers? Did you graduate from high school?
7      A   I graduated from high school.
8      Q   Do you recall when?
9      A   1964.
10     Q   Did you attend college?
11     A   Went to Monmouth College in 1964 to 1969.
12     Q   Did you get a degree?
13     A   I got my Bachelors of Science degree.
14     Q   Any other degrees?
15     A   I got my master's degree at Wagner College
16  in 1973. I got my paralegal certification
17  certificate in Blackstone School of Law in 19 -- let
18  me think, 1989, 1990, somewhere around there.
19     Q   Other than getting a paralegal certificate
20  did you ever attend law school?
21     A   No.
22     Q   Alright. I showed you a little while ago
23  what I'm going to hand back to you Exhibit 103. Can
24  you identify this?
25     A   My license distribution manufacturing

Page 101

1  agreement.
2      Q   Between you and Stelor, correct?
3      A   Yes.
4      Q   And pursuant to this agreement just so we
5  are clear you, Steven Silvers, are the licensor,
6  correct?
7      A   Yes.
8      Q   And Stelor is the licensee, right?
9      A   Yes.
10     Q   Take a look at the first page. The second
11  to the last whereas clause where it says, "Licensee
12  desires to obtain from licensor an exclusive license
13  to use, manufacture, have manufactured and sell
14  licensed products in the territory." And it goes
15  on. What did exclusive mean to you?
16     A   Exclusive is the sole, the sole right.
17     Q   All rights to use the licensed products
18  under the license agreement belong to Stelor, is
19  that fair to say?
20         MR. COOPER: Object to the form.
21         THE WITNESS: According to the agreement
22  so long as Stelor doesn't breach the agreement
23  that's correct.
24  BY MR. KAPLAN:
25     Q   That whereas clause refers to a term

(Pages 98 to 101)

Page 102

1    Territory with a capital T. If you look at
2    Schedule A to the agreement, territory refers to
3    global worldwide rights. Is that your
4    understanding?
5        A    Where are we now? Yes. Okay. That's
6    correct.
7        Q    So Stelor was to be the exclusive or sole
8    user of the licensed products everywhere in the
9    world, right?
10       A    Correct.
11       Q    Take a look at the license grant. Do you
12   see that Article 1 of the agreement?
13       A    Yes.
14       Q    It says there that, "The grant of the
15   license is exclusive even as to licensor." What
16   does that mean to you?
17       A    I don't really know.
18       Q    Does that mean Stelor was to have the sole
19   and exclusive right to use the licensed property
20   even with respect to you?
21           MR. COOPER: Objection to the form.
22   BY MR. KAPLAN:
23       Q    You can answer.
24       A    I don't know.
25       Q    Was it your understanding that under the

Page 103

1    term of the license while the license is in effect
2    you no longer have any rights to use the licensed
3    property; is that correct?
4            MR. COOPER: Object to the form.
5            THE WITNESS: Yes.
6    BY MR. KAPLAN:
7        Q    And just so we are clear, I'm using the
8    term licensed property. What do you understand that
9    to be?
10       A    I think it's outlined in here what that
11   is. I believe in Schedule A that speaks to the
12   definition of the licensed property.
13       Q    What's your understanding of it?
14       A    The characters, the trademarks. I guess
15   it's the service marks and the merchandise that
16   Stelor was going to go forward and manufacture or
17   sublicense, things of that nature.
18       Q    Basically everything related to the
19   Googles From Goo, correct?
20       A    I believe that that may be accurate with
21   the exception of the domain names, the Web site.
22   That is not mentioned in here specifically. I don't
23   believe it is.
24       Q    But the -- what do you mean by the domain
25   name www.google.com?

Page 104

1        A    The domain names I don't know 80 or 90 of
2    them and the Web site. I am not sure it mentioned
3    the Web site in that characterization of licensed
4    intellectual property.
5        Q    But it's your understanding that under the
6    license Stelor had the exclusive right to use the
7    domain names and the Web site, correct?
8        A    That's been a dispute. I'm not sure of
9    that so I'm not going to give you a yes or no to
10   that. I know what it says here so I'm going to
11   defer to what it says here licensed intellectual
12   property as being that rate. And I don't see it in
13   here as the domain names of the license agreement --
14   I mean, excuse me, the Web site being listed.
15       Q    Is it your position under the license that
16   you still maintain the right to use the domain
17   names, the Google domain names?
18       A    I have the exclusive right as the
19   registrant of those domain names and I'm the
20   exclusive owner of those domain names and the
21   exclusive owner of the Web site domain name. Not
22   the content but the domain name.
23       Q    Is it your position that you have the
24   right to use any of those domain names while the
25   license is in effect, yes or no?

