**Page 118**

```
 1        MR. COOPER:  Object to the form.
 2        THE WITNESS:  I believe that's an issue at
 3    hand, yes.
 4    BY MR. KAPLAN:
 5     Q    And if Google wins in connection with that
 6    claim do you agree that would put you in breach of
 7    this warranty provision?
 8        MR. COOPER:  Object to the form.
 9        THE WITNESS:  I don't have that answer.  I
10    mean that's a legal answer to be answered.
11    BY MR. KAPLAN:
12     Q    If Google wins its claim and your
13    ownership of the trademark rights, the Google mark
14    is invalidated, wouldn't that put you in breach of
15    this representation, Mr. Silvers?
16        MR. COOPER:  Object to the form.
17        THE WITNESS:  It would appear that it
18    would.
19    BY MR. KAPLAN:
20     Q    Now, take a look at paragraph 6 if you
21    would.
22        MS. CALABRIA:  Excuse me.  What was
23    Mr. Silvers' response?
24        THE WITNESS:  It would appear that it
25    would.
```

**Page 119**

```
 1    BY MR. KAPLAN:
 2     Q    Take a look at paragraph 6, Article 6, are
 3    you there, page 4?
 4     A    Uh-huh.
 5        MR. COOPER:  Roman numeral VI down here.
 6    Notices quality control and samples.
 7    BY MR. KAPLAN:
 8     Q    Specifically paragraph C.
 9     A    Uh-huh.
10     Q    It says, "Prior to the commencement of
11    manufacturer and sale of the licensed products
12    licensee shall submit to licensor for his input at
13    no cost to licensor a reasonable number of samples."
14    Do you see that provision?
15     A    Uh-huh.
16     Q    And you complain as one of the basis for
17    terminating the agreement that Stelor failed to
18    comply with that provision, right?
19     A    That's correct.
20     Q    Now we agree -- or rather do we agree that
21    the timing for Stelor's obligation to provide you
22    with samples is prior to commencement of manufacture
23    and sale of the products, right?
24        MS. CALABRIA:  Object to form.
25        MR. COOPER:  Object to the form.
```

**Page 120**

```
 1    BY MR. KAPLAN:
 2     Q    You can answer.
 3     A    Yes, that's what it says, yes.
 4     Q    So until Stelor starts to manufacture and
 5    sell products is it correct that Stelor has no
 6    obligation to show you samples?
 7     A    No, that's not correct.
 8     Q    Why not?
 9     A    Read what it says, "Prior to the
10    commencement of manufacturing" it could be a year,
11    it could be six months, it could be two months.
12    They have to have prototypes made before they could
13    manufacture.  So it says prior to the commence of
14    manufacturing.  It doesn't mean the day before, two
15    days before, and the sale of licensed product.
16     Q    Is it fair to say the provision fails to
17    specify exactly how long prior to the commencement
18    of manufacture and sale samples have to be provided
19    to you?
20        MR. COOPER:  Object to the form.
21        THE WITNESS:  I think a reasonable and
22    prudent person would know that's not the day
23    before manufacture.  So I would have to say
24    that it's not spelled out specifically, but a
25    reasonably prudent person that would be reading
```

**Page 121**

```
 1    this would know that prior to the commencement
 2    of manufacturing I should have been provided
 3    with adequate samples for my input.
 4    BY MR. KAPLAN:
 5     Q    So basically you are saying it's a
 6    reasonable time prior to the commencement of
 7    manufacturing, right?
 8     A    I think so, yes.
 9        MR. COOPER:  Object to the form.
10        THE WITNESS:  Yes.
11    BY MR. KAPLAN:
12     Q    What do you think a reasonable time is?
13     A    30 days.
14     Q    Take a look at paragraph 8 of the
15    agreement, intellectual property protection.
16        MR. COOPER:  Sorry, paragraph 8 or Section
17    8.
18        MR. KAPLAN:  Section 8.  Thank you.  What
19    do you want me to call them paragraphs,
20    articles?
21        MR. COOPER:  Sections.
22    BY MR. KAPLAN:
23     Q    Sections, okay.  Section 8, 8A, "Licensor
24    hereby grants licensee all right, power, interest to
25    seek, obtain and maintain all intellectual property
```

Page 122

```
 1   rights associated with the licensed intellectual
 2   property and licensed trademarks, licensed
 3   copyrights and any other intellectual property
 4   rights granted herein."  Do you agree that's a
 5   pretty broad grant of rights to the licensee?
 6           MR. COOPER:  Object to the form.
 7           THE WITNESS:  Yes.
 8   BY MR. KAPLAN:
 9       Q    Essentially you gave the licensee all
10   rights and powers with respect to the protection of
11   the intellectual property, is that fair to say?
12           MR. COOPER:  Object to the form.
13           THE WITNESS:  The document speaks for
14       itself.
15   BY MR. KAPLAN:
16       Q    Is that your understanding?
17       A    Yes.
18       Q    Why did you do that?
19       A    That's what Stelor and I agreed to through
20   our negotiations between our lawyers.
21       Q    And you wanted Stelor to be responsible
22   for protecting the intellectual property, right?
23       A    Yes.  So long -- yes.
24       Q    You wanted Stelor to have that
25   responsibility and not you, correct?
```

Page 123

```
 1       A    That's what the document states.
 2       Q    And as part and parcel of that you agreed
 3   to stay out of Stelor's way with respect to the
 4   protection of the property, right?
 5           MR. COOPER:  Object to the form.
 6           THE WITNESS:  So long as Stelor did not
 7       breach the caveats and the agreement and lived
 8       and abided by the other caveats they had that
 9       exclusive right to do that.  When they failed
10       to properly, you know, carry forth the
11       obligations to me that clause and every other
12       clause became knowledgeable.
13   BY MR. KAPLAN:
14       Q    In other words, when you purported to
15   terminate the agreement, right?
16       A    When I actually terminated the agreement.
17       Q    But until the time you claim to have
18   terminated the agreement you agree with me that the
19   sole right and power to protect the intellectual
20   property was Stelor's and that you were obligated to
21   stay out of Stelor's way, correct?
22           MR. COOPER:  Object to the form.
23           THE WITNESS:  I'm going to defer to what
24       the document states.  If the document reads
25       that then that's what it is.
```

Page 124

```
 1           MS. CALABRIA:  Kevin, just for
 2       clarification, when you say termination what do
 3       you mean, what date?
 4           MR. KAPLAN:  Thanks Johanna.  Just so we
 5       are clear here.
 6   BY MR. KAPLAN:
 7       Q    I'm referring to your April 27, 2005
 8   letter purporting to terminate the license.  Has
 9   that been your understanding as I have been asking
10   the questions?
11       A    Is that when the settlement agreement was
12   declared null and void?
13       Q    Yes.
14       A    I remember a date in November, I remember
15   a date in January and I remember a date in April.
16   So November was the first letter, then there was a
17   cure in January and there was a final breach in
18   April; is that correct?
19       Q    Let me just show you.  I'll mark this in a
20   minute.  The April 27, 2005 letter from your lawyers
21   at Cozyak Tropin to Steve Esrig.  Do you recall that
22   letter, sir?
23       A    Yes, I saw a copy of that letter.
24       Q    Pursuant to that letter you purported to
25   terminate the license agreement effective
```

Page 125

```
 1   immediately, correct?
 2       A    Was this before the first termination?
 3   There was a initial termination then there was a
 4   settlement and then there was a second termination.
 5           MR. COOPER:  Read the first paragraph.
 6           THE WITNESS:  On November 12 --
 7       (Pause.)
 8           THE WITNESS:  So the answer is no.  It was
 9       not April 27th.  It was effective back on
10       November 12, 2004.
11   BY MR. KAPLAN:
12       Q    Give me that back.  We will get to this in
13   sequence.
14           Take a look at Section 8E of the license
15   agreement.
16       (Pause.)
17   BY MR. KAPLAN:
18       Q    Last sentence says, "During the term of
19   this agreement licensor," that's you, "shall not
20   initiate or maintain any relationship or
21   conversation -- conversations with licensee's
22   current or prospective clients, vendors, any company
23   relationships with the media, press, et cetera,
24   without the prior express written request by
25   licensee."
```

Page 126

1    A   Okay.
2    Q   Have you done anything covered by that
3  provision since April 2005?
4        MR. COOPER:  Object to the form.
5        THE WITNESS:  I'm not following what you
6    are asking me now.
7  BY MR. KAPLAN:
8    Q   Have you taken any action to initiate or
9  maintain relationships or conversations with any of
10  Stelor's current or prospective clients or vendors?
11   A   Since the termination?
12   Q   Correct.
13   A   I can't recall.
14   Q   Have you done anything with respect to the
15  intellectual property since April 2005?
16       MR. COOPER:  Object to the form.
17       MS. CALABRIA:  I join in that objection.
18       THE WITNESS:  Me personally?
19  BY MR. KAPLAN:
20   Q   Yes.
21   A   I think it was an issue where the DNS was
22  supposedly changed where I took the initiative to
23  take back the web -- the domain name based upon the
24  termination of Stelor Productions so that I could
25  then continue to maintain -- develop the property.

Page 127

1    Q   And you did that, correct?
2    A   I attempted to do that.
3    Q   And you were unsuccessful, correct?
4    A   That's correct.
5    Q   Have you done anything else to attempt to
6  develop the property since then?
7    A   Not that I can recall, no.
8    Q   When did you attempt to take back the
9  domain name.  I don't recall.  It had to be after
10  the breach.  The breach was after this April 5th
11  letter.
12   Q   Are you sure it was after the letter?
13   A   I'm not sure.  I would think it would have
14  to have been.
15   Q   Take a look at Section 9 of the agreement.
16  Right to terminate on notice.  Would you read that
17  provision?
18   A   9?  "Right to terminate on notice.  This
19  agreement may be terminated by either party upon 60
20  days written notice to the other party in the event
21  of a breach of a material provision of this
22  agreement by the other party provided that during
23  the 60-day period the breaching party fails to cure
24  such breach."
25   Q   Is there anything unclear in that

Page 128

1  provision to you?
2    A   No.
3    Q   It's clear from that provision that before
4  you could terminate the agreement you've got to
5  specify in writing to Stelor how you believe it's
6  breached the agreement, correct?
7    A   Yes.
8    Q   It's also clear pursuant to this provision
9  that the breach that you specify in writing must be
10  material, correct?
11   A   Yes.
12   Q   What does material mean to you?
13       MR. COOPER:  Object to the form.
14       THE WITNESS:  A substantive or substantial
15    breach that would otherwise render the
16    agreement null and void.
17  BY MR. KAPLAN:
18   Q   Something more than just a minor breach,
19  right?
20   A   Up to the interpretation of the court what
21  might be minor to Stelor may be major to me.
22   Q   Fair to say the reason for that provision
23  is to give Stelor an opportunity to fix or cure what
24  you believe the breach is?
25   A   If in fact, the breach or alleged breaches

Page 129

1  are in fact curable ones.  If they were not curable
2  ones it would serve no purpose.  Once the bell has
3  rung you can't undo the sound of the ring.
4    Q   Well, the agreement requires you to
5  provide written notice regardless of whether you
6  think the breach is curable or not, correct?
7    A   Yes.
8    Q   Is it fair to say that this provision
9  really benefits Stelor, protects Stelor by giving
10  the opportunity to cure?
11   A   Yes.
12   Q   And that's because Stelor at least
13  according to the next section of the agreement 9B,
14  Stelor can terminated agreement at any time on 30
15  days written notice, right?
16   A   Yes.  Yes.
17   Q   Does Stelor have to give any opportunity
18  for you to cure?
19       MR. COOPER:  Object to the form.
20       THE WITNESS:  I don't see anything there.
21  BY MR. KAPLAN:
22   Q   Stelor can terminate for any reason,
23  right?
24   A   Yes.
25   Q   Stelor can terminate even without a

(Pages 126 to 129)

Page 130

1 reason, right?
2    A   I think so, according to that language.
3    Q   Is it fair to say that the relationship
4 under this license agreement between you and Stelor
5 was somewhat complex?
6        MR. COOPER:  Object to the form.
7        MS. CALABRIA:  I join.
8        THE WITNESS:  I would have to say so.
9 BY MR. KAPLAN:
10    Q   There is a number of obligations that are
11 not always clear cut, is that fair to say?
12        MR. COOPER:  Objection to the form.
13        MS. CALABRIA:  Object to form.
14        THE WITNESS:  The document speaks for
15 itself.
16 BY MR. KAPLAN:
17    Q   Well, is that consistent with your
18 understanding of the relationship?
19    A   In some regards, yes.
20    Q   Alright.  So is it fair to say there is
21 room for disagreement or potential for disagreement
22 between you and Stelor about whether Stelor is
23 performing it's obligations under the license
24 agreement?
25        MR. COOPER:  Object to the form.

Page 131

1        THE WITNESS:  I guess that would be up to
2    the interpretation of the jury or the court.
3 BY MR. KAPLAN:
4    Q   But you recognize that possibility existed
5 at the time you entered into the agreement, right?
6        MR. COOPER:  Object to the form.
7        THE WITNESS:  Not at the time I entered
8    into the agreement.  It only surfaced as the
9    agreement became -- as it became apparent that
10    the agreement was not being kept by Stelor
11    Productions.
12 BY MR. KAPLAN:
13    Q   Isn't it fair to say that the agreement by
14 requiring you to give Stelor notice of what you
15 think is a breach and an opportunity to cure insures
16 that you can try to work out any disagreement over
17 performance at least for a 60-day period before the
18 agreement gets terminated?
19    A   I did that on a number of occasions until
20 I got tired of doing it, especially when I was not
21 paid on time.  And in other areas where the breaches
22 were uncurable because the damage was already done
23 it could not be undone.
24        And I believe that there was proper
25 notice given and the documents speak for

Page 132

1 themselves as far as the letters and the timing.
2        MR. COOPER:  Whenever you get finished
3    with this document let's take a restroom break
4    when you get a chance.
5 BY MR. KAPLAN:
6    Q   Take a look at Section 9 of the agreement,
7 infringements?
8        MR. COOPER:  That's 11.
9        MR. KAPLAN:  I'm sorry.  I have trouble
10    with Roman numerals.
11        MS. CALABRIA:  Where are you?
12        MR. KAPLAN:  11, infringements.
13        MS. CALABRIA:  Thanks.
14 BY MR. KAPLAN:
15    Q   This provision, especially Section 8
16 provides that, "The licensee, that's Stelor, shall
17 have the sole right in its discretion and at its
18 expense to take any and all actions against third
19 persons to protect the intellectual property
20 rights," correct?  Did I read it right?
21    A   One moment.
22        (Pause.)
23        MR. COOPER:  Objection, the document
24    speaks for itself.
25        THE WITNESS:  Okay.  So I'll join in with

Page 133

1    my counsel, the document speaks for itself.
2 BY MR. KAPLAN:
3    Q   And I read it correctly, right?
4    A   Yes.
5    Q   Now, you filed suit yourself against
6 Google, correct?
7    A   I believe so, yes.
8    Q   And that's a suit against a third person
9 to protect the intellectual property rights,
10 correct?
11    A   Yes.
12    Q   So if the agreement is still in effect and
13 I know you dispute that, would you agree that your
14 filing of the suit against Google violates the
15 agreement?
16        MR. COOPER:  Object to the form.
17 BY MR. KAPLAN:
18    Q   You can answer.
19    A   The document speaks for itself.
20    Q   What's your understanding, sir?
21    A   The document speaks for itself.
22    Q   If the agreement were in effect only
23 Stelor could sue Google, correct?
24        MR. COOPER:  Object to form.
25        MS. CALABRIA:  I'm sorry, what was that

(Pages 130 to 133)

Page 134

1    question?
2    BY MR. KAPLAN:
3        Q    If the agreement were still in effect only
4    Stelor could sue Google for trademark infringement,
5    correct?
6            MS. CALABRIA:  Object to the form.
7            MR. COOPER:  Object to form.
8            THE WITNESS:  I repeat my answer.  The
9        document speaks for itself.
10   BY MR. KAPLAN:
11       Q    I'm asking for your understanding,
12   Mr. Silvers.  You need to answer my question.
13       A    I don't need to answer your question other
14   than to say to you that the document speaks for
15   itself.  You read it under infringements.  If that's
16   your interpretation of it then I'm not going to give
17   you a yes or no answer when we have a contract and
18   it says whatever it says there that's what it says.
19       Q    Would that -- does that provision permit
20   you to bring a trademark infringement action against
21   Google?
22           MS. CALABRIA:  Object to the form.
23           MR. COOPER:  Object to form.
24           THE WITNESS:  If the settlement -- if the
25       license agreement were to be reinstated, is

Page 135

1        that your question?
2    BY MR. KAPLAN:
3        Q    Answer that question.
4            MR. COOPER:  Object to the form.
5            MS. CALABRIA:  Object to the form only
6        because I have lost the question at this point.
7    BY MR. KAPLAN:
8        Q    You can answer, Mr. Silvers.
9        A    I would have to say that if Stelor chose
10   not to protect my intellectual property rights by
11   any third party that infringed on it because it uses
12   the word option, it uses the word at its discretion.
13       So assuming that at it's discretion
14   Stelor decided not to protect my intellectual
15   property rights that would be, in my opinion, a
16   violation of the agreement and I would in turn
17   have the right to institute any such action.
18       So I'll just defer to the language in
19   the contract and let the court decide how that
20   language is to be interpreted.
21       Q    Okay.  Now, in fact if you turn the page
22   and look at Section 9B.
23       A    Okay.
24       Q    That says --
25           MR. COOPER:  Where?

