# EXHIBIT B

Dockets.Justia.com

Page 274

UNITED STATES DISTRICT CIRCUIT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80387 CIV RYSKAMP/VITUNIC

STEVEN A. SILVERS, an individual,
          Plaintiff,
v.
GOOGLE INC., a Delaware corporation,
          Defendant.
_____

GOOGLE INC., a Delaware corporation,
          Counterclaimant,
v.
STEVEN A. SILVERS, an individual;
STELOR PRODUCTIONS, INC., a Delaware
Corporation; STELOR PRODUCTIONS, LLC, a
Delaware limited liability company,
          Counterdefendants.
_____

DEPOSITION OF STEVEN SILVERS
VOLUME III

Friday, October 13, 2006
11:46 a.m. - 2:00 p.m.
2699 South Bayshore Drive
Miami, Florida 33133

Reported By:
Thomas R. Neumann
Notary Public, State of Florida
Network Reporting Corporation
Phone:  888.358.8188
        305.358.8188

- - - -

Page 275

```
1   APPEARANCES:
2   On behalf of the Plaintiff:
3      ROBERT H. COOPER, ESQUIRE
       ROBERT H. COOPER, P.A.
4      2999 N.E. 191 Street
       Suite 704
5      Aventura, Florida 33180
6
    On behalf of the defendant Google:
7
       JOHANNA CALABRIA, ESQUIRE  (By telephone.)
8      PERKINS COIE LLP
       Suite 2400
9      Four Embarcadero Center
       San Francisco, California 94111
10
11  On behalf of defendant Stelor:
12     KEVIN C. KAPLAN, ESQUIRE
       BURLINGTON, SCHWIEP, KAPLAN & BLONSKY, P.A.
13     2699 South Bayshore Drive
       Penthouse
14     Miami, Florida 33133
15
16
17
18
19
20
21
22
23
24
25
```

Page 276

```
1
2
3           I N D E X
4        DIRECT CROSS
    WITNESS
5   STEVEN SILVERS
    By Mr. Kaplan      278
6
7
8           E X H I B I T S
9   NUMBER   PAGE   NUMBER PAGE
       118    291    128   341
10     119    295    129   343
       120    304    130   344
11     121    306    131   347
       122    316    132   351
12     123    318    133   353
       124    318    134   354
13     125    328    136   360
       126    340    137   364
14     127    341
15
16
17
18
19
20
21
22
23
24
25
```

Page 277

```
1          P R O C E E D I N G S
2                  - - -
3        Deposition taken before Thomas R. Neumann,
4   Registered Reporter and Notary Public in and for the
5   State of Florida at Large, in the above cause.
6                - - - -
7        VIDEO OPERATOR:  This is the videotape
8   deposition continuation of Steven Silvers taken
9   in the mater of Steven Silvers versus Google,
10  Inc.  This deposition is being held at 2699
11  South Bayshore Drive, Miami, Florida.  Today's
12  date is October 13, 2006.  The time is 11:47
13  a.m.  The court reporter's name is Tom Neumann
14  with the firm of Network Reporting.  The
15  videographer is David Zeber with the firm of
16  Action Video.  Will counsel now please
17  introduce themselves.
18       MR. KAPLAN:  I'm Kevin Kaplan counsel for
19  the crossplaintiffs, Stelor Productions, LLC.
20  With me is my partner David Zack.
21       MR. COOPER:  Robert Cooper on behalf of
22  Steven Silvers making a limited appearance for
23  the purpose of this deposition.
24       MS. CALABRIA:  Johanna Calabria on behalf
25  of Google, Inc.
```

Page 278

```
1        MR. KAPLAN:  Mr. Cooper, again we object
2   to the so-called limitation of your appearance.
3        MR. COOPER:  So noted.
4        MR. KAPLAN:  Would you swear the witness,
5   please.
6                  - - -
7   Thereupon,
8            (STEVEN SILVERS)
9        having been first duly sworn or affirmed,
10  was examined and testified as follows:
11           DIRECT EXAMINATION
12  BY MR. KAPLAN:
13       Q   Good morning, Mr. Silvers.  You understand
14  this is a continuation of the deposition we started
15  two days ago.
16       A   Yes.
17       Q   Is there anything that you recall
18  testifying to on Tuesday that as you think back was
19  inaccurate or incorrect?
20       A   Not at this time.  I have to probably wait
21  until I reread the transcripts.  At this time I
22  don't believe so.
23       Q   As you think back on your testimony from
24  two days ago do you believe anything was -- any of
25  your testimony was incomplete in any way?
```

(Pages 275 to 278)

Page 279

```
 1      A    I would not be able to give you that
 2 answer until I reread the transcripts.
 3      Q    Let me ask you a couple of general
 4 questions about Stelor and your relationship with
 5 it.
 6          Is it important to you -- let me ask you
 7 the question this way.  Under the license
 8 agreement while you agreed it was still in effect
 9 was it important to you to watch out for Stelor's
10 interests?
11          MR. COOPER:  Object to the form.
12          MS. CALABRIA:  Object to form.
13          THE WITNESS:  That I was responsible for
14 watching out for Stelor's interests.  I would
15 think so.  There was some language in there
16 that I had responsibility to that effect as my
17 licensee.
18 BY MR. KAPLAN:
19      Q    You wanted to help do what you could to
20 protect Stelor's and for that matter your interests
21 with respect to the intellectual property, right?
22          MS. CALABRIA:  Object to form.
23          MR. COOPER:  Object to the form.
24          THE WITNESS:  So long as they complied
25 with the caveats and mandates of the license
```

Page 280

```
 1 agreement, yes.
 2 BY MR. KAPLAN:
 3      Q    Certainly you agree that under the license
 4 agreement you did not want to take any action to
 5 jeopardize Stelor's interest, is that fair?
 6          MS. CALABRIA:  Object to form.
 7          MR. COOPER:  Same.
 8          THE WITNESS:  I would answer that by
 9 saying that that is an accurate statement to
10 the extent that when I found out there was
11 possible breaches that I had to take care of my
12 interests first not Stelor's interests at that
13 point.
14 BY MR. KAPLAN:
15      Q    You agree under the license agreement --
16 let me ask the question this way.  Did you think you
17 had the right under the license agreement just to
18 make up a reason to terminate Stelor?
19          MS. CALABRIA:  Object to form.
20          MR. COOPER:  Object to the form.
21          THE WITNESS:  Make up a reason?  I don't
22 believe so.
23 BY MR. KAPLAN:
24      Q    In other words, you could terminate the
25 license agreement on proper notice but only if there
```

Page 281

```
 1 was a material breach by Stelor, right?
 2          MR. COOPER:  Object to the form.
 3          THE WITNESS:  I don't know that to be an
 4 accurate statement.  You are using material
 5 breach.  I know the document speaks for itself.
 6 The license agreement has certain specifics.
 7 As to whether or not I was able to allege a
 8 breach, I spoke to counsel about that and they
 9 advised me accordingly.
10 BY MR. KAPLAN:
11      Q    Let's assume for a second that you
12 terminated Stelor at some point in time, terminated
13 the license agreement without a valid reason, just
14 make that assumption for a second.
15          What do you think Stelor's rights would
16 be?  Could they fairly get the license agreement
17 reinstated?
18          MR. COOPER:  Object to the form.
19          THE WITNESS:  I don't know that to be a
20 fact, I'm not a lawyer.  There is case law that
21 goes either way at this point.  I can't give
22 you a definitive answer in that regard.
23 BY MR. KAPLAN:
24      Q    What about in your view as the licensor,
25 would it be fair to Stelor for you to terminate the
```

Page 282

```
 1 license without a valid reason and then take the
 2 position that notwithstanding that the license is
 3 over, would that be fair?
 4          MR. COOPER:  Object to the form.
 5          THE WITNESS:  I don't think it's a matter
 6 of the question of being fair or not fair.  I
 7 don't think that I purposely terminated the
 8 agreement -- license agreement between myself
 9 and Stelor for no reason.
10          I'm sure the reasons that I alleged in the
11 violation letter and the termination letter and
12 the advice of counsel that the reasons were,
13 you know, proper and that's my answer.
14 BY MR. KAPLAN:
15      Q    But is it your position as the licensor
16 that you can terminate the license agreement any
17 time with or without a valid reason and the effect
18 of that is the license is over whether you are right
19 or wrong, is that your position?
20          MR. COOPER:  Object to the form.
21          THE WITNESS:  No.  I believe the document
22 speaks for itself.  The license agreement has
23 language in there, I believe, that stipulates,
24 if I'm not mistaken, on 60-days notice either
25 party may terminate the agreement.  I can't
```

(Pages 279 to 282)

Page 283

1   remember the exact verbiage, but that's not my
2   position.
3   BY MR. KAPLAN:
4       Q   Do you agree that if you terminate the
5   license and you do not have a good reason or a valid
6   reason for doing it that the license stays in
7   effect?
8           MR. COOPER:  Object to the form.
9           THE WITNESS:  I don't have that answer.  I
10  don't have an answer definitive one way or the
11  other on that question.  That's as a matter of
12  law.
13  BY MR. KAPLAN:
14      Q   Well, what do you think is fair in your
15  view as the licensor?
16          MR. COOPER:  Object to the form.
17  BY MR. KAPLAN:
18      Q   Is it fair -- would it be fair to Stelor
19  for the license just to be over even if you
20  terminate it without a valid reason?
21      A   Stelor, I'm sure, has good counsel --
22          MR. COOPER:  Object to the form.
23          THE WITNESS:  -- to advise them about
24  their remedies in that regard.  Now, whether it
25  was fair or not is a matter for the court and

Page 284

1   jury to determine.
2   BY MR. KAPLAN:
3       Q   What do you think as licensor --
4           MR. COOPER:  Same objection.
5           THE WITNESS:  I don't have an opinion to
6   share with you.
7   BY MR. KAPLAN:
8       Q   Let me hand you what was previously marked
9   as Exhibit 113, which we were talking about when the
10  deposition concluded two days ago.  That's your
11  declaration, Mr. Silvers, correct?
12      A   Yes.
13      Q   The declaration you signed and had your
14  lawyers file in the action that was pending before
15  Judge Hurley, right?
16      A   I believe so, yes.
17      Q   Take a look at paragraph 18 of that
18  declaration if you would.
19      A   Yes.
20      Q   You say in the last sentence there that,
21  "Stelor failed to oppose other parties' federal
22  registration of the Google mark for a variety of
23  goods."  Is that -- do you stand by that statement?
24          MR. COOPER:  Object to the form.
25          THE WITNESS:  From the knowledge that I

Page 285

1   was given by counsel at the time that this --
2           MR. COOPER:  Hang on.  If you are only
3   answering based on attorney-client privilege
4   communications then I'm instructing you not to
5   answer and insert the privilege objection.
6           THE WITNESS:  Okay.  I would assert the
7   privilege objection then.
8   BY MR. KAPLAN:
9       Q   Well, whose application or whose
10  registration did Stelor fail to oppose?
11      A   I don't recall.  It might have been
12  Google, I'm not sure.  It might have been Google's
13  and Google, I'm not sure.  I'm reading what I'm
14  reading, but I'm not sure of the exact parties that
15  were involved at this time.
16      Q   As you sit here today do you recall what
17  the basis for that statement in this declaration
18  was?
19      A   I believe there were a number of parties
20  that I might have brought to the attention of my
21  counsel that I had believed Stelor had failed to
22  oppose, but as I sit here today I can't recall other
23  than Oogles and Googles.
24      Q   That's OOGLES and --
25      A   Googles.

Page 286

1       Q   GOOGLES?
2       A   Yes, and then there was, of course,
3   Google, I believe, and I'm not sure of the others.
4   I'm sure there were some others but I can't recall.
5       Q   Of course as of the time of this
6   declaration Stelor had office actions pending in
7   front of the Trademark Trial and Appeal Board
8   related to Google, Inc., correct?
9       A   I don't know that to be a fact.  Counsel,
10  if you say so and the dates are accurate then I
11  cannot argue that.
12      Q   And also Stelor had brought an office
13  action against Oogles and Googles, correct?
14      A   I think after the fact that they brought
15  an office action against them after I had made it
16  known to Mr. Esrig via correspondence -- I believe
17  it might have been verbal that that was something he
18  needed to look into immediately because I was
19  getting concerned about the opposition coming to an
20  end.
21      Q   Oh, so you advised Stelor of the problem
22  and they immediately took action to address it
23  including instituting an office action against
24  Oogles and Googles, right?
25          MR. COOPER:  Object to the form.

