UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CIVIL DIVISION

CASE NO. 05-80387-CIV-RYSKAMP/VITUNAC

Steven A. Silvers, an individual
    Plaintiff
v.
Google Inc., a Delaware corporation
    Defendant

## SILVERS' MEMORANDUM OF LAW IN OPPOSITION TO STELOR'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Steven Silvers files this memorandum of Law in opposition to Stelor's Motion for Summary Judgment.

As will be argued below, Stelor's motion does not remotely attempt to provide this Court with complete or undisputed facts. Stelor is essentially attempting to present its side of the case as if this were a bench trial and not a summary judgment motion. Stelor not only incorrectly states that many of the facts are undisputed which are in fact disputed, but Stelor fails to mention the numerous facts in its motion or in its Statement of Material Facts which are material to the issues before this Court on Summary Judgment. Strangely, most of those omissions and inaccuracies are found within the documents Stelor filed in support of its motion.1

## Stelor's Breaches and Termination

---

1 As a result, Silvers will mainly be referencing Stelor's appendix. The only other record support upon which Silvers relies is the Declaration of Steven Silvers in Opposition to Stelor's Motion for Summary Judgment filed in support of this motion and its exhibit. As Silvers will be relying on both his own Declaration filed in the Hurley action and his Declaration filed in this action, the references to the Hurley Declaration will be "Silvers" of the appendix (A9) and in the instant Declaration as "Instant Silvers".

1

Despite claiming to invest vast sums and enormous energy into developing and exploiting the Googles IP (which cannot be substantiated without an audit), Stelor has paid little attention to its obligations under the License Agreement. Specifically, Stelor failed to pay royalties or provide proper royalty statements, failed to allow an audit, failed to properly register and protect various elements of the Googles IP, failed to obtain insurance, failed to provide samples of goods and services merchandised under the Googles IP ("Licensed Product"), failed to maintain quality control over Licensed Products, and failed to provide lists of sublicenses. (A.9)

### First Termination

Fed up, Silvers retained counsel to persuade Stelor to meet its obligations. When Stelor refused, Silvers provided notice of default on November 12, 2004, initiating a 60 day cure period. (A9 ex G)  Stelor's failure to cure led to Silvers' termination of the License Agreement on January 13, 2005. (A9 Ex F)  Throughout this process, Silvers went by the book and in accordance with the terms of the License Agreement, provided the requisite notice and cure period. (A9)

### The Settlement Agreement and Stelor's' Breach of the Settlement Agreement

While Stelor I was pending, the parties tried to resolve the issues between them. They reached a settlement agreement which included an obligation of Stelor to pay advance royalties and health insurance to Silvers. (A3) Silvers intentionally did not withdraw his notice of default that underpinned the termination. Thus the threat of termination still loomed if Stelor did not provide "full performance" with the Settlement Agreement to avoid termination.   By virtue of the express terms of

the parties' settlement agreement, the parties agreed to be held to "full performance" standard and not a "substantial performance" standard or a materiality standard.  That is a crucial distinction.  The settlement agreement states that "full performance by each party of its obligations under this agreement cures the breaches alleged against each by the other party".  It was the intent of the parties that if either party failed to *fully perform* all of its obligations, the prior notice and opportunity to cure those breaches would not be discharged, released or altered in any way and would be immediately reinstated. (A10 par. 8-11) Substantial performance and the degree of materiality of the breach were intended to be irrelevant to the parties' obligations to fully perform.

Despite the settlement agreement, Stelor still disregarded its obligations.  As of April 27, 2005, three (3) months after the settlement, Stelor had refused to schedule an audit, failed to provide samples, failed to timely pay advance royalties, and failed to timely pay Silvers' health insurance reimbursements. (A9, A10).

Stelor's continued refusal to provide a date for the audit was the last straw. (A9,A10) Silvers requested that payments be made timely and to the correct payee many times and while some payments were finally paid, others were ignored and at one point Stelor flat out said they would not be paid unless Silvers provided a draft complaint against Google (which is not an obligation of Silvers under the settlement agreement.) (A10 and A10)  Yet, while attempting to appear cooperative, Stelor just would not provide an audit date nor provide timely payment of its financial obligations nor did it even evidence an intent to do so. (A10)  On April 27, 2005, Silvers terminated Stelor again. (A10 ex. JJJ).

