# Exhibit

# 9

Dockets.Justia.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, L.L.C., a
Delaware corporation, f/k/a STELOR
PRODUCTIONS, INC.,

      Plaintiff,

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant,

_____/

CASE NO. 05-80393-CIV-HURLEY
Magistrate Hopkins

### DECLARATION OF STEVEN A. SILVERS

I, Steven Silvers, make this Declaration based on personal knowledge.

1.     I reside in Palm Beach County, and have a business address at 8983 Okeechobee Blvd., Suite 202, PMB 203, West Palm Beach, FL 33411.

2.     Throughout the 1980s, I developed an animated character concept designed to appeal to children. In 1996, I published the book "Googles and the Planet of Goo," which I authored. I wrote the book while incarcerated for a conviction on federal charges as a way to stay connected to my children. Exhibit "A" shows the front and back covers, and some pages from the book.

3. The book features a family of Gootians, alien creatures from another planet who are forced to come to earth. The characters are cute, lovable and smart; they use a unique vocabulary and espouse maxims for life on earth (or any other planet), all designed to further the "edutainment" and development of young children. Our motto since early on has been "Teaching children of today, visions of tomorrow."

4.      I have marketed and promoted the characters through a variety of mediums. The characters staged live appearances and musical shows; plush toys were developed as well as stickers for school notebooks and the like.

5.      In 1997, I registered the domain name Googles.com to promote the characters and related products on the internet, and operated a website for that purpose. The same year I obtained a federal trademark registration for "Googles" for use with children books. I have subsequently registered hundreds of domain names and trademarks for the characters and related "Goo" terms, for use with children's education and entertainment, and related products.

6.      I have also created, and overseen the creation of, numerous songs featuring the characters and Googles themes. I own numerous copyrights for Googles related drawings and literary works. I also own design patents for a "Googles" shoe, the GooShoe, and alien figurines, The Googles.

7.      In May 2002, after my then licensee experienced unrelated problems, I licensed the intellectual property described above ("Googles IP") to Stelor Productions, Inc. (Exhibit "B"). I have not been advised of Stelor Productions, Inc.'s assignment of its rights under the License Agreement to Stelor Productions, L.L.C. and have not consented to such a transfer. I first learned that Stelor Productions, L.L.C. claims the status of licensee when served with this lawsuit. Both Stelor entities are referred to herein as "Stelor."

8.      In May, 2002, as additional consideration for the License Agreement, I entered into a Letter Agreement with Stelor for consulting services. The Letter Agreement (Exhibit "C") specifically provides that, if Stelor fails to compensate me for consulting services as required, I may terminate the License Agreement; Exhibit "C," ¶ 1(c).

9.      Under the Letter Agreement, ¶1(b), Stelor is required to provide a written agreement granting me 1,000 options for Stelor stock, with the number of options to increase if Stelor's option plan changes. Stelor has not provided this agreement to me. In fact, Stelor has even refused to provide me a copy of its then existing option plan, or any option plan, which is necessary to determine if I am entitled to more options.

10.     Under the Letter Agreement, Stelor is also required to compensate me by paying my health insurance premiums. As of the date of the Settlement Agreement discussed below, Stelor had failed to do so, paying only a portion of what it owed.

11.     Under the Letter Agreement, Stelor is required to reimburse my expenses, including domain name registration fees and consulting related travel. As of the date of the Settlement Agreement discussed below, Stelor had failed to do this.

12.     Under the License Agreement, Stelor is allowed to market and sell products and services utilizing the Googles IP ("Licensed Products"). Related requirements include: providing samples of Licensed Products for my inspection and maintaining "high quality"; paying royalties for such sales; providing detailed royalty statements each quarter; and permitting me to audit Stelor's books and records. Stelor is also required to identify and provide me with a quarterly list of all sublicenses it grants regarding Licensed Products.

13.     Stelor markets and sells a variety of Licensed Products. Stelor has since at least 2004 been marketing Googles-based music through Itunes, by which a customer pays to download songs contained in the two Googles compact discs, "The Googles From Goo/One GooWorld" and "Un GooMunndo/The Googles From Goo," (total of 30 songs). For example, attached as Exhibit "D" is a receipt an associate provided to me reflecting the purchase and download of the entire "One

3

GooWorld" compact disc in August, 2004. Stelor never provided a royalty statement reflecting any sales for 2004 or paid any royalties for such sales. In fact, Stelor has consistently maintained that there have been no sales of Licensed Products.