Page 105

1            MR. COOPER: Object to the form.
2            THE WITNESS: I'm not going to give you a
3    yes or no to that answer. I'll give you I
4    don't know.
5    BY MR. KAPLAN:
6        Q    You don't know?
7        A    I don't know because that has been a
8    question.
9        Q    Do you claim that you have the right to
10   use those domain names while the license is in
11   effect?
12       A    I don't know.
13       Q    Have you attempted to use any of the
14   Google domain names at any time while the license
15   was in effect?
16       A    No, not until after Stelor was terminated,
17   then there was an issue involving changing the MS.
18       Q    Take a look at Schedule A if you would.
19   On the 5th line down --
20       A    Of what section?
21       Q    Licensed intellectual property.
22       A    Okay.
23       Q    The end of that line it specifically says,
24   computer Web sites, correct?
25       A    It says computer Web sites.

(Pages 102 to 105)

28

## Page 106

1    Q    What do you understand that to mean?
2    A    The content of the Web site not the actual
3  domain name.
4    Q    It doesn't say content of computer Web
5  sites, does it?
6    A    No.
7    Q    It just refers to computer Web sites
8  period, correct?
9    A    That's correct. That is correct.
10    Q    Turn back, if you would, to page 2 of the
11  license agreement under the section compensation.
12    A    Okay.
13    Q    Under the license agreement Stelor agrees
14  to pay you a royalty in the amount recited in
15  Schedule A, correct?
16    A    Correct.
17    Q    The only payments that you receive under
18  the license are those royalties, correct?
19        MR. COOPER:  Object to the form.
20        THE WITNESS:  No.  That is not correct.
21    There is a clause somewhere where there is a
22    minimum guarantee of 100,000 per year.  Under
23    page 6 it letter C it speaks to the issue of,
24    "Additionally, if after five years of the
25    initial intellectual property license there are

## Page 107

1    three consecutive years during which royalty
2    payments to licensor are less than $100,000 the
3    licensor has the option to cancel this
4    agreement in accordance with Section 9,
5    termination paragraph A."
6  BY MR. KAPLAN:
7    Q    But that relates to the same royalty
8  payments, correct, the same royalties as specified
9  in paragraph 3A, right?
10    A    Yes, I believe so.
11    Q    It just says that royalties have to be at
12  least $100,000 in year eight of the license
13  agreement, right?
14    A    No.  In year 5 of the license agreement
15  and year 6 of the license of the agreement and year
16  7 of the license agreement and if during any three
17  of those years there was a payment of less than
18  $100,000 then the license agreement, if it's two
19  consecutive years, is cancelled at my option.
20    Q    Okay.  And that just -- does that include
21  advance royalties, Mr. Silvers?
22    A    Absolutely not.
23    Q    So your view is that if Stelor pays you
24  more than $100,000 in advance royalties for each of
25  those three consecutive years after five years of

## Page 108

1    the license agreement you can still cancel it?
2    A    Yes.  Advance royalties are not royalties.
3  It doesn't speak to advance royalties as being part
4  of the verbiage in this section.
5    Q    Does it exclude advance royalties?
6        MR. COOPER:  Object to the form.
7        THE WITNESS:  That's for the court to
8    decide, I guess.
9  BY MR. KAPLAN:
10    Q    Well, in your view where does it exclude
11  advance royalties, it just says royalty payments,
12  right?
13        MR. COOPER:  Objection to the form, the
14    documents speaks for itself.
15  BY MR. KAPLAN:
16    Q    You can answer.
17    A    The document speaks for itself.
18    Q    All the documents says is royalty
19  payments, correct?
20    A    Correct.
21    Q    Is there anything in this document, as you
22  understand it, that prohibits Stelor from paying you
23  advance royalties?
24    A    No, not at all.
25        MR. COOPER:  Object to the form.