Page 136

1            MR. KAPLAN:  9B, page 7, next page.
2            MR. COOPER:  You are not looking at 9.
3            MR. KAPLAN:  I'm sorry, 11.  I did it
4        again, 11B, excuse me.  The scarry thing is
5        Mr. Silvers understood me.
6            THE WITNESS:  It actually says 12.
7            MR. COOPER:  Are you looking at 12B or
8        11B?
9            MR. KAPLAN:  12B.
10           MS. CALABRIA:  What paragraph are you
11       looking at?
12           MR. KAPLAN:  12B, top of page 7.
13   BY MR. KAPLAN:
14       Q    "Licensor," that's you, "agrees to
15   indemnify and hold harmless licensee," that's
16   Stelor, right?
17       A    Yes.
18       Q    "Against all costs, expenses and losses
19   incurred through claims of third parties against
20   licensee based on or arising from any infringement,
21   misappropriations involving the licensed
22   intellectual property, the licensed trademarks."
23           Correct me if I'm wrong, but don't you
24   understand that provision to require you to
25   indemnify Stelor in this action that's brought

Page 137

1    against Stelor by Google?
2            MR. COOPER:  Object to the form.
3            THE WITNESS:  The document speaks for
4        itself.
5    BY MR. KAPLAN:
6        Q    Do you agree that the license agreement
7    imposes an obligation on you to indemnify Stelor if
8    Stelor is sued by a third party for infringement?
9        A    That's a legal question that I'm not
10   scholar enough to answer so I'm going to defer to
11   the document and the document speaks for itself.
12       Q    But you know that Google is suing you for
13   trademark infringement, right?
14       A    Yes.
15       Q    And you know that Google is suing Stelor
16   for trademark infringement, right?
17       A    Yes.
18       Q    Under this provision of the license
19   agreement as you understand it, do you have to
20   indemnify Stelor in its defense of the claims
21   brought by Google?
22           MS. CALABRIA:  Objection, asked and
23       answered.
24           MR. COOPER:  Object to the form.
25           THE WITNESS:  The document, Kevin Kaplan,

(Pages 134 to 137)

Page 138

1   speaks for itself. I'm not a lawyer. I don't
2   have the answer to that question right now.
3   The document speaks for itself.
4   BY MR. KAPLAN:
5       Q   Do you have an understanding, sir?
6       A   No, I don't, okay.
7       Q   Are you prepared to indemnify Stelor?
8           MR. COOPER: Object to the form.
9           THE WITNESS: If that's what is determined
10  by the court that has to be done in the event
11  that this caveat has to be implemented then
12  I'll have to abide by the court's order.
13          MR. KAPLAN: Alright. Let's take a break.
14  Short.
15          VIDEO OPERATOR: We are off the record.
16              (Thereupon, a brief recess was
17              taken.)
18          VIDEO OPERATOR: We are on the record.
19  BY MR. KAPLAN:
20      Q   Mr. Silvers, I have handed you what I have
21  marked as Exhibit 104 for identification. Do you
22  recognize that as your consultant agreement with
23  Stelor?
24              (Deposition Exhibit No. 104 was
25              marked for identification.)

Page 139

1           THE WITNESS: Yes.
2   BY MR. KAPLAN:
3       Q   That's your signature on page 4?
4       A   Uh-huh, yes.
5       Q   What exactly did you do as a consultant
6   for Stelor?
7       A   What they allowed me to do.
8       Q   Which was what?
9       A   Very little.
10      Q   Look at paragraph 1B which lays out the
11  payment terms.
12      A   Okay.
13      Q   You got a signing bonus of 10,000,
14  correct?
15      A   Yes.
16      Q   That was paid, correct?
17      A   Yes.
18      Q   You got a monthly fee of $5,500 for the
19  first 12 months, right?
20      A   Yes. That's what it says, correct.
21      Q   That was paid in full, correct?
22          MR. COOPER: Object to the form.
23          THE WITNESS: I believe so, yes.
24  BY MR. KAPLAN:
25      Q   So that adds up to $66,000; is that

Page 140

1   correct?
2       A   I believe so, yes.
3       Q   And in addition you got a monthly fee of
4   $6,000 for another 18 months, correct?
5       A   Yes.
6       Q   By my calculation that adds up to
7   $108,000, right?
8       A   Okay.
9       Q   On top of that you also got $300 a month
10  to reimburse you for health insurance, right?
11      A   That's what it says in the agreement, but
12  that's not what took place, I don't believe. That's
13  what it says in the agreement.
14      Q   Do you dispute you were paid $300 a month
15  for health insurance per the terms of the agreement?
16      A   I dispute that I was not paid it timely
17  and that I had to fight for the balance of the
18  settlement agreement, but I will say that what this
19  document says at B is what I agreed, and for the
20  most part was eventually all paid.
21      Q   The term of the agreement was 30 months,
22  right?
23      A   I believe so.
24      Q   That's what it says on page 3 under
25  section five, term and termination, right?

Page 141

1       A   Okay.
2       Q   "This agreement shall commence upon
3   execution and it shall have a term of 30 months,"
4   correct.
5       A   Yes.
6       Q   By my count that runs to December 2004,
7   right?
8       A   I believe that's correct.
9       Q   So you agree that this letter agreement
10  expired by its own terms in December of 2004?
11      A   Yes.
12      Q   So during the term of the agreement or in
13  connection with the agreement you got a $10,000
14  signing bonus, you got $66,000 in consulting fees
15  for the first 12 months, another $108,000 during the
16  next 18 months, and a total of $9,000 for health
17  insurance reimbursements, right?
18      A   No. I didn't get the -- I don't believe I
19  got the insurance reimbursement. Somehow that
20  stopped for some reason, I can't recall, and then I
21  had to fight for that later on and the settlement
22  where they paid me a lump sum that they I believe
23  were not going to pay me for and that was settled.
24          And I also -- let me finish, if I may.
25  I also never to this day received my option shares

(Pages 138 to 141)

## Page 142

1  of Stelor stock which you made reference to in B.
2      Q    I'm just asking about the money. I'll
3  come back to the options in a second.
4      A    Okay.
5      Q    By my calculations you were to get
6  $203,000 under this agreement?
7      A    The document speaks for itself. I don't
8  have a calculator. So if that's what you are adding
9  up that's what it is. I'm not going to dispute
10 that. I tell you I got paid every penny --
11         MR. COOPER: Let him ask his question.
12 BY MR. KAPLAN:
13     Q    Assuming the amount is $203,000 and I did
14 the math correctly, how much did you get?
15     A    I got the full amount.
16     Q    And you complain about not getting
17 options; is that correct?
18     A    It's not a complaint, it's a fact. There
19 was no options provided to me as promised in this
20 agreement.
21     Q    In fact, what the agreement says is,
22 "Stelor will write an agreement with consultant
23 granting him options for 1,000 shares of Stelor
24 stock under Stelor's stock option plan," right?
25     A    Keep reading.

## Page 143

1      Q    Did I read that sentence correctly?
2      A    That sentence you read correctly.
3      Q    Did Stelor write such an agreement?
4      A    No, not to my knowledge and certainly not
5  during this engagement period.
6      Q    Do you dispute that Stelor provided you an
7  agreement for the options?
8      A    I dispute the fact that they provided me
9  agreement for the options after the fact of
10 termination not during any time during the
11 agreement, that's a fact.
12     Q    Take a look at the second page, paragraph
13 3B.
14     A    Okay.
15     Q    That prohibits you from engaging in any
16 business, trade or profession that competes in any
17 way with the company's business, do you see that?
18     A    Yes.
19     Q    Have you complied with that provision?
20     A    I believe I have.
21     Q    Have you done anything since December 2004
22 to compete with Stelor's business?
23     A    Not after the one year option period
24 expired.
25     Q    I'm sorry, say that again.

## Page 144

1      A    Not after the one year option period
2  expired. It says here, "During the term of this
3  agreement and for a period of one year after the
4  termination of expiration of this agreement." I
5  certainly complied with that. After the year was
6  over to this day I don't believe that I violated
7  this. But even if I did after the year --
8         MR. COOPER: Just answer his question.
9         THE WITNESS: Okay.
10 BY MR. KAPLAN:
11     Q    Take a look at paragraph 6 on page 3.
12     A    Okay.
13     Q    Now that says generally that you had
14 access to proprietary information from the company.
15 Did you?
16     A    I don't believe I was presented with
17 proprietary information. They kept a lot of things
18 from me. I can't recall what proprietary
19 information they may have shared with me in any
20 regard. I was basically kept out of the loop and I
21 don't recall receiving any proprietary information.
22     Q    Did you get any information from Stelor
23 during the period of this agreement?
24     A    I'm sure they provided me with some
25 information. I can't recall at this time what

## Page 145

1  information that might have been.
2      Q    Do you still have that information?
3      A    I don't recall what information it would
4  be.
5      Q    Did you get any documents from Stelor
6  during the term of the agreement?
7      A    I believe so.
8      Q    Do you still have those documents?
9      A    I believe so.
10     Q    Have you kept those documents in trust?
11     A    No. I don't know what that means. What
12 does that mean?
13         MR. COOPER: I'll object to the form.
14 BY MR. KAPLAN:
15     Q    Have you kept those documents in
16 confidence?
17         MR. COOPER: Object to the form.
18         THE WITNESS: Other than what may have
19     been disseminated to the court or a matter of
20     public record I believe I have.
21 BY MR. KAPLAN:
22     Q    In what document specifically are those?
23     A    I would gather the royalty statements, the
24 contract.
25         MR. COOPER: Object to the forms of the

38

### Page 146

```
1    last question.
2         THE WITNESS:  The contracts that I was
3    provided.  I can't recall any other documents.
4    Maybe there were others but I can't recall at
5    this time.
6    BY MR. KAPLAN:
7         Q    Are those documents all in your office at
8    home now?
9         A    Probably some of them are and I don't know
10   what's still left at the offices of the lawyer.
11        I believe the royalty statements of my
12   contracts are in my possession.
13        Q    Are the documents either in your office at
14   home or in your lawyer's possession?
15        A    I would believe so, yes.
16        Q    Which lawyer?
17        A    Excuse me.  It would be KTT law.
18        Q    Would you hand me that exhibit back
19   please.
20        A    (Witness complies.)
21        Excuse me, can I see that one more time,
22   please.  There you go.
23        Q    Let me hand you what I'm marking as
24   Exhibit 105.
25
```

### Page 147

```
1              (Deposition Exhibit No. 105 was
2              marked for identification.)
3    BY MR. KAPLAN:
4         Q    Which is a document entitled, Composer
5    Agreement.  Take a look at that and let me know if
6    you can identify it?
7         MS. CALABRIA:  Kevin, what is 105?
8         MR. KAPLAN:  It's the Composer Agreement.
9         MS. CALABRIA:  I don't think I have a copy
10   of that.  What was the agreement?
11        MR. KAPLAN:  Composer Agreement dated
12   August 19, 2003?
13        MS. CALABRIA:  Is that part of the
14   pleadings?
15        MR. KAPLAN:  I'm not sure offhand Johanna.
16   I think it's been filed before.
17        MS. CALABRIA:  Can you send me a copy,
18   please, and then we will take a break.  I'll get
19   a copy that I can receive.
20        MR. KAPLAN:  It's not going to take long
21   to question about it.
22        MS. CALABRIA:  Yes, but I don't have copy,
23   Kevin, and we could have resolved it before and
24   we didn't, so I would appreciate a copy so I
25   can follow along.
```

### Page 148

```
1         MR. KAPLAN:  I'm sorry, I got a limited
2    time, Johanna.  I'm working with you as best I
3    can to get you documents.  You chose to appear
4    by phone.  I'm going to do what I can, but I'm
5    not going to take a break.
6         MS. CALABRIA:  Okay.  We weren't told
7    about this deposition until two days before.
8    We didn't object to it assuming you would
9    cooperate as well.  So I would like a copy of
10   the exhibit.  I'm doing the best I can to
11   follow along through our pleading but this one
12   I don't have.  I'm entitled to see it.
13        MR. KAPLAN:  Okay.  As soon as we take a
14   break I'll be happy to fax it to you.
15   BY MR. KAPLAN:
16        Q    Take a look at this document, Mr. Silvers.
17   Tell me -- I got lost in the argument.  Did you
18   identify it?
19        A    Yes.
20        MS. CALABRIA:  Object to form.
21   BY MR. KAPLAN:
22        Q    It's a Composure Agreement that you
23   entered into with Stelor?
24        MS. CALABRIA:  Object to form.
25
```

### Page 149

```
1    BY MR. KAPLAN:
2         Q    You can answer.
3         A    Yes.
4         Q    As I understand it it refers to one
5    composition; is that correct?
6         MS. CALABRIA:  Object to form.
7         THE WITNESS:  Why don't you just have your
8    secretary fax this to her so she doesn't have
9    to keep objecting to form.
10   BY MR. KAPLAN:
11        Q    She can object to form.
12        A    It's a waste of time, though.
13        Q    No.  You still have to answer the
14   question.  Go ahead.  It refers to one specific
15   composition, correct?
16        A    Yes.
17        MS. CALABRIA:  Object to form.
18   BY MR. KAPLAN:
19        Q    That composition is the Googles From Goo,
20   right?
21        MS. CALABRIA:  Objection form.
22        THE WITNESS:  I'm not answering any more
23   question until she gets a copy of the document.
24   You can fax it to her and make it easy so we
25   don't have to listen to her objecting, okay.
```

(Pages 146 to 149)

Page 150

```
1         MR. KAPLAN:  No.  It's not okay.
2         THE WITNESS:  Well, then, I'm not going to
3    answer the questions.
4         MR. KAPLAN:  I'll ask them for the record
5    anyhow.
6    BY MR. KAPLAN:
7         Q    As I understand it Exhibit A1 references
8    the composition that's covered by the agreement, is
9    that right?
10        MR. COOPER:  Objection, document speaks
11   for itself.
12   BY MR. KAPLAN:
13        Q    Mr. Silvers, are you refusing to answer my
14   question?
15        MR. COOPER:  Answer his question, please.
16        THE WITNESS:  The document speaks for
17   itself.
18   BY MR. KAPLAN:
19        Q    Is the only song covered by this
20   agreement.  As you understand it, from Googles From
21   Goo?
22        A    The document speaks for itself.
23        Q    So then please answer my question yes or
24   no.
25        A    The document speaks for itself.
```

Page 151

```
1         Q    We are going to end up in front of the
2    court on a motion to compel you to answer.  Why are
3    we standing on the ceremony?
4         A    The document speaks for itself.  You can
5    read the document.  It speaks for itself.
6         Q    I'm asking for your understanding of the
7    document.  This is the easy part of the deposition.
8    We are going to get to the hard part in a little
9    bit.  Is it your understanding that the only --
10        A    You are being cute now?  Is that what you
11   are doing, you are being cute now?
12        Q    I'm not being cute.  I'm trying to get you
13   to answer a simple question.
14        A    What was the reason for that kind of
15   remark?  Mr. Esrig is smiling, laughing about it.
16        Q    You are giving me a hard time on what
17   should be a simple question.
18        A    I basically asked you to fax Ms. Calabria
19   a copy of this document that she is entitled to.
20   All you got to do is tell your secretary to fax it.
21        MR. KAPLAN:  I'm going to fax it to her as
22   soon as we take a break.  I want to ask three
23   simple questions about this document and then
24   we will be done.  Answer my question.
25        THE WITNESS:  Please.
```

Page 152

```
1    BY MR. KAPLAN:
2         Q    Please.  I asked you please six times.
3         Is it your understanding that the only
4    composition covered by this agreement is the
5    Googles From Goo?
6         MS. CALABRIA:  Object to form.
7         THE WITNESS:  Yes.
8    BY MR. KAPLAN:
9         Q    Is that song being used, to your
10   knowledge?
11        MS. CALABRIA:  Object to form.
12        THE WITNESS:  I have no idea if it's being
13   used or not.  It may or may not be.
14   BY MR. KAPLAN:
15        Q    Do you have any basis -- do you claim that
16   it's being used?
17        MS. CALABRIA:  Object to form.
18        THE WITNESS:  I don't have any idea
19   whether this song is being used or not.  I have
20   never been privy to any of this from the Stelor
21   Productions.  So I don't know if it's being
22   used or not.
23   BY MR. KAPLAN:
24        Q    Is this song included on the music that's
25   downloadable from i-Tunes?
```

Page 153

```
1         MS. CALABRIA:  Object to form.
2         THE WITNESS:  I don't believe so.
3         MR. KAPLAN:  Can I have the agreement
4    back.
5         THE WITNESS:  Thank you.
6    BY MR. KAPLAN:
7         Q    Do you contend Stelor breached this
8    agreement?
9         MS. CALABRIA:  Object to form.
10        THE WITNESS:  I would have no way of
11   knowing because I don't know if they received
12   royalties that I was otherwise entitled to.  So
13   to that effect if it was then I do contend that
14   it was breached.  And if it wasn't then they
15   don't owe me royalty then it was not breached.
16   BY MR. KAPLAN:
17        Q    Sir, yes or no, do you think Stelor
18   breached the agreement, yes or no?
19        MR. COOPER:  Objection, asked and
20   answered.
21        MS. CALABRIA:  Object to form.
22        THE WITNESS:  I don't know.
23   BY MR. KAPLAN:
24        Q    Alright.  Let me show you what I'm marking
25   as Exhibit 106 which appears to be a copy of the
```

(Pages 150 to 153)

Page 154

1  complaint that Stelor filed against you in or about
2  October of 2004, case number 04-80954.
3          (Deposition Exhibit No. 106 was
4          marked for identification.)
5  BY MR. KAPLAN:
6      Q    Take a look at that document and let me
7  know when you are done.
8          (Pause.)
9      Q    Now, you were served with this complaint
10  in or about November of 2004, Mr. Silvers?
11      A    I don't recall, may have been.
12      Q    I'll tell you what, I'll go ahead and mark
13  as Exhibit 107 a printout of the Pacer docket for
14  that lawsuit.  Go ahead and take a look at that.
15          (Deposition Exhibit No. 107 was
16          marked for identification.)
17          THE WITNESS: Stanley Bailey.
18  BY MR. KAPLAN:
19      Q    According to this docket, Mr. Silvers, the
20  lawsuit was served on you on or about 10/25/04,
21  that's docket entry number 11.  Does that sound
22  correct to you?
23      A    If that's what it says, yes.
24      Q    You hired the firm of Kozyak Tropin to
25  represent you in that case?

Page 155

1      A    I believe so.
2      Q    In fact, they appeared in the case on or
3  about November 2nd according to the docket sheet; is
4  that right?
5          MR. COOPER: Can we move on?  His reading
6  ability is not really an issue here.
7  BY MR. KAPLAN:
8      Q    Is that consistent with your recollection?
9      A    I think so, yes.
10          MS. CALABRIA: Kevin, have you marked the
11  docket sheet or you are just referring to it?
12          MR. KAPLAN: I marked it.
13          MS. CALABRIA: Is that 107.
14          MR. KAPLAN: Correct.
15  BY MR. KAPLAN:
16      Q    Would you hand me back Exhibit 106,
17  please.
18      A    You are done with this?
19      Q    I'm done with that.
20          Now, let me show you what I'm marking as
21  Exhibit 108, which appears to be a November 12,
22  2004 letter from Cozyak Tropin to Mr. Esrig.
23          (Deposition Exhibit No. 108 was
24          marked for identification.)
25          MR. KAPLAN: Johanna, I think that's the

Page 156

1  12th document that you got from me.
2          MS. CALABRIA: I have that document and I
3  didn't receive any documents from you, but
4  thanks.
5  BY MR. KAPLAN:
6      Q    Mr. Silvers, do you recognize this letter?
7      A    Yes.
8      Q    Alright, and can you confirm as we sit
9  here today having reviewed the document the docket
10  sheet from the prior lawsuit?  This was a letter
11  that your lawyer sent after you were served with
12  that complaint, correct?
13      A    I believe so.
14      Q    This is a default letter under the license
15  agreement, right?
16      A    Right.
17      Q    The purpose of this letter was to put
18  Stelor on notice of certain defaults that you
19  believed existed, correct?
20      A    Yes.
21      Q    And, in fact, in the first paragraph of
22  the letter you specifically reference paragraph 9A
23  of the agreement.  That's the termination provision
24  that we looked at before, right?
25      A    Where is this now, 9A?