(Pages 283 to 286)

5

**Page 287**

1      THE WITNESS: No. He didn't do it for a
2  long time. If he did it it was months and
3  months and months later. I never was told
4  about it. I found out about it later. I don't
5  know how long it was after he was made aware
6  and there was others -- excuse me. There were
7  other companies. Now I'm getting my memory
8  back, Aston Products, federal registration
9  involving a product called Googles or Pet Toys
10  for Children -- excuse me, Pet Toys for
11  Animals. That opposition -- that information
12  was brought to Mr. Esrig and Stelor's attention
13  on numerous occasions. To this day I don't
14  know if they did anything with that federal
15  opposition and 016 class code for I think 02A
16  close code.
17  BY MR. KAPLAN:
18      Q   Anything else?
19      A   I cannot recall, but I'm pretty certain
20  that there were other federal registrations that I
21  brought to the attention of Stelor that I believe to
22  this day have not been properly addressed.
23      Q   Any mention of any of those issues in your
24  April 27, 2005 letter which is marked as Exhibit
25  111?

**Page 288**

1      A   I'm not sure. I know they were mentioned
2  in the violation letter that was sometime in January
3  in correspondence with Mr. Esrig during our
4  relationship.
5      Q   Take a look at the January letter, the
6  November letter that's attached there. Do you see
7  that?
8      A   Okay.
9      Q   Where specifically in the November 12,
10  2004 letter does it tell Stelor what action it
11  failed to take to oppose trademark applications?
12      A   No. I'm referring to correspondence that
13  I had specifically with Mr. Esrig and his board of
14  directors that was sent to him with my violations
15  that I had put him on notice by characterizing the
16  letter as an official notice of breach, and I'm
17  pretty certain that you have those documents. That
18  was before I retained counsel.
19      Q   You agree there is no reference to any of
20  that in what I've handed you as Exhibit 111,
21  correct?
22      MR. COOPER: Object to the form.
23      THE WITNESS: I would have to say yes,
24  that's accurate.
25

**Page 289**

1  BY MR. KAPLAN:
2      Q   Would you hand me back Exhibit 111,
3  please.
4      A   Yes.
5      Q   Take a look at the next paragraph of your
6  declaration where it talks about Stelor's failure to
7  obtain product liability insurance. In fact, you
8  now know Stelor did obtain that insurance, correct?
9      A   They obtain that insurance, I believe,
10  after the fact and at the time it was not for the
11  proper amount. It was $1 million less than what it
12  was supposed have been from what I can recall to the
13  pest of my knowledge. I also put Mr. Esrig and
14  Stelor on notice about that.
15      Q   When?
16      A   I'm not sure. And I believe they failed
17  to correct that problem within the proper timeframe,
18  and then eventually we did get some documentation.
19  As I sit here I'm trying to recall something that
20  came to me FedEx with documentation of the updated
21  insurance plan or policy which I sent to my counsel
22  KTT law at the time.
23      Q   Take a look at page 7 of the declaration
24  if you would.
25      A   Okay.

**Page 290**

1      Q   Do you see paragraph G where you refer to
2  the issue of providing samples of any license
3  product and you say, "Other than the two Googles
4  music compact disks provided after the settlement
5  agreement." So you did receive samples of those
6  compact discs, correct?
7      A   I received a demo product which I was not
8  told or instructed that that was the final sample or
9  the final production sample of a Spanish version and
10  a English version of the two CDs that were
11  supposedly made available on i-Tunes.
12      Q   You say here you received two Googles
13  music compact discs. Is that statement true or
14  false?
15      A   I received two compact Googles music discs
16  after the settlement agreement.
17      Q   So as of the time of your declaration you
18  had received those two music compact discs, correct?
19      A   I believe so.
20      Q   Alright. Will you hand me back your
21  declaration, please.
22      A   (Witness complies.)
23      Q   I'm going to hand you what I'm marking as
24  Exhibit 118, which is a copy of a declaration filed
25  by your former counsel Gail McQuilkin. I want to

(Pages 287 to 290)

Page 291

1   just ask you about one exhibit that's attached to
2   that. Let me turn to that page. Just give me one
3   second. It's Exhibit FFF.
4           (Deposition Exhibit 118 was
5           marked for identification.)
6       MS. CALABRIA: Kevin, is this the April
7   29th letter?
8       MR. KAPLAN: No. This is Gail McQuilkin's
9   June 17th declaration.
10      MS. CALABRIA: Give me one second, please.
11  Let me try to find it.
12      The first or second action?
13      MR. KAPLAN: 80393.
14      MS. CALABRIA: Was that the first or the
15  second?
16      MR. KAPLAN: Second.
17      MS. CALABRIA: Okay, go ahead.
18  BY MR. KAPLAN:
19      Q   Okay. Is that a declaration that you
20  signed, Mr. Silvers?
21      A   Yes.
22      Q   Did you understand that form to be
23  something that confirmed you were making those
24  statements under oath?
25      A   That's what it says.

Page 292

1       Q   This is like an affidavit, right?
2       A   That's what it says.
3       Q   It says you paid to the Aurora Collection
4   the amounts reflected in a chart, but I don't see
5   that chart attached. That statement was true, that
6   you paid those amounts to the Aurora Collection?
7       A   If I said that that's what it was.
8       Q   How did you pay, cash, check?
9       A   By check, I believe.
10      Q   Why couldn't you just provide copies of
11  the checks to Stelor?
12      A   Because the checks were made payable to
13  the Aurora Collection not to the insurance company.
14  The only person that could prove that the checks
15  were being made to the insurance company on my
16  behalf was the Aurora Collection who directly made
17  the checks from their company, deposited it
18  directly to -- excuse me, sent directly to
19  Neighborhood Health Partnership, the insurance
20  company. And that was made clear to Stelor that
21  that's the way it was going to be handled.
22      I probably could have had no problem
23  supplying checks, but the checks would have been
24  shown they were made payable to the Aurora
25  Collection not to the insurance company.

Page 293

1       So then we would have had the issue of
2   what I was paying checks to the Aurora for. Check
3   came to me, I took the check and sent it to the
4   Aurora Collection. The Aurora Collection turned
5   around and sent it to the insurance company, end
6   of story.
7       Q   So you had the checks, right? The checks
8   that you paid to the Aurora, you had those, they
9   were readily available, correct?
10      A   Yes. I had checks that I made payable to
11  Aurora for my monthly insurance premiums.
12      Q   And you could easily have provided those
13  checks to Stelor, correct?
14      A   They were never -- there was no checks
15  that were asked to be provided by Stelor. There was
16  documentation that was asked by me to provide Stelor
17  of health insurance premiums being paid by Aurora
18  not by Steven Silvers. Let's make that clear.
19      So I took the liberty of contacting the
20  CEO of the company of Aurora Collection, Ryan
21  Blumquist and he turned around provided
22  documentation -- proper documentation of the money
23  that was paid by me on behalf of my insurance that
24  was sent to the insurance company.
25      Q   Mr. Silvers, I need you to answer the

Page 294

1   questions that I'm asking. I got a limited amount
2   of time left for the deposition, and if you are not
3   going to answer my questions then we will have an
4   issue when we get to the end of that time and I'm
5   not done with my questions.
6       I understand what you are saying but
7   that's not what I asked you. Listen to my
8   question and please answer what I asked.
9       You had the checks that you paid to
10  Aurora, correct?
11      A   Yes.
12      Q   You could easily have provided those
13  checks to Stelor, correct?
14      MR. COOPER: Object to the form.
15      THE WITNESS: If they would have asked me
16  to provide checks to them I could have easily
17  done that, that's correct.
18  BY MR. KAPLAN:
19      Q   In fact, you refused to provide those
20  checks to Stelor, correct?
21      A   No. I'm not sure that's an accurate
22  statement. Why would I refuse to provide checks to
23  Stelor?
24      Q   Did your lawyer ever ask you to assemble
25  those checks to provide to Stelor?

(Pages 291 to 294)

7

Page 295

1      MR. COOPER: Hang on. Objection,
2  attorney-client privilege. Don't answer.
3  BY MR. KAPLAN:
4      Q   Is it your testimony that no one asked you
5  to provide copies of your checks to Stelor?
6      A   Repeat the question, please.
7      Q   Is it your testimony that no one ever
8  asked you to provide copies of those checks to
9  Stelor?
10     A   I don't recall. I don't remember and I
11 don't recall at this time.
12     Q   Can I have that declaration back, please?
13     A   One second, please.
14     Q   Let me show you what I marked as
15 Exhibit 119. It's a declaration of Steven Esrig.
16     MR. COOPER: You don't have an extra copy
17 of 118, do you?
18     MR. KAPLAN: I don't, no.
19 BY MR. KAPLAN:
20     Q   This is a declaration of Mr. Esrig that
21 was filed in case number 05-80393.
22          (Deposition Exhibit No. 119 was
23          marked for identification.)
24 BY MR. KAPLAN:
25     Q   Do you recall seeing this?

Page 296

1      A   I believe so.
2      Q   Alright. Take a look if you would at
3  Exhibit B?
4      MS. CALABRIA: Mr. Kaplan, what's the date
5  of the declaration?
6      MR. KAPLAN: May 22, 2005, docket entry
7  16.
8      MS. CALABRIA: Okay.
9      THE WITNESS: Where am I going to find
10 Exhibit B?
11     MR. KAPLAN: Let me get it for you.
12 BY MR. KAPLAN:
13     Q   I'm showing you a redacted e-mail from
14 Gail McQuilkin to me dated April 12, 2005. Did you
15 ever see this?
16     A   No, I don't believe so.
17     Q   Take a look at the second page, begins
18 finally how important I feel it is for us to stay
19 aligned and it continues. Did you see this e-mail
20 that your lawyer sent out?
21     A   Can I finish reading it?
22     Q   Please.
23     MS. CALABRIA: Which exhibit is that?
24     MR. KAPLAN: B as in boy.
25     (Pause.)

Page 297

1      THE WITNESS: Okay. What's the question
2  now?
3  BY MR. KAPLAN:
4      Q   Did you see this e-mail before it was
5  sent?
6      A   I don't think so.
7      Q   Did you see it after it was sent?
8      A   No, I don't believe so.
9      Q   Your testimony is that this is the first
10 time you have ever seen this e-mail here today?
11     A   No.
12     Q   So you saw it in connection with the
13 action, right?
14     A   No.
15     Q   When did you see it?
16     A   I think Mr. Esrig provided me a copy of it
17 when I met with him up in Maryland and showed me
18 some things that he felt may have been improper.
19     Q   Take a look at the second page of the
20 e-mail. Look at the 5th sentence where your lawyer
21 writes, "I agree that this has gotten silly and I'm
22 sure the board would rather focus it's discussions
23 on the upcoming launch and trade show than obsessing
24 over these rather small advances to my client."
25          Were you aware that your lawyer made

Page 298

1  that statement to us in April of 2005 before you
2  terminated the license?
3      MR. COOPER: Hang on one second.
4      I'm going to object to the question on the
5  basis of attorney-client privilege and instruct
6  him not to answer.
7  BY MR. KAPLAN:
8      Q   Did you agree that the so-called dispute
9  between you and Stelor had gotten silly as of that
10 time?
11     MS. CALABRIA: Object to form.
12     MR. COOPER: Object to the form.
13     THE WITNESS: Once again.
14 BY MR. KAPLAN:
15     Q   Did you agree with your lawyer's statement
16 that this has gotten silly?
17     MS. CALABRIA: Object to form.
18     MR. COOPER: Same.
19     THE WITNESS: I agree with the fact that
20 it had gotten -- I don't know if the right word
21 is silly, but out of control, going the wrong
22 way. But I don't believe it would be
23 characterized as being silly. It was very
24 serious, if anything.
25

(Pages 295 to 298)

8

**Page 299**

1  BY MR. KAPLAN:
2     Q   Did you agree that the issue related to
3  rather small advances to you?
4     A   I don't believe so.
5     Q   Is the statement that Ms. McQuilkin had
6  spent considerable time getting my client, that
7  would be you, to focus on what your client, that
8  would be Stelor, has and will accomplish, was that
9  statement true?
10        MR. COOPER:  Can you read the question
11     back, please.
12        MR. KAPLAN:  Let me ask it this way.
13  BY MR. KAPLAN:
14     Q   Your lawyer writes, "I have spent
15  considerable time getting my client to focus on what
16  your client has and will accomplish."  Was that
17  statement true?
18        MR. COOPER:  Hang on a second.  I'm going
19     to object to the question as worded on the
20     basis of attorney-client privilege and instruct
21     you not to answer.
22        MR. KAPLAN:  Clearly if she wrote that in
23     an e-mail.  She waived it as to that.
24        MR. COOPER:  We can bring it up with the
25     court.