<u>The Prior Injunction Proceedings held Specific Performance (via Injunctive Relief) is not an Available Remedy to Stelor</u>

Stelor filed suit in May of 2005 against Silvers seeking injunctive and declaratory relief. (2PA DE1)   There was an evidentiary hearing before Magistrate Hopkins and Stelor places great emphasis on his Report and Recommendations. (A22, 2PA DE 24)

Stelor fails to advise this Court, that according the Silvers' prior attorney Gail McQuikin,  Stelor pulled a fast one on Silvers and Magistrate Hopkins in that proceeding by providing out of context e-mail communications and attributing statements to her which were not true. (A10)

Stelor was aware that Silvers' lead counsel was going to be on vacation and out of the country at the time of the hearing before Magistrate Hopkins.  The morning of the hearing, Stelor filed declarations and provided testimony which it knew were misleading and could only be refuted by Silvers' then lead counsel, who they knew would not be present to inform Magistrate Hopkins of the truth.  (A10)  As a result of these tactics, Magistrate Hopkins found a likelihood that Silvers'' April 27, 2005 termination of the license agreement was improper. (A22, 2PA DE 24)   In response to this finding, Silvers filed objections to the Report and Recommendations and the Declaration of Gail A. Mcquilkin, Silvers' lead counsel.  (2PA DE 46).

The Honorable Judge Hurley, while not specifically addressing Stelor's improprieties, entered an Order rejecting in part and approving in part the Report and Recommendations in his Order dated July 2, 2005 (A25;  2PA DE 52). In that order, Judge Hurley denied Stelor future injunctive relief based upon the finding that an injunction for their continued use of the license agreement after termination was unjustified as there was insufficient "irreparable harm" to justify continuation

of an injunction. Judge Hurley specifically noted that Stelor's allegations of future losses of goodwill, profits and reputation posed by Silvers' termination of the license agreement is an injury that can be adequately compensated by money damages making equitable relief inappropriate. (A25; 2PA DE 52).

Judge Hurley properly analyzed that compelling specific performance is not legally justified where a party can be adequately compensated by money damages and concluded that, based upon substantially the same record which is before this Court, that even if the license agreement were improperly terminated by Silvers, that Stelor's could be adequately compensated by monetary damages and is not entitled to specific performance as a matter of law. In support, Judge Hurley cited to *Freeplay Music, Inc. v. Verance Corp.* 80 Fed. Appx 137 (2d Cir 2003)(unpub) and *A.L.K. Corporation V. Columbia Pictures industries, Inc.* 440 F.2d 761 (3d Cir. 1971).

Florida law governs the contracts between the parties to this action and there is ample authority under Florida law that specific performance is not an available remedy where there is an adequate remedy at law.

In *Lewis v. Guthartz* 428 So.2d 222 (Fla. 1982), the Florida Supreme Court of Florida stated: "compensatory damages as substituted performance are an adequate remedy for an aggrieved party to a breached contract." Florida Courts have uniformly upheld the rule that specific performance is not an available remedy where there is an adequate remedy at law. See*: Linkous v. Linkous,  2006 WL 3208458 (Fl. 1st DCA 2006) (*Plaintiff had adequate remedy at law through cause of action for breach of contract, and thus, specific performance was not an appropriate remedy.) *Florida Physicians Ins. Reciprocal v. Spooner* 470 So.2d 793 (Fla.4th DCA1985) citing to. *Biscayne Associates, Inc. v. Carson,  104 So.2d 871*

...

*(Fla. 3d DCA 1958)*; and *Vagabond Travel and Tours, Inc. v. Universal Inns of America, Inc. 440 So.2d 482* (Fla. 2 DCA 1983); *Jacksonville Elec. Auth. v. Beemik Bldrs. & Const., Inc.,* 487 So.2d 372 (1S` DCA 1986); *Airlines Reporting Corp. v. Incentive Int'l Travel, Inc.,* 566 So.2d 1377, 1379 (5th DCA 1990).

Stelor improperly assumes that this Court held to the contrary in its Order dated Feb 27th, 2006 (A26; DE71) on Silvers' motion to dismiss Stelor's crossclaim. This Court stated that there "may be circumstances" that would allow the trial court to reinstate a contract after its wrongful termination through specific performance or injunctive relief (citing to *Adrian Developers Corp. v, de la Fuentes* 905 So.2d 155 (Fl. 3d DCA 2004) and *Vela v. Kendall 905 So.2d 1033 (Fl. 5th DCA 2005)).* While those cases may have been sufficient to justify Stelor to proceed at the pleadings stage, those cases do not support a summary judgment of specific performance under the facts of this case at this stage. *Vela* was a case dealing with a noncompete contract*; Adrian Developers* dealt with the acquisition of real property. In neither case did the courts address whether or not there was an adequate remedy at law since there generally is a presumption of no adequate remedy at law in real property acquisition and non-compete cases.