14.    Stelor is also merchandising various Googles-related items, such as clothing, coffee mugs, hats, mouse pads, etc. through an internet store called CafePress.com. I learned of this in 2004. Stelor has never provided a royalty statement reflecting any sales of this Licensed Product or pay any royalties for such sales. Stelor never provided samples of this merchandise. However, I recently inspected the Googles merchandise sold on CafePress.com. Incredibly, Stelor is placing a notice on the merchandise where Stelor claims it is the copyright owner of my characters and drawings, for which I hold the copyrights.

15.    Most significantly, Stelor has used the Googles IP to attract users to its websites, and developed a valuable database of customers and potential customers for the Licensed Products. None of this commercial activity has been reflected in any royalty statements, and I have received no royalties for this. Because I have been denied an audit, I cannot determine whether Stelor, as is typical in the internet industry, monetizes the traffic channeled through the Googles IP domain names, and the information derived from such traffic.

16.    In connection with the Licensed Products described above, as of the date of the Settlement Agreement, Stelor had not:

a.    Provided any detailed royalty statements, as specified in the License Agreement. In fact, Stelor has not provided any statements at all for the 3rd and 4th quarters of 2004; copies of Stelor's non-royalty statements which do not comply with the License Agreement, III(C), are attached as Exhibit "E."

4

   b.  Paid any royalties;

   c.  Provided me with all samples of the Licensed Product; and

   d.  Provided any information regarding sublicenses for the Licensed Product

described above. (If Stelor failed to obtain such sublicenses while allowing others to market and sell

Licensed Product, then it is failing to protect the Googles IP as required by the License Agreement).

   17.  After learning, on my own, of Stelor's commercial efforts, I requested an audit.

Correspondence reflecting my initial request, on November 5, 2004, and the repeated requests by my

attorneys, is attached as Exhibit "F." Stelor initially refused to allow an audit, and then admitted I

was entitled to the audit but objected to my choice of accountant and imposed a series of other

conditions. As of today, six months after I requested it, Stelor claims it will permit an audit but still

has refused to provide a date for the audit.

   18.  Under the License Agreement, Stelor is required to protect the Googles IP. In this

regard, Stelor failed to renew several of the licensed domain name registrations, allowing others to

obtain registration rights for these domain names. And, Stelor failed to oppose other partys' federal

registration of the "Googles" mark for a variety of goods.

   19.  Stelor is required under the License Agreement to obtain product liability insurance

and include me as a named insured. It did not do so.

   20.  As a result of Stelor's failure to abide by the License Agreement and the Letter

Agreement's compensation requirements, I gave notice of Stelor's default, which allows Stelor to

cure prior to actual termination of the License Agreement. A copy of my attorney's letter dated

November 12, 2004 is attached as Exhibit "G."

21.     Stelor had a 60-day period to cure its defaults. It failed to do so. Accordingly, I terminated the License Agreement on January 13, 2005. (Exhibit "H").

22.     Prior to the first termination , Stelor sued me. The suit was frivolous. However, when Stelor promised to cure its defaults, and pay advances against future royalties, we settled the case. The Settlement Agreement (filed under seal) reflects Stelor's promise to cure many of the defaults. In return, I withdrew the termination. I did not agree to, and did not withdraw the notice of default, because Stelor had yet to cure the defaults.

23.     The Settlement Agreement is dated January 28, 2005. Stelor did cure some defaults; it paid the expenses and insurance premiums it owed under the Letter Agreement, although it delayed doing so. It cleaned up some of the registrations for the Googles IP. However, as of April 27, 2005, Stelor had still failed to:

    a.     Pay any royalties;

    b.     Provide proper royalty statements, or any statements for the last two quarters of 2004 and the first quarter of 2005;

    c.     Provide a date for me to audit Stelor's books and records despite my attorneys' repeated requests, spanning six months (Exhibit "F");

    d.     Obtain insurance, naming me as an insured;

    e.     Provide an agreement for my stock options, or provide Stelors' stock option plan;

    f.     Pay the health insurance premium compensation of the settlement (a royalty advance) due on April 1, 2005. Stelor had also failed to timely pay for the past due health insurance

6

compensation, far exceeding the time requirements of the Settlement Agreement before finally paying;

g.    Provide samples of any Licensed Product (other than the two Googles' music compact discs, provided <u>after</u> the Settlement Agreement), in violation of the License Agreement.

h.    Provide copies of any pleadings or materials filed with or received from the USPTO, as required by the Settlement Agreement.