## Page 109

1  BY MR. KAPLAN:
2    Q    Alright.  Take a look at Schedule A.  The
3  very last page of the agreement where it refers to
4  royalty rate.
5    A    Okay.
6    Q    Do we agree that the royalty rate is 6% of
7  the net sales?
8    A    That's what it says.
9    Q    And 3% of net sales based on derivative
10  products, right?
11    A    Yes.
12    Q    What do you understand derivatives to be?
13    A    As explained on page 10, two pages over,
14  one page over.
15    Q    What's your understanding of that
16  provision?  What's a derivative under this
17  agreement?
18    A    Whatever that provision states in this
19  agreement is what it is.  Me giving you an
20  explanation of it is not going to serve any purpose.
21  This is engraved in stone, what it says right here
22  on this document and that's what we are going to
23  abide by.
24    Q    But Stelor comes up with some kind of
25  technology, let's say, for example, Stelor creates a

(Pages 106 to 109)

29

Page 110

1  search engine that's even better than Google Inc.'s.
2  Google incorporates it.
3      A    A search engine?
4      Q    A search engine, yes.  Do you think that's
5  a derivative under this agreement?
6          MR. COOPER:  Object to the form.
7          THE WITNESS:  If used in conjunction with
8      my characters, absolutely.
9  BY MR. KAPLAN:
10     Q    And what if it's not?
11         MR. COOPER:  Object to the form.
12         THE WITNESS:  Then it would not be
13     considered derivative.
14  BY MR. KAPLAN:
15     Q    So Stelor under this agreement can engage
16  in other businesses, develop other technologies.
17  There is nothing that prevents Stelor from doing
18  that, correct?
19         MS. CALABRIA:  Objection form?
20         MR. COOPER:  Object to form.
21         THE WITNESS:  The document speaks for
22     itself the way it's interpreted.  If you would
23     like for me to read it on the record I'll be
24     happy to do so.
25

Page 111

1  BY MR. KAPLAN:
2      Q    No.  I'm asking for your understanding.
3      A    I can't give you that understanding.  It's
4  what it says in this agreement, and to my
5  understanding based upon what Steve and I --
6  Mr. Esrig and I agreed to, the derivatives would be
7  basically anything that was used in conjunction with
8  indirect or directly with the Google's property
9  would be considered derivative.
10     Q    Sir, is there anything in the agreement as
11  you understand it that prevents Stelor from engaging
12  in businesses other than development of the Google
13  From Goo?
14     A    That's a good question.  I don't have that
15  answer.  I mean, I never thought about that.
16         MR. COOPER:  Object to the form.
17         THE WITNESS:  That's an interesting
18     question as to whether or not.
19  BY MR. KAPLAN:
20     Q    As you sit here today.  As you sit here
21  today do you have an understanding whether or not
22  the license agreement prevents Stelor from engaging
23  in other businesses?
24         MR. COOPER:  Object to the form.
25         THE WITNESS:  No.  I really can't answer

Page 112

1      that question for you as a matter of fact.  I
2      never thought of that.  That's something I need
3      to explore.  That's interesting.
4  BY MR. KAPLAN:
5      Q    Now, turn back to paragraph 2 where it
6  deals with compensation.
7      A    Okay.
8      Q    3B relates to how the royalties are
9  calculated, do you see that?
10     A    3B, where are we, what page?
11     Q    Two.
12     A    Okay.
13     Q    It says, "The royalties shall be
14  calculated on a quarterly calendar basis on
15  collected funds."  Do you agree that collected funds
16  means the funds actually collected by Stelor?
17     A    Where are we now, sir?
18     Q    3B.
19     A    I'm not reading what you are saying.  I'm
20  on page 2 at 3B and I'm right here.
21         MR. COOPER:  There is the word collective.
22  BY MR. KAPLAN:
23     Q    "The royalty owed licensor shall be
24  calculated on quarterly calendar basis on collected
25  funds."  My question is, do you agree that collected

Page 113

1  funds refers to the funds actually collected by
2  Stelor?
3      A    Yes.
4      Q    And it requires the payments to be no
5  later than 30 days after the termination of the
6  preceding full calendar quarter, correct?
7      A    Yes.
8      Q    So, for example, the first quarter of the
9  year ends March -- how many days does March have 31,
10  March 31st, so the payment is due at the end of
11  April, correct?
12     A    Okay.
13     Q    And it's the same with respect to the
14  second quarter?
15     A    Third and fourth.
16     Q    Second quarterly payment is due the end of
17  July, correct?
18     A    Yes.
19     Q    Stelor has 30 days -- 30 day grace period,
20  if you will, to make the payment, correct?
21     A    Correct.
22     Q    And paragraph 3C talks about a written
23  royalty statement to be provided in connection with
24  each payment, correct?
25     A    In a form acceptable to licensor.