Page 157

1      Q    First paragraph of the letter.
2      A    Failure to pay royalties.
3      Q    No.  "We represent Steven Silvers."  Next
4  sentence.
5      A    Okay.
6      Q    Pursuant to.
7      A    Right.
8      Q    You reference paragraph 9A of the license
9  agreement, correct?
10      A    Okay.
11      Q    Let me hand you the license agreement, 9A
12  of Exhibit 103 is the provision relating to notice
13  and termination, correct?
14      A    60 days, right.
15      Q    Why do you reference that provision in the
16  letter?
17      A    Because it's required for termination
18  purposes.
19      Q    You had to comply with the notice and
20  opportunity to cure provision in the agreement
21  before you could terminate it, right?
22          MR. COOPER: Object to the form.
23          THE WITNESS: Yes.
24  BY MR. KAPLAN:
25      Q    You knew that that notice provision

(Pages 154 to 157)

Page 158

1   existed in the license agreement, correct?
2       A   Yes.
3       Q   And it was important to you in setting up
4   a potential termination of the agreement that you
5   complied with that provision, right?
6       A   Correct.
7       Q   And you sent this letter in order to
8   comply with that provision, right?
9       A   Upon the advice of counsel that's correct.
10      Q   Is there any mention in this letter of the
11  settlement agreement with Stelors -- with Stelor?
12      MR. COOPER: I'm sorry, what was the
13      question again?
14  BY MR. KAPLAN:
15      Q   Is there any mention in this letter of the
16  settlement agreement with Stelor?
17      MR. COOPER: Object to the form.
18      THE WITNESS: I don't believe there was a
19      settlement agreement at this time.
20      MR. COOPER: What settlement agreement are
21      you talking about?
22  BY MR. KAPLAN:
23      Q   So no settlement agreement existed at this
24  time, you couldn't conceivably mention it in your
25  letter, right?

Page 159

1       A   That's correct.
2       Q   Now, look at paragraph A of your letter,
3   "Failure to pay royalties under paragraph 3A." If
4   no royalties were owed at this time do you agree
5   there was no breach?
6       A   No.  I agree there was still a breach.
7       Q   Why?
8       A   If you read the license agreement you will
9   see that even if there was no royalties due and
10  owing to me under the agreement that Stelor was
11  obligated under the agreement to provide me with a
12  royalty statement regardless of whether or not
13  royalties were paid or due or owed to me.
14      Q   Well, let's take these allegation of
15  default one at a time, okay.
16      A   Okay.
17      Q   I'm just asking you about A, failure to
18  pay royalties.  If no royalties were owed at this
19  time then there was no breach, right?
20      MR. COOPER: Under A.
21  BY MR. KAPLAN:
22      Q   Under A, correct?
23      A   Failure to pay royalties under paragraph
24  3A.  May I see 3A?
25      Q   Sure.  There is Exhibit 103.

Page 160

1       A   Okay.  I believe there were royalties that
2   were due or that I alleged that were due and owed to
3   me from some transactions if my memory is right that
4   I was not paid, otherwise this would not have been
5   put in there.
6       So it's obvious that my lawyer knew or
7   it was known that there was royalties that were
8   due me and I was not paid them under the license
9   agreement and therefore that was added as a
10  breach.
11      Q   What investigation did you do before
12  sending the letter?
13      A   My lawyer did whatever investigation she
14  needed to do to comply with this information.
15      Q   Did you do any investigation independent
16  of your lawyer?
17      A   I think I assisted her with certain things
18  that she asked me to help her with.
19      Q   Tell me what investigation was done
20  whether by you or your lawyer into the factual
21  foundation for this letter?
22      MR. COOPER: Okay to the extent -- I'm
23      going to object as worded and instruct you not
24      to answer, attorney-client privilege.
25      THE WITNESS: Yes.

Page 161

1       MR. COOPER: Hang on.  Don't answer.  You
2       can reword it as to him only.
3       MR. KAPLAN: I don't think it's privileged
4       if they did an investigation into the factual
5       foundation for the letter.  We are entitled to
6       know what that is.
7   BY MR. KAPLAN:
8       Q   What investigation was done into the
9   factual foundation for the letter?
10      MR. COOPER: Same objection.  As worded
11      instruct you not to answer.
12  BY MR. KAPLAN:
13      Q   Is it your testimony, sir, with respect to
14  paragraph B that Stelor was still obligated to
15  provide a royalty statement even if no royalties
16  were earned?
17      A   Yes.
18      Q   What about with respect to section --
19  paragraph C of the letter, is Stelor still obligated
20  to provide a list of sublicensees or sublicenses if
21  there are none?
22      MR. COOPER: Objection, document speaks
23      for itself.
24      THE WITNESS: I believe there were
25      sublicensees that were mentioned to me by

(Pages 158 to 161)

Page 162

1   Mr. Esrig during the course of the agreement
2   that were not listed in any royalty statement
3   or that could be construed as sublicensees.
4   BY MR. KAPLAN:
5   Q   If there were no -- if there were no
6   sublicenses, was Stelor required to provide a list,
7   yes or no?
8   A   No. If there were none then they couldn't
9   have put anything in there that there were none, but
10  I contend that there were.
11  Q   Paragraph D?
12  A   Okay.
13  Q   "Failure to use commercially reasonable
14  efforts." Do you agree that this letter contains no
15  specification about how Stelor failed to use
16  commercial and reasonable efforts?
17      MR. COOPER: Object to the form.
18      THE WITNESS: This was a list that was
19  provided and I think it was broadened at some
20  point with -- one second. This is 533. Okay.
21      So it says here, "Will use commercially
22  reasonable efforts to promote, market, sell and
23  distribute the licensed products." And my
24  lawyer felt that that had not been done and so
25  that is what that was.

Page 163

1   BY MR. KAPLAN:
2   Q   Does this letter specify how Stelor failed
3   to use commercial reasonable efforts?
4   A   No, it does not.
5   Q   Take a look at paragraph F if you would.
6   It says, "Failure to provide samples of all licensed
7   products you intend to manufacture."
8   A   Why are we skipping letter E?
9   Q   Because I want to.
10  A   I see, that's convenient.
11  Q   We will come back to the audit issue in
12  detail later, if that's okay with you.
13  A   F, what now?
14  Q   It says, "Failure to provide samples of
15  all licensed products you intend to manufacture."
16  A   "And all promotional and advertising
17  materials associated with those products under
18  paragraph 6C." Let's visit 6C. 6C says, "Prior to
19  the commencement of manufacture and sale of licensed
20  products, licensee shall submit to licensor for his
21  input at no cost to licensor a reasonable number of
22  samples of all licensed products which licensee
23  intends to manufacture and sell of all promotional
24  and advertising materials associated therewith."
25  Q   Do you agree that a reasonable period of

Page 164

1   time was 30 days before commencement of manufacture
2   and sale, right?
3   A   30 days before manufacture and sale and
4   also 30 days before promotional material.
5   Q   Now, what products did Stelor sell within
6   30 days of this letter?
7       MR. COOPER: Object to the form.
8       THE WITNESS: My memory strikes me
9   correctly Stelor Productions made available a
10  CD on i-Tunes that I was never given a finished
11  copy of. I was provided by Mr. Esrig a
12  demonstration copy, not a finished product. No
13  cover, no artwork, just a CD promotional use
14  only. I was never given the finished product.
15  BY MR. KAPLAN:
16  Q   Don't you consider that to be a sample,
17  sir?
18  A   No, sir. That was not a sample of the
19  finished manufactured product. That was a
20  production of a CD with no finished artwork on it
21  and no finished sleeve. It was a basic CD with the
22  music on it. And also if I may finish, there were
23  no samples provided to me of any of the promotional
24  material including any of the advertising that was
25  being done at the trade shows or the bag that they

Page 165

1   used or anything involving any of the shows in 2003,
2   4, 5, and 6.
3   Q   As of November 2004 the trade show
4   following this letter was not until what, June 2005,
5   right?
6   A   So we have the trade show in 2003 in June
7   that this pertains to. Failure to provide material
8   and promotional material for the June 2004 trade
9   show.
10  Q   Okay.
11  A   Okay, next.
12  Q   Moving on to the next document. Can you
13  hand me the letter back.
14  A   You are done with rest of this?
15  Q   Yes. That was November 12, 2004, right?
16  A   What was that?
17  Q   The letter.
18  A   I thought it said November 4. Did it say
19  November 12?
20  Q   November 12, 2004?
21  A   Yes, okay.
22  Q   And let me show you what I'm marking as
23  Exhibit 109. Can you identify that as a copy of the
24  counterclaim that your lawyers filed in the action
25  that was pending in front of Judge Hurley four days

(Pages 162 to 165)

43

---

Page 166

1  later.
2              (Deposition Exhibit No. 109 was
3              marked for identification.)
4         MS. CALABRIA:  Kevin, can you tell me the
5    docket entry number, please?
6         MR. KAPLAN:  14 from the 8095 case.
7         THE WITNESS:  Okay, I recall this
8    document.
9    BY MR. KAPLAN:
10        Q    Four days after the default letter was
11   sent this was filed, correct?
12        A    Four days after --
13        MR. COOPER:  The document speaks for
14        itself.  If you have personal knowledge of when
15        it was filed go ahead and answer his question.
16        THE WITNESS:  I don't have personal
17        knowledge when it was filed.  I can see here it
18        says November 16th.
19   BY MR. KAPLAN:
20        Q    Clearly you did not allow Stelor time to
21   cure the breaches you alleged in that November 12,
22   2004 default letter before filing your counterclaim
23   for breach of contract, did you?
24        MR. COOPER:  Object to the form.
25        THE WITNESS:  We are missing some date

---

Page 167

1    here in January or -- no.
2    BY MR. KAPLAN:
3         Q    Would you hand me that document back?
4         A    No.  One second, please.  There was a
5    document -- please, counselor.
6              There was a document that was sent to
7    Mr. Esrig in January putting him on notice by me
8    personally before I had counsel that spoke to him
9    having to cure certain breaches, and then when I
10   obtained counsel my lawyer then filed that
11   November 12th letter.
12        Q    January of what year, sir?
13        A    2004.  Sometime in January of 2004 there
14   was communication, I believe, between me and
15   Mr. Esrig where there was a notice of breach sent to
16   him by me.  I'm fairly certain of that and I put him
17   on notice of these breaches in detail.
18        Q    Let me hand you back Exhibit 108 for a
19   second.
20              First, is there any reference in
21   Exhibit 108 to a letter you sent in January 2004?
22        A    There is not.
23        Q    Second, the very first paragraph that we
24   looked at a second ago asks that Stelor -- rather
25   demands that Stelor cures the following breaches

---

Page 168

1    within 60 days.  That's 60 days from November 12,
2    2004, right?
3         A    Where are you getting the 2004 date?
4         Q    That's the date of the letter, November
5    12, 2004?
6         A    Excuse me.
7         Q    So you asked -- or rather demanded that
8    Stelor cure the breaches within 60 days of November
9    12, 2004, correct?
10        A    Okay.
11        Q    And then four days later you sued them for
12   breach of contract, right?
13        MR. COOPER:  Objection.  The document
14        speaks for itself.
15        THE WITNESS:  Okay.  So the document
16        speaks for itself.
17   BY MR. KAPLAN:
18        Q    That's what you did, isn't it?
19        A    That's what appears to be according to
20   this document.
21        Q    So you didn't really mean what you said in
22   your letter, did you, you weren't going to give them
23   60 days, you were only going to give them 4 days,
24   isn't that right?
25        MR. COOPER:  Object to the form.

---

Page 169

1         THE WITNESS:  I don't know that that's
2         accurate.  I'm going to reserve my right to --
3         the document speaks for itself.  I reserve my
4         rights to it.
5    BY MR. KAPLAN:
6         Q    I guess it does.  Can I have that back?
7         A    (Witness complies.)
8         Q    Let me show you what I'm marking as
9    Exhibit 110, which is a copy of a January 13, 2005
10   letter.
11             (Deposition Exhibit No. 110 was
12             marked for identification.)
13        MR. KAPLAN:  Here is a copy for your
14        lawyer.  Hold on, Mr. Silvers, I'll give you
15        the marked copy.  That's Exhibit 110.
16   BY MR. KAPLAN:
17        Q    This is a copy of the so-called
18   termination letter that your lawyer sent, right?
19        A    Yes.
20        Q    Of course you had already filed your claim
21   for breach of contract against Stelor months before
22   sending this letter, right?
23        A    In November, okay.
24        Q    Why did you wait until January 13, 2005 to
25   send this termination letter?

(Pages 166 to 169)

44

### Page 170

```
 1      A   My lawyer sent it.  She must have had her
 2   reasons.
 3      Q   You waited because that's 60 days from the
 4   date of your November 12th letter, right?
 5          MR. COOPER:  If you can't answer that
 6      without revealing attorney-client communication
 7      don't answer it.
 8          THE WITNESS:  Yes.  I mean I can't give
 9      you that answer.  I don't know what I was
10      thinking.
11   BY MR. KAPLAN:
12      Q   You waited 60 days to send the termination
13   letter because that's what the provision, the
14   termination provision in the license agreement
15   required you to do, right?
16      A   November 12 to January 13th, okay, if
17   that's what -- I don't know what the lawyer was
18   thinking.
19          MR. COOPER:  Just answer his question.  If
20      you don't know what she was thinking you
21      answered it.  Let's go on to the next question.
22          THE WITNESS:  I don't know what she was
23      thinking.
24   BY MR. KAPLAN:
25      Q   You wanted to make it look like you were
```

### Page 171

```
 1   complying with the 60 day requirement in the license
 2   agreement even though you had already filed the
 3   claim for breach of contract, right?
 4          MR. COOPER:  Object to the form.
 5          THE WITNESS:  I don't know that filing the
 6      breach of contract constitutes the 60-day
 7      notice, so it would have to be -- like I said,
 8      the lawyer basically wrote is what it is.
 9   BY MR. KAPLAN:
10      Q   Was it important to you in trying to
11   terminate the contract in or about January 2005 that
12   you comply with the 60-day notice provision in the
13   license agreement?
14      A   I have to defer to the lawyer and her
15   decision making process on this.
16      Q   Would you hand me back the termination
17   letter, please.
18          In any event, a few weeks later you
19   entered into a written settlement agreement with
20   Stelor, correct?  Correct?
21      A   I believe so, yes.
22          MR. COOPER:  Before we get to the
23      settlement agreement let's take a five minute
24      break.
25          MR. KAPLAN:  We just took a break.
```

### Page 172

```
 1          MR. COOPER:  I just want to stretch my
 2      legs.  My client is looking very tired over
 3      here.  I would like him to get some water and
 4      coffee or something.
 5          MR. KAPLAN:  Alright.  Take a five minute
 6      break though.
 7          MR. COOPER:  Yes.
 8          VIDEO OPERATOR:  Off the record.
 9             (Thereupon, a brief recess was
10          taken.)
11             (Continues in Volume II.)
```

### Page 173

```
 1              UNITED STATES DISTRICT CIRCUIT
                 SOUTHERN DISTRICT OF FLORIDA
 2
 3           CASE NO. 05-80387 CIV RYSKAMP/VITUNIC
 4
     STEVEN A. SILVERS, an individual,
 5       Plaintiff,
         v.
 6   GOOGLE INC., a Delaware corporation,
         Defendant.
 7   _____
 8   GOOGLE INC., a Delaware corporation,
         Counterclaimant,
 9       v.
     STEVEN A. SILVERS, an individual;
10   STELOR PRODUCTIONS, INC., a Delaware
     Corporation; STELOR PRODUCTIONS, LLC, a
11   Delaware limited liability company,
         Counterdefendants.
12   _____
13
14          DEPOSITION OF STEVEN SILVERS
                     VOLUME II
15
16          Tuesday, October 10, 2006
                1:00 p.m. - 8:00 p.m.
17            2699 South Bayshore Drive
                Miami, Florida 33133
18
19
20
21   Reported By:
     Thomas R. Neumann
22   Notary Public, State of Florida
     Network Reporting Corporation
23   Phone:  888.358.8188
              305.358.8188
24
25               - - -
```

(Pages 170 to 173)

Page 174

```
1        VIDEO OPERATOR:  We are on the record.
2   BY MR. KAPLAN:
3        Q   I have handed you what's been previously
4   marked as Exhibit 41.  Just so I can confirm here
5   this is two copies of the settlement agreement which
6   I believe you testified were the counterparts of the
7   same agreement.  Can you just confirm that for me?
8        A   Did I testify to?
9        Q   It was marked at your prior deposition in
10  the case.
11       A   The deposition when Johanna was here?
12       Q   No.  The deposition that was taken July 13
13  2006, co-counsel for Google?
14       A   You are asking me to do what?
15       Q   Look at this document and confirm for me
16  that this is the confidential settlement agreement
17  entered between you and Stelor.
18       A   Okay.
19       Q   Okay.  It is?
20       A   Yes, I signed it, yes.
21       Q   This agreement was entered into on or
22  about January 28, 2005, correct?
23       A   Okay.
24       Q   Is that correct?
25       A   January 28, 2005.
```

Page 175

```
1        Q   That's the date of the agreement, correct?
2        A   Yes.
3        Q   That's about two weeks after you sent the
4   termination letter, right?
5        A   Which was on the 13th of January, okay.
6        Q   You were represented by counsel in
7   connection with this agreement, correct?
8        A   Yes.
9        Q   And your lawyer was involved in the
10  drafting of it, correct?
11       A   Yes.
12       Q   The purpose of this agreement as you
13  understood it was to settle the pending lawsuit,
14  right?
15       MR. COOPER:  Object to the form.
16       THE WITNESS:  Yes.
17       MS. CALABRIA:  I'm sorry, I join in that
18  objection.
19  BY MR. KAPLAN:
20       Q   You can answer, sir.
21       A   It was to resolve the issues between the
22  parties.
23       Q   And you wanted to resolve those issues
24  fully and finally, correct?
25       A   Yes.
```

Page 176

```
1        Q   You wanted the lawsuit and the dispute to
2   be over and done with and Stelor to be proceeding
3   with you under the terms of the license agreement?
4        A   Yes.
5        Q   Did you intend any aspect of that dispute
6   to remain?
7        MR. COOPER:  Object to the form.
8        THE WITNESS:  I believe --
9   BY MR. KAPLAN:
10       Q   Let me rephrase the question in light of
11  the objection.
12       Take a look at the last whereas clause
13  on the first page of the agreement.  Will you read
14  that for me?
15       A   "The parties wish to resolve all the
16  foregoing disputes to their mutual satisfaction."
17       Q   That's an accurate statement of your
18  intent in entering into this agreement?
19       A   Yes.
20       Q   Now, the whereas clause just above that
21  says, "The parties intended full performance by each
22  party of its obligations under this agreement cures
23  the breaches alleged against each by the other
24  party."  Do you see that provision?
25       A   Yes.
```