**Page 300**

1        MR. KAPLAN:  Okay.
2  BY MR. KAPLAN:
3     Q   Were you really very happy with the
4  project and excited about the launch and upcoming
5  show?
6     A   I have to say that I was excited about the
7  upcoming show and the potential of the launch.  I
8  was concerned about some issues involving protection
9  of the property that I expressed to Stelor verbally
10  and in writing about not being protected
11  internationally.  But I would have to say that I was
12  kind of excited about the potential of what was
13  going to be happening at the show.
14     Q   Did you agree that the potential was the
15  result of the work and investment made by everyone
16  at Stelor?
17        MR. COOPER:  Object to the form.
18        THE WITNESS:  I didn't know what was going
19     to be at the show.  I couldn't have made that
20     statement until I saw what was physically there
21     at the show, what they had planned to do at the
22     launch.
23  BY MR. KAPLAN:
24     Q   To your knowledge did your lawyer ever
25  send a retraction of those statements?

**Page 301**

1     A   I don't believe so.  I'm not sure, not to
2  my knowledge.
3     Q   Hand me that back.  I want to direct your
4  attention to Exhibit C.
5        Take a look at this which appears to be
6  a November 5, 2003 letter from you to Stelor
7  Productions.  Can you identify it as that and then
8  turn to page 4?
9     A   Okay.
10     Q   Is that a letter you wrote to Stelor?
11     A   I'm sure it is, yes.
12     Q   On or about November 5, 2003?
13     A   Uh-huh.
14     Q   You got to answer out loud.
15     A   Yes, I'm sorry, yes.
16     Q   Take a look at page 4 of that letter?
17     A   Okay.
18     Q   The part that's got the asterisk around
19  it, actually a little above it says, "I'm likewise
20  further informing Stelor as follows.  You and the
21  board have expressed a concern that I may attempt
22  now or perhaps at some point in the future to
23  exercise my authority given the fact that I
24  currently control the googles.com and other Googles
25  related domain names that I own, authority that may

**Page 302**

1  include the shutting down of the googles.com Web
2  site."  Did you recognize at the time that the board
3  had that concern?
4     A   Yes.
5     Q   And you assured the board that you would
6  not do that unless and until a court ruled on the
7  issue of whether there was a material breach, right?
8     A   No.  Where does it say that?
9     Q   "I'm willing, assuming that we can
10  amicably resolve the aforementioned issues, to
11  assure Stelor with the exception of a material
12  breach by Stelor and ruled as such by a court of
13  competent jurisdiction that at that time and only at
14  such time shall I then determined what would be in
15  the best interest of my intellectual property and
16  the rights associated with same."  Did you make that
17  assurance to Stelor?
18        MR. COOPER:  Object to the form.
19        MS. CALABRIA:  Object to form.
20        THE WITNESS:  Yes, I did.
21  BY MR. KAPLAN:
22     Q   And, in fact, upon sending your
23  termination letter in April 2005 before the court
24  ever determined the validity of your claimed
25  breaches, you took action, including trying to shut

(Pages 299 to 302)

9

<table>
<tr><td>

Page 303

1    down the googles.com Web site, didn't you?
2       A   Yes.
3            MR. COOPER:  Object to the form.
4    BY MR. KAPLAN:
5       Q   So what was the point of that assurance
6    that you gave to Stelor?
7       A   Things had changed between our
8    relationship and basically what they had done they
9    didn't keep their word to me about specific things,
10   and I'm sure that my reasons were sound.
11      Q   Is it fair to say that in taking those
12   actions in April of 2005 you did not stand by the
13   promise you made to Stelor in 2003, is that fair to
14   say?
15      A   Two years is a long time for things have
16   changed.
17      Q   So the answer to my question is yes,
18   correct?
19      A   Yes.
20      Q   Alright.  Take a look at Exhibit E if you
21   would.  That's an April 14, 2003 letter that I sent
22   to your lawyer Ms. McQuilkin.  Do you recognize that
23   letter?
24      A   I don't think I would have seen this
25   letter but that's okay.

</td><td>

Page 305

1            THE WITNESS:  These are '05, right, okay.
2    Before the termination.
3            MS. CALABRIA:  And attached to an April
4    29th letter?
5            MR. KAPLAN:  I don't know, they are
6    someplace.
7            MS. CALABRIA:  Is the first one dated
8    4/28/05?
9            MR. KAPLAN:  3/7/05.
10           THE WITNESS:  These were all checks that
11   were previously owed to me.
12   BY MR. KAPLAN:
13      Q   Okay.  And they were received by your
14   lawyers and cashed, right?
15      A   Okay.  So you have here -- there was only
16   two checks received by my lawyer and cashed.  The
17   other ones were received by me, I believe, and
18   cashed.  Pay to the order of Bank of America.  These
19   checks here are for 5,000 and 5,000 and 5,000 were
20   paid to me so the payment was not to my lawyer.  The
21   only checks that were paid to my lawyer were the
22   2,000, the 4,000 and 318.
23      Q   So the first three checks in Exhibit 120
24   were paid to your lawyer and deposited by your
25   lawyer, correct?

</td></tr>
<tr><td>

Page 304

1       Q   Take a look at the checks.
2       A   Okay.
3       Q   Do you recognize those checks?
4       A   Yes.
5       Q   You received those checks, your lawyer
6    received those checked?
7       A   I believe so.
8       Q   Your lawyer cashed those checks?
9       A   No.
10      Q   Are you sure about that?
11      A   Let me see, hold on.  I may have made a
12   mistake here, excuse me.  Yes, I'm sorry.  I think
13   these checks were involving the settlement agreement
14   action, and these were checks that were owed to me.
15      Q   In fact, let me show you Exhibit 120,
16   copies of those cancelled checks with the
17   endorsement of your lawyer's at Kozyak Tropin; is
18   that correct?
19           (Deposition Exhibit No. 120 was
20           marked for identification.)
21           THE WITNESS:  Yes, I believe so.
22           MS. CALABRIA:  What are you marking as
23   Exhibit 120?
24           MR. KAPLAN:  The four checks -- those
25   checks with the cancelled marks.

</td><td>

Page 306

1       A   Yes, and they subsequently, I think, gave
2    me a check for that amount.
3       Q   And the next -- the last three checks were
4    paid directly to you and cashed by you, correct?
5       A   Yes.
6       Q   Hand me that exhibit back.
7       A   (Witness complies.)
8       Q   Okay.  Let me show you a March 23, 2005
9    e-mail from Gail McQuilkin to me.  Take a look at
10   this.  I'm going to give Johanna the record site and
11   let me know when you are done reading it.  That's
12   Exhibit 121.
13           (Deposition Exhibit No. 121 was
14           marked for identification.)
15           MS. CALABRIA:  So what exhibit was that,
16   Kevin?
17           MR. KAPLAN:  Hold on.  It's in the Esrig
18   declaration, Exhibit H.
19           MS. CALABRIA:  Repeat that.
20           MR. KAPLAN:  That's in the supplemental
21   Esrig declaration, Exhibit E.
22           MS. CALABRIA:  What's the docket entry?
23           MR. KAPLAN:  53.
24   BY MR. KAPLAN:
25      Q   Are you finished reading this e-mail,

</td></tr>
</table>

(Pages 303 to 306)

10

**Page 307**

1   Mr. Silvers?
2      A   No.
3      (Pause.)
4      MS. CALABRIA:  Okay.  I have it.
5   THE WITNESS:  Okay.
6   BY MR. KAPLAN:
7      Q   Ever see this before?
8      A   I don't recall.  I think this might have
9   been another one of the correspondences that was
10  shared when I went up to a meeting with Mr. Esrig
11  not too long ago.
12     Q   That was in about June of 2006?
13     A   Yes.
14     Q   When you saw this e-mail at that meeting
15  had you ever seen it before?
16     A   I don't believe so.
17     Q   Were you surprised when you saw it?
18     A   Somewhat.
19     Q   Why?
20     MR. COOPER:  If the answer involves your
21  communications with your attorney I'll instruct
22  you on the basis of attorney-client privilege
23  not to answer.  If you can otherwise answer the
24  question feel free to go ahead.
25     THE WITNESS:  Why?  I don't think I saw it

**Page 308**

1      before it was sent.
2   BY MR. KAPLAN:
3      Q   But what about its content surprised you?
4      A   I'm going to invoke the attorney-client
5   privilege.
6      Q   Is it fair to say your lawyer was raising
7   the issue of getting samples from Stelor just to
8   appease you?
9      MR. COOPER:  I'm going to object to the
10  form -- hang on a second.  I got to think if
11  this is an attorney-client privilege issue.
12     (Pause.)
13     MR. COOPER:  I'm going to object on the
14  basis of attorney-client privilege and/or
15  work-product privilege and instruct him not to
16  answer.
17     MR. KAPLAN:  Okay.
18  BY MR. KAPLAN:
19     Q   Look at the last paragraph, if you would,
20  where Ms. McQuilkin writes, "Think of it as quid pro
21  quo for agreeing to postpone the audit."  Were you
22  aware that as of March 23, 2005 Ms. McQuilkin agreed
23  to postpone the audit?
24     A   I can't say that I did or did not.  She
25  may have had some reasons for that.  I'm not sure.

**Page 309**

1   I did not know why she agreed to postpone the order.
2   It may have conflicted with her schedule, I'm not
3   sure.
4      Q   Do you deny that she agreed to postpone
5   the audit?
6      A   I don't know if I had that -- I don't
7   recall if I had that conversation with her or not.
8      Q   Let me show you your declaration again,
9   Exhibit 119, and I'm directing your attention to
10  Exhibit H.
11     MS. CALABRIA:  Silvers' declaration or
12  Esrig's declaration?
13     MR. KAPLAN:  Silvers' -- I'm sorry, you
14  are right, Johanna, it's Esrig's declaration,
15  Exhibit H.
16  BY MR. KAPLAN:
17     Q   It's another e-mail from Gail McQuilkin to
18  me dated April 22, 2005.  Did you see that e-mail,
19  Mr. Silvers, at any time?
20     A   I don't remember seeing this e-mail.  I
21  may have seen it but I don't recall seeing it.
22     Q   And note the date.  It's April 22nd,
23  right?  That's the week before you sent your
24  termination letter, correct?
25     A   Yes.

**Page 310**

1      Q   And the letter, the e-mail rather, asks
2   for dates in the next two weeks for the scheduling
3   of the audit, right?
4      A   That's what it appears to say, yes.
5      Q   And yet you didn't wait two weeks to
6   terminate the license including for the reason that
7   Stelor never scheduled the audit, right?
8      MR. COOPER:  Object to the form.
9      THE WITNESS:  I don't know what my lawyer
10  was thinking when she wrote this e-mail.  I
11  know there was some back and forth e-mails
12  between you and her at the time involving dates
13  and promises for dates.  And I don't believe I
14  saw this e-mail until I think it was sometime
15  way after it had been sent.
16  BY MR. KAPLAN:
17     Q   As of April 22, 2005, had you decided to
18  terminate the license?
19     A   I don't recall what Gail's position was in
20  that regard.  I know there were some other concerns
21  and other breaches that were not addressed.  So
22  whatever she did she was my counsel.
23     Q   I'm asking you, Mr. Silvers, as of April
24  22nd, 2005, had you, Steve Silvers, decided to
25  terminate the license?

(Pages 307 to 310)

Page 311

1    A   I don't recall. I don't recall my frame
2  of mind back then.
3    Q   Do you agree that Stelor could reasonably
4  expect upon receiving this e-mail that it would have
5  a week or two weeks to schedule the audit?
6    A   I don't see the e-mail of the response to
7  what happened in this response. "Please give me a
8  date in the next two weeks other than the April 28th
9  or 29th which are good for him for the visit.
10  Thanks." From what I remember my lawyer instructing
11  me I guess it's attorney privilege what they told me.
12  So I can't answer that question.
13    Q   You can't answer my question.
14       Is it reasonable to expect -- for Stelor
15  to expect based on this communication that it had
16  a week or two to schedule the audit, yes or no?
17       MR. COOPER: Object to the form.
18       THE WITNESS: Based upon that e-mail I
19       would have to say yes.
20  BY MR. KAPLAN:
21    Q   In fact, the e-mail say the auditor is
22  preparing a letter outlining the documents and
23  records he will need available, do you see that?
24    A   Yes.
25    Q   Was that letter ever provided to Stelor?