As Judge Hurley held under the license agreement at issue in this case, this case falls within the general rule that there is an adequate remedy at law. (A25; 2PA DE 52).

As a matter of law a terminated franchisee's remedy for wrongful termination is an action for money damages, and not the continued unauthorized use of its franchisor's trademarks. Thus, while a terminated franchisee may seek money damages for any injuries resulting from the alleged wrongful termination of

its franchise, it may not continue to use the franchisor's trademarks without consent.

Burger King Corp. v. Austin, No. 90-0784-Civ-Hoeveler (S.D. Fla. Dec. 26, 1990) ; Cl-Ware Rayco, Inc. v. Perlstein, 401 F. Supp. 1231, 1234 (S.D.N.Y.1975). *Burger King Corp. v. Hall,* 770 F. Supp. at 638. Same result in *Burger King Corp. v. Majeed,* 805 F. Supp. 994, 1003 (S.D. Fla. 1992) (terminated franchisee's remedy for wrongful termination is an action for damages and not the continued unauthorized use of its franchisor's trademarks) (citing *Burger King Corp. v. Austin,* Bus. Fran. Guide CSCH) 19788 (S.D. Fla. 1990).

The relief Stelor requests is really a disguised prayer for specific performance, and even if there weren't numerous factually disputed issues, Stelor would still not be entitled to the relief it requests under the plethora of Florida cases, the Burger King line of cases and Judge Hurley's prior finding of fact and holding relating to the very license agreement now at issue before this Court.

<u>Despite the Allegations in the Motion for Summary Judgment, Stelor Admitted it Breached the Settlement Agreement</u>

In its motion for summary judgment, Stelor claims that it did not breach the settlement agreement. However, Stelor and its attorney's own communications with Silvers prove that it not only breached the settlement agreement but that Stelor intentionally breached the settlement agreement.

This is how it happened. After the settlement agreement was entered into, counsel for Silvers volunteered to draft a complaint against Google. (A10 par. 20) There was no requirement in the settlement agreement for Silvers to draft a complaint against Google; thus, this was a voluntary act outside of the scope of the

settlement agreement. In fact, the settlement agreement envisioned that Stelor would pursue such an action and that Silvers would provide whatever evidence in his possession Stelor needed to support its position.

The settlement agreement obligated Stelor to pay Silvers monthly payments of advanced royalties and payment of his health insurance premiums on the first of each month, to permit an audit and to provide samples of the products under the IP. All of these were material to Silvers especially the timely monetary payments. Silvers expressed to Esrig his urgent financial needs and especially his need to ensure that his health insurance premiums were paid. (Instant Silver) Stelor breached and admitted in correspondence between the parties to breaching each of these provisions. (A15).

### Advance Royalty Breach

The first advance royalty payment was due on February 1, 2005. Stelor did not make that payment until the seventh of February, a week late. (A10 par 40-47, ex.s QQ-ZZ) When it was received, Silvers requested that the payment be made payable to his corporation and not him personally. Stelor agreed and advised Silvers to return the check for immediate replacement of a check made payable to the Silvers' entity. The parties further agreed that all future checks would be made payable to the Silvers' entertainment entity. (A10 par 40-47, ex.s QQ-ZZ) The first check was returned and as of February 22, 2005, Stelor had still not replaced it. Silvers e-mailed Stelor demanding payment and demanding that the March advance royalty payment be made on a timely basis. As of March 2, 2005, when neither the February advance royalty payment nor the March advance royalty payment had been paid, Silvers again made a written demand for payment. (A10 par 40-47, ex.s QQ-ZZ) Finally, albeit untimely, Stelor made the February and