24.    By April 27, 2005, I concluded that Stelor's failure to respect its obligations was no longer tolerable. Stelor has repeatedly breached the License Agreement, Letter Agreement and now the Settlement Agreement. I have been denied an audit for almost six (6) months. I see Licensed Product on the market, and am aware of sales yet Stelor pays no royalties, and provides non-conforming royalty statements. I have other opportunities to exploit the Googles IP, and expect to generate substantial income immediately. I therefore terminated the License Agreement on April 27, 2005. (Exhibit "I").

25.    After the License Agreement was terminated, Stelor belatedly tried to cure its numerous defaults. (Exhibit "J"). It provided the first ever royalty statement reflecting income (although it was not certified as required, and like past statements is not in conformity with the License Agreement). It claimed to have sent a letter (not received by me) agreeing in principle to a grant of options, but Stelor has never provided a contract or a written plan. It offered to produce samples of the Licensed Product for the first time. It belatedly sent copies of checks (not the actual checks) for advance royalties and overdue health insurance premiums. It obtained insurance <u>after</u> the termination. (Exhibit "K"). This is all too little, too late. I want to divorce Stelor, and I am entitled to do so under the agreements.

**I HEREBY DECLARE** under penalty of perjury that I have read the foregoing Declaration and that the facts stated in it are true.

Dated: May 20, 2005

_____
Steven A. Silvers

3339/101/253342.1

8

# EXHIBIT "A"





# GOOGLES

# AND

# THE

# PLANET OF GOO

## VOLUME I

### by: Steven A. Silvers

---

**The Googles Children's Workshop, Inc.**
**P.O. Box 2123**
**Union, New Jersey  07083**

Printed in the United States
of America by:

**Morris Publishing**
**3212 E. Highway 30**
**P.O. Box 2110**
**Kearney, Nebraska  68847**

**First Printing:  May, 1996**

ISBN: 1-57502-184-6

Library of Congress Catalog Card No.: 96-94384

The Googles logo,  children's books, and illustrations are the products and trademark of:

**The Googles Children's Workshop, Inc.**

An affiliate of:

**SAS Entertainment Group.**

Produc d, published, and c tributed by:

**The Googles Children's Workshop, Inc.**
**P.O. Box 2123**
**Union, New Jersey 07083**
**(908) 688-3995**

Copyright 1995 by:  **Steven A. Silvers**

Written by:  **Steven A. Silvers**

Cover design & layout
by:   **Kenneth R. Rayburn**

Cover artwork & solar system
illustration by:  **Hendrick A. Gil**

Edited by:  **Cindy Greenfield**

**ALL RIGHTS RESERVED.**  No portion of this book may be used or reproduced in any manner without the expressed written permission from the publisher.  For further information, kindly forward your inquiry to the address noted above.

# DEDICATION

This children's book and the entire Googles edutainment concept is dedicated to my two wonderful children.

**Renee** is the beautiful daughter I've had the wonderful pleasure and enjoyable experience of having raised into womanhood as a single parent.

While **Joshua,** on the other hand, is the son I've always yearned for and truly hope I will one day get to know.

This work is dedicated to the both of you.

Love, Dad!

# SPECIAL THANKS TO:

My dad

**Michael L. Silvers**

and

my dearest friend,

**Marsha Perry Genaro,**

for

without their efforts, dedication, and perserverance this wonderful children's edutainment book would not have been published.

# AUTHOR'S NOTE

## SOMETHING NEW & REFRESHING! SOMETHING EXCITING & EDUTAINING!

That is what parents and children are saying about our innovative children's edutainment reading book.

The Googles concept was created as a means to provide children with a fun-filled method of expanding their vocabulary.

In this first of several Googles adventures, your child will learn and recognize many new words.