(Pages 110 to 113)

**Page 114**

1  Q   Did you ever tell Stelor what form you
2  required?
3  A   I never had an opportunity to.
4  Q   Stelor is provided with a number of
5  royalty statements, correct?
6  A   Yes.
7  Q   Have you ever advised Stelor that the form
8  is unacceptable?
9  A   I'm not sure whether my letters speaks to
10  that or not. I need to do some research on that.
11  Q   Is the form of the royalty statements you
12  have been provided every quarter since January 2005
13  unacceptable?
14  MR. COOPER: Object to the form.
15  THE WITNESS: 2005? January 2005, I'm not
16  sure how many quarterly royalty statements I
17  received since January 2005.
18  Certainly I have not received, to the best
19  of my knowledge, all of the quarterly
20  statements that I was supposed to have
21  received.
22  BY MR. KAPLAN:
23  Q   We will get to that in a minute. Put
24  aside whether you received all or not. You
25  certainly received some, correct?

**Page 115**

1  A   Yes.
2  Q   And are the form -- is the form of the
3  statements that you have received acceptable or not?
4  MR. COOPER: Object to the form.
5  THE WITNESS: Based upon the fact that
6  there was no royalties due and owed it was just
7  zero for the most part. I would have to say
8  that the statements were okay.
9  BY MR. KAPLAN:
10  Q   Turn the page if you would. Look at
11  Section 3F referring to late payments, do you see
12  that?
13  A   Okay.
14  Q   Do you agree that the license agreement
15  specifically contemplates that payments may be late?
16  MR. COOPER: Object to the form.
17  THE WITNESS: Payments on royalties?
18  BY MR. KAPLAN:
19  Q   Correct.
20  A   Okay.
21  Q   And the way the agreement deals with that
22  is to impose interest at the rate of 1% per month,
23  correct?
24  MR. COOPER: Object to the form.
25  THE WITNESS: Okay.

**Page 116**

1  BY MR. KAPLAN:
2  Q   I'm sorry, what was that answer?
3  A   Yes, okay, I agree.
4  Q   Do you agree there is no statement in this
5  agreement that time is of the essence with respect
6  to those payments?
7  MR. COOPER: Objection to the form.
8  THE WITNESS: I agree to that.
9  BY MR. KAPLAN:
10  Q   Take a look at Article 4 dealing with
11  audit. I understand you had an auditor engaged
12  after the date of the settlement agreement to do an
13  audit on Stelor, right?
14  A   I believe that's correct.
15  Q   What was the name of the firm?
16  A   I don't recall.
17  Q   Who engaged that auditor?
18  A   KTT law.
19  Q   Take a look at Section 5 dealing with
20  warranties and obligations. 5A recites the
21  representations and warranties that you made as a
22  licensor under this agreement, right?
23  A   Uh-huh.
24  Q   Were those representations and warranties
25  accurate at the time you made them?

**Page 117**

1  A   Yes.
2  Q   Accurate as of the date of the agreement
3  June 2002, right?
4  A   Yes.
5  Q   Are they still accurate today?
6  A   As far as I'm concerned, yes.
7  Q   Take a look at A3.
8  MS. CALABRIA: I'm sorry, which?
9  BY MR. KAPLAN:
10  Q   A3, "Licensor owns the exclusive rights in
11  and to the licensed intellectual property." It goes
12  on. Do you see that provision?
13  A   Uh-huh.
14  Q   Do you understand Google is making some
15  claims in this lawsuit that that statement by you is
16  not accurate. Do you agree?
17  MR. COOPER: Object to the form.
18  MS. CALABRIA: Object to form.
19  THE WITNESS: I guess if that's what the
20  lawsuit is about I assume that's accurate.
21  BY MR. KAPLAN:
22  Q   Google is contesting your exclusive
23  ownership to the rights covered by the intellectual
24  property, right?
25  MS. CALABRIA: Object to form.

(Pages 114 to 117)