Page 177

```
1        Q   So it's your position that a failure by
2   Stelor to perform its obligations under the
3   settlement agreement would allow you to terminate
4   the license agreement, correct?
5        MR. COOPER:  Hang on.  Can you repeat that
6   or have him read it back.
7   BY MR. KAPLAN:
8        Q   Is it your position that failure by Stelor
9   to perform its obligations under the settlement
10  agreement would allow you to terminate the license
11  agreement?
12       MR. COOPER:  Object to the form.
13       THE WITNESS:  Yes, I believe that's
14  correct.  If Stelor breached a settlement
15  agreement the license agreement would likewise
16  be breached.
17  BY MR. KAPLAN:
18       Q   In order to terminate the license
19  agreement, though, you would still have to comply
20  with the termination provision in Section 9 of the
21  license agreement, correct?
22       MR. COOPER:  Object to the form.
23       THE WITNESS:  I believe there was some
24  type of communication which I guess is
25  attorney-client.
```

(Pages 174 to 177)

Page 178

1      MR. COOPER: Whatever your understanding
2   is based upon your communication with your
3   attorney don't answer.
4      THE WITNESS: I guess I have to say the
5   document speaks for itself, and go on the
6   record as such.
7   BY MR. KAPLAN:
8      Q   Well, turn to the second page of the
9   settlement agreement if you would.
10     A   Okay.
11     Q   I have the license agreement right here in
12  my hand if you want to refer to it, just ask me,
13  okay.
14        Paragraph 3 says, "License distribution
15  and Manufacturing Agreement. Silvers withdraws
16  his notice of termination of the license agreement
17  and reaffirms his obligation under the license
18  agreement." Right? That's what it says, correct?
19     A   Yes.
20     Q   And the effect of that provision as you
21  understood it was to reinstate the license, right?
22        MR. COOPER: I'm going to object on
23     attorney-client privilege. If you can answer
24     that without disclosing your communications
25     with your attorney as to your understanding

Page 179

1      then you can go ahead and do that.
2        THE WITNESS: Yes. I'm not -- would you
3      repeat the question again.
4   BY MR. KAPLAN:
5      Q   Yes, sure. The purpose of that provision
6   as you understood it was to reinstate the license,
7   right?
8        MR. COOPER: If your understanding of this
9      agreement could be answered other than apart
10     from your communications with your attorneys as
11     to the intention of this agreement you can
12     answer the question, otherwise don't answer it
13     on the basis of attorney-client privilege.
14        THE WITNESS: Yes. I have to not answer
15     on the basis of attorney-client privilege.
16  BY MR. KAPLAN:
17     Q   Until you signed this agreement your
18  position was the license agreement was terminated,
19  correct?
20     A   Yes.
21     Q   Once you signed this agreement your
22  position was the license was in effect, correct?
23     A   The license was reinstated, I believe,
24  that is correct, right.
25     Q   And every single provision of the license

Page 180

1   except as it might have been modified by this
2   settlement agreement was in full force and effect,
3   correct?
4      A   I believe so.
5      Q   You expressly reaffirm your obligations
6   under the license agreement, right?
7      A   I believe so.
8      Q   What does reaffirm mean to you?
9      A   Establish, you know, put back in the same
10  place as before.
11     Q   Like never terminated, right?
12     A   I know there was some discussions between
13  me and the counsel that I can't discuss, okay. It
14  had to do with notices --
15        MR. COOPER: Excuse me, stop there. Don't
16     discuss what it even had to do with.
17  BY MR. KAPLAN:
18     Q   Look at paragraph 3, it says, "Silver
19  withdraws his notice of termination of the license
20  agreement." Was there any condition as you
21  understood it to the withdrawal of that notice of
22  termination?
23        MR. COOPER: If you have an understanding
24     separate and apart from your communication with
25     your attorneys answer the question, otherwise

Page 181

1      don't answer on the basis of attorney-client
2      privilege.
3        THE WITNESS: I guess I don't have any
4      separate opinion.
5   BY MR. KAPLAN:
6      Q   Does the agreement, the settlement
7   agreement as you read it, impose any condition on
8   your withdrawing the notice of termination in
9   paragraph 3?
10        MR. COOPER: Same objection, same
11     instructions.
12        THE WITNESS: Attorney-client.
13  BY MR. KAPLAN:
14     Q   No, no, no, sir. You are sitting here
15  now. Read this provision, "Silver withdraws his
16  notice of termination of license agreement." As you
17  understand that provision sitting here today does it
18  condition in any way your withdrawal of that notice?
19        MR. COOPER: Same objection. Don't
20     answer. Don't answer. I'm instructing him not
21     to answer on the basis of attorney-client
22     privilege.
23        MR. KAPLAN: I'm asking for his
24     understanding as he sits here. Understand,
25     whatever he is not answering he ain't

(Pages 178 to 181)

47

| Page 182 | Page 184 |
|---|---|
| 1    testifying about at trial, right. | 1         (Thereupon, a portion of the record |
| 2         MR. COOPER:  Go right ahead. | 2         was read by the reporter.) |
| 3    BY MR. KAPLAN: | 3         MR. COOPER:  I'm going to instruct him not |
| 4    Q    Isn't it true, sir, that the withdrawal of | 4    to answer that on the basis of work-product |
| 5    the notice of termination was unconditional? | 5    privilege. |
| 6         MR. COOPER:  Objection, document speaks | 6    BY MR. KAPLAN: |
| 7    for itself. | 7    Q    The settlement agreement, when you entered |
| 8    BY MR. KAPLAN: | 8    into the settlement agreement you amended some of |
| 9    Q    You can answer. | 9    the terms of the license agreement, right? |
| 10   A    The document speaks for itself. | 10   A    I believe so. |
| 11   Q    If after entering into this license | 11   Q    In fact, one of the things that you |
| 12   agreement you believed that there was a breach of | 12   amended was how the royalties were paid, right? |
| 13   the settlement agreement, you had an obligation | 13   A    I'm not sure of that one.  Where would I |
| 14   under the notice provision in the license to specify | 14   find that?  I don't think I did anything with |
| 15   in writing to Stelor what that breach was and give | 15   royalties.  It had to do with getting a royalty |
| 16   them 60 days to cure it, didn't you? | 16   advance. |
| 17        MR. COOPER:  Objection to form. | 17   Q    There is nothing in the license agreement |
| 18        THE WITNESS:  No, I don't believe so. | 18   that requires Stelor to pay royalty advances, is |
| 19   BY MR. KAPLAN: | 19   there? |
| 20   Q    You needed to comply with Article 9 of the | 20   A    That's correct. |
| 21   license agreement before you could terminate it, | 21   Q    So that's a provision in the settlement |
| 22   didn't you? | 22   agreement that changes something in the license |
| 23        MR. COOPER:  Object to the form. | 23   agreement, right? |
| 24        THE WITNESS:  I don't believe so. | 24   A    Yes. |
| 25 | 25   Q    And you had negotiations with Stelor about |

| Page 183 | Page 185 |
|---|---|
| 1    BY MR. KAPLAN: | 1    changing things in the license agreement when you |
| 2    Q    Where in this agreement, the settlement | 2    entered into the settlement agreement, right? |
| 3    agreement, does it say Article 9 of the license | 3    A    I believe so. |
| 4    agreement no longer applies? | 4    Q    Alright.  But there is nothing in the |
| 5         MR. COOPER:  Object to the form, | 5    settlement agreement, as you understand it, that |
| 6    mischaracterizes. | 6    changes the termination provision in the license |
| 7         THE WITNESS:  I don't believe there is | 7    agreement, is there? |
| 8    anything in the settlement agreement that | 8    A    There is no place in this agreement where |
| 9    requires 60 days notice. | 9    it requires me to get 60 days notice to Stelor in |
| 10   BY MR. KAPLAN: | 10   this agreement. |
| 11   Q    But where in the settlement agreement does | 11   Q    The settlement -- |
| 12   it say that Article 9 of the license agreement no | 12   A    And let me finish my question.  The |
| 13   longer applies? | 13   communication I had with my counsel, which I'm not |
| 14        MR. COOPER:  Object to the form.  The | 14   at liberty to divulge, attorney-client privilege, |
| 15   document speaks for itself. | 15   there was some indication that there was no need to |
| 16   BY MR. KAPLAN: | 16   give 60 days notice.  So I'm just going to leave it |
| 17   Q  .  Show me. | 17   at that. |
| 18   `  A    The document speaks for itself. | 18   Q    You could have asked Stelor to amend the |
| 19   Q    Is it your position that the document -- | 19   termination provision that's in the license |
| 20   that the settlement agreement relieves you of the | 20   agreement when you entered into the settlement |
| 21   obligation in the license agreement to comply with | 21   agreement, right? |
| 22   the requirements of paragraph 9 relating to | 22   A    My lawyer did what she had to do to |
| 23   termination yes or no? | 23   protect me.  I don't know.  It was her call. |
| 24        MR. COOPER:  Hang on a second.  Don't | 24   Q    You could have negotiated the termination |
| 25   answer that.  Can you read this back, please. | 25   provision with Stelor when you entered into the |

(Pages 182 to 185)

Page 186

1  license agreement, right?
2      A   I'm not -- I don't have enough legal
3  background to know that to be right or wrong.
4      Q   You certainly wanted royalty advances to
5  be provided when you entered into the settlement
6  agreement, right?
7      A   That's what it says here.
8      Q   You reviewed this settlement agreement
9  before you signed it, didn't you?
10     A   Yes.
11     Q   You asked that certain changes be made to
12  drafts of this agreement?
13     A   We went back and forth for a time, yes.
14     Q   Did you ever ask that a different
15  provision be included in the settlement agreement
16  about notice in the event of a breach?
17     A   I left that to my attorneys.
18     Q   By the way, this agreement references KTT
19  and in a bunch of places, doesn't it?
20     A   Yes.
21     Q   Take a look at paragraph 1 on page 2
22  domain name administration.
23     A   Yes.
24     Q   Were you going to pay KTT for those
25  services?

Page 187

1          MR. COOPER:  Objection, attorney-client
2      privilege.  Don't answer.
3  BY MR. KAPLAN:
4      Q   No, no, no, no, no.  Under the settlement
5  agreement when KTT was performing these services was
6  it to be compensated?
7      A   I don't believe so.
8      Q   KTT was going to provide these services
9  for free?
10     A   I believe so.  I'm not sure.
11     Q   Is KTT going to provide those services to
12  your knowledge if the settlement agreement is deemed
13  still to be in force?
14     A   I don't have that answer for you.
15     Q   Is that an issue that will need to be
16  addressed if the settlement agreement is inforced?
17     A   Perhaps.
18     Q   Paragraph 1B refers to a --
19         MR. COOPER:  Object to the form of the
20     last question.
21         MR. KAPLAN:  It's a little late,
22     counselor.
23  BY MR. KAPLAN:
24     Q   1B says, "KTT will create and control a
25  domain name renewal database."  Do you see that?

Page 188

1      A   Yes.
2      Q   Did they?
3      A   I do not know.
4      Q   Did you ever see it?
5      A   I don't know if there is a timeframe when
6  they are supposed to do this.  So I never saw it,
7  but I don't know if, in fact, there was a timeframe
8  when this was supposed to be done.
9      Q   Sir, can you just answer my question.  The
10  question was did you ever see it?
11     A   No.
12     Q   Did you ever tell them not to create that
13  database?
14     A   No.
15     Q   Do you know where the database is now?
16     A   No.
17     Q   Do you know whether it exists?
18     A   No.
19     Q   Take a look at paragraph 2.  It imposes an
20  obligation on you to cooperate impending a future
21  trademark and domain name dispute, do you see that?
22     A   Yes.
23     Q   What does cooperate mean to you as it's
24  used in this agreement?
25     A   Assist.

Page 189

1      Q   Are you familiar with the litigation
2  Stelor brought against Googles and Oogles?
3      A   I was never made privy to that.  To my
4  knowledge I was kept in the dark about that also.  I
5  found it out on my own.
6      Q   When did you find it out?
7      A   I went to the U.S. PTO Government Web site
8  and found out.
9      Q   When was that?
10     A   I don't know, months and months ago.
11     Q   In fact, you have taken action to
12  interfere with that litigation, haven't you?
13     A   I don't know that to be an accurate
14  statement.
15     Q   I'll show you some documents in a little
16  bit.  We can reask those questions.
17     A   Okay.
18     Q   Take a look at paragraph 6 on page 3?
19     A   Okay.
20     Q   It says, "KTT and Stelor's counsel shall
21  include each other in any and all negotiations and
22  discussions with Google, Inc. that relate to
23  resolving the pending trademark and domain name
24  disputes or the sale or assignment of the Google's
25  IP."  Did you have any such conversations or did

(Pages 186 to 189)

| Page 190 | Page 192 |
|---|---|
| 1  your lawyer have any such conversations with Google<br>2  or Google's lawyers before April 2005?<br>3      A   I don't recall.<br>4      Q   Did you or your lawyer exchange any<br>5  documents with Google or Google's lawyers before<br>6  April 2005?<br>7      A   I don't remember.<br>8      Q   Alright now.  From April 2005 until the<br>9  time that Cozyak Tropin withdrew as your counsel,<br>10 did you have -- did you or your lawyers have any<br>11 such discussions with Google or its lawyers?<br>12         MR. COOPER:  Can you read the question<br>13     back, please.<br>14         (Thereupon, a portion of the record<br>15         was read by the reporter.)<br>16         MR. COOPER:  If you had direct<br>17     communications with Google you can answer the<br>18     question.  If you are only going to say what<br>19     you have learned from your attorney that's<br>20     attorney-client privilege and don't answer.<br>21         THE WITNESS:  Before the withdrawal I<br>22     wouldn't have had any communications to my<br>23     knowledge directly with Google or Google's<br>24     counsel.<br>25 | 1      Q   And that's something you would need to<br>2  provide Stelor, correct?<br>3      A   Yes.<br>4         VIDEO OPERATOR:  One minute left on tape.<br>5         · MR. KAPLAN:  Alright.  Let's go ahead and<br>6     change it.<br>7         VIDEO OPERATOR:  We are off the record.<br>8             (Thereupon, a brief recess was<br>9             taken.)<br>10        VIDEO OPERATOR:  We are on the record.<br>11 BY MR. KAPLAN:<br>12     Q   Mr. Silvers, take a look at paragraph 8,<br>13 it's got the title Options Acknowledgment.<br>14     A   Okay.<br>15     Q   "Stelor agrees --" I'm reading from it<br>16 "that it will confirm in writing that no additional<br>17 options have been granted that would obligate it to<br>18 provide such options under the now expired letter<br>19 agreement."  That was all that Stelor had to do to<br>20 resolve the issue you raised related to options,<br>21 correct?<br>22     A   That statement is inaccurate, though.<br>23     Q   That's what the settlement agreement<br>24 specifies Stelor needs to do, correct?<br>25     A   Yes. |

| Page 191 | Page 193 |
|---|---|
| 1  BY MR. KAPLAN:<br>2      Q   Do you know whether or not your lawyers<br>3  did, yes or no?<br>4      A   Communication with Google's counsel prior<br>5  to the termination?<br>6      Q   Related to settlement.<br>7      A   I don't recall.<br>8      Q   After the term -- what about the period<br>9  after the termination before KTT's withdrawal, do<br>10 you know?<br>11     A   No.<br>12        MR. COOPER:  I'm sorry, after what<br>13     termination?<br>14        THE WITNESS:  This settlement.<br>15        MR. COOPER:  The termination of the<br>16     settlement agreement?<br>17        MR. KAPLAN:  Right.<br>18 BY MR. KAPLAN:<br>19     Q   Take a look at paragraph 7, domain name<br>20 renewal expenses.  "Stelor agrees to reimburse<br>21 Silvers for documented expenses."<br>22     A   Uh-huh.<br>23     Q   What do you understand document to mean?<br>24     A   Not just hearsay.  You know, a paper trail<br>25 or a receipt. | 1      Q   And, in fact, Stelor did give you that<br>2  written confirmation, didn't it?<br>3      A   I believe so, yes.<br>4      Q   So Stelor complied with that provision of<br>5  the settlement agreement, right?<br>6      A   Not really, because that was an inaccurate<br>7  statement based upon communications with other<br>8  people that I have spoken to.<br>9      Q   I'm just looking at the agreement, sir.<br>10     A   I see that.<br>11     Q   Stelor agrees it will confirm in writing<br>12 and it provided you that confirmation, right?<br>13     A   Yes.<br>14     Q   That complied with the provision, right?<br>15        MR. COOPER:  Object to the form.<br>16        THE WITNESS:  If it was an accurate<br>17     statement I would assume it could comply with<br>18     the form.<br>19 BY MR. KAPLAN:<br>20     Q   Do you believe additional options would<br>21 have been granted that would obligate Stelor to<br>22 provide additional options to you?<br>23     A   I believe they were promised to other<br>24 people.<br>25     Q   This is from your conversations with |

50

Page 194

1  Eisenberg, Miller, et cetera?
2      A   No.
3      Q   Who?
4      A   Mr. Maitland, Jack Maitland.
5      Q   Anybody else?
6      A   I can't recall at this time.
7      Q   Take a look at paragraph 9, LLC
8  acknowledgment.  You acknowledged when you signed
9  this settlement agreement that Stelor was converting
10  from being a Delaware C corporation to a Delaware
11  LLC, correct?
12     A   Yes.
13     Q   You clearly knew Stelor was undergoing
14  that conversion, right?
15     A   Yes.
16     Q   You acknowledged it and agreed that it was
17  okay that you didn't have any objection, is that
18  fair to say?
19     A   Yes.
20     Q   Paragraph 10.  That's the provision laying
21  out how much Stelor is supposed to pay you a month,
22  right?
23     A   Yes.
24     Q   Under paragraph A it's $5,000 a month for
25  advances against royalties, right?

Page 195

1      A   It doesn't mention the word $5,000 a
2  month, it says 60,000 a year.
3      Q   The advance will be made in equal monthly
4  installments, right, so that's 5,000 a month, right?
5      A   Okay.
6      Q   Right?
7      A   Yes.
8      Q   And B talks about paying you an amount
9  equivalent to what's required by you to maintain
10  your insurance coverage through Aurora, right?
11     A   Yes.
12     Q   And paragraph C specifies that the
13  reimbursements are going to be provided to you
14  within 50 days of Stelor receiving evidence of paid
15  premiums, right?
16     A   Yes.
17     Q   You needed to provide evidence,
18  documentation to Stelor, right?
19     A   Yes.
20     Q   And you didn't do that, did you?
21     A   No, I did that.  I absolutely did that.
22     Q   How did you pay those premiums?
23     A   They were paid from me to Aurora and
24  Aurora then paid the premiums.
25     Q   How did you make the payments to Aurora?