Page 312

1    A   I'm not certain. I do not know that
2  answer.
3    Q   Assuming it wasn't, do you know why?
4    A   No, I don't.
5    Q   Would it be reasonable for Stelor to
6  expect to see that letter before it provided dates
7  for when the audit would be scheduled?
8       MR. COOPER: Object to the form.
9       THE WITNESS: I don't know what my
10       lawyer's frame of mind was about this letter.
11       I know there was a lot of communication going
12       back and forth between you on behalf of Stelor
13       and myself and Gail on behalf of myself.
14       I remember that period distinctly and
15       there was a lot of back and forth e-mails to
16       that effect. I think she was waiting on dates
17       from you and you were waiting on dates from
18       her. I don't know the specifics between the
19       two of you.
20  BY MR. KAPLAN:
21    Q   Turn, if you would, to Exhibit I, the next
22  one. Do you see the e-mail April 26th from
23  Ms. McQuilkin to me, have you ever seen that before?
24    A   April 26, this is the 22nd --
25    Q   "I cannot get into this with you right

Page 313

1  now. I assure you I will get back to you and Stelor
2  by Friday." Ever seen that e-mail?
3    A   I don't believe so.
4       MR. COOPER: Is this redacted?
5       MR. KAPLAN: Yes.
6  BY MR. KAPLAN:
7    Q   So this is one day before you sent the
8  termination letter, correct?
9    A   It appears that way, the 26th and the
10  27th.
11    Q   Had you decided to terminate on April
12  26th?
13    A   I believe Gail was preparing something for
14  the 27th. It was obvious the 27th when you got the
15  letter.
16    Q   A little misleading for her to write back
17  and say, "I assure you I'll get back to you and
18  Stelor by Friday." when she was intending to send a
19  termination letter on your behalf on Wednesday,
20  right?
21       MR. COOPER: Object to the form. Don't
22       answer on attorney-client privilege.
23  BY MR. KAPLAN:
24    Q   That's not privilege. I'm asking for your
25  view.

Page 314

1       Do you agree it was a little misleading
2  for her to assure us she would get back to us on
3  Friday when she intended to send a termination
4  letter the next day. Do you agree or not?
5       MR. COOPER: Same objection,
6       attorney-client privilege. Don't answer.
7  BY MR. KAPLAN:
8    Q   Take a look at the last exhibit to this
9  declaration, two certificates of insurance. What's
10  wrong with those certificates?
11    A   These were the ones after the fact, I
12  believe. I'm not a hundred percent certain on that,
13  but I believe these are the ones that were -- hold
14  on one second.
15    Q   The first certificates were policy term
16  July 2004 to July 2005. Do you agree that's before
17  the fact, right?
18    A   No. We have certificates or some
19  information that was originally sent to us that are
20  different from these numbers and these policy
21  figures.
22    Q   Does this certificate of insurance satisfy
23  what you understood to be the insurance requirements
24  for the period July '04 to July '05, yes or no?
25    A   I cannot give you a definitive answer on

(Pages 311 to 314)

Page 315

1  that.
2      Q    You agree that you are included as a named
3  insured under this policy?
4      A    Yes.
5      Q    And you agree it's for the amount of $2
6  million?
7      A    Yes.
8      Q    Take a look at the next page.
9      A    Okay.
10     Q    This is a certificate of insurance for the
11  period 4/05 to 4/06, correct?
12     A    Okay.
13     Q    You agree that your name appears you see
14  down on the bottom as the certificate holder?
15     A    Yes.
16     Q    That makes you an additional insured under
17  that policy, correct?
18     A    I believe so.
19     Q    Do you see anything wrong with that
20  policy?
21     A    Not that I'm aware of.
22     Q    Will you hand me back the declaration,
23  please?
24     A    Uh-huh.
25     Q    That's Mr. Esrig's declaration.

Page 316

1          Alright.  Let me hand you what I'm
2  marking as Exhibit 122 which is a second
3  supplemental declaration of Mr. Esrig filed in
4  case number 80393, docket entry 63.
5          (Deposition Exhibit No. 122 was
6          marked for identification.)
7  BY MR. KAPLAN:
8      Q    Take a look, if you would, at the last
9  page of this document, Exhibit A?
10     A    Okay.
11     Q    Have you ever seen that list of licensees
12  or description of licensees status before?
13     A    Not that I can recall.
14     Q    If I were to read this declaration when it
15  was filed with the court and served on your lawyers.
16         MR. COOPER:  Object to the form.
17         THE WITNESS:  I don't recall.  This is a
18     licensee status.  I think I remember this now.
19  BY MR. KAPLAN:
20     Q    Anything inaccurate?
21     A    I think I remember this now.
22     Q    Anything inaccurate -- anything that is
23  inaccurate in that description to your knowledge?
24         MS. CALABRIA:  Object to form.
25         THE WITNESS:  I believe we had an issue

Page 317

1  about the verbiage where it says, major this,
2  major that, international this, Fortune 500.
3  We requested specifically who they were.  Who
4  was the major children entertainment
5  conglomerate.  Who was the nationally
6  recognized sporting goods company and so on.
7  BY MR. KAPLAN:
8      Q    Are you sure you sent that request to
9  Stelor?
10     A    No, I'm not sure.
11     Q    Did you ever advise --
12     A    I believe my lawyer was advised by me of
13  that and I think she was supposed to have done
14  something about that.
15         MR. COOPER:  Let's not go into your
16     communications with your lawyer.
17         THE WITNESS:  Okay.
18  BY MR. KAPLAN:
19     Q    To your knowledge did your lawyer send
20  such a letter to Stelor?
21     A    I don't have that knowledge.  What
22  exhibit is that?
23     Q    122.  Let me show you what I'm marking as
24  Exhibit 123, which is an April 29th, 2005 letter
25  from me to Ms. McQuilkin.  Take a look at that and

Page 318

1  let me know if you have ever seen it?
2          (Deposition Exhibit No. 123 was
3          Marked for identification.)
4          THE WITNESS:  I think I recall receiving
5     this letter.
6  BY MR. KAPLAN:
7      Q    Why didn't you accept the checks that they
8  were tendering?
9      A    I guess that's attorney client.
10     Q    Okay.  Hand me the letter back, please.
11  Did you accept the checks that were tendered?
12     A    The checks were mailed to me so if that's
13  accepting checks the answer is yes.  They were not
14  cashed.  They were never cashed.
15     Q    Let me show you a May 2nd, 2004 letter
16  from your lawyer to actually my partner Dan Blonsky
17  that I marked as Exhibit 125.  Do you recognize this
18  letter?
19         MS. CALABRIA:  Do you mean 124?
20         MR. KAPLAN:  Yes, thank you, 124.
21         (Deposition Exhibit No. 124 was
22         marked for identification.)
23         THE WITNESS:  I remember this letter.
24  BY MR. KAPLAN:
25     Q    The effect of this letter was to advise

(Pages 315 to 318)

Page 319

1   Stelor that you refused to accept any payments or
2   any other performance Stelor was making under the
3   license agreement; is that correct?
4       A   I think the document speaks for itself,
5   late compliance.
6       Q   Do you agree with my characterization?
7           MR. COOPER:  Object to the form.  Can you
8       read the question back again, the prior one?
9           MR. KAPLAN:  Let me ask it this way.
10  BY MR. KAPLAN:
11      Q   You refused to accept Stelor's attempt to
12  comply with the license agreement because you claim
13  the attempts were late, is that fair to say?
14      A   Yes.
15      Q   But in any event, you refused to accept
16  Stelor's efforts to comply; is that correct?
17          MR. COOPER:  Object to the form.
18          THE WITNESS:  I have to defer to advice of
19      counsel in this regard.
20  BY MR. KAPLAN:
21      Q   I'm not asking why.  Let me ask you the
22  question this way.
23          You know Stelor has tendered checks
24  every month under the agreements since you
25  terminated, correct?

Page 320

1       A   That's correct.
2       Q   Stelor sent you $6,000 worth of checks for
3   each month since April 2005, correct?
4       A   I believe so.
5       Q   And you've refused to accept any of those
6   checks, correct?
7       A   I've accepted them but have not cashed
8   them.
9       Q   In fact, you have returned all of those
10  checks with the exception of the last three months,
11  correct?
12      A   That's correct.
13      Q   You are still holding checks for what is
14  it September -- August, September and October,
15  correct?
16      A   I believe they are in my files.
17      Q   What are you holding those checks for?
18      A   I was going to use them as
19  exhibit perhaps, no particular reason.  I think we
20  spoke to -- there was communication for you to stop
21  sending the checks -- for Stelor to stop sending the
22  checks and they continue to send them and so instead
23  of conveniently having you send them to me and put
24  them back in the mail at my expense I just kept
25  them.

Page 321

1       Q   You maintained the position since April
2   27th, 2005 that the license is terminated, correct?
3       A   Yes.
4       Q   In fact, this letter says May 2nd, 2004
5   but it was really 2005, right?
6       A   May 2nd, 2004 should have been 2005,
7   that's correct, that's a mistake.
8           MR. KAPLAN:  Let's pause for a second to
9       change the tape.
10          VIDEO OPERATOR:  We are off the record.
11          (Thereupon, a brief recess was
12      taken.)
13          VIDEO OPERATOR:  We are on the record.
14          MS. CALABRIA:  We just had a discussion
15      off the record regarding whether or not Google
16      would have an opportunity to cross examine
17      Mr. Silvers within the scope of the questions
18      that Mr. Kaplan just asked.
19          And I would like to state for the record
20      that when we first began this deposition on
21      Tuesday at the end of it when we all agreed to
22      continue the deposition to today I requested
23      approximately 30 minutes time, and in fact I
24      think and hour was contemplated for my ability
25      to ask questions.

Page 322

1           I confirmed that everyone was going to
2       stay for those questions.  Just now off the
3       record and counsel for Mr. Silvers and counsel
4       for Stelor have now objected.  We intend to ask
5       approximately 30 minutes of questions on cross
6       examination which we are entitled to do, and if
7       Mr. Silvers leaves then we will bring him back
8       and we will redepose him.
9           MR. COOPER:  Just for the record, my
10      client, I believe, is obligated to be in this
11      deposition for seven hours.  If Stelor finishes
12      in six and a half hours to leave you a half
13      hour of time to ask cross examination questions
14      we will sit here and have you ask those
15      questions.
16          In seven hours we believe our obligation
17      to comply with the rules, especially after your
18      client has already asked their seven hours of
19      questions.  It will be our position that the
20      deposition is finished.
21          MS. CALABRIA:  Mr. Cooper, you agreed on
22      Tuesday that you would stay for an additional
23      half hour and that was in contemplation of
24      Mr. Kaplan asking seven hours worth of
25      questions.  Right now you changed your

(Pages 319 to 322)

Page 323

1  position.
2      MR. COOPER: As you know, I'm very new to
3  this case. I was not aware at that point when
4  I discussed that Google had already taken a
5  seven hour deposition of my client.
6      MS. CALABRIA: That was during the
7  deposition, wasn't it?
8      MR. KAPLAN: The other concern that I
9  have, and Stelor has, is that this deposition
10  has been addressed specifically to issues
11  concerning the dispute between Stelor and
12  Silvers on the contract claims. Google is not
13  a party to that dispute as Google has made
14  clear. Google has no position with respect to
15  that dispute. It has no standing with respect
16  to that dispute. I'm concerned for that reason
17  about the propriety of Google asking questions
18  related to the contract claim issues, and I
19  guess to the extent you are trying to ask
20  questions that relate to the registration
21  issues you've already had seven hours to depose
22  this witness.
23      MS. CALABRIA: We intend to ask questions
24  that relate to the scope of this examination as
25  you have taken it, Mr. Kaplan. I have

Page 324

1  approximately half hour worth of questions that
2  relate to testimony that Mr. Silvers just gave.
3      MR. KAPLAN: We are not in agreement,
4  obviously. Let me go on and finish my
5  deposition and then we can address the
6  questions that you want to ask afterwards.
7      MS. CALABRIA: Well, I'm going to call the
8  court if you guys are not agreeing. So if you
9  are not agreeing now then I'll call the clerk
10  and make sure that we have permission to have
11  Mr. Silvers stay.
12      MR. KAPLAN: Okay. Well, I'm going to go
13  forward with the deposition. I'm happy to
14  continue discussing the issue when we are done.
15  It's not really up to me whether Mr. Silvers
16  stays or not, and I can address my specific
17  objections if and when you ask your questions,
18  but I would really like to proceed with my
19  deposition.
20      MS. CALABRIA: Okay. Can I represent to
21  the court that Mr. Silvers is refusing to stay?
22      MR. KAPLAN: No, because we are not at
23  that point yet.
24      MR. COOPER: Mr. Silvers is amenable to
25  stay his full seven hours.