March advance royalty payments. (A10 par 40-47, ex.s QQ-ZZ) The April payment was due on April 1, 2005 and again Stelor breached its obligation for "full performance" under the settlement agreement and made the April payment late and again to the wrong payee. It was again returned to Stelor for re-issue. On April 8, 2005, Stelor agreed in writing to send a replacement check. (A10 par 40-47, ex.s QQ-ZZ) On April 11, 2005, Stelor's president Esrig sent an e-mail to counsel for Silvers unequivocally stating that he would not make the April payment, which was a material obligation under the settlement agreement, until counsel for Silvers provided him with a draft of the complaint against Google, which was not an obligation of Silvers under the settlement agreement.   This was an intentional material breach. (A10 par 40-47, ex.s QQ-ZZ)

     Finally, while the April advance royalty payment had still remained unpaid (now intentionally) and while finally fed up with Stelor's other intentional breaches of the settlement agreement (to be discussed below), Silvers, on April 27, 2005 declared the settlement agreement and underlying license agreement in breach. (A 14).

     On April 29, 2005, counsel for Stelor, Kevin Kaplan sent a letter to counsel for Stelor in which he admitted that the April 2005 advance royalty payment had not been paid, that he was holding it, and that he would only release the payment (now a month past due) if Silvers withdrew his notice of termination 2. (A15)

Health Insurance Payment Breach

     This is not the only intentional material breach.   It was very important for Silvers to make sure that he was financially able to maintain health insurance due

---

2 Stelor's own correspondence refutes the allegation it made in its motion for summary judgment wherein Stelor alleges that despite Silvers' termination of the license and settlement agreement, Stelor has complied with its obligations under the settlement agreement and license agreement.

to his personal health issues. The settlement agreement specifically provided that Stelor would pay for Silvers' health insurance coverage not to exceed $1,000 per month. On February 15, 2005, Silvers' counsel notified Stelor that the required amount was a hair under $1,000.00 a month. (A10 par 48-54, ex. AAA-III) Stelor was obligated to pay Silvers $1,000 per month in order for Silvers to maintain his health insurance. Those health insurance advances were also due on the first of each month. On March 2, 2005, Council for Silvers e-mailed Stelor demanding both of the February and now past due March health insurance reimbursements. The next day Stelor responded to the e-mail discussing other matters and ignoring the demand for the health insurance payments. (A10 par 48-54, ex. AAA-III) Counsel for Silvers again e-mailed Stelor on March 3, 2005 requesting a response regarding the health insurance. When that was again ignored, on March 5, 2005 council for Silvers again requested payment and/or a response to the prior inquiries regarding health insurance payments. Silvers' continued again and again and again to request Stelor to make the health insurance payments and sent e-mails requesting payments on April 5, on April 7, and again on April 8, 2005. (A10 par 48-54, ex. AAA-III)   On April 11, 2005 Stelor's President Steven Esrig sent an e-mail to counsel for Silvers unequivocally stating he instructed his attorney Kevin Kaplan not to release the past due health insurance checks (as required by the settlement agreement) until he received a copy of the draft Google complaint (not required by the settlement agreement). Finally, on April 14, 2005 Stelor paid the past due February and March, 2005 health insurance payments but failed to pay the April 2005 health insurance payment which was now two weeks past due. (A10 par 48-54, ex. AAA-III).

On April 27, 2005, Silvers declared the agreement in breach and terminated. (A 14) As of April 27, 2005, the April health insurance payment had not been made, one of many breaches existing on April 27, 2005. (A10 par 57).

## Sample Breach

In *Ron Matusalem & Matusa of Florida, Inc. v. Ron Matusalem, Inc.* 872 F.2d 1547 (11 Cir. 1989) the Court noted "It is clear that a trademark owner has a duty to exercise control and supervision over the licensee's use of the mark". Silvers took this duty seriously. The license agreement and settlement agreement specifically reiterated Stelor's obligation to provide Silvers with product samples as well as all advertising and promotional materials.

Although this obligation was already in the license agreement, it was also made part of the settlement agreement. There is a reason it is in both. The license agreement had a 60 day notice and opportunity to cure provision and the license agreement is governed by usual legal standards (e.g. the substantial performance doctrine and materiality of breach). The settlement agreement intentionally did not have a notice and opportunity to cure provision and required "full performance". Substantial performance and the materiality of a breach were intentionally substituted with a full performance standard. (A10 par 9-10)

The reasons were obvious, once an improper sample or advertisement was disseminated, the potential damage to the mark may not be susceptible to being cured. For example, Stelor's fraudulent advertisements on the web that Plaintiff's music (part of the IP) sold over a million downloads and was Grammy nominated. (Instant Silvers ex A) would not be curable if the public relied on the fraud to its detriment. This particular fraud was removed after Silvers had put Stelor on notice of it. However, Stelor deprived Silvers of the opportunity to review these in

advance to protect his mark. This is a continuing pattern.