Along with vocabulary enrichment your child will also learn, through application of the imagination, identifiable lessons in conceptual awareness and social interaction.

To further assist your child in learning new words, a dictionary appendix is conveniently provided at the end of each

(Author's Note, continued)

book which corresponds to the *italicized* words in the original text. This method of learning prevents the child from the tedious task of having to refer to a regular dictionary to find the meaning of the new words he/she is about to learn.

A phonetic pronunciation of each *italicized* word is also provided.

We sincerely hope your child will enjoy reading all about the adventures of Googles, Giggles, and Goggles from the imaginary planet of Goo.

We welcome your comments and/or suggestions about our innovative children's edutainment reading and vocabulary enrichment learning technique.

Kindly direct your correspondence to:

**The Googles Children's Workshop, Inc.**
**P.O. Box 2123**
**Union, New Jersey  07083**

# CHAPTER 1

## Googles Comes To Earth

Once upon a *millennium* ago there was a planet called Goo. On this planet lived three little creatures who would one day visit Earth where they would learn and play with the many children there.

Before we begin our journey to this far away planet and the story of how the Gootians: Googles, Giggles, and Goggles came to visit Earth, we must first learn something about the solar system as it

Steven A. Silvers                           2

exists today.

The universe is composed of all things that exist in the world, including the sun, moons, stars and planets contained in it.

There are nine planets in our solar system: Mercury, Venus, Earth, Mars, Jupiter, Saturn, Uranus, Neptune, Pluto, and the (imaginary) planet of Goo.

To further understand the *composition* of the solar system and how far away your new friend, Googles, has traveled to visit us, please refer to the *illustration* provided on the last page of this book.



# EXHIBIT "B"

# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This **LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT** between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

## WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## I. LICENSE GRANT

A.    LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith.

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement; provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement.

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement.

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording.

## II.  TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term").

## III.  COMPENSATION

A.    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid.

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement.

C.    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties.



E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.    All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)    LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.



(iv) ......... the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party; and

(v) except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B. LICENSEE represents and warrants that:

(i) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii) the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

(iii) it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C. Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D. LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith.

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A. The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices.

B. The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C. Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A. Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B. Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

4

## VIII.  INTELLECTUAL PROPERTY PROTECTION

A.      LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.      LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.      LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein.

D.      LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.      Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation.  The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX.  TERMINATION

A .     Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach.

B.    LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C.    Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X.  POST TERMINATION RIGHTS

A.    Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B.    Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C.    Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D.    Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI.  INFRINGEMENTS

A.    During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B.    Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII.  INDEMNITY

A.    LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.



B.     LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.     With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

### XIII. LIMITATION OF LIABILITY

A.     IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES. THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.     EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

### XIV. INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

### XV. FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.

7





### XVI.  JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

### XVII.  AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

### XVIII.  WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

### XIX.  SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

### XX.  NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

### XXI.  ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of **LICENSEE** and/or with the consent of **LICENSOR**, which shall not be unreasonably withheld or delayed. By way of example and not limitation, **LICENSEE** may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc.

### XXII.  INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

### XXIII.  RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1st, 2002, and executed between the above mentioned parties

8



IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS                                    STELOR PRODUCTIONS, INC.

Steven A. Silvers                                    By: _____
Title:  Owner/LICENSOR                               Printed Name: _Steven A. Esrib_
Dated:  _5/09/02_                                    Title: _President_
                                                     Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc,) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term.  This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year  extended Term on the



same terms and conditions provided for herein, unless **LICENSOR** provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

**LICENSEE** shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

5/9/02

Succession
Rights of Survivor

In the event of the Death of Licensor all of the Licensor's rights under this agreement Shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.

*Steve A. Silvers*                    *[signature]*
5/09/02                               5/9/02

*[signature]*

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

11

# EXHIBIT "C"

# Exhibit B

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

    This letter agreement ("Agreement") will serve to memorialize the terms of the consultantcy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

    1.    <u>Engagement of Consultant.</u>

    a.    Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

    b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003. All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

    c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

    2.    <u>Relationship of Parties.</u> The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.     Duties of Consultant.  Consultant's duties hereunder are as follows:

a.     Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

b.     During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

c.     Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and/or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

d.     Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

4.     Duties of Company.

a.    Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.    Term and Termination.

a.    Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.    Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.    Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.    Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.    Proprietary Information; Proprietary Rights.

a.    In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

b. The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c. The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7. Limitations of Liability. TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8. Miscellaneous.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument. This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder. This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

STEVEN A. SILVERS    Date 5/09/02

Stelor Productions, Inc.