Page 196

1      A   By check.
2      Q   Did you ever give Stelor the checks,
3  copies of the checks?
4      A   Aurora provides Stelor with documented
5  statement that they made the payments.
6      Q   Hold on a second.  My question was and is,
7  did you ever give Stelor the checks?
8      A   I didn't need to give Stelor the checks.
9  I needed to give Stelor the documents of premiums
10  that were paid which Aurora Collections did, that
11  satisfied that and I paid the $4,000.
12     Q   Let's make it simple, okay.  Let's avoid
13  the argument.
14     A   Okay.
15     Q   Just answer my question.  Did you ever
16  give Stelor the checks, yes or no?
17     A   No.
18     Q   In fact, you refused to give Stelor the
19  checks, correct?
20     A   Absolutely not.
21     Q   Why didn't you give them to him?
22     A   There was no need to give them to him.
23     Q   In your view.
24     A   I needed to give them documentation that
25  the premiums were paid.  The documentation of

Page 197

1  premiums were paid can only be provided by Aurora
2  Collection because Aurora was making the premium
3  payments not me.  I was reimbursing Aurora every
4  month because I was not getting paid the premiums
5  from Stelor Productions.
6      Q   You tried to give Stelor a letter from
7  Mr. Blumquist that wasn't even signed, isn't that
8  right?
9      A   I don't remember that.
10     Q   I'll show you that in a little bit.
11         Royalty statements.  Now, you complained
12  that Stelor had failed to give you royalty
13  statements for 2004, right?
14         MR. COOPER:  What paragraph are you
15     looking at?
16         MR. KAPLAN:  12.
17  BY MR. KAPLAN:
18     Q   In the litigation, right in your
19  termination -- in your termination letter you
20  complained that Stelor failed to give you royalty
21  statements, right?
22     A   Okay, go ahead, that is correct.
23     Q   And in the settlement agreement in
24  paragraph 12, you agreed that that issue would be
25  resolved if Stelor confirmed in writing that no

(Pages 194 to 197)

51

Page 198

1  royalty payments are outstanding and thus no royalty
2  payments are due, correct?
3      A   Correct.
4      Q   And Stelor gave you that confirmation,
5  right?
6      A   Stelor gave me that confirmation. I later
7  was able to prove that it was inaccurate.
8      Q   Did Stelor give you that confirmation, yes
9  or no?
10     A   Yes.
11     Q   14 talks about the audit, correct?
12     A   Yes.
13     Q   And it indicates that Aronson & Company
14  are the auditors; is that right?
15     A   Yes. That's what the document says.
16     Q   Did you change who the auditor was going
17  to be at any time?
18     A   Not to my knowledge.
19     Q   How did you get to Aronson & Company?
20     A   My lawyers, I think, enlisted them.
21     Q   When was Aronson & Company retained?
22     A   I don't recall.
23     Q   Was a formal retainer agreement signed
24  with Aronson & Company?
25     A   I don't know.

Page 199

1      Q   Did Aronson & Company require payment to
2  perform the audit?
3      A   I'm not clear on that.
4      Q   Were they ever paid?
5      A   I'm not clear on that.
6      Q   Who was the specific professional at
7  Aronson Company who was retained to supervise the
8  audit?
9      A   I don't have any idea.
10     Q   Did you ever talk to them yourself?
11     A   No.
12     Q   Did you ever see any documents or
13  information from Aronson & Company?
14     A   No.
15     Q   Did you ever ask for any documents or
16  information from Aronson & Company?
17     A   No.
18     Q   Take a look at paragraph 15. "Licensed
19  product samples, seller shall provide Silvers
20  through KTT samples of any licensed product that is
21  being offered for sale." Right?
22     A   Yes.
23     Q   Do you agree that if there was no licensed
24  product being offered for sale then Stelor was under
25  no obligation to provide samples, do you agree?

Page 200

1      A   No.
2          MR. COOPER: Object to the form.
3  BY MR. KAPLAN:
4      Q   According to this provision Stelor's only
5  obligation is to provide KTT samples of products
6  that are being offered for sale, correct?
7          MR. COOPER: Objection, document speaks
8      for itself.
9  BY MR. KAPLAN:
10     Q   You can answer.
11         MR. COOPER: He is asking you to read it.
12         THE WITNESS: I'm not sure if this negates
13     the obligation under the licensing agreement.
14     But in specific as it reads here I would have
15     to assume that the only samples that needed to
16     be provided to me according to the settlement
17     agreement would be those products that were
18     being offered for sale.
19  BY MR. KAPLAN:
20     Q   Alright. Take a look at paragraph 20 on
21  page 7. Paragraph A says, "The settlement shall not
22  be provided to the court unless necessary to enforce
23  rights and then under seal." Do you see that?
24     A   Yes.
25     Q   Your lawyer violated that provision,

Page 201

1  didn't she?
2      A   I don't know that to be a fact.
3      Q   Well, Cozyak Tropin filed that agreement
4  as an exhibit to one of their papers, although it
5  had been filed under seal by us with the court;
6  isn't that right?
7      A   I don't have information to that effect.
8  I mean --
9          MR. COOPER: Don't speculate. If you
10     don't know the answer --
11         THE WITNESS: I don't know the answer to
12     that.
13         MR. KAPLAN: Don't do that, Mr. Cooper.
14     Don't instruct your witness here, okay. He has
15     to answer the questions. If he goes on to say
16     things you don't like that's part of the deal,
17     right. All you are allowed to say is objection
18     to form.
19         MR. COOPER: Answer the questions on your
20     own personal knowledge.
21         Can you read back the question so he can
22     answer it again, please.
23  BY MR. KAPLAN:
24     Q   Did you instruct your lawyer to violate
25  that provision, sir?

(Pages 198 to 201)

52

---

Page 202

1     A   Of course not.
2     Q   You know your lawyer filed the agreement
3   not under seal, don't you?
4         MR. COOPER: Object to the form.
5         THE WITNESS: I believe I later found out
6     about something to that effect, but I know that
7     somehow the document was placed or introduced,
8     you know, to the court. I don't know how that
9     happened.
10  BY MR. KAPLAN:
11    Q   Was that an intentional violation by your
12  lawyer, the agreement?
13    A   I have no idea.
14    Q   But it's a violation nonetheless, right?
15    A   Not that I can -- I can't speak to that.
16    Q   And that's the kind of violation that
17  can't be cured, can it?
18        MR. COOPER: Object to the form.
19        THE WITNESS: The document speaks for
20    itself here.
21  BY MR. KAPLAN:
22    Q   No, no, I'm not asking about the document.
23  The filing of this agreement not under seal is a
24  violation of the settlement agreement which cannot
25  be cured, is that statement correct?

---

Page 203

1         MR. COOPER: Object to the form.
2         THE WITNESS: I'm not a lawyer so I
3     wouldn't know how to -- I wouldn't know if
4     that's correct or not correct. I would assume
5     that if it was supposed to be put under seal
6     and it wasn't there must have been a reason for
7     her to have done that.
8   BY MR. KAPLAN:
9     Q   Should you be responsible for that
10  violation of the agreement?
11    A   I don't have the answer to that.
12        MR. COOPER: Object to the form.
13  BY MR. KAPLAN:
14    Q   Keep the settlement agreement in front of
15  you if you want, and let me show you what I'm
16  marking as Exhibit 111 which is the April 27, 2005
17  letter that we looked at earlier.
18            (Deposition Exhibit No. 111 was
19            marked for identification.)
20  BY MR. KAPLAN:
21    Q   Now, let me ask you this first. Why was
22  this letter sent to Mr. Esrig instead of to me as
23  counsel for Stelor?
24        MR. COOPER: If you know the answer other
25    than from attorney-client communications you

---

Page 204

1     can go ahead and answer, otherwise don't
2     answer.
3         THE WITNESS: I have no idea.
4   BY MR. KAPLAN:
5     Q   Was it because the notice provision of the
6   license agreement required notices to be provided
7   directly to Stelor?
8     A   I don't know.
9     Q   Now, take a look at the first paragraph.
10  I apologize, I misspoke.
11        Take a look at the second paragraph. It
12  refers to the settlement agreement. Do you see
13  that?
14    A   Yes.
15    Q   And it says in which Silvers agreed to
16  withdraw his notice of termination provided Stelor
17  performance obligations under the settlement
18  agreement. Help me out with this because I have
19  been looking through that settlement agreement and I
20  don't see any place in that agreement where your
21  withdrawal of the notice was in any way conditioned
22  upon Stelor performing its obligations.
23        Can you show me in the settlement
24  agreement where the withdrawal of the notice was
25  made conditional?

---

Page 205

1         MR. COOPER: Object to the form.
2         THE WITNESS: The document would have to
3     speak for itself. This document was prepared
4     by my lawyers on my behalf and I'm assuming
5     that they knew what they were doing.
6   BY MR. KAPLAN:
7     Q   I'm assuming that you knew what you were
8     doing when you signed it. Did you?
9     A   Signed the settlement agreement?
10    Q   You did sign the settlement agreement,
11  didn't you?
12    A   Yes, and I read it over and it appeared to
13  be accurate in what was being said and upon advice
14  of counsel I executed the agreement.
15    Q   Did you have an understanding of the
16  document when you signed it?
17    A   I would think I did, yes.
18    Q   Do you think you did or did you?
19    A   I had an understanding of the agreement.
20    Q   And you knew what you were doing when you
21  signed it, right?
22    A   Yes.
23    Q   Alright. In that agreement that you
24  signed and of which you had an understanding where
25  does it say that the notice of termination was

---

(Pages 202 to 205)

53

Page 206

1  withdrawn provided Stelor performed certain
2  obligations?
3      A    The document speaks for itself.  I don't
4  know where it would be or not be.
5      Q    It's not in there, is it?
6      A    If you say it's not in there it's not in
7  there.
8      Q    I say it's not in there, so we agree it's
9  not in there?
10     A    No, we don't agree.  You say it's not in
11  there.  The document speaks for itself.
12     Q    Well, show me in the document where you
13  think is the person who signed it it says the
14  withdrawal of the notice is conditioned on
15  something?
16         MR. COOPER:  Objection.  The document
17     speaks for itself and you are calling for a
18     legal conclusion with this question.
19  BY MR. KAPLAN:
20     Q    Will you answer, Mr. Silvers?
21     A    I don't have an answer to give you.
22     Q    Now, let's look at the bullet points.
23     A    Okay.
24     Q    There are five of them, right?
25     A    Yes.

Page 207

1      Q    These are the specific breaches that you
2  think -- these are the specific reasons why you
3  think Stelor is in breach of the settlement
4  agreement, right?
5      A    Okay.
6      Q    These bullet points all relate to
7  provisions of the settlement agreement, right?
8      A    I believe so.
9      Q    They all reference specific paragraph
10  numbers, correct?
11     A    Yes.
12     Q    Are all of those paragraph numbers
13  references to the settlement agreement?
14     A    I believe so.
15     Q    Are any of them references to the license
16  agreement?
17     A    I do not believe so.  Let me see here.  I
18  don't believe so.
19     Q    This letter was the first time you ever
20  provided written notice to Stelor of alleged
21  breaches of the settlement agreement, correct?
22     A    I believe so.
23     Q    And the letter purported to terminate the
24  license agreement effective immediately, correct?
25         MR. COOPER:  Object to the form.

Page 208

1          THE WITNESS:  I believe if the settlement
2      agreement was breached the license agreement
3      would be immediately breached.  I guess the
4      document speaks for itself.
5  BY MR. KAPLAN:
6      Q    Did you give Stelor 60 days to cure its
7  breaches of the settlement agreement before you
8  terminated the license agreement?
9          MR. COOPER:  Object to the form.
10         THE WITNESS:  I'm not sure how this
11     worked.  I believe if the settlement agreement
12     was breached then the license agreement was
13     automatically breached.  There was no need for
14     an additional 60 day curing period.
15  BY MR. KAPLAN:
16     Q    What's the basis for that as you
17  understand it?
18         MR. COOPER:  Again, if you have an
19     understanding of that separate and apart from
20     communications with your attorney answer it.
21     If your only understanding is from
22     communications with your attorney don't answer
23     based on attorney-client privilege.
24         THE WITNESS:  So I reserve might rights
25     based upon attorney-client privilege which she

Page 209

1  communicated to me as to the reasons for her
2  having filed these letters and notices.
3  BY MR. KAPLAN:
4      Q    Just so we are clear.  Do you agree that
5  you gave Stelor no opportunity to cure these
6  breaches before terminating the agreements, yes or
7  no?
8          MR. COOPER:  Object to the form.
9          THE WITNESS:  I don't believe I had an
10     obligation according to my conversation with my
11     counsel that I needed to do that.  I can't give
12     you a yes or no answer because there is no yes
13     or no answer to be given.
14  BY MR. KAPLAN:
15     Q    Sir, I'm not asking what you believed was
16  required or not.  I'm just asking what you did.  Did
17  you give Stelor any opportunity to cure the breaches
18  before you terminated the license agreement?
19         MR. COOPER:  You are referring to as of
20     April 27, 2005?
21  BY MR. KAPLAN:
22     Q    Let me ask you a question.  I asked you a
23  moment ago to confirm this letter was the first time
24  you ever put Stelor on notice of any alleged
25  breaches of the license -- of the settlement

(Pages 206 to 209)

54

### Page 210

1  agreement and you answered, yes, it was.
2      A   To the best of my knowledge, yes.
3      Q   So after putting Stelor on notice of the
4  breaches for the first time in this April 27, 2005
5  letter how much time did you give Stelor to cure
6  those breaches before terminating the license
7  agreement?
8      A   I don't believe there was any time,
9  minimal time.
10     Q   No time, right?
11     A   I don't know if it was no time, but I
12  think it was minimal time.
13     Q   Upon sending this letter you thought the
14  license agreement was terminated, right?
15     A   Yes.
16     Q   That's why the letter says on page 2 on
17  the bottom of the second paragraph --
18     A   Yes.
19     Q   -- that the agreement was terminated
20  "effective immediately," right?
21     A   Yes.
22     Q   Now, you easily could have given Stelor
23  time to cure these alleged breaches, right?
24         MR. COOPER:  Object to the form.
25         THE WITNESS:  The answer to that question

### Page 211

1      is based upon the communications with
2      counsel --
3         MR. COOPER:  Don't answer.
4         THE WITNESS:  Attorney-client that I
5      followed her advice and was that there was
6      no need to give any more notice.
7  BY MR. KAPLAN:
8      Q   These breaches were the kinds of things
9  that certainly could have been cured, right, if they
10  even existed?
11     A   After the fact.  I mean some of these
12  breaches would be able to be cured after the fact of
13  them being breached.
14     Q   Well, let's look at the specific breaches
15  for a second.
16     A   Okay.
17     Q   Look at the first one.  You say, "Stelor
18  failed to provide you with unit interests --"
19         MR. COOPER:  Let me see your copy.
20  BY MR. KAPLAN:
21     Q   "-- in Stelor LLC under paragraph 9,"
22  right?
23     A   Yes.
24     Q   You got the settlement agreement in front
25  of you?

### Page 212

1      A   Yes.
2      Q   Take a look at paragraph 9 if you would.
3      A   Alright.
4         MR. COOPER:  Just one second.  Is your
5      copy of the first page of this April 27 under
6      the word any that paragraph doesn't continue on
7      the next page?
8         MR. KAPLAN:  Yes.
9  BY MR. KAPLAN:
10     Q   Are you looking at paragraph 9, sir?
11     A   Yes.
12     Q   All it says is that you acknowledge that
13  Stelor is converting to a Delaware LLC, right?
14  That's the first sentence, correct?
15     A   Yes.
16     Q   And the second sentence says that upon the
17  conversion that any options that were granted to you
18  and the corporation will be converted to a like
19  amount of unit interest under the LLC, right?
20     A   Correct.
21         MR. COOPER:  That's not what it says.
22         MR. KAPLAN:  Then make an objection to
23  form.
24         MR. COOPER:  Objection to form,
25      mischaracterizes the document.

### Page 213

1         MR. KAPLAN:  That's a speaking objection.
2      Just say objection to form because you know the
3      local rules limit your objections to that.
4  BY MR. KAPLAN:
5      Q   So if you are going to get -- if your
6  options are going to be converted to unit interest
7  under the LLC, Mr. Silvers, the conversion has got
8  to take place first, right?
9      A   Okay.
10     Q   Until the conversion occurs and is
11  completed you agree that Stelor couldn't give you
12  any unit interest in the LLC, right?
13     A   They certainly could have provided me with
14  some documentation that that's what they were going
15  to do.
16     Q   Well, what requirement is there in this
17  paragraph to give you documentation of that?  That's
18  not what it says, is it?
19     A   Okay.  So they failed to do that.
20     Q   Well, the conversion hadn't been completed
21  as of April 2005, right?
22     A   I don't know that to be a fact.
23     Q   Well, don't you think you better -- don't
24  you think you better had -- it's getting late, let
25  me try it again.