Page 325

1      MS. CALABRIA: And, Kevin, I assume you
2  are going to take the full seven hours because
3  you had seven hours and fifteen minutes,
4  correct?
5      MR. KAPLAN: I expect.
6      MS. CALABRIA: Okay. I will call the
7  court.
8      MR. KAPLAN: Johanna, are you there?
9      MS. CALABRIA: Yes.
10  BY MR. KAPLAN:
11      Q   Exhibit 124, do you have it in front of
12  you? No, because I have it in front of me.
13          Your lawyer writes this letter,
14  "Mr. Silvers has terminated the license and
15  intends to go in a different direction to develop
16  his characters and intellectual property." What
17  direction?
18      A   That's proprietary.
19      MR. COOPER: I'll make an objection based
20  upon my client's answer, objection on the
21  grounds of trade secret.
22      MR. KAPLAN: We got a confidentiality
23  order in effect in the case.
24  BY MR. KAPLAN:
25      Q   Go ahead, please answer.

Page 326

1      MR. COOPER: I don't think --
2      THE WITNESS: Explain that to me.
3      MR. COOPER: I didn't see the
4  confidentiality order.
5      MR. KAPLAN: Stelor has produced
6  proprietary stuff. You want to designate it
7  attorneys eyes only so that Stelor is not a
8  party to it, that's fine. But it's not a basis
9  for not answering the question.
10      MS. CALABRIA: Can you repeat the
11  question?
12      MR. KAPLAN: What direction.
13      MS. CALABRIA: Can you repeat the question
14  before it?
15      MR. KAPLAN: The letter writes that
16  Mr. Silvers has terminated the license and
17  intends to go in a different direction to
18  develop his characters' and intellectual
19  property. The question is what direction?
20      MR. COOPER: You can go ahead and answer,
21  and this attorney eyes only and make sure when
22  this deposition is transcribed your client does
23  not receive the copy without the answer being
24  redacted.
25      MR. KAPLAN: Understood.

(Pages 323 to 326)

Page 327

```
1        THE WITNESS:  I was going to be involved
2   with my son who is an animation student and we
3   were going to develop some additional
4   characters and we were planning to utilize the
5   Googles Web site for doing some flash animation
6   and cartoon characterization and some story
7   lines involving the characters and the
8   interaction and possibly do some exploring of
9   doing some downloadable down rings for children
10  with cell phones and basically turning the site
11  into a flash site.
12  BY MR. KAPLAN:
13       Q    Have you done any of that?
14       A    No.
15       Q    You still intend to do that?
16       A    If I prevail at trial I will definitely
17  explore that as opportunities.
18       Q    Why have you waited?
19       A    Why have I waited?
20       Q    Yes.
21       A    Probably lack of capitalization and
22  forcing me to put money into a project if the court
23  decide to rule not in my favor.
24       Q    Still want to do an audit?
25       A    Do I still want to do and audit?  I
```

Page 329

```
1        THE WITNESS:  My lawyer was handling that
2   so I had no input with this.  I'm assuming that
3   that was between you and the lawyer.
4   BY MR. KAPLAN:
5        Q    Did your lawyer to your knowledge or
6   anyone advise Stelor that you refused to proceed
7   with the audit on that day?
8        A    I don't recall.
9        Q    The letter also asks that you provide
10  Stelor with a letter from the auditor listing the
11  information requested.  Did you provide that letter
12  in response to this June 21st request?
13       A    This is after the termination was sent on
14  April 27, 2005.  So I think my lawyer's position was
15  that none of the contents of this letter mattered to
16  her.
17       Q    And, In fact, she just ignored it,
18  correct?
19       A    I would probably assume so.
20       Q    Now, turn the page if you would.  Look at
21  the second to the last paragraph that says,
22  "Finally, with respect to Mr. Silvers' claimed
23  options, we reiterate that LLC's certificate and
24  options have not yet been issued."  Do you have any
25  basis for claiming that statement is untrue?
```

Page 328

```
1   believe that that is something that I would consider
2   doing.
3        Q    Let me show you what I'm marking as
4   Exhibit 125.
5             (Deposition Exhibit No. 125 was
6             marked for identification.)
7   BY MR. KAPLAN:
8        Q    Which is a June 21, 2005 letter from me to
9   your lawyer, Ms. McQuilkin.  Take a look at this and
10  let me know if you have ever seen it.
11            (Pause.)
12       A    Okay.
13       Q    Have you ever seen this?
14       A    I believe so.
15       Q    Did you see it at or about the time it was
16  sent?
17       A    I can't answer that question.  I wouldn't
18  be able to answer that question.
19       Q    The last paragraph on the first page
20  proposes a date for the audit on June 27, 2005.  Do
21  you see that?
22       A    Yes.
23       Q    Did you agree to proceed with the audit on
24  that date?
25            MR. COOPER:  Object to the form.
```

Page 330

```
1        A    This is a letter from you to
2   Ms. McQuilkin.  So you are asking this question.
3   You are saying finally -- claimed options -- you are
4   saying we reiterated LLC options was not yet
5   issued --
6        Q    Do you dispute that?
7        A    Do I dispute what?
8        Q    That statement in the letter that as of
9   June 21, 2005 the LLC certificates and options have
10  not yet been issued?
11       A    Where are you reading that?
12       Q    The top.
13       A    It doesn't say anything about a date.  You
14  just read a date, June what?
15       Q    The letter is dated June 21, 2005.  In the
16  letter there is a statement that says, "We reiterate
17  that LLC certificates and options have not yet been
18  issued."  Do you dispute that statements?
19       A    I don't have any reason to dispute or not
20  dispute it.  I don't know that that is the case,
21  whether or not there was options issued or not.
22       Q    Take a look at the next sentence.  "Stelor
23  did provide Mr. Silvers with a letter in December of
24  2004 asking him to confirm his claimed options."  I
25  showed you that letter.
```

(Pages 327 to 330)

16

```
                                    Page 331
1     A   Okay, right.
2     Q   You saw that letter at your last
3  deposition, right?
4     A   Right.
5     Q   But for whatever reason he failed and
6  refused to sign or return that letter.
7     A   Correct.
8     Q   The letter then asks that, "If his
9  position has changed please have him execute and
10  return that letter now." Did you?
11     A   No.
12     Q   Can you hand me the letter back.
13        Let me show you what was previously
14  marked as Exhibit 116. This is the June 24, 2005
15  letter with the bulky set of attachments.
16        Now, the letter asks in paragraph 3,
17  "Please advise immediately in writing what
18  breaches you contend remain uncured." Do you see
19  that?
20     A   Yes.
21     Q   Did you do that? Did your lawyers do
22  that? Did anyone do that?
23     A   I believe if I'm not mistaken
24  Ms. McQuilkin did provide a letter. I'm not a
25  hundred percent sure. I'm fairly certain that she
```

```
                                    Page 332
1  provided a letter about what is still not yet to be
2  cured.
3     Q   If she did I ask that you to provide it to
4  me because I have never seen it.
5     A   Please make a note of that.
6     Q   Will you agree to do that?
7     A   I'll speak with my counsel about that.
8     Q   Now, in the last paragraph on the first
9  page at the very end we are talking about the issue
10  about you documenting the premiums for your
11  insurance through Aurora, right, and it says
12  Silvers -- it says -- it asks you to document that
13  and it says, these are the last three sentences,
14  "The requirement is not difficult to satisfy.
15  Silvers need only forward a cancelled check or a
16  statement or invoice for the insurance premium."
17  And the question is, did you ever forward the
18  cancelled checks or the statements or invoices for
19  the insurance premiums to Stelor, yes or no?
20     A   I don't recall. This letter is dated the
21  24th of 2005, which is three months after the
22  termination. So assumingly my lawyer probably just
23  ignored this as well.
24     Q   Did you agree that you had an obligation
25  to cooperate with respect to the audit under the
```

```
                                    Page 333
1  agreements?
2        MR. COOPER: Object to the form.
3        THE WITNESS: I would have to say the
4     document will speak for itself. I don't know
5     that answer.
6  BY MR. KAPLAN:
7     Q   Take a look at the second page. The third
8  paragraph references that December 10, 2004 letter
9  relating to the options again. Do you see that?
10     A   Okay.
11     Q   And it asks you again to sign it and
12  provide it to us if you wanted the options, right?
13        MR. COOPER: Object to the form.
14        THE WITNESS: Correct.
15  BY MR. KAPLAN:
16     Q   Did you?
17     A   I did not because I dispute the fact that
18  there was only a thousand options being granted when
19  I had reason to believe that there were more options
20  due me.
21        Once I executed that agreement for one
22  thousand options it would have precluded me from
23  challenging Stelor from getting future options
24  that I was made aware of that other people in the
25  like class as me were given more than 1,000
```

```
                                    Page 334
1  options as promised.
2  BY MR. KAPLAN:
3     Q   Do you still want options?
4        MR. COOPER: Object to the form.
5        THE WITNESS: Do I still want options?
6     Assuming that the license agreement is
7     reinstated then I would expect to receive what
8     I'm entitled to. If it's 1,000 options so be
9     it. If it's 2,000 options so be it.
10  BY MR. KAPLAN:
11     Q   As you sit here today do you want the
12  options, yes or no, today?
13        MR. COOPER: Object to the form.
14        THE WITNESS: Yes.
15  BY MR. KAPLAN:
16     Q   Are you willing to sign the option letter?
17        MR. COOPER: Object to the form.
18        THE WITNESS: I would have to take that
19     upon advice of counsel.
20  BY MR. KAPLAN:
21     Q   Let me hand you Exhibit 114, that's the
22  option letter and here is my pen. Please sign it
23  and date it, Mr. Silvers.
24        MR. COOPER: He is not signing the option
25     letter here. That's not proper deposition
```

(Pages 331 to 334)

## Page 335

1    questions.
2          THE WITNESS: First of all --
3          MR. COOPER: Excuse me, hang on. There is
4    no question pending.
5          Here you go. If you have a question you
6    can ask him.
7    BY MR. KAPLAN:
8    Q    Will you sign that letter today?
9    A    No.
10   Q    Is there some change that you request in
11   that letter after which you would sign it today?
12         MR. COOPER: Object to the form.
13         THE WITNESS: I would have to defer to my
14   new counsel to discuss that, Mr. Kaplan.
15   BY MR. KAPLAN:
16   Q    Alright. Now, attached to this letter you
17   looked at the end -- you still have it. We looked
18   at that royalty statement the last session of your
19   deposition, right? Do you recall now that you
20   received the royalty statements from Stelor?
21   A    I received royalty statements from Stelor
22   but they were not timely submitted to me and I do
23   acknowledge that I did receive, I believe, most of
24   them. I'm not sure if I received all of them. I
25   think there is still an outstanding dispute of two

## Page 336

1    of the royalty statements being inaccurate. One the
2    dates are inaccurate, improper reporting dates and
3    one I never did receive to this date to the best of
4    my knowledge.
5    Q    Which one -- first of all, which one is
6    inaccurate?
7    A    I don't have all of them to look at, and
8    if you would be kind enough to provide me with all
9    of them I could point it out to you.
10   Q    Which one is missing?
11   A    I don't recall. I believe it might have
12   been in 2004. December quarter of 2004. I'm not
13   sure. One of them I don't believe I have ever
14   received.
15   Q    Are they two royalty statements for
16   periods in 2004?
17   A    I'm not sure, sir. But I know there was
18   one that was inaccurate. I addressed it in numerous
19   letters to Mr. Esrig, I believe, and Stelor
20   Productions and one I never received.
21   Q    And just before the royalty statements do
22   you see copies of some pleadings Stelor had filed in
23   the federal court action against Oogles and Googles?
24   A    I would like to go back to the last
25   statement before, I just remembered something. Also

## Page 337

1    the initial issue with the royalty statements had to
2    do with Stelor Productions providing me with -- I
3    want to say two years worth of royalty statements,
4    eight quarters after the fact about a year later not
5    when they were due each quarter as the license
6    agreement called for, but a year and a half to two
7    years later where, of course, I got one statement
8    that says there was zero owed to me, and I just want
9    to put that on the record.
10         Now, are you asking me to go to --
11   Q    You got a copy of the complaint that was
12   filed by Stelor against Oogles and Googles in
13   Federal Court in Indiana, right?
14   A    I was never made aware of this to be
15   honest with you. This is something that I found out
16   on my own when I went to the Internet and did some
17   research.
18   Q    When?
19   A    Way after the fact. I don't recall when.
20   It was way after the fact. There are numerous
21   letters between me and Mr. Esrig outlining my
22   insistence on him looking into this. There was some
23   negotiations going on, I believe, with Stelor. They
24   were trying to negotiate something. I don't know
25   nothing -- I didn't know anything about this