Despite the rhetoric in Stelor's motion for summary judgment that it complied with the sample requirement, the samples were not provided (A10 par 26-33 ex. F, AA-HH, W, Y and Z). Stelor's own correspondence to Silvers following the April 27, 2005 termination letter reveals that Stelor was fully aware it was in breach of this provision. (A 15) Stelor's April 29, 2005 letter to Silvers admits there were samples that were not provided stating: "Fifth, samples of licensed products have been collected and are available to Mr. Silvers pursuant to the agreement, provided that the notice of termination is withdrawn…".

Clearly as of April 29, 2005 Stelor was aware it had breached its sample obligation under the settlement and license agreements in addition to the other breaches.

## Audit Breach

Stelor's motion for summary judgment argues that Stelor could not have breached its obligations under both the license agreement and settlement agreement to cooperate with Silvers' right to perform an audit of Stelor because Silvers only renewed his demand for an audit on April 22, 2005 "just five days before the termination letter!".

What Stelor omits to tell this Court is what occurred before and during a five-day period and how Stelor's continued refusal to cooperate with Silvers right to conduct an audit was the final straw that caused Silvers to declare the settlement agreement and license agreement again in breach and terminated. (A10 par 12 – 25, ex. H – Z).

First, the motion for summary judgment takes out of context the March 23, 2005 e-mail in which counsel for Silvers made reference to an agreement to

postpone the audit. In her declaration, counsel for Silvers clarifies that around that time, the parties were discussing the audit to take place during the first week of April. (A10 par. 18-19, ex N-P). Later counsel for Silvers told Stelor in a telephone conversation that they would agree that the audit would take place April 26, 2005. (A10 par 19) That is the postponement mentioned in the e-mail. Stelor's attorney Kaplan responded that he would check with his client and get back with Silvers. (A10 par 19) On April 10, 2005, Kaplan called and informed Silvers that the April 26 date would not work but refused to provide alternate dates. (A10 par. 19) The following day, April 11, 2005, Silvers' attorney told Kevin Kaplan that Silvers would reinstitute the termination if Stelor continued to refuse to provide a date for the audit. (A10 par. 20) In response, the president of Stelor sent an e-mail to Silvers' Attorney stating that Stelor will not to comply with the license and settlement agreements despite his Board of Directors' position regarding strict adherence to the same. Esrig went on to say that the law firm representing Silvers' could "finance Mr. Silvers next lawsuit with Stelor". (A10 par 20, ex. R)

      The following day Silvers' attorney again sent a lengthy e-mail to Kevin Kaplan specifically advising him that Stelor's' obligations to comply with the settlement agreement have no bearing on her drafting of the proposed Google complaint and again requesting compliance by Stelor with the settlement agreement. (A10 ex. S) The next day again Silvers requested an audit date in writing. (A10 ex. T). On April 22, 2005 Silvers again requested to be provided with an available date for the audit within the next two weeks. (A10 ex. U Approximately an hour later, Kevin Kaplan sent a response e-mail bringing up unrelated issues and ignoring the request for an audit date. (A10 ex. V) Two hours

thereafter Silvers' attorney sent another e-mail again requesting audit dates. (A10 ex. W)  An hour after that, Kevin Kaplan responded by e-mail again bringing up other issues and ignoring the request for the audit date. (A10 ex. X)  Three days later, on April 25, 2005 still not having received an available date after the numerous prior requests, Silvers attorney again requested an audit date by e-mail to Kevin Kaplan.  (A10 ex. Y). Kevin Kaplan again responded approximately (2 minutes later) again addressing other issues and ignoring the request for an available audit date.  (A10 ex. Y)  The next day, April 26, 2005 Kevin Kaplan again wrote a lengthy e-mail to Silvers' attorney again ignoring the request for an audit date. (A10 ex. Z)

The next day with four distinct breaches of the settlement agreement, one of which was blatant (the audit breach) and two others were admittedly intentional (the royalty breach and the health insurance breach), Silvers declared another default and terminated the license. (A 14)

One must wonder what an audit would reveal where Stelor has allegedly raised and spent six million dollars to commercialize Silvers' IP and has earned $2.00 in net revenues.  It is no wonder that Stelor would rather risk losing its license than to allow an audit.