By: _____    Date 5/9/02
Name: Steven A Esrig    Title: President

Received Ten Thousand Dollar signing bonus ($10,000.00)

# EXHIBIT "D"



# COMPOSITE
# EXHIBIT "E"

FROM : SILVERS ENT                    FAX NO. : 5617849959                May. 19 2005 12:15PM P2

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 6/1/02 to 6/30/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|-------|-------------|------|--------------|-----------|------------------|---------------------------|---------------------------|-----------|------------------------|-----------|---------|-----------------|----------------|--------------|-----------------|
| Jun-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____  Date 11/2/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 7/1/02 to 9/30/02

| Months | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|--------|-------------|------|--------------|-----------|------------------|---------------------------|---------------------------|-----------|------------------------|-----------|---------|-----------------|----------------|--------------|-----------------|
| Jul-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Aug-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Sep-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____  Date 11/18/03

FROM : SILVERS ENT                    FAX NO. : 5617849959                    May. 19 2005 12:15PM  P3

## Steve Silver's Royalty Schedule

Country: All Counties
Period: 1/1/03 to 3/10/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/12/03

## Steve Silver's Royalty Schedule

Country: All Counties
Period: 10/1/02 to 12/31/02

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Nov-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Dec-02 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____    Date 11/12/03

FROM : SILVERS ENT                    FAX NO. : 5617849959              May. 19 2005 12:16PM  P4

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 7/1/03 to 9/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Aug-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Sep-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____     Date 11/12/03

## Steve Silver's Royalty Schedule

Country: All Countries
Period: 4/1/03 to 6/30/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| May-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Jun-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature _____     Date 11/12/03

FROM : SILVERS ENT                    FAX NO. : 5617849959              May. 19 2005 12:16PM  P5

## Steve Silver's Royalty Schedule

Country: All Countries    to    3/21/04
Period: 1/1/04

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice Amount Billed To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Feb-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Mar-04 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature: _Glenn N. DePue_    Date _4/28/04_

## Steve Silver's Royalty Schedule

Country: All Countries    to    12/31/03
Period: 10/1/03

| Month | Description | Item | Stock Number | Units Sold | Quantity Shipped | Gross Invoice Amount Billed To Customers | Amount Billed To Customers | Discounts | Net Billed To Customers | Allowances | Returns | Reportable Sales | Cash Collected | Royalty Rate | Amt. Of Royalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Nov-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Dec-03 | No Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6% | 0 |
| Total | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 |

To the best of my knowledge, I certify this schedule to be accurate.

Signature: _Glenn N. DePue_    Date _12-23-03_

FROM : SILVERS ENT

FAX NO. : 5617849959

May. 19 2005 12:17PM  P6



# EXHIBIT "F"

Kozyak Tropin & Throckmorton, P.A
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Gail A. McQuilkin
gam@kttlaw.com

Telephone (305) 372-1800
Fax (305) 372-3508

Via Overnight Delivery
Federal Express Tracking No. 7903-2948-5586

November 5, 2004

Steven A. Esrig
President
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland  20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to Paragraph IV of the Agreement, this will serve as the Licensor's 30-day notice to Stelor that Mr. Silvers is exercising his right to have a certified public accountant conduct an audit of Stelor's "books and records and all other documents and material in the possession of or under the  control of" Stelor that relate to this Agreement, the Licensed Intellectual Property and the Licensed Products.  In addition to Stelor's books and records, the particular documents and other material that should be made available for this audit include:

1.    All documents, including advertisements, marketing materials, correspondence, agreements, and letters of intent,  that show your efforts to "promote, market, sell and distribute" the Licensed Products;

2.    All sublicenses;

3.    All copyright and trademark registration applications and registrations;

4.    All domain name registrations;

5.    All documents regarding enforcing rights as to third-party uses of the Licensed Intellectual Property; and

6.    Proof of insurance as required under Paragraph XIV.