(Pages 210 to 213)

Page 214

1 Isn't that something you should have
2 investigated and determined before you just went
3 off willy-nilly and declared a breach of the
4 agreement?
5 MR. COOPER: Object to the form.
6 THE WITNESS: That's something my lawyer,
7 I'm sure, had to have looked into.
8 BY MR. KAPLAN:
9 Q What did your lawyer do to look into it?
10 A I have no idea.
11 Q Do you agree with me that if the
12 conversion had not been completed Stelor had not yet
13 breached the settlement agreement?
14 A That seems to be an accurate statement,
15 but also the fact that the license agreement was
16 also terminated and the license agreement -- excuse
17 me -- okay. I take that back.
18 The answer is yes.
19 Q Now, the monthly installments. First of
20 all, that was a new obligation under the settlement
21 agreement, right?
22 A Yes.
23 Q And as of the date of this agreement you
24 had been paid some of those installments, correct?
25 I mean as of the date of this letter you had been

Page 215

1 paid some of those installments, correct?
2 MR. COOPER: Object to the form.
3 THE WITNESS: I don't recall. I may have
4 been.
5 BY MR. KAPLAN:
6 Q And with respect to the audit, did you
7 know your lawyer agreed to postpone the date of the
8 audit?
9 MR. COOPER: Object to the form.
10 THE WITNESS: I'm not clear about that. I
11 know there is a lot of back and forth between
12 you and her at some point about a determination
13 of a date but I'm not clear about whether she
14 agreed to postpone it or not.
15 BY MR. KAPLAN:
16 Q What are you going to do to get clear
17 before we go to trial in December?
18 A I'll discuss it with my counsel.
19 Q That's going to be work-product, right?
20 A I don't know.
21 Q Is that something you plan to testify
22 about at trial in December?
23 A I have not decided yet.
24 Q What about failing to provide samples of
25 products that are being offered for sale, what

Page 216

1 products do you contend were being offered for sale
2 as of April 2005?
3 A According to Mr. Esrig's testimony not too
4 long ago from what I understand and I could be
5 mischaracterizing but I believe there was stickers
6 that were mentioned and there were CDs or music CDs
7 that were mentioned and I'm not sure if you
8 mentioned books. I think that's the extent of the
9 products that were available for sale. I know for
10 certain the music.
11 Q Well, you had certainly seen the books,
12 right?
13 A Yes. If they were the books that was my
14 book. I'm not sure. They were working on other
15 books.
16 Q And you had certainly seen the music CD as
17 of April 27, 2005, right?
18 A No. I never saw the finished music CD. I
19 saw a promotional copy of the CD not the finished CD
20 in its final sale version that would be made
21 available for sale.
22 Q Let me get this right. As I understand it
23 tell me if you understand it differently.
24 A Okay.
25 Q The way the music was being sold was over

Page 217

1 the Internet through i-Tunes, right?
2 A To the best of my knowledge. I don't have
3 any other knowledge it was being sold anywhere else.
4 Q What's i-Tunes, just so we are clear on
5 the record here?
6 A It's a downloadable product.
7 Q It's a Web site that Apple has?
8 A I believe so.
9 Q And through that Web site you can pay to
10 download music, right?
11 A You can download a single song or the
12 whole CD, that's correct.
13 Q And you got access to that downloadable
14 music just like anybody else has, right?
15 A Yes.
16 Q So if you wanted to see what was being
17 offered for sale by Stelor on the i-Tunes site all
18 you had to do was log on to your computer and take a
19 look at the i-Tune site, right?
20 A That's not what the obligation of Stelor
21 Productions required. It required them to provide
22 me with adequate sample of finished product prior to
23 going on sale. I saw no artwork. All I saw was a
24 CD with the music on it. I did not see any artwork.
25 Q Did you log on to the i-Tune site before

Page 218

1    April 27, 2005?
2        A    I didn't even know it was available on
3    i-Tunes. I think I found out through the grapevine.
4    I was not made aware it being sold on i-Tunes. I
5    think I found out through Mr. Eisenberg, if I'm not
6    mistaken. I was not told by Stelor that the music
7    was being sold on i-Tunes.
8        Q    When was the first time you looked on the
9    i-Tunes Web site to see the music?
10       A    I don't recall.
11       Q    Have you?
12       A    I have done that probably in the last six
13   months or so.
14       Q    Did you do it at or around April 2005?
15       A    I don't think so, no. I don't believe so.
16   That's not the issue here. The issue here is that
17   they were supposed to provide me with samples, not
18   to direct me to a Web site. That's what it clearly
19   says, failed to provide Silvers samples of licensed
20   products being offered for sale under paragraph 15.
21       Q    If Stelor failed to provide you with
22   something that you already had, do you agree that
23   would not be a material breach of any of these
24   agreements, yes or no?
25       A    I did not already have it. So I couldn't

Page 219

1    answer yes or no. I was never provided with a
2    finished product of the music.
3        Q    You had a sample, right?
4        A    I had a sample of a promotional copy, not
5    a finished product sample.
6        Q    Will you hand me back those documents?
7        MR. COOPER: It's now 20 of 7. It's
8    getting late. My client is getting tired. You
9    have already acknowledged even if we stay here
10   until 8:30 or quarter to 9 you are not going to
11   finish today.
12       MR. KAPLAN: No, I don't think that's what
13   I said. There is a good likelihood that we
14   will finish tonight.
15       MS. CALABRIA: By the way, this is on the
16   record. I do intend to have -- I think at this
17   point I will have some follow up cross
18   examination. We should calculate that into
19   whatever timing plans we are making here.
20       MR. KAPLAN: We had an agreement when I
21   agreed to change this deposition from Monday to
22   today to accommodate your new appearance in the
23   case, Mr. Cooper, that we would go late
24   tonight --
25       MR. COOPER: And this is late tonight.

Page 220

1        MR. KAPLAN: Just let me finish my schpiel
2    and then you can make yours, okay.
3        At the beginning of this deposition before
4    we started we confirmed on the record that we
5    planned to go until about 9 o'clock. You
6    advised you had no conflict. Mr. Silvers
7    advised that he had no conflict, and we are
8    entitled to conduct seven hours worth of
9    deposition under the rules.
10       Now, you have also advised me tomorrow you
11   got a very limited window of availability. You
12   are not going to be around here until ten
13   o'clock in the morning and then you told me you
14   need to leave at about -- what did you say, 12
15   o'clock. You are giving me a two hour window
16   tomorrow which isn't going to be sufficient.
17       We are going to stay here to night and we
18   are going to finish the deposition. That's
19   what your client is obligated to do. My
20   representative is here. He has got to fly out
21   tomorrow mid-morning and it's not fair given
22   the representations that you have made and the
23   accommodations that I have made for you to end
24   this deposition now.
25       MR. COOPER: Alright. Let me speak with

Page 221

1    my client, please.
2        MR. KAPLAN: I'm going to put you on hold
3    Johanna.
4        VIDEO OPERATOR: We are off the record.
5        (Thereupon, a brief recess was
6        taken.)
7        VIDEO OPERATOR: We are on the record.
8        MR. KAPLAN: Okay. We have had a
9    discussion about schedule during the break. We
10   are all working under the constraints of the
11   court's order and we are mindful of that, but
12   we are trying to accommodate the witness and of
13   course the lawyer's schedules.
14       What we have agreed to do is to go until 8
15   o'clock tonight which gives us about another
16   hour, and then we are going to resume either
17   Thursday at 2 o'clock our time or if I can
18   clear a conflict for Friday on Friday at 11; is
19   that correct?
20       MR. COOPER: Yes.
21       MR. KAPLAN: Johanna, you agree with that?
22       MS. CALABRIA: Yes.
23       MR. KAPLAN: And Mr. Silvers are you in
24   agreement that you can appear at one of those
25   times as well?

(Pages 218 to 221)

---

**Page 222**

1  THE WITNESS: Yes.
2  MR. KAPLAN: Do we also have an agreement
3  that these arrangements are consistent with the
4  court's order and that nobody intends to raise
5  any objection or make any argument to the
6  contrary, Mr. Cooper?
7  MR. COOPER: Yes, that's fine.
8  MR. KAPLAN: Johanna.
9  MS. CALABRIA: We don't intend to make any
10  argument to the contrary, but I want to make
11  sure everyone has the same understanding.
12  My understanding is that dispositive
13  motions are due on -- they were due on the 9th
14  pursuant to the court's order, but because of
15  the implementation of the Pacer System my
16  understanding now is that those motions are due
17  on the 13th.
18  MR. KAPLAN: Actually I think there is a
19  five day -- an automatic five day enlargement
20  from the 9th. So it's really probably the
21  16th.
22  MS. CALABRIA: Okay.
23  MR. COOPER: That's my assumption as well.
24  MS. CALABRIA: Okay. If that's correct
25  then that's fine. I'll look -- relook at the

---

**Page 223**

1  order, maybe I read it wrong, but that's the
2  only concern that I had is that we would be
3  running up against that deadline.
4  MR. KAPLAN: Okay. But otherwise are you
5  in agreement with the stipulation?
6  MS. CALABRIA: Yes.
7  MR. KAPLAN: Let's proceed.
8  BY MR. KAPLAN:
9  Q   I'm going to mark as Exhibit 112 a copy of
10  Silvers' memorandum in opposition to plaintiff's
11  motion for preliminary injunction in case number
12  80393. I do not have the docket site offhand, but I
13  have a very limited question to ask.
14  (Deposition Exhibit No. 112 was
15  marked for identification.)
16  MS. CALABRIA: Can you tell me the name of
17  the document again?
18  MR. KAPLAN: Silvers' memorandum in
19  opposition to plaintiff's motion for
20  preliminary injunction. It's dated -- I think
21  it's May 20, 2005 is the service date.
22  MS. CALABRIA: Okay. Give me just one
23  second.
24  BY MR. KAPLAN:
25  Q   While she is looking I'm going to ask you

---

**Page 224**

1  to look at the first paragraph on page 5 -- actually
2  the second paragraph.
3  (Pause.)
4  MR. COOPER: Starting with central issues
5  or starting with Stelor's motion?
6  MR. KAPLAN: Stelor's motion.
7  (Pause.)
8  MS. CALABRIA: Kevin, this is the Hurley
9  case?
10  MR. KAPLAN: Correct.
11  MS. CALABRIA: I can't find it.
12  MR. KAPLAN: Let me ask my question. It's
13  going to be really quick.
14  MS. CALABRIA: Alright.
15  BY MR. KAPLAN:
16  Q   Mr. Silvers, you recognize this as a paper
17  your lawyer filed on your behalf in the case that
18  was pending before Judge Hurley?
19  A   Yes.
20  Q   You looked at the paragraph that I
21  referenced for you on page 5? Turn to that if you
22  would. Did you see this paper before it was filed?
23  A   Which?
24  MR. COOPER: The whole memo. Did you see
25  it?

---

**Page 225**

1  THE WITNESS: I don't believe so.
2  BY MR. KAPLAN:
3  Q   Did you see it after it was filed?
4  A   I believe I was -- I might have been
5  e-mailed a copy of it.
6  Q   Did you find anything in the paper to be
7  inaccurate when you reviewed the e-mail of it?
8  MR. COOPER: Object to the form.
9  THE WITNESS: I don't recall.
10  BY MR. KAPLAN:
11  Q   Did you look at the paper when it was
12  e-mailed to you?
13  A   I don't recall.
14  Q   Alright. Take a look at page 5 of the
15  paper.
16  A   Okay.
17  Q   The second sentence under the heading
18  there reads, "Silvers is admittedly not complying
19  with the license agreement because he is no longer
20  bound by it." Is that an accurate statement of your
21  position?
22  A   That should be a typo. Silvers is
23  admittedly not complying with the license --
24  Q   That's your position, right?
25  A   No.

(Pages 222 to 225)

Page 226

1    Q   You admitted that you are not complying
2    with the license agreement and haven't been
3    complying since you terminated it in April of 2005,
4    right?
5              MR. COOPER:  Object to the form.
6              THE WITNESS:  I don't understand this at
7    all.  I don't recall even reading this.
8    BY MR. KAPLAN:
9         Q   Do you agree with that statement?
10        A   "Silver is admittedly not complying with
11   the license agreement because he is no longer bound
12   by it."
13        Q   That's what your lawyers wrote, right?
14        A   Okay.  Now I see what this is.
15             MS. CALABRIA:  Kevin, while he is reading
16   it, I just want to be clear.  I found the
17   document, but I think that the reason I was
18   confused is because it's a different case.
19   This is the second case.
20             MR. KAPLAN:  This is 05-80393.
21             MS. CALABRIA:  This is the case Stelor
22   filed against Silvers.
23             MR. KAPLAN:  Correct.
24             MS. CALABRIA:  Okay, got it.
25             THE WITNESS:  Now that I'm reading it in

Page 227

1    this context this is my lawyer wrote this.  I'm
2    not complying with the license agreement
3    because I'm no longer bound by it based upon
4    her alleging that it was terminated, okay.
5    BY MR. KAPLAN:
6         Q   Is that an accurate statement of your
7    position?
8         A   I would have to state that this is what
9    the lawyer wrote and this is what the position is.
10        Q   Do you agree with that statement?
11        A   I think the document will speak for
12   itself.
13        Q   Sir, I'm asking you as you sit here today
14   do you agree with the representation made in this
15   paper that you are admittedly not complying with the
16   license agreement because you contend you are no
17   longer bound by it?  Do you agree, yes or no?
18        A   I can't give you yes or no.  Again, this
19   is what my lawyer wrote on my behalf.  She is my
20   counsel.  She had a reason for putting it in there.
21   I will defer to counsel and what she wrote in this
22   document, end of story.
23        Q   Are you complying with the license
24   agreement?
25        A   Am I complying with the license agreement?

Page 228

1         Q   Yes.
2         A   The license agreement, as far as I'm
3    concerned, was terminated.  So it's obvious that I'm
4    not complying with the license agreement if my
5    position is that it was terminated.
6         Q   In fact, you went ahead and filed a law
7    suit against Google, Inc. obviously, right?
8         A   I believe that's the case.
9         Q   You filed that lawsuit on or about May 4,
10   2005, correct?
11        A   That's what the record says, that's what
12   it is.
13        Q   If the license agreement -- assume that
14   the license agreement was still in effect on May 4,
15   2005, okay.
16        A   Assuming that the license agreement was
17   still in effect on May 4th, go ahead.
18        Q   Was your filing of that action against
19   Google in violation of the license agreement?
20             MR. COOPER:  Object to the form.
21             THE WITNESS:  I'm not an attorney so I
22   cannot give you that answer.
23   BY MR. KAPLAN:
24        Q   What's your understanding?
25             MR. COOPER:  Same objection.

Page 229

1             THE WITNESS:  Defer to counsel on that.
2    BY MR. KAPLAN:
3         Q   If the license -- assuming the license
4    agreement was still in effect on May 4, 2005 would
5    you have filed that lawsuit?
6             MR. COOPER:  Object to the form.
7             THE WITNESS:  I'm not knowledgeable in the
8    law to know if that's something that I had a
9    right to do or not.  That's why I had counsel.
10   BY MR. KAPLAN:
11        Q   But you wouldn't have, you would have
12   wanted Stelor to do it or to do it jointly with
13   Stelor, right?
14             MR. COOPER:  Object to the form.
15             THE WITNESS:  Perhaps.
16   BY MR. KAPLAN:
17        Q   Not perhaps, yes.
18        A   Don't put words in my mouth.
19        Q   That's what I'm doing today, I'm asking
20   leading questions.
21        A   I said perhaps.
22        Q   The answer really is yes, though, isn't
23   it?
24             MR. COOPER:  Object to the form.
25             THE WITNESS:  The answer is perhaps.  The

(Pages 226 to 229)

59

**Page 230**

1     answer is not yes.
2   BY MR. KAPLAN:
3     Q   Alright.  Let me show you what I'm marking
4   as Exhibit 113.
5         (Deposition Exhibit No. 113 was
6         marked for identification.)
7   BY MR. KAPLAN:
8     Q   It's a copy of declaration of Steven
9   Silvers that was filed in case 05-80393 before Judge
10  Hurley.
11        MS. CALABRIA:  What's the date of the
12  document?
13        MR. KAPLAN:  May 20, 2005.  It's docket
14  entry 11.
15        MS. CALABRIA:  Thank you.
16  BY MR. KAPLAN:
17    Q   Is that your signature, Mr. Silvers, on
18  the declaration on page 8?
19    A   Yes.
20    Q   Who prepared this document?
21    A   May have been my lawyer with information I
22  gave her, provided her.
23    Q   Did you write the declaration or did your
24  lawyer?
25    A   I don't recall.

**Page 231**

1     Q   Did you review this declaration before you
2   signed it?
3     A   I'm sure.
4     Q   Did you make any changes to it before you
5   signed it?
6     A   I didn't read the whole document so I
7   don't recall.
8     Q   You didn't read the whole document before
9   you signed it?
10    A   I'm saying didn't -- I read the document
11  and I don't recall if I made any changes.  If I did
12  they would have been implemented in this file of
13  motion -- I mean this file with the declaration.
14    Q   What did you do -- well, when you signed
15  it you understood that you were signing it under
16  penalty of perjury, right?
17    A   Yes.
18    Q   So did that mean to you that it was
19  important that all of the statements in the
20  declaration were accurate?
21    A   Yes.
22    Q   What did you do to confirm that the
23  statements in the declaration were accurate before
24  you signed it?
25    A   I'm sure I read it over carefully.

**Page 232**

1     Q   Did you do anything other than reading it
2   over to confirm the accuracy of the declaration?
3     A   Without having read the whole declaration
4   I would not be able to give you that answer.
5     Q   Well, let's go through it.
6     A   Okay.
7     Q   Take a look at paragraph 2.
8     A   Okay.
9     Q   This is 1996 you published the book
10  Googles and the Planet of Goo which you authored; is
11  that correct?
12    A   Yes.
13    Q   Did you write the book while incarcerated
14  for a conviction on federal charges?
15    A   Yes.
16    Q   What charges?
17        MR. COOPER:  Object to the form.
18        THE WITNESS:  It was multitude of charges,
19  conspiracy, there was an 848 CCE, there was a
20  Title 21, 841, there was a whole host of
21  charges.
22  BY MR. KAPLAN:
23    Q   Did the charges relate to cocaine
24  trafficking?
25        MR. COOPER:  Object to the form.

**Page 233**

1         THE WITNESS:  I believe so.
2   BY MR. KAPLAN:
3     Q   You wrote a book as a way to stay
4   connected to your kids while you were incarcerated,
5   correct?
6         MR. COOPER:  Objection to the form.
7         THE WITNESS:  My son specifically.
8   BY MR. KAPLAN:
9     Q   Take a look at paragraph 7.  In the second
10  sentence you say, "I have now been advised of Stelor
11  Productions Inc.'s assignment of its rights under
12  the license agreement to Stelor Productions, LLC and
13  have not consented to such a transfer."  Now, we
14  looked at the settlement agreement just a few
15  minutes ago in which you specifically acknowledge
16  that Stelor was converting to an LLC.  Do you
17  remember that, and let me hand you back the
18  settlement agreement Exhibit 41, specifically
19  paragraph 9?
20    A   Okay.
21    Q   Do you remember that in the settlement
22  agreement?
23    A   Okay.  What's this now please, again?
24    Q   In the settlement agreement in paragraph 9
25  in January of 2005 you specifically acknowledged

(Pages 230 to 233)

Page 234

1   that Stelor was converting to an LLC, right?
2     A   What was the date of this?
3     Q   May 2005?
4     A   This was when?
5     Q   The settlement agreement was January 2005?
6     A   Okay.
7     Q   So the statement in your declaration in
8   paragraph 7 is inaccurate; isn't that correct?
9     A   Let me think.
10        MR. COOPER:  Object to the form.
11        THE WITNESS:  No.  I think the confusion
12   here is that I was not made aware that Stelor
13   Productions was converting -- was assigning the
14   property, the Google property, from its
15   corporation to the LLC.
16        My knowledge, as best as I can ascertain,
17   was here.  I'm agreeing the parties acknowledge
18   that Stelor, Inc. a Delaware C corporation is
19   in the process of converting to a -- is in the
20   process of converting to an LLC.  "Any options
21   granted to Silvers from the Stelor, Inc. C
22   Corporation will be converted to like amount of
23   units interest under the LLC," in this
24   statement here it mentions I have not been
25   advised of Stelor Productions, Inc.'s

Page 235

1     assignment of its rights under the license
2     agreement to Stelor Productions, LLC and have
3     not consented to such a transfer of those
4     rates.
5   BY MR. KAPLAN:
6     Q   Read the next sentence.
7     A   "I first learned that Stelor Productions
8   LLC claims the status of licensee when served with
9   this lawsuit.  Both Stelor entities are referred to
10  herein as Stelor."
11    Q   Let me ask you this question.  In the
12  settlement agreement you specifically agreed and
13  acknowledged that Stelor Productions, Inc. was
14  converting to Stelor Productions, LLC, correct?
15    A   It was in the process of converting, okay.
16    Q   So you knew under the settlement agreement
17  that the licensee was going to be Stelor Productions
18  LLC, correct?
19    A   I had no knowledge that Stelor was going
20  to assign its rights under the license agreement to
21  Stelor Productions, LLC.
22    Q   What makes you think it did?  Stelor, the
23  corporation, simply changed to an LLC, right, and
24  you knew that because you wanted the options in the
25  LLC, right?