## Page 338

1    litigation until way after the fact and I don't
2    recall when.
3    Q    Certainly your lawyer knew that it was
4    filed as of June 2005, right?
5    A    I don't know that to be a fact.
6    Q    Your lawyer got this letter, right?
7    A    What letter is that?
8    Q    The one you are looking at, Exhibit 116,
9    right?
10   A    Okay. Where does it mention here Oogles
11   and Google.
12         MR. COOPER: She only asked -- he only
13   asked you if your lawyer got that, if you know
14   if your lawyer got that or not.
15         THE WITNESS: I would assume she got that.
16   BY MR. KAPLAN:
17   Q    There is also voluminous information
18   attached to the document in all of the actions
19   Stelor had taken to protect the trademark, right?
20         MR. COOPER: Object to the form.
21         THE WITNESS: I never received this.
22   BY MR. KAPLAN:
23   Q    Did you have a communication issue with
24   your lawyer?
25         MR. COOPER: I'm going to object to the

(Pages 335 to 338)

18

**Page 339**

1    form, attorney-client privilege. Instruct him
2    not to answer.
3 BY MR. KAPLAN:
4    Q   Did you get papers from your counsel from
5 Kozyak Tropin when they were representing you in
6 this case?
7    A   Yes. I got e-mails and --
8    Q   Did they keep you informed about what was
9 happening in the action?
10       MR. COOPER: Object to the form,
11    attorney-client privilege. Don't answer.
12 BY MR. KAPLAN:
13    Q   It's a yes or no question. Do you believe
14 your lawyers kept you informed about what was
15 happening in the action?
16       MR. COOPER: I'm going to make the same
17    objection and same instruction, don't answer.
18       THE WITNESS: I need to take a men's room
19    break, please.
20       MR. KAPLAN: Okay.
21       VIDEO OPERATOR: We are off the record.
22       (Thereupon, a brief recess was
23       taken.)
24       VIDEO OPERATOR: We are on the record.
25

**Page 340**

1 BY MR. KAPLAN:
2    Q   Mr. Silvers, let me hand you what I marked
3 as Exhibit 126, copy for your lawyer. It appears to
4 be June 29th letter from Ken Hartman, one of your
5 lawyers over at Cozyak Tropin to Stelor advising of
6 claims breaches under the composure agreement. Have
7 you seen this before?
8       (Deposition Exhibit No. 126 was
9       marked for identification.)
10       THE WITNESS: I believe so.
11 BY MR. KAPLAN:
12    Q   Yes or no, do you believe there is still a
13 breach under the composer agreement?
14       MR. COOPER: Object to the form.
15       THE WITNESS: I don't have enough
16    knowledge to give you a yes or no answer. I
17    haven't taken the time to reread the composer
18    agreement, and it may very well likely be there
19    is still a breach.
20 BY MR. KAPLAN:
21    Q   Hand me that letter back if you would.
22 Let me show you what I marked as Exhibit 127, which
23 is a July 29th letter from me back to Mr. Hartman.
24       (Deposition Exhibit No. 127 was
25       marked for identification.)

**Page 341**

1       MS. CALABRIA: Kevin, which letter are you
2 talking about?
3       MR. KAPLAN: July 29, 2005 Kaplan to
4 Hartman re composure agreement, SP10829.
5       MS. CALABRIA: Got it.
6       (Pause.)
7 BY MR. KAPLAN:
8    Q   Have you ever seen this before?
9    A   Excuse me for one second.
10       (Pause.)
11    A   I don't believe I saw this letter.
12    Q   It says in the first paragraph, "The
13 Silvers composition does not appear on any of
14 Stelor's CDs and is not included on i-Tunes." Do
15 you agree with that statement?
16    A   Yes.
17    Q   Let me show you what I marked at Exhibit
18 128.
19       (Deposition Exhibit No. 128 was
20       marked for identification.)
21 BY MR. KAPLAN:
22    Q   Which appears to be an August 4, 2005
23 letter from Mr. Hartman back to me. In it he says,
24 "My letter is unsatisfactory," Do you know why?
25       Let me ask you the question this way.

**Page 342**

1 What use do you contend is being made by Stelor of
2 your composition?
3       MR. COOPER: Object to the form.
4       THE WITNESS: Okay. I'm not aware that I
5    received this letter and Mr. Hartman, I can't
6    speak for him whatever -- he was my counsel at
7    the time. So he wrote what I wrote. I don't
8    know what he was thinking.
9    I do know that the Googles From Goo song
10    that I created or was part and parcel to
11    creating was manufactured and placed on a CD
12    that Stelor took inventory of from Aurora
13    Collections and to that effect I don't know
14    what, if any, of those CDs were sold, and so I
15    can't give you an answer one way or the other.
16 BY MR. KAPLAN:
17    Q   But what information do you have that you
18 think will prove your allegation for making it that
19 Stelor breached the composure agreement?
20    A   I have to defer to my former counsel and
21 gather that information based upon the contracts
22 that were signed between us and based upon what
23 their position was at the time.
24    Q   Hand me that exhibit back if you would and
25 I'll trade you for what I marked as Exhibit 129.

(Pages 339 to 342)

Page 343

1          (Deposition Exhibit No. 129 was
2              marked for identification.)
3    BY MR. KAPLAN:
4        Q   This is a letter from me back to
5    Mr. Hartman dated August 8th.  Have you seen this?
6        A   I don't believe I have ever seen this
7    letter.
8        Q   It says, "Specific questions that we
9    asked." in the first paragraph.  Did you or anybody
10   on your behalf ever answer them?
11       A   I could not answer that question August 8,
12   2005.
13       Q   Hand me the letter back, please.
14           Have you done any further investigation
15   into the allegations you made about the composer
16   agreement since August 2005?
17       A   I don't believe I had any obligation to do
18   anything past April 27, 2005, the date of the
19   termination.
20       Q   I'm just asking have you done any
21   investigation?
22       A   Me personally, no.
23       Q   Anybody on your behalf?
24       A   Not that I can think of.
25       Q   I have just handed you what I marked as

Page 344

1    Exhibit 130, a declaration from Keva, KEVA,
2    Labossiere, LABOSSIERE, that was filed in case
3    number 80393.
4          (Deposition Exhibit No. 130 was
5              marked for identification.)
6    BY MR. KAPLAN:
7        Q   Who is she?
8        MS. CALABRIA:  Kevin, what's the docket
9    entry number, please?
10       MR. KAPLAN:  I don't know.  It's from May
11   19, 2005.
12       MR. COOPER:  That's the Hurley case.
13       MS. CALABRIA:  The second action?
14       MR. KAPLAN:  Yes.
15       THE WITNESS:  The question is?
16   BY MR. KAPLAN:
17       Q   Who is she?
18       A   Keva Labossiere, I believe, was one of
19   Ms. McQuilkin's paralegals.
20       Q   Turn if you would to Exhibit B.
21       A   Exhibit what?
22       Q   B as in boy.  It appears to be some pages
23   from an Internet site located at wwwcafepress.com?
24       MR. COOPER:  Exhibit B?
25       THE WITNESS:  That's it.

Page 345

1        MR. COOPER:  Where do you see the Cafe
2    Press?
3        MR. KAPLAN:  At the bottom.
4        MR. COOPER:  Okay.
5    BY MR. KAPLAN:
6        Q   Have you ever seen these pages before,
7    Mr. Silvers?
8        A   Yes.
9        Q   When did you first see the so-called
10   Google Store at the Cafe Press Web site?
11       A   When did I first see it?  I can't give you
12   an answer.  That's a loaded question, Mr. Kaplan,
13   probably a while back.  I know it existed because
14   I'm pretty sure that I clicked it and went to the
15   store.
16       Q   Well, tell me when, approximately?
17       A   I can't give you an answer.  I would be
18   sitting here lying if I did.
19       Q   Before you sent the termination notice in
20   April of 2005?
21       A   I do not know.
22       Q   Can you tell me what year it was,
23   approximately?
24       A   No, I can't.
25       Q   This is dated May 13, 2005.  So certainly

Page 346

1    you had seen it by May of 2005, right?
2        A   No, not necessarily.  This was printed out
3    by -- I don't even know who.
4        Q   Keva Labossiere.
5        A   Okay, so this is a printout of May of
6    2005.  I'm not certain.
7        Q   When did you first talk to Paul Worsham
8    about the Cafe Press site?
9        MR. COOPER:  Object to the form.
10       THE WITNESS:  I wouldn't be able to recall
11   that information either.
12   BY MR. KAPLAN:
13       Q   Approximately?
14       A   No.
15       Q   Before or after May of 2005?
16       A   I don't recall.
17       Q   Have you talked to Paul Worsham about the
18   Cafe Press site?
19       A   Yes, I have.
20       Q   And what conversations -- what has he told
21   you about it?
22       A   Basically that he was commissioned to do
23   something of this nature from Mr. Esrig on Stelor's
24   behalf initially when the -- I guess back in 2002,
25   2003 when the site was being developed and there was

(Pages 343 to 346)

**Page 347**

1  some conversation about ways to market some of the
2  products for the Googles and I believe they had some
3  conversations that I, you know, was not made aware
4  of or privy to, and this was, I believe, at the
5  behest of Mr. Esrig, Stelor Productions, to do this.
6     Q   Would you hand me that declaration back
7  and take a look at Exhibit 131, please.
8             (Deposition Exhibit No. 131 was
9             marked for identification.)
10       THE WITNESS:  Okay.
11  BY MR. KAPLAN:
12     Q   Do you recognize that as a declaration of
13  Paul Worsham that was filed in the declaration
14  action?
15     A   Yes.
16       MS. CALABRIA:  Which exhibit are you
17     talking about?
18       MR. KAPLAN:  The declaration of Paul
19     Worsham on June 17, 2005.
20       MS. CALABRIA:  Same action?
21       MR. KAPLAN:  Yes.  It's actually Worsham
22     with an M, correct?
23       THE WITNESS:  WORSHAM, Worsham, yes.
24  BY MR. KAPLAN:
25     Q   Did you pay Mr. Worsham for providing this

**Page 348**

1  declaration?
2     A   No.
3     Q   Was Mr. Worsham retained as an expert or a
4  consultant by you or your lawyers in connection with
5  the lawsuit?
6     A   No.
7     Q   Did your lawyer provide free legal
8  services to Mr. Worsham?
9     A   I have no idea.
10     Q   Do you know if your lawyers charged
11  Mr. Worsham for the legal services they provided him
12  in connection with the Jabbles mark?
13     A   No, I do not.
14     Q   Do you know who prepared this affidavit?
15     A   No, I do not.
16     Q   Take a look at the last page, page 4, the
17  declaration, paragraph 12?
18     A   Okay.
19     Q   He says, "After the October, November 2002
20  timeframe I did not log into or assist with the
21  Google Store cafepress.com."  Do you know why?
22       MR. COOPER:  What paragraph?
23       MR. KAPLAN:  12.
24       THE WITNESS:  Do I know why?
25

**Page 349**

1  BY MR. KAPLAN:
2     Q   Yes.
3     A   No.
4     Q   When did Mr. Worsham stop having any
5  involvement with Stelor?
6     A   I have no idea.
7     Q   Did you know that he stopped having any
8  involvement with Stelor?
9     A   I did not know that he was really actively
10  involved with Stelor.
11     Q   You knew he was a consultant, right?
12     A   No, I did not know that.
13     Q   You didn't know that?
14     A   Not in the true sense of the word.  I knew
15  he was doing some favors or helping out, but I
16  didn't know he was a consultant.
17     Q   Did you know that he was advised by Stelor
18  to stop helping out as you put it?
19     A   No, that's not an accurate statement from
20  my conversation with Mr. Worsham.
21     Q   Tell me what that -- what was said during
22  that conversation?
23     A   There was nothing mentioned about stopping
24  any kind of communication with Mr. Esrig and
25  Mr. Worsham to the best of my knowledge for him to

**Page 350**

1  stop or do anything.  It was a situation where there
2  was a favor done to create the shop for Mr. Esrig
3  and that was the extent of Mr. Worsham's involvement
4  to the best of my knowledge.
5     Q   Would you hand me that back?
6     A   Yes.
7     Q   By the way, you know that the Google Store
8  on Cafe Press has been closed down; is that correct?
9     A   I know that because I was instrumental in
10  making that happen, to the best of my knowledge.
11     Q   How so?
12     A   I believe I communicated or my lawyers
13  communicated, I'm not sure, with Cafe Press to
14  inquire why that was still operating.  I think I
15  have communicated that also to Mr. Esrig, if my
16  memory strikes me correctly, and I think at that
17  point the store was, in fact, shut down.
18     Q   So you brought it to Stelor's attention
19  and they immediately took action, correct?
20       MR. COOPER:  Object to the form.
21       THE WITNESS:  I don't know how immediate
22     it was.  It's been the common scenario that
23     every time I found something that was being
24     done wrong it would be brought to their
25     attention and then they did whatever they had