<u>The Settlement Agreement Did Not Contain a Provision Requiring an Additional Notice and Opportunity to Cure</u>

Stelor tries to get around the fact that it was intentionally breaching the agreements by claiming (1) it had the right to notice and an additional 60 days opportunity to cure its own intentional breaches and (2) that time was not "of the essence".

Silvers made sure that the settlement agreement did not include a notice and opportunity to cure clause as the parties did not intend for Stelor to have an opportunity to play the breach and cure game any longer. (A10 par 8 – 11)  The agreement called for only one thing – "full performance".   Second, as a result of the numerous demands for timely payment, and the provision requiring full performance, time became "of the essence" with regard to Stelor's payment obligations. (A10 par 34 – 54, ex. JJ – III)

The settlement agreement states "Silvers withdraws his notice of termination of the license agreement and reaffirms his obligations under the License Agreement".   The settlement agreement specifically did not withdraw the prior notice of default.   It was the intent of the parties that in the event Stelor did not "fully perform" each and every obligation under the settlement agreement that the settlement agreement could be declared in breach without notice or an additional opportunity to cure.  This is why the agreement reads "the parties intend that full performance by each party of its obligations under this agreement cures the breaches alleged against each other by the other party".  If there is no full performance, then there is no cure of the prior breaches nor is there a need to send a new notice and opportunity to cure the prior breaches since the agreement does not even purport to withdraw the prior notice of breach served on Stelor, although it does explicitly withdraw the prior termination letter.

To the extent that there is an ambiguity with regard to whether or not the settlement agreement somehow incorporates by reference the notice and cure provision of the license agreement or restarts the 60 day cure period, the only record evidence before this Court is the declaration of Silvers' attorney Gail McQuilkin, who provided testimony that the parties only intended to withdraw the

termination but not the prior notice of default, nor to provide any additional time to cure the default unless Stelor fully complied with the settlement agreement with no new cure rights. (A10 par. 8-11).

It is unambiguous that the settlement agreement does not contain a notice and cure provision. However to the extent this Court concludes that the settlement agreement is ambiguous as to this issue, this Court would be obligated to consider parole evidence and since only the parole evidence is Silvers' attorney's declaration (A10), this would become a jury issue not appropriately resolved by summary judgment (likely to involve a directed verdict for Silvers).

Furthermore the parties agreed on a "full" performance standard. Contracting parties can provide whatever standards for enforcement so long as those standards do not violate public policy such as varying rights under a remedial statute. See: *Blankfeld v. Richmond Health Care,* Inc. 902 So.2d 296 (Fl. 4th DCA 2005). Substantial performance is not enough.

Failure to make payments on time is not full performance. Despite the implication to the contrary in Stelor's motion for summary judgment, Stelor intentionally withheld tendering performance of its obligations to pay the advance royalty and insurance payments due April 1, 2005 until after Silvers already declared the settlement agreement and license agreement breached and terminated.

By definition there is a distinct difference between full and substantial performance. Stelor's argument, that because the settlement agreement did not contain a "time is of the essence clause" and therefore it can make payments whenever it wanted to instead of on time, holds no water especially in light of the "full performance" standard the parties agreed to in the settlement agreement.

The court in *National Constructors, Inc. v. Ellenberg* 681 So.2d 791

(Fl. 3d DCA 1996) explain the difference between substantial and full performance stating: "Substantial performance is that performance of a contract which, while not full performance, is so nearly equivalent to what was bargained for that it would be unreasonable to deny the promisee the full contract price subject to the promisor's right to recover whatever damages may have been occasioned him by the promisee's failure to render full performance". In the instant case the parties agreed on full performance. Thus Stelor's failure to make the payments on time, while possibly constituting substantial performance, cannot by definition constitute full performance. Therefore Silvers' termination was proper. While Silvers did accept and cash the untimely Feb. and March 2005 payments when he finally received them on April 14, 2005 (A4 par. 28 b), he never cashed the April 2005 payment which was allegedly tendered 29 days late and two days after the settlement (A4 par. 28 b).