Page 236

1     A   As I was promised, that's correct.
2     Q   Because you knew that the LLC was going to
3   be your licensee when you entered into the
4   settlement agreement, right?
5     A   It would appear to be so.
6     Q   So paragraph 7 of this declaration is
7   wrong, isn't that a correct statement?  You knew
8   that Stelor Productions, LLC was claiming the status
9   of licensee the moment you signed the settlement
10  agreement in January 2005, right?
11        MR. COOPER:  Object to the form.
12        THE WITNESS:  There had to be a reason why
13  this clause was put in here.
14  BY MR. KAPLAN:
15    Q   Yes.  Your lawyer made something up and
16  got you to sign it, right?
17        MR. COOPER:  Object to the form.
18        THE WITNESS:  I can't say yes or no to
19  that.  All I know is that they talked about the
20  assignment of its rights under the license
21  agreement --
22  BY MR. KAPLAN:
23    Q   As you sit here today --
24        MR. COOPER:  Let him finish his answer,
25  please.

Page 237

1         THE WITNESS:  Have not consented to such a
2   transfer and have not consented to such a
3   transfer.
4   BY MR. KAPLAN:
5     Q   Let me ask you this question, Mr. Silvers?
6         MR. COOPER:  Hang on a second.  Are you
7   still going?
8         THE WITNESS:  Yes.  Go ahead.
9   BY MR. KAPLAN:
10    Q   As you sit here today you know that the
11  statement in this declaration of paragraph 7, "I
12  first learned that Stelor Productions, LLC claims
13  the status of licensee when served with this
14  lawsuit."  That was in May of 2005.  You know that
15  statement is false, don't you?
16    A   It's not -- from what I'm reading here and
17  comparing this it's not -- it's inaccurate.
18        I have not been advised that Stelor
19  Productions, Inc.'s assignment of its rights under
20  the license agreement to Stelor Productions, LLC
21  and have not consented to such a transfer.
22    Q   Let's move on.  Take a look at
23  paragraph --
24    A   Excuse me.
25        MR. COOPER:  Let him finish the answer.

(Pages 234 to 237)

61

**Page 238**

1      THE WITNESS: Can you provide me with the
2    license agreement one more time, please.
3    BY MR. KAPLAN:
4      Q    Sure. There is no question pending.
5      A    I just want to see something.
6      Q    I'm handing the witness Exhibit 103 at his
7    request.
8      A    One second here. There is supposed to be
9    a clause in here about assignment and the rights of
10   assigning, which is what I was -- page 8 under
11   Section 21 assignability, "Neither party may assign
12   by any act or operation of law the rights and
13   obligations of this agreement unless in connection
14   with a transfer of substantially all of the assets
15   of the licensee and/or with the consent of the
16   licensor, which shall not be unreasonably withheld
17   or delayed by way of example and not limitation.
18   Licensee --" which I believe is a typo, it should
19   have been licensor, "May freely assign it's rights
20   and obligations under this agreement to Stelor
21   Productions, Inc." I don't think there was a proper
22   assignment that was done between the LLC and the
23   corporation that I was made aware of.
24     Q    There wasn't any assignment of the
25   corporation just converted to an LLC, right?

**Page 239**

1      A    But the assets of the corporation had to
2    be assigned to the LLC. It can't just be
3    automatically --
4      Q    You acknowledge that that conversion could
5    be made in the settlement agreement -- you
6    acknowledged that conversion in the settlement
7    agreement are you saying you then had the right to
8    disapprove it later?
9      A    Well, it says it's in the process of
10   converting to an LLC. It had not converted to an
11   LLC and I don't know if it did convert to an LLC by
12   the time that I made this statement. This statement
13   was made when, in --
14         MR. COOPER: May 2005.
15         THE WITNESS: And this here was made in --
16   BY MR. KAPLAN:
17     Q    You new in January 2005 that Stelor, LLC
18   was soon going to be your licensee?
19     A    No. What I did know, so you don't trick
20   me up on this so we have an accurate record, sir.
21   Is that there was knowledge that I was made aware of
22   that Stelor, Inc. a Delaware C Corporation was in
23   the process of converting to a Delaware LLC and any
24   options granted to me from the corporation would
25   then be converted to the LLC, but I think and I

**Page 240**

1    believe it was not intentional that I misrepresented
2    myself when I signed this.
3          I don't believe Stelor Productions
4    become and LLC. When did Stelor Productions
5    become an LLC? Was it at the time that I executed
6    the declaration so it's obvious that my lawyer
7    advised me at this period of time Stelor did not
8    become an LLC and therefore I made this statement.
9      Q    Sir, look at the caption of the pleading,
10   please.
11     A    Declaration of Steven S. Silvers.
12     Q    No, the caption of the case, Stelor
13   Productions -- what is it?
14     A    LLC, a Delaware corporation formerly known
15   as Stelor Productions, Inc. the plaintiff.
16     Q    Can I move on to my next question?
17     A    Yes.
18     Q    Take a look at paragraph 9.
19     A    Okay.
20     Q    You are complaining about Stelor's alleged
21   failure to provide a written agreement granting me
22   1,000 options for Stelor's stock.
23         Is it your testimony as you sit here
24   today that Stelor never provided you with a
25   written agreement granting you the options, yes or

**Page 241**

1    no?
2      A    I recall receiving a letter, but I think
3    it was after the fact. I recall receiving a letter
4    to something to that effect, but I received it after
5    the fact.
6      Q    You received that letter on December 11,
7    2004, didn't you?
8      A    I don't recall.
9      Q    If you have received that letter on
10   December 11, 2004, would you agree that it was
11   before the fact?
12         MR. COOPER: Object to the form.
13         THE WITNESS: I would agree that if I
14   received the letter I would have to say that it
15   would be before the fact. I don't know if I,
16   in fact, received the letter.
17   BY MR. KAPLAN:
18     Q    Let me show you what I'm marking as
19   Exhibit 117.
20         (Deposition Exhibit No. 117 was
21          marked for identification.)
22         MS. CALABRIA: Did you say 117?
23         MR. KAPLAN: 117, yes. This is an
24   exhibit to Esrig's declaration. I think it's
25   an exhibit -- the declaration is docket entry

(Pages 238 to 241)

62

| Page 242 |
|---|

1  63.
2       MS. CALABRIA:  Exhibit A?
3       MR. KAPLAN:  It's probably not Exhibit A.
4  It's Exhibit F as in Frank.
5       MS. CALABRIA:  I don't have that because
6  I'm guessing because I probably wasn't able to
7  pull it off.  Can you tell me what it is?
8       MR. KAPLAN:  This is a letter dated
9  December 10, 2004 that is an agreement relating
10  to the options between Stelor and Silvers and
11  attached to it is a FedEx confirmation that
12  indicates that it was signed for by Steven on
13  December 11, 2004.  You got this letter didn't
14  you, Mr. Silvers?
15       THE WITNESS:  I don't recall to be honest
16  with you and I never would have signed for it
17  by Steven.  It would have been Steven Silvers.
18  This letter here I'm almost positive was after
19  the fact and it didn't -- it's talking about
20  option shares vested one third after the end of
21  2004.  That's not what my agreement called for.
22  It was 1,000 shares not with any caveats with
23  vested interests expiring at the end of 2007.
24  BY MR. KAPLAN:
25       Q   Mr. Silvers --

| Page 243 |
|---|

1       A   I don't think this was even signed by Mr.
2  Esrig.
3       Q   Let's just take this one step a time --
4       MR. KAPLAN:  Hold on.  We have to change
5  the tape.
6       VIDEO OPERATOR:  We are off the record.
7            (Thereupon, a brief recess was
8            taken.)
9       VIDEO OPERATOR:  We are on the record.
10  BY MR. KAPLAN:
11       Q   One housekeeping item.  This letter that I
12  have been questioning the witness about was
13  inadvertently marked as Exhibit 116.  In fact it's
14  going to be marked as Exhibit 114.
15            (Deposition Exhibit No. 114 was
16            marked for identification.)
17  BY MR. KAPLAN:
18       Q   So let's go back to Exhibit 114, and here
19  is the question, Mr. Silvers.
20            Did you receive this letter on or about
21  December 11, 2004?
22       A   I don't recall.
23       Q   Do you deny receiving the letter on or
24  about December 11, 2004?
25       A   I can't deny or affirm.

| Page 244 |
|---|

1       Q   Was your address at the time 8983
2  Okeechobee Boulevards, Suite 202?
3       A   Yes.
4       Q   Was there any other Steven at that
5  address?
6       A   No.
7       Q   You were the only Steven, correct?
8       A   That's correct.
9       Q   Do you dispute the accuracy of the FedEx
10  delivery confirmation that I have attached to this
11  exhibit?
12       A   No.
13       Q   Now, did you sign Exhibit 114 and send it
14  back to Stelor?
15       A   I don't believe so.
16       Q   Did you refuse to sign it?
17       A   I think my counsel and I discussed some
18  things in reference to this document and that's
19  attorney-client privilege as to why there was no
20  signature.
21       Q   Did you object to this document?
22       A   I think the lawyer objected to it.
23       Q   Did you or your lawyer or anybody ever
24  advise Stelor that you objected to this letter
25  agreement?

| Page 245 |
|---|

1       A   I believe so.
2       Q   When?
3       A   I don't know, but I believe my lawyer did
4  object to it.  It made specific discussions about
5  vested one-third after the end of 2004 and so on.
6  That was not what I agreed with Mr. Esrig.
7       Q   You knew Stelor had an option plan?
8       A   That's another issue that I raise in my
9  declaration that I was never provided.  In fact,
10  Stelor has even refused to provide me a copy of its
11  then existing option plan and any option plan which
12  is necessary to determine if I'm entitled to more
13  options.  I believe my lawyers inquired with Stelor
14  about those documents and was never given them.  I
15  was not aware of them having an option plan.
16       Q   I'm sorry.  Let me hand you back
17  Exhibit 111.  That's your termination letter.  I
18  don't see any request in there for a copy of the
19  option plan.  Can you point it out to me?
20       A   It's not in this letter.  I think it was
21  in some other document that she may have
22  communicated with either Stelor or Stelor's counsel.
23       Q   What document, can you tell me?
24       A   A letter or e-mail perhaps.
25       Q   Isn't it true that as of the date of your

63

Page 246

1  declaration May 20, 2005 Stelor had provided you
2  with a written agreement granting the options which
3  you refused to sign, isn't that true?
4      A   It appears that there is a letter here
5  dated prior to this declaration, and I did upon
6  advice of counsel refuse to sign this letter -- this
7  option shares because it was after the fact.
8      Q   The statement in paragraph 9 that Stelor
9  has not provided this agreement to me is false.
10     MR. COOPER:  Object to the form.
11     THE WITNESS:  The reason why I addressed
12  this the way that I did was that this option
13  letter does not comport with what I stated in
14  my declaration, which was that provided written
15  agreement granting me one thousand option
16  shares of Stelor stock with the number of
17  options to increase if Stelor's option plan
18  changed.
19         Stelor has not provided me with this
20  agreement -- Stelor has not provided this
21  agreement to me.  If you look at my original
22  consulting agreement it states in there that
23  they will provide me with an agreement that
24  stipulated that if there was other option
25  shares granted to other people that I would

Page 247

1  certainly be entitled to additional option
2  shares.  And that was not in this letter.  I
3  believe that's why I was told not to execute
4  this agreement, because this would lock me into
5  one thousand shares when I had knowledge that
6  there were other people that Stelor had
7  promised in like categories of myself and
8  Mr. Maitland more option shares than what
9  Mr. Esrig had led me to believe that I would
10  otherwise be entitled to.  So that's why I
11  think I believe I made this statement the way I
12  did.
13  BY MR. KAPLAN:
14     Q   That's not what the April 27th letter
15  says, is it?
16     A   What does the April 27th letter state?
17     Q   I just showed it to you.  "Failed to
18  provide seller with unit interests in Stelor, LLC.
19  There is not one word in there about options, is
20  there?
21     A   I cannot speak for what my counsel did on
22  my behalf in that regard.  All I know is that you
23  are trying to get me to state that I committed
24  perjury when I wrote this or I signed this document
25  and that's not an accurate statement.

Page 248

1      Q   The statement in paragraph 9 is a little
2  misleading to say the least, isn't it?
3      A   The document speaks for itself.
4          MR. COOPER:  Object to the form.
5  BY MR. KAPLAN:
6      Q   It sure does.  Now, take a look at
7  paragraph 13 of your declaration.
8      A   Okay.
9      Q   You are referencing the i-Tunes music,
10  right and you say, for example, attached is Exhibit
11  D.
12     A   Yes.
13     Q   Feel free to look at Exhibit D is a
14  receipt an associate provided to me reflecting the
15  purchase and the download of the entire One Goo
16  World compact disc in August 2004.
17     A   Where is that exhibit?
18     Q   Behind the page that says Exhibit D.
19     A   D.  Here is Exhibit B, okay.
20     Q   Who is the associate?
21     A   I was provided this, I believe, by Mr. --
22  I believe Eisenberg.
23     Q   Why didn't you put his name in there?
24     A   I don't know.  I didn't think it was
25  necessary.

Page 249

1      Q   When did he provide it to you?
2      A   Before this document was issued, that's
3  for sure.
4      Q   Before May 20, 2005, but how much before?
5      A   I don't recall.  All I know is that the
6  document and the exhibit speaks for itself and I was
7  never paid royalties on this.
8      Q   The document indicates that Mr. Eisenberg,
9  if it was him, purchased the music from i-Tunes on
10  or about August 31st, 2004?
11     A   No, not Mr. Eisenberg.  Where are you
12  reading this, sir?
13     Q   Paragraph 13 of your declaration says that
14  an associate -- paragraph 13 says, "Attached as
15  Exhibit D is a receipt an associate provided to me."
16     A   Right, reflecting the purchase and
17  download of the entire One Goo World compact disc in
18  August of 2004.
19     Q   Who was the associate?
20     A   The associate that provided me the
21  document was Mr. Eisenberg.  The person that
22  purchased this I don't have the exact name of the
23  person that purchased it.  But we can certainly find
24  that out by the order number and the invoice.
25         The point is that this purchase was

(Pages 246 to 249)

Page 250

1   never reflected in any royalty statement that I
2   was provided.
3       Q    I understand your point. What I'm trying
4   to ask you where this purchase receipt came from.
5   Where did Mr. Eisenberg get it?
6       A    It was provided to him by the person that
7   purchased the CD from what I understand.
8       Q    Which was who?
9       A    I don't know. I'm sure that I could find
10  that out.
11      Q    How would you find out?
12      A    I would speak to Mr. Eisenberg.
13      Q    Did you bother to ask Stelor why you
14  hadn't received any royalty information for that
15  purchase?
16      A    Yes.
17      Q    When?
18      A    I don't recall.
19      Q    Does your termination letter say anything
20  about the download of the Googles from Goo sound
21  track?
22      A    I don't remember either way. All I know
23  is that this document is a purchase history of
24  somebody that purchased this entire album. The
25  dates and everything else the document speaks for

Page 251

1   itself and was never reflected in any royalty
2   statement. To that effect I made this claim as I
3   made.
4       Q    What's AWAL?
5       A    Some company that Mr. Esrig and some
6   gentleman by the name of Figelman or somebody
7   formed, an artist without -- Artist Without License
8   AWAL, Artist Without License -- Licenses or license.
9   I never did know what that company was all about.
10      Q    Stelor advised you, in fact you have seen
11  it in the court papers we filed that AWAL was
12  handling the sale of the music through i-Tunes,
13  correct?
14      A    I recall something to some effect about
15  that. I never could get a straight answer about
16  who, what, why, where, when.
17      Q    Will you just try and stick with my
18  questions for a second, okay. And in fact Stelor
19  advised you that the very first statement they got
20  from AWAL was dated February 25, 2005, correct?
21      A    I don't know that answer. AWAL was
22  involved with i-Tunes and I would assume that AWAL
23  would be considered a sublicensee, and if that's the
24  case I never received any information about them
25  being a sublicensee.

Page 252

1       Q    Can you stick with my question for a
2   second? They are a service that just handled the
3   sale of music on i-Tunes right?
4       A    I have no idea who they were. This is the
5   first time I'm seeing this.
6       Q    Take a look -- this is the first time you
7   are seeing this?
8       A    I think so.
9       Q    Did you read the papers that were filed in
10  this action? Did you see the declarations Mr. Esrig
11  filed?
12      A    This is the first time I'm seeing this
13  document.
14      Q    Did your lawyers send you the papers that
15  were filed?
16      A    Sometimes they e-mail them to me and
17  sometimes I get them sent to me. This is the first
18  time I'm looking at this document to the best of my
19  knowledge. This statement totals $48.82, okay.
20      Q    Now, the download was August 2004, right?
21      A    August 31st.
22      Q    And you see that this report reports by
23  month. There is three entries for 7/31, right,
24  7/31/2004, although the '04 is cut off, do you see
25  that?