(Pages 347 to 350)

Page 351

1    to do. Sometimes to correct it other times not
2    to correct it.
3    BY MR. KAPLAN:
4        Q    But in this instance they corrected it,
5    correct?
6        A    To the best of my knowledge. I'm not sure
7    if they corrected it or if it was corrected through
8    the efforts of my counsel.
9        Q    Let me show you what's been marked as
10    Exhibit 132, which is also included as Exhibit D to
11    Mr. Esrig's supplemental declaration.
12            (Deposition Exhibit No. 132 was
13            marked for identification.)
14    BY MR. KAPLAN:
15        Q    Now, you saw this, right, when Mr. Esrig
16    filed the supplemental declaration in the Judge
17    Hurley action? And, for the record, it's a
18    transaction report that lists the total commissions
19    earned from this Google Store at Cafe Press in the
20    amount of $2. You saw this, Mr. Silvers?
21        MS. CALABRIA: Mr. Kaplan, sorry to
22    interrupt. Where are you?
23        MR. KAPLAN: Exhibit D to Esrig's
24    supplemental declaration.
25        THE WITNESS: I'm not sure if I saw this

Page 352

1    or not to be honest with you.
2    BY MR. KAPLAN:
3        Q    Do you dispute the total commissions
4    earned to Stelor from the Cafe Press store were $2?
5        A    That's what it appears to be on this
6    document. Pending orders. There was pending
7    orders. Those are completed orders. So it says
8    total commissions $2.
9        Q    Do you dispute that?
10        A    The document speaks for itself.
11        Q    So of that your royalty rate is 6%, right?
12        A    No, I think it's 10% from Internet sales.
13        Q    Actually we looked at the royalty rate
14    before under the agreement it says 6%, correct?
15        A    There is a 6, there is a 10 and there is a
16    3%. 3% for the royalties, 10% for sublicensees
17    which this would be considered a sublicensee, Cafe
18    Press.
19        Q    Okay. Let's assume it's 10%?
20        A    That's 20 cents.
21        Q    Of course it's 20 cents if and when Stelor
22    received the 2 bucks, right?
23        A    Right.
24        Q    Was there -- were you aware of any issue
25    involving fraud on that Web site?

Page 353

1        A    Fraud? Not that I can recall.
2        Q    Let me show you what I marked as
3    Exhibit 133.
4            (Deposition Exhibit No. 133 was
5            marked for identification.)
6    BY MR. KAPLAN:
7        Q    Which was included in Exhibit D to
8    Mr. Esrig's deposition -- I'm sorry, Exhibit C to
9    Mr. Esrig's supplemental declaration. Have you ever
10    seen this before?
11        MS. CALABRIA: Is that the Paul Worsham
12    letter?
13        MR. KAPLAN: It's the e-mail after it.
14        MS. CALABRIA: September 12, e-mail?
15        MR. KAPLAN: Next one.
16        MS. CALABRIA: September 30th, 2002
17    e-mail?
18        MR. KAPLAN: Correct.
19        THE WITNESS: Okay. I can't say that I
20    have seen it or did not see it.
21    BY MR. KAPLAN:
22        Q    It was in Mr. Esrig's declaration,
23    correct?
24        A    Then I would have saw it, I'm pretty sure.
25        Q    Did you see it before you saw it attached

Page 354

1    to Mr. Esrig's declaration?
2        A    I don't believe so.
3        Q    Did Mr. Worsham give you this e-mail?
4        A    I don't believe so.
5        Q    Do you know why not?
6        A    I have no clue.
7        Q    Would you hand that exhibit back to me,
8    please.
9        Let me show you what's been marked as
10    Exhibit 134.
11            (Deposition Exhibit No. 134 was
12            marked for identification.)
13    BY MR. KAPLAN:
14        Q    Which is a letter from Stelor to
15    Mr. Worsham dated 10/3/02. This was included in
16    Mr. Esrig's supplemental declaration, but had you
17    seen it before then?
18        A    This is the famous letter. Okay. I think
19    my lawyer provided me a copy of this letter.
20        Q    When, before or after you saw Mr. Esrig's
21    declaration?
22        A    Probably before, I think.
23        Q    Well, why didn't you bother to make sure
24    this was included in Mr. Worsham's declaration?
25        A    I don't have an answer for that question.

(Pages 351 to 354)

Page 355

1  I do know that there was some discussion about this
2  being a bogus letter and not being accurate, and the
3  fact that if you look at the way the letter is
4  situated and the address on the bottom is crooked it
5  was pasted.  There was some discussion about this
6  letter not being authentic.
7      Q    Did Mr. Worsham receive this letter, to
8  your knowledge?
9      A    Yes.  I think he received it and he
10 disputed it.
11     Q    But you agree based on this letter at
12 least as of October 2002, Mr. Worsham knew that
13 Stelor had asked him to remove from that Web site
14 any product with Stelor's name on it, correct?
15     A    No.  That's where the issue comes in that
16 it's Mr. Worsham's belief -- I believe, I can't
17 speak for him, that this letter was made after the
18 fact.  He never received -- this letter went to an
19 improper address, an addressee that he never lived
20 at, and there is some deep concern about the
21 contents of this letter being erroneous.
22     Q    What exactly did Mr. Worsham tell you
23 about this letter?
24     A    It's not accurate at all and that he never
25 received it and it's not true.  He was never sent

Page 356

1  this letter, never received this letter.
2      Q    Well, I asked you a moment ago if
3  Mr. Worsham confirmed receiving this letter.  I
4  understood you to say yes.
5      A    He received the letter when Ms. McQuilkin
6  got this letter and she sent it to Mr. Worsham, I
7  believe for him to read it, which he said he never,
8  ever saw this letter to the best of my knowledge.
9  That's when he agreed to give a declaration that
10 this letter is absolutely false in all regards
11 according to Mr. Worsham.
12     Q    Alright so you are saying Mr. Worsham was
13 sent this letter before he gave his declaration?
14     A    I'm not sure when he was sent this letter,
15 before or after.  He got this letter sometime when
16 Ms. McQuilkin got it for Mr. Esrig's declaration.
17 So if Paul's declaration was before Mr. Esrig's
18 declaration then I would assume that he would have
19 gotten it after his declaration.
20     Q    Are you telling me things you heard from
21 Mr. Worsham directly or that you heard from your
22 lawyer?
23     A    Both, I believe both.
24     Q    Did Mr. Worsham admit to you that his
25 services were terminated by Stelor?

Page 357

1      A    No.  He left Stelor Productions because he
2  did not care for the way he was treated at Stelor
3  Productions according to his conversations with me,
4  promises that were made to him that were never kept
5  and he left Stelor Productions.  He was not
6  terminated from Stelor Productions.
7      Q    Okay.  Can I have that exhibit back,
8  please?
9      A    Yes.
10          MR. COOPER:  I think we are beyond the
11     seven hours so if you can wrap up the next
12     couple of questions I would appreciate it.
13          MR. KAPLAN:  I need ten more minutes and
14     I'll be done.
15 BY MR. KAPLAN:
16     Q    Who is Russell Tewksbury, TEWKSBURY?
17     A    Russell Tewksbury is a, I guess,
18 consultant or he was hired as a consultant for Gail.
19     Q    Did you ever talk to him?
20     A    We met, I think, on one or two occasions.
21     Q    What did you ask him to do?
22     A    I didn't ask him to do anything.
23 Ms. McQuilkin handled that, contacted him.  She was
24 seeking some knowledge, I believe.
25     Q    Did he, to your knowledge, take action to

Page 358

1  shut down Stelor's Web site?
2      A    Not to my knowledge, absolutely not.
3      Q    Did you ever direct him to do that?
4      A    No.
5      Q    Let me show you a copy of a pleading from
6  that Indiana action.  Brief in support of motion to
7  dismiss plaintiff's amended complaint, filed in the
8  case of Stelor Productions, Inc. versus Oogles and
9  Googles in the Southern Districts of Indiana,
10 Indianapolis.  Division document 39.  Are you aware
11 that your lawyer provided a declaration to assist
12 Oogles and Googles in its defense of that action?
13          MS. CALABRIA:  Kevin, which document is
14     this?
15          MR. KAPLAN:  39.
16          MR. COOPER:  Wait a second.  I'm going to
17     object on the basis of attorney-client
18     privilege unless you actually saw the document
19     that was provided in that case.
20          MR. KAPLAN:  Let me show you the
21     declaration.
22          MS. CALABRIA:  This is the declaration of
23     Paul Worsham?
24          MR. KAPLAN:  No.  This is in the
25     Indianapolis action.

(Pages 355 to 358)

Page 359

1      MS. CALABRIA:  Oh, well, I don't have
2   that.
3   BY MR. KAPLAN:
4      Q   Alright.  Were you aware that declaration
5   was filed by your lawyer.  Let me rephrase the
6   question.
7      Are you aware that declaration was
8   provided by your lawyer to the lawyer for Oogles
9   and Googles?
10      MR. COOPER:  I'm going to object.
11      MS. CALABRIA:  We don't have a copy of
12   that so I can't follow along.
13      MR. COOPER:  To the extent that you had
14   communications with anybody at Oogles and
15   Googles to give you that knowledge you can
16   answer.
17      To the extent that the only basis of
18   knowledge you have to answer that questions is
19   communication with your own counsel, it's
20   attorney-client privilege, don't answer.
21      MS. CALABRIA:  I'm going to object to
22   form.
23      THE WITNESS:  I never had communication
24   with Oogles and Googles in reference to this
25   that I can recall and therefore it's

Page 360

1   attorney-client privilege.  Do you have a copy
2   of this?
3      MR. COOPER:  No.
4      THE WITNESS:  I need a copy of that.
5      MR. KAPLAN:  Here is a copy.  I have two
6   documents.
7   BY MR. KAPLAN:
8      Q   I'm going to show you a memorandum in
9   opposition to plaintiff's motion for leave to file a
10   surreply that was filed in the Hurley action.  It's
11   docket entry 97.  Let me direct your attention to
12   Exhibit A of that.
13      Take a look at those documents and let
14   me know if you have ever seen it before?
15      MS. CALABRIA:  Kevin, are you introducing
16   the entire memorandum and attached exhibit?
17      MR. KAPLAN:  Yes, it is Exhibit 136.
18         (Deposition Exhibit No. 136 was
19      marked for identification.)
20      MS. CALABRIA:  What is it you are asking
21   Mr. Silvers to focus on?
22      MR. KAPLAN:  Exhibit A.
23      THE WITNESS:  What are you asking me now,
24   sir?
25

Page 361

1   BY MR. KAPLAN:
2      Q   Have you seen that document before?
3      A   Yes.
4      Q   When did you first see it?
5      A   I don't recall.
6      Q   Where did you get it?
7      A   Through counsel.
8      Q   Where did your counsel get it?
9      A   Attorney-client privilege.
10      Q   Sir, who provided this document to you or
11   your counsel?
12      MR. COOPER:  If the only basis of your
13      knowledge is what you were told by your counsel
14      then that's attorney-client privilege and I
15      instruct you not to answer.
16   BY MR. KAPLAN:
17      Q   Sir, this is a document that your lawyers
18   filed with the court in the prior lawsuit.  I'm
19   trying to find out where it came from.  If you know
20   you need to tell me where did it come from?
21      MR. COOPER:  If you have a basis to answer
22      than question other than your direct
23      communications with your attorney answer,
24      otherwise don't, it's attorney-client
25      privilege.

Page 362

1      THE WITNESS:  The lawyer acquired the
2      document, you have to -- it's attorney-client,
3      I guess.
4   BY MR. KAPLAN:
5      Q   Alright.  Who did you talk to about this
6   document other than your lawyer?
7      A   Who did I talk to other than my lawyer?
8      Q   I'm referring to all of the documents in
9   Exhibit A.
10      MR. COOPER:  Object to the form.
11   BY MR. KAPLAN:
12      Q   There is four pages of documents.
13      A   I believe after the document was
14   disseminated and made part of this memorandum I
15   think I might have spoken with Mr. Sagan, I believe,
16   in reference to the document.
17      Q   Tell me what Mr. Sagan said.
18      A   He was in communication with my lawyer in
19   reference to something that might be of benefit
20   based upon perjury that was committed in the
21   affidavit by -- declaration by Mr. Esrig that he had
22   reason to suspect was not accurate.
23      Q   Did Mr. Sagan provide this document to
24   you?
25      A   I do not -- not to me, no.