Even if "full performance" were not the standard applicable to the contract issue, under Florida law when a party to a contract (that does not have a "time is of the essence clause") demands that the other party timely perform its obligations, time becomes "of the essence". *Centurion Air Cargo v.. United Parcel Service 420 F.3d 1146 (11th Cir. 2005)* and *Blaustein v. Weiss  409 So.2d 103 (Fl. 4th DCA 1982)* . As Silvers made numerous demands on Stelor for reasonable and timely performance of its payment obligations, time became "of the essence" and Stelor's failure to make timely payments was a material breach entitling Silvers to terminate the agreements.

While the facts seem to indisputably prove that Sivlers' termination was rightful, at a minimum, the intent of the parties with regard to this issue would be a question of fact for the jury to resolve.

Silvers' Post-Termination Notice of Additional Breaches by Stelor

Despite the fact that the settlement agreement was terminated, Stelor continued to allege it has remained in full compliance with both the settlement agreement and license agreement. It has not. Solely to provide this Court with additional grounds to see that Stelor is not being above board and without waiving the fact of a valid prior termination, Silvers again sent Stelor notice of additional breaches on August 27, 2006. (Instant Silvers)  In that letter, Silvers put Stelor on notice of the following additional defaults: (1) making changes to the trademarked names without consent or approval nor getting appropriate trademark protection for those derivative names, and failing to obtain domain names to support the new altered names; (2) making fraudulent false statements on the web to the entire world that there were over one million downloads of plaintiff's music and that plaintiff's music was a "Grammy nominated album"; (3) Stelor registering trademarks for names extremely similar to the licensed trademarked property under a newly formed entity "the Stelor Group Ltd."; (4) failing to file for trademark protection for GooRoo and additional characters and other associated documents necessary to protect plaintiff's license to trademarks; (5) failing to reasonably commercialize plaintiff's products potentially putting plaintiffs trademark in jeopardy3; and (6) Stelor's filing a frivolous lawsuit against Silvers in state court in Maryland in violation of the provisions of the license agreement including the jurisdiction and limitation of liability clauses.

---

3 Stelor, which has supposedly raised over $6 million, has a monthly payroll of $150,000, has 15 or more full-time employees, has attended four international trade shows, and has been an exhibitor for the past three consecutive years, but lists on its financial statements to <u>total revenue of $20.41</u> for a handful of downloadable songs on the iTunes website. While Stelor has not manufactured a single product nor sold any of the plush toy inventory, books or a single licensed products (with the exception of iTunes).  It baffles the mind to figure out how Stelor can maintain its has been reasonably commercializing plaintiffs intellectual property.

As set forth in Declaration of Steven Silvers filed in support of this memorandum (Instant Silvers), Stelor did not cure all of those breaches within 60 days of the date of that notice. Accordingly, even if there had not been a breach of the settlement agreement, Silvers still properly has terminated the license agreement.

## Conclusion

This case is very similar to facts in ***Burger King Corp. v. Majeed*** 805 F.Supp. 994, 1002 (S.D.Fla.1992) where the Court stated:

> Having chosen to stop her own performance under the parties' Franchise Agreement by refusing to pay her monthly royalties and advertising and sales promotion contributions to BKC, Hall herself effectively terminated her Franchise Agreement with BKC. Having done so, Hall may pursue her damage claims against BKC, including her wrongful termination claim, but she may not continue to use the BKC Marks in the operation of her restaurant. In order to have preserved her right to continue to use the BKC Marks, Hall should have continued to pay her contractual royalties and advertising and sales promotion contributions to BKC.

In the instant case, on April 27, 2005, Stelor intentionally decided to stop paying the amounts it owed Silvers pursuant to the settlement agreement. Just as Burger King had the right to the return of its intellectual property in the cited case so to does Silvers in this case.

As a result of the numerous disputed facts and the application of the law to those disputed facts in the settlement agreement and license agreement, Stelor's request for summary judgment should be denied.

As a result of withdrawal of Silvers' prior attorney and late appearance of his present attorney, Silvers was unable to effectively file his own cross motion for summary judgment on these issues. Silvers suggests that this Court on its own motion consider postponing the scheduled trial date and permitting Silvers to file his own motion for summary judgment on these issues if the Court believes based upon its review of the record at this stage, that Silvers' filing of a motion for summary judgment would be in the interest of judicial economy.

>Robert H. Cooper P.A.
>2999 N.E. 191 St. Suite 704
>Miami, Fl. 33180
>305-792-4343 (direct extension)
>305-792-0200 (fax)
>robert@rcooperpa.com
>Fl. Bar No. 0650323
>
>
> _s/ Robert Cooper_____