Page 253

1       A    Yes.
2       Q    And then there is a bunch of entries for
3   8/28/2000, do you see those?
4       A    Yes. None for 8/31.
5       Q    Of course 8/31 would be after the cutoff
6   for August of 2004, right, it's reported by month.
7   Do you see that?
8       A    I know that from what I'm looking at here.
9   I see all the dates for July, August and all of the
10  dates for September and October. So why wouldn't
11  there be an August 31st?
12      Q    All of the dates on this report correspond
13  to the end of the month which is the reporting
14  cycle, do you see that?
15      A    No.
16      Q    For example, the first three entries all
17  bear the date 7/31, correct?
18      A    Yes.
19      Q    That's not the date of the download,
20  that's the date of the report for downloads during
21  the month of July, do you understand that?
22      A    I don't know how they keep the accounting
23  records. You are telling me, you know, so if you
24  are surmising that I know this, I'm just listening
25  to what you are telling me. I don't see the date

(Pages 250 to 253)

Page 254

1  August 31 anywhere in here, not even September.
2      Q    Wait. Just take this one step at a time.
3      A    Okay.
4      Q    I want you to accept as true that the
5  downloads are reported on a monthly basis, okay.
6  Can you do that?
7      A    Do you know this to be a fact?
8      Q    Yes.
9      A    Okay, well, I don't know it to be a fact
10  so I'm going to base it on what you are telling me.
11      Q    Yes. That's what I'm asking you to do.
12  Now, assuming that's true, if the cut off date for
13  reporting downloads during the month of August 2004
14  was August 28, a download that occurred on August
15  31st would show up on the report for the following
16  month, correct?
17      A    But this is seemingly an inconsistency
18  here. There is the 31st of July, the 28th of
19  August, the 25th of September, the 30th of October.
20  There is no consistency here. I'm of the opinion
21  that this is when these dates -- this is when these
22  downloads actually took place.
23      Q    Do you know that for a fact?
24      A    No, but I don't know that to be not for a
25  fact. You are telling me something that I don't

Page 255

1  think is accurate. I see your July 31, 2004, the
2  title, the downloads, the amount.
3      Q    Do you see a download next to the date
4  9/25/2004 for One Goo World?
5      A    Yes.
6      Q    That's the entire album, correct, the
7  entire CD, generating --
8      A    Not for $6,000.50, I don't believe.
9      Q    Well, that's the commission that comes
10  from the download, right? That's not the retail
11  price --
12      A    I don't know that. That's what you are
13  telling me. I have never seen anything. I have
14  never been explained about this company and how they
15  work.
16      Q    Do you dispute that?
17      A    I would have to dispute it because I was
18  never told about it.
19      Q    Did you ever bother to ask?
20      A    I'm sure that I inquired a number of times
21  with Steve about certain things that I was never
22  given information about.
23      Q    Did you bother to read what Mr. Esrig had
24  to say in his declaration about this?
25      A    I don't recall. I'm sure I read his

Page 256

1  declaration.
2      Q    Do me a favor. Count up the number of
3  downloads that are listed on this first page. Do
4  you see that number? It's mostly 1's under the
5  heading downloads.
6      A    Yes.
7      Q    I count up -- I get to 32, do you see
8  that?
9      A    Okay.
10      Q    Do you agree with that?
11      A    If that's what you say, 32.
12      Q    Turn the page. I see 8 more on the second
13  page.
14      A    Okay.
15      Q    It totals 40 by my count, okay. Now, in
16  fact you were provided a royalty statement for this
17  period by Stelor in June -- let me just find it.
18  I'm going to hand you what I'm marking as
19  Exhibit 116 which is a big letter from me to Gail
20  McQuilkin dated June 21, 2004?
21          (Deposition Exhibit No. 116 was
22          marked for identification.)
23      MS. CALABRIA:  Kevin, excuse me. Did you
24  say 116? Did I miss 115?
25      MR. KAPLAN:  Yes, that's the AWAL

Page 257

1      statement.
2          (Deposition Exhibit No. 115 was
3          marked for identification.)
4      MS. CALABRIA:  Oh, I see. Okay, I got it.
5  BY MR. KAPLAN:
6      Q    Let me show you the royalty statement that
7  appears on the last page of that letter, second to
8  the last page.
9      MS. CALABRIA:  Is there a document entry
10      that corresponds to 116?
11      MR. KAPLAN:  Yes. Hold on one second.
12      It's in one of the Esrig declarations.
13      THE WITNESS:  I never saw this before.
14      MR. KAPLAN:  You never saw that letter.
15      THE WITNESS:  I never saw this.
16  BY MR. KAPLAN:
17      Q    This is a royalty statement for the period
18  January 1, 2005 to March 31, 2005. Do you deny
19  receiving this?
20      MS. CALABRIA:  Kevin, I'm sorry to
21      interrupt. Could you get a docket entry for me
22      so I can follow along?
23      MR. KAPLAN:  I don't have it at hand.
24      Just give me one second and I'll get it to you
25      in a minute.

(Pages 254 to 257)

Page 258

1  BY MR. KAPLAN:
2      Q   Do you deny receiving this royalty
3  schedule?
4      A   I can't be sure.  This is advance royalty.
5  This is advance royalty.
6      Q   This reports on royalties for i-Tunes
7  downloads, correct?  You see the item says download
8  description, album single, album single.
9      A   What is derivative work, where would that
10  be?
11      MS. CALABRIA:  Kevin, I'm having a hard
12  time following.  Would you mind giving me that
13  number so that I can follow on?
14      MR. KAPLAN:  Johanna, I got ten minutes
15  left before we are going to depart.  Just let
16  me get through this then I'll be happy to get
17  you the document.
18      MS. CALABRIA:  Okay.  I just -- you know.
19  BY MR. KAPLAN:
20      Q   It says unit sold 40.
21      A   Okay, from January.
22      Q   The item is downloads, correct?
23      A   Yes.
24      Q   Alright.  That corresponds exactly to the
25  number of downloads shown on the AWAL report, right?

Page 259

1      A   From January to March.
2      Q   Right, and we agreed earlier on when I
3  showed you the license agreement that what counts is
4  when Stelor received the revenues, right?
5      A   Okay.
6      Q   If Stelor didn't receive the revenues
7  until it got this AWAL statement in February of
8  2005, then those revenues, those royalties were
9  accurately reported in the royalty statement for
10  that period which Stelor gave to you, right?
11      A   I'm trying to understand what the point is
12  here.  Are you saying that this download here is
13  included in this royalty statement.
14      Q   Yes.  That's exactly what I'm saying.
15      A   I don't see how you are coming up with
16  that conclusion.  This is from January to March.
17  This is August, which is 2004.  June 31st, 2004.
18  These royalty statements, excuse me, cover 1/1/05 to
19  3/31/05 January, February, March and you are telling
20  me that it took August, September, October,
21  November, December, January, six months for Stelor
22  to get paid its royalty on this, is that what you
23  are telling me?
24      Q   Assuming it did, then Stelor accurately
25  reported it to you, right?

Page 260

1      MS. CALABRIA:  What's the amount of
2  royalty on that document?
3      THE WITNESS:  The $12 no.  The credit
4  card --
5      MR. KAPLAN:  One the statement, $2.89.
6  BY MR. KAPLAN:
7      Q   And, Mr. Silvers, in light of
8  Ms. Calabria's question, the total amount of
9  royalties that you are fighting over is $2.89,
10  right?
11      A   I'm fitting over the principle of not
12  reporting accurately to me when I was led to believe
13  otherwise was the case, not seeing this anywhere in
14  a royalty statement.
15      Q   And you jumped the gun.  You terminated
16  the agreement without even bothering to ask Stelor
17  to explain to you why it hasn't been reported,
18  right?
19      A   I asked -- this was directed to Mr. Esrig,
20  I believe, in a letter or verbally, probably in a
21  letter I'm pretty sure.  The answer was he knew
22  nothing about it, from what I recollect, and I think
23  he would look into it, something along those lines,
24  and I never got any definitive answer one way or the
25  other.

Page 261

1      Q   A letter you can't point me to and haven't
2  provided me with, right?
3      A   I will look to search for that letter.
4  There is something to that effect.  Because I
5  remember Mr. Esrig telling me that he knew nothing
6  about this download.
7      Q   Will you provide me that letter Thursday
8  or Friday when we continue?
9      A   I will try to look for it.
10      Q   Go back to your declaration.
11      A   Okay.
12      Q   Page 4, paragraph 16.  Now, again, you are
13  talking about royalty statements for the 3rd and 4th
14  quarters of 2004, right?
15      A   That's what I'm saying here.
16      Q   But you agreed in the settlement agreement
17  that Stelor didn't need to provide you with those
18  royalty statements, right?
19      A   I don't -- you have to show me that
20  document.
21      Q   You agree -- let me show you the
22  settlement agreement again.  I direct your attention
23  to paragraph 12.  You agree that Stelor shall
24  confirm in writing that no royalty payments are
25  outstanding and thus no royalty statements are due.

(Pages 258 to 261)

Page 262

1  Paragraph entitled Royalty Statements, right?
2      A   Yes.
3      Q   And Stelor provided you with that
4  certification, right?
5      A   I believe so.  What was the date of this
6  again?
7      Q   The settlement agreement, January 28,
8  2005?
9      A   The date of my declaration was?
10     Q   May 2005?
11         MR. COOPER:  Object to the form.
12         THE WITNESS:  Okay.
13 BY MR. KAPLAN:
14     Q   Let me show you what I marked as
15 Exhibit 117.  This is the certification that Stelor
16 provided you on or about March 8, 2005.  It's
17 Exhibit A to the supplemental Esrig declaration.
18             (Deposition Exhibit No. 117 was
19               marked for identification.)
20         MS. CALABRIA:  Do you have a docket entry
21 number?
22         MR. KAPLAN:  53.
23 BY MR. KAPLAN:
24     Q   Stelor provided you the certification that
25 was required under the settlement agreement, right?

Page 263

1      A   March 8, '05.
2      Q   "No royalty payments from Stelor to
3  Mr. Silvers are owed or outstanding.
4      A   As of December 31, 2004.
5      Q   That satisfies the requirement of
6  paragraph 12 of the settlement agreement, doesn't
7  it?
8      A   What was the royalties that were paid
9  January -- that was in 2005, January, February,
10 March 2005.
11         MR. COOPER:  Object to the form.
12         THE WITNESS:  Okay.
13 BY MR. KAPLAN:
14     Q   So the certification satisfies the
15 requirement of paragraph 12 of the settlement
16 agreement, right?
17         MR. COOPER:  Object to the form.
18         THE WITNESS:  I'm getting tired.  Once
19     again -- okay, January 28, 2005 and this is March of
20     the settlement agreement and this is March of
21     2005, three months later.
22 BY MR. KAPLAN:
23     Q   And yet in paragraph 16A of your
24 declaration you don't make any mention about
25 paragraph 12 of the settlement agreement or the

Page 264

1  certification that Stelor provided, do you?
2      A   No.
3      Q   It's a little misleading, don't you think?
4  You are alleging a breach under the license
5  agreement after you have already agreed that Stelor
6  can follow a procedure to satisfy the issue which
7  procedures Stelor followed, isn't that misleading?
8      A   I'm trying to understand here --
9         MR. COOPER:  Object to the form.
10        THE WITNESS:  I'm trying to understand
11    here.  There was some kind of technicality in
12    reference to the settlement agreement was
13    breached, then the license agreement would
14    automatically have terminated based upon the
15    noncompliance, but I see what you are saying.
16 BY MR. KAPLAN:
17     Q   There is no technicality, is there?  You
18 agree with what I'm saying, don't you?
19        MR. COOPER:  Object to the form.
20        THE WITNESS:  Okay.
21 BY MR. KAPLAN:
22     Q   Alright.  Take a look at paragraph 17.  By
23 the way, this certification Exhibit 117, what does
24 paragraph one say?  Read it out loud, please.
25     A   "Pursuant to the January 28th, 2004

Page 265

1  settlement agreement between and amongst Stelor
2  Productions Incorporated, Stelor and Steven Silvers
3  Stelor hereby certifies as follows."
4      Q   One, go ahead.
5      A   Why doesn't it say Stelor LLC, among
6  Stelor Productions, Inc.  Wasn't Stelor Productions
7  an LLC at that time?
8      Q   Can you answer my question, sir?  Can you
9  read paragraph 1 out loud?
10     A   "Stelor has not increased the amount of
11 stock options created under the original stock
12 option plan."
13     Q   There it is.  What more did you want from
14 Stelor about the stock options?
15     A   Well, it's not an accurate statement.  It
16 was basically not an accurate statement.
17     Q   It says certification under penalty of
18 perjury.
19     A   Right.  So if I can prove that this is not
20 accurate --
21     Q   Hold on a second.  That's not what
22 paragraph 9 of the declaration says.  Paragraph 9
23 says, "Stelor is required to provide a written
24 agreement granting you 1,000 options with the number
25 of options to increase if Stelor's option plan

Page 266

1  changes. Stelor provides you with a written
2  certification March 8, 2005 that the amount of the
3  stock options has not increased." They provide you
4  with another copy of the letter and you still refuse
5  to sign; isn't that right?
6    A    Because I had reason to suspect it was not
7  accurate.
8    Q    Because you were trying to set up a breach
9  that didn't really exist?
10     MR. COOPER:  Object to the form.
11     THE WITNESS:  That's not true at all.
12  BY MR. KAPLAN:
13    Q    Back to paragraph 17. You say you
14  requested an audit. You mentioned --
15    A    Where are we now?
16    Q    Paragraph 17 of the declaration. You
17  complained Stelor refused to allow you an audit.
18  You failed to mention, though, that your lawyer
19  agreed to postpone that audit in March of 2005,
20  don't you?
21    A    I'm not following you. 17 says, after
22  learning on my own that Stelor's commercial efforts,
23  I requested an audit -- okay, I'm sorry.
24    Q    You failed to mention anywhere in that
25  paragraph that your own lawyer had agreed to

Page 267

1  postpone the audit. Why don't you mention that?
2    A    I don't have the knowledge to know what
3  she did or what she didn't do about postponing. I
4  know there was some back and forth e-mails between
5  you and her. And I don't know to what extent those
6  e-mails reflected about postponement or
7  reestablishing a new date that wasn't complied with
8  or whatever.
9    Q    She didn't bother to mention that to you
10  when she prepared the affidavit and gave it to you
11  to sign?
12    A    I don't recall.
13    Q    I'll show you that e-mail Thursday or
14  Friday when we come back.
15    A    Okay.
16     MR. COOPER:  It's 8 o'clock. So soon as
17   you are to a good point let's wrap it up for
18   the evening.
19     MR. KAPLAN:  I'm ready to break for now
20   based on our agreement.
21     MR. COOPER:  Let's talk tomorrow and we
22   will figure out whether it's Thursday or
23   Friday.
24     MR. KAPLAN:  Let's have this clear on the
25   record. Let's plan to resume Thursday at 2

Page 268

1  unless we have got something in writing
2  agreeing otherwise.
3     MR. COOPER:  That's fine.
4     MR. KAPLAN:  Okay Johanna? Johanna?
5     MS. CALABRIA:  Sorry, I had you on mute.
6  That's fine with me too.
7     One thing, Kevin, if you would
8  please. There have been a couple of exhibits
9  that I didn't receive. Can we straighten out
10  now what they are?
11     MR. KAPLAN:  I'll follow up with you
12  tomorrow on the exhibits.
13     MS. CALABRIA:  I can just tell you now.
14     MR. KAPLAN:  We are going off the record.
15     MS. CALABRIA:  I would like to have this
16  on the record because I didn't get a copy of
17  the exhibit. The exhibits are 114, 115 and
18  116.
19     MR. KAPLAN:  Okay. Going off the record.
20     VIDEO OPERATOR:  We are off the record.
21         - - -
22     (Witness excused.)
23     (Thereupon, the deposition was
24     adjourned.)
25

Page 269

1
2  THE STATE OF FLORIDA)
3  COUNTY OF MIAMI-DADE)
4
5    I, the undersigned authority, certify that the
6  aforementioned witness personally appeared before me
7  and was duly sworn.
8
9     WITNESS my hand and official
10     seal this 23rd day of October
11     2006.
12
13
14
15
16
17
18     ---------------------------
       Thomas R. Neumann
       Notary Public - State of Florida
19     My Commission Expires: 3/22/07
       My Commission No.: DD187497
20
21
22
23
24
25

Page 270

```
1              C E R T I F I C A T E
2
3    THE STATE OF FLORIDA)
4    COUNTY OF DADE)
5
6        I, Thomas R. Neumann, Registered Reporter,
     State of Florida at large, do hereby certify that I
     was authorized to and did report said deposition in
7    stenotype; and that the foregoing pages, numbered
     from 1 to 268, inclusive, are a true and correct
8    transcription of my shorthand notes of said
     deposition.
9
         I further certify that said deposition was
10   taken at the time and place hereinabove set forth
     and that the taking of said deposition was commenced
11   and completed as hereinabove set out.
12       I further certify that I am not attorney or
     counsel of any of the parties, nor am I a relative
13   or employee of any attorney or counsel of party
     connected with the action, nor am I financially
14   interested in the action.
15       The foregoing certification of this transcript
     does not apply to any reproduction of the same by
16   any means unless under the direct control and/or
     direction of the certifying reporter.
17
         IN WITNESS WHEREOF, I have hereunto set my hand
18   this 23rd day of October 2006.
19
20
21
22
23          -----------------------
            Thomas R. Neumann
24          Notary Public - State of Florida
            My Commission Expires:  3/22/07
25          My Commission No.:  DD187497
```

Page 271

```
1    DATE:     October 23, 2006
2    TO:       STEVEN SILVERS
               C/O ROBERT H. COOPER P.A.
3              2699 N.E. 191 Street
               Suite 704
4              Aventura, Florida 33180
5    IN RE:    STEVEN A. SILVERS V GOOGLE, INC.
6    CASE NO.:  05-80387
7
8        Please take notice that on Tuesday, the 10th of
     October 2006, you gave your deposition in the
9    above-referred matter.  At that time, you did not
     waive signature.  It is now necessary that you sign
10   your deposition.
         Please call our office at the below-listed
11   number to schedule an appointment between the hours
     of 9:00 a.m. and 4:30 p.m., Monday through Friday,
12   at Network Reporting Corporation, 44 W. Flagler
     Street.
13       If you do not read and sign the deposition
     within a reasonable time, the original, which has
14   already been forwarded to the ordering attorney, may
     be filed with the Clerk of the Court.  If you wish
15   to waive your signature, sign your name in the blank
     at the bottom of this letter and return it to us.
16
               Very truly yours,
17             NETWORK REPORTING CORPORATION.
18             _____
19             THOMAS R. NEUMANN
20   I do hereby waive my signature:
21
22   _____
     STEVEN SILVERS
23
24   cc via transcript:  KEVIN C. KAPLAN, ESQ.
                         JOHANNA CALABRIA, ESQ.
                         ROBERT H. COOPER, ESQ.
25   file copy
```

Page 272

```
1              C E R T I F I C A T E
2              - - -
3
4    THE STATE OF FLORIDA)
5    COUNTY OF MIAMI-DADE)
6
7        I hereby certify that I have read the foregoing
8    deposition by me given, and that the statements
9    contained herein are true and correct to the best of
10   my knowledge and belief, with the exception of any
11   corrections or notations made on the errata sheet,
12   if one was executed.
13
14       Dated this ____ day of _____,
15   2006.
16
17
18
19
20   _____
21   STEVEN SILVERS
22
23
24
25
```

Page 273

```
1              E R R A T A   S H E E T
2    IN RE:  STEVEN A. SILVERS V GOOGLE, INC.
3    DEPOSITION OF:  STEVEN SILVERS
4    TAKEN:  10/10/06
5     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
6    PAGE #  LINE #  CHANGE          REASON
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   Please forward the original signed errata sheet to this
     office so that copies may be distributed to all parties.
18
         Under penalty of perjury, I declare that I have read my
19   deposition and that it is true and correct subject to any
     changes in form or substance entered here.
20
21   DATE:  _____
22
23   SIGNATURE OF DEPONENT:_____
24
25
```

(Pages 270 to 273)