(Pages 359 to 362)

Page 363

```
 1      Q    Do you know if Mr. Sagan was the source of
 2  this document?
 3      A    That would have to be answered to my
 4  counsel.
 5      Q    Do you have any information about how this
 6  document -- you contend this document came from
 7  Stelor, right?
 8      A    I believe it did come from Stelor.  I have
 9  no genuine knowledge that it came from Stelor, but I
10  believe it came from Stelor.  It was later proof of
11  the information on this document that would be
12  reason to suspect that it did come from Stelor.
13      Q    That's your speculation, right?
14      A    No.  That's fact based upon follow up
15  conversations with my counsel that she did
16  investigate it.
17          MR. COOPER:  Let's not get into your
18      communications with your counsel.
19  BY MR. KAPLAN:
20      Q    Do you have any independent knowledge to
21  support the statement you just made that this
22  document came from Stelor?
23      A    Independent knowledge, no.
24      Q    Any knowledge?
25      A    The document came from Stelor.
```

Page 364

```
 1      Q    Other than what you learned from your
 2  attorney?
 3      A    I don't recall.
 4      Q    I'm going to hand you what I marked as
 5  Exhibit 137?
 6          (Deposition Exhibit No. 137 was
 7           marked for identification.)
 8          MR. COOPER:  Excuse me one second.
 9      Mr. Videographer, how much time do we have?
10      How much time has elapsed for the video so
11      far -- for the depo so far?
12          VIDEO OPERATOR:  7 hours and 8 minutes.
13  BY MR. KAPLAN:
14      Q    Take a look at that document, 137, which
15  is copy of the defendant's supplement in support of
16  motion for attorney's fees and expenses filed by
17  your lawyers in the Hurley action, docket entry 99.
18          Attached as Exhibit A to this is a
19  transcript from somebody named Rebecca Gardner.
20  Do you see that?  Hold on.  You got my copy.
21          Where did this come from?
22      A    Where did what come from, sir?
23      Q    The transcript.
24          MR. COOPER:  Again, if you can answer
25      without revealing attorney-client privileged
```

Page 365

```
 1      communication go ahead.
 2          THE WITNESS:  I would have to defer to
 3      counsel.
 4  BY MR. KAPLAN:
 5      Q    Do you know where this came from?
 6      A    No, sir.
 7      Q    How did you find out this transcript
 8  existed?
 9      A    My lawyer.  I have no idea.
10      Q    Did you pay anyone to get this transcript?
11      A    Attorney-client privilege.
12      Q    Well, do you know whether or not payments
13  were made by you or anybody that works for you to
14  get this document?
15      A    Not to my knowledge.
16      Q    What about the documents attached to
17  Exhibit 136, were any payments made for those that
18  we just looked at, 136, Exhibit A?
19      A    Not to my knowledge.
20      Q    Who did you discuss this transcript with
21  other than your lawyers?
22      A    Which transcript?
23      Q    This transcript we are looking at that was
24  attached to Exhibit 137?
25          MR. COOPER:  Rebecca Gardner.  Object to
```

Page 366

```
 1      the form.
 2          THE WITNESS:  I think I was provided the
 3      opportunity to read this transcript after it
 4      was acquired and I see Mr. Sagan's name in
 5      here.
 6  BY MR. KAPLAN:
 7      Q    It said Mr. Sagan stole documents from
 8  Stelor.  Do you have any information about that?
 9      A    No, none whatsoever.
10      Q    Now the question was and is what
11  conversations did you have with anyone regarding
12  this transcript aside from your lawyers?
13      A    I'm sure I might have spoken to Mr. Sagan
14  about this, and I think I haven't read all of this
15  transcript but I think this was refuted by Rebecca
16  Gardner if there was no transcript that -- there was
17  no document stolen.
18      Q    What conversation did you have with
19  Mr. Sagan about this?
20      A    Basically his involvement with Mr. Esrig
21  and his -- the allegations that were made in this --
22  something to do with an unemployment claim.
23      Q    But what specifically did Mr. Sagan say to
24  you?
25      A    I don't recall.
```

(Pages 363 to 366)

Page 367

1  Q   Do you have any recollection of what
2  Mr. Sagan said to you other than what you just
3  described for me?
4  A   Not at this time.
5  Q   Did you ever talk to Mr. Sagan about the
6  allegation that he stole documents from Stelor?
7  A   I think I might have breached that
8  question to him and he flatly refused that
9  allegation as being untrue and had no substantiated
10 documentation.
11 Q   What did he say exactly?
12 A   He never stole any documents from Stelor
13 Productions.
14 Q   Did you ever talk to Rebecca Gardner
15 directly?
16 A   No.
17     MR. KAPLAN:  Alright.  In light of the
18 time limitation I'll stop.
19     VIDEO OPERATOR:  Are we going off the
20 record?
21     MR. COOPER:  Yes.  He will read if it gets
22 typed up.
23     MR. KAPLAN:  We will order it.
24     VIDEO OPERATOR:  We are on the record.
25     MS. CALABRIA:  Google would like an

Page 368

1  opportunity to cross examine this witness and I
2  understand from his counsel and from Stelor's
3  counsel that they are taking the position that
4  they are going to leave the deposition now; is
5  that correct?
6      MR. COOPER:  More than the seven hours,
7  that is correct.
8      MR. KAPLAN:  Stelor objected.  We are
9  still here, but you have heard the position
10 from Silvers' lawyer.
11     MS. CALABRIA:  Right.  My understanding is
12 that a deposition is not admissible if a party
13 is deprived of the opportunity to cross
14 examine.  So if we are deprived, as it seems we
15 are, then we reserve the right to exclude any
16 or all of the testimony that was just provided.
17     We also reserve the right to move to
18 compel Mr. Silvers to return for the cross
19 examination, and we will also seek costs in
20 doing that.
21     We called the judge's chambers and we were
22 unable to get in touch with them so we have no
23 option but to reserve our right on the record
24 and move for relief later on.
25     MR. KAPLAN:  Johanna, let me clarify.

Page 369

1  Surely you are not objecting to the use of this
2  deposition limited to the crossclaim dispute
3  between Stelor and Silvers, are you?
4      MS. CALABRIA:  I am objecting to it,
5  Kevin.  We have the right to cross examine the
6  witness and we are not being permitted the
7  opportunity to do that.
8      MR. KAPLAN:  Do you contend you have a
9  right to cross examine the witness related to
10 the contract claim dispute?
11     MS. CALABRIA:  We reserve -- we have the
12 right to cross examine the witness as to the
13 scope of the testimony he just provided.
14     MR. KAPLAN:  Okay.  I guess don't see why
15 that's a basis for objecting to its use in
16 connection with the crossclaims, that's what
17 I'm trying to get clear.  But in any event
18 Silvers -- you have heard the position of
19 Silvers' counsel so that's what it is.
20     MS. CALABRIA:  Right.  The last thing is
21 that I guess we will fight about this, but the
22 agreement of the parties as of last Tuesday was
23 to allow this cross examination and it was in
24 part based on that agreement that we agreed to
25 return here on Friday.  Since that agreement

Page 370

1  has been reneged we contend that the deposition
2  testimony that was heard today should be
3  stricken.
4      MR. KAPLAN:  Stelor has not and is not
5  terminating the objection.  We just voiced our
6  position on the record.
7      MS. CALABRIA:  I understand that, Kevin,
8  but the rules say that we are entitled to cross
9  examination of deposition testimony, and the
10 witness is leaving.
11     So under the rules the relief that we are
12 entitled to is, A, to move to exclude all of
13 the testimony or any portion of it; or B, to
14 move to compel him to return and to move for
15 sanctions against him.  And so we are
16 seeking -- we are reserving both of those
17 rights.
18     MR. KAPLAN:  I think I misspoke.  I just
19 want to make sure.  Stelor has not terminated
20 the deposition and we are still sitting here,
21 so in any event.
22     MS. CALABRIA:  And I, you know, restate my
23 objection.  I think your position earlier was
24 that we should not be permitted to cross
25 examine, so that is our position.

(Pages 367 to 370)

/ 26

---

Page 371

1    MR. KAPLAN: Yes, and as I confirmed,
2  Stelor was and will make its objections to your
3  questions at the time.
4        Anything more?
5        MR. COOPER: No.
6        MR. KAPLAN: Anything more Johanna?
7        MS. CALABRIA: No.
8        VIDEO OPERATOR: We are off the record.
9              - - -
10             (Witness excused.)
11             (Thereupon, the deposition was
12        concluded.)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 372

1
2    THE STATE OF FLORIDA)
3    COUNTY OF MIAMI-DADE)
4
5        I, the undersigned authority, certify that the
6  aforementioned witness personally appeared before me
7  and was duly sworn.
8
9             WITNESS my hand and official
10            seal this 23rd day of October
11            2006.
12
13
14
15
16
17
18        ------------------------
        Thomas R. Neumann
19        Notary Public - State of Florida
        My Commission Expires: 3/22/07
        My Commission No.: DD187497
20
21
22
23
24
25

---

Page 373

1        C E R T I F I C A T E
2
3    THE STATE OF FLORIDA)
4    COUNTY OF DADE)
5
6        I, Thomas R. Neumann, Registered Reporter,
    State of Florida at large, do hereby certify that I
6   was authorized to and did report said deposition in
    stenotype; and that the foregoing pages, numbered
7   from 274 to 371, inclusive, are a true and correct
    transcription of my shorthand notes of said
8   deposition.
9
        I further certify that said deposition was
10  taken at the time and place hereinabove set forth
    and that the taking of said deposition was commenced
11  and completed as hereinabove set out.
12      I further certify that I am not attorney or
    counsel of any of the parties, nor am I a relative
13  or employee of any attorney or counsel of party
    connected with the action, nor am I financially
14  interested in the action.
15      The foregoing certification of this transcript
    does not apply to any reproduction of the same by
16  any means unless under the direct control and/or
    direction of the certifying reporter.
17
        IN WITNESS WHEREOF, I have hereunto set my hand
18  this 23rd day of October 2006.
19
20
21
22
23        ------------------------
        Thomas R. Neumann
24        Notary Public - State of Florida
        My Commission Expires: 3/22/07
25        My Commission No.: DD187497

---

Page 374

1    DATE:    October 23, 2006
2    TO:      STEVEN SILVERS
            C/O ROBERT H. COOPER P.A.
3            2699 N.E. 191 Street
            Suite 704
4            Aventura, Florida 33180
5    IN RE:   STEVEN A. SILVERS V GOOGLE, INC.
    CASE NO.: 05-80387
6
7
8        Please take notice that on Friday, the 13th of
    October 2006, you gave your deposition in the
9   above-referred matter. At that time, you did not
    waive signature. It is now necessary that you sign
10  your deposition.
        Please call our office at the below-listed
11  number to schedule an appointment between the hours
    of 9:00 a.m. and 4:30 p.m., Monday through Friday,
12  at Network Reporting Corporation, 44 W. Flagler
    Street.
13      If you do not read and sign the deposition
    within a reasonable time, the original, which has
14  already been forwarded to the ordering attorney, may
    be filed with the Clerk of the Court. If you wish
15  to waive your signature, sign your name in the blank
    at the bottom of this letter and return it to us.
16
        Very truly yours,
17        NETWORK REPORTING CORPORATION.
18
19        ------------------------
        THOMAS R. NEUMANN
20  I do hereby waive my signature:
21
22        ------------------------
'23   STEVEN SILVERS
24        cc via transcript: KEVIN C. KAPLAN, ESQ.
                JOHANNA CALABRIA, ESQ.
                ROBERT H. COOPER, ESQ.
25  file copy

(Pages 371 to 374)

Page 375

```
 1          C E R T I F I C A T E
 2               - - -
 3
 4   THE STATE OF FLORIDA)
 5   COUNTY OF MIAMI-DADE)
 6
 7      I hereby certify that I have read the foregoing
 8   deposition by me given, and that the statements
 9   contained herein are true and correct to the best of
10   my knowledge and belief, with the exception of any
11   corrections or notations made on the errata sheet,
12   if one was executed.
13
14      Dated this _____ day of _____,
15   2006.
16
17
18
19
20   _____
21   STEVEN SILVERS
22
23
24
25
```

Page 376

```
 1          E R R A T A  S H E E T
 2   IN RE:  STEVEN A. SILVERS V GOOGLE, INC.
 3   DEPOSITION OF:  STEVEN SILVERS
 4   TAKEN:  10/13/06
 5     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 6   PAGE #  LINE #  CHANGE        REASON
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   Please forward the original signed errata sheet to this
     office so that copies may be distributed to all parties.
18
     Under penalty of perjury, I declare that I have read my
19   deposition and that it is true and correct subject to any
     changes in form or substance entered here.
20
21   DATE: _____
22
23   SIGNATURE OF DEPONENT:_____
24
25
```

(Pages 375 to 376)