# Exhibit

# 10

Dockets.Justia.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA.

FILED by _____ D.C.

JUN 17 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · W.P.B

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,

     Plaintiff,

v.                         Case No. 05-80393-CIV-HURLEY

STEVEN A. SILVERS, a Florida resident,

     Defendant.

_____

## DECLARATION OF GAIL A. MCQUILKIN

I, GAIL A. MCQUILKIN, declare under penalty of perjury that the following is based upon my personal knowledge and is true and correct, and that all emails and letters attached as Exhibits are true and correct copies.

1.    I am a partner and managing shareholder in the firm of Kozyak Tropin & Throckmorton, counsel for defendant, Steven A. Silvers ("Silvers").    I was also counsel for Silvers in the prior action before this Court entitled <u>Stelor Productions, Inc. v. Steven A. Silvers</u>, Civil Action No. 04-80954 (the "District Court Action").

2.    I am the attorney who has been primarily involved in the dispute between Silvers and Stelor Productions ("Stelor"), and the person with the most personal knowledge of the communications between this office and Stelor's counsel.

3.    I was unable to attend the May 23, 2005 preliminary injunction hearing before Magistrate Judge Hopkins due to a prearranged trip out of the country from May 13 – 31.   Prior to my departure on this trip, I had a telephone conversation with Stelor's counsel, Kevin Kaplan, in which I informed him that I was leaving to go out of the country.  Mr. Kaplan asked me if I was attending the hearing.  I informed him that I was not, but that my partner Ken Hartmann would be there.  On the morning of the hearing, Stelor filed a lengthy declaration from its

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA.

STELOR PRODUCTIONS, L.L.C.,
a Delaware corporation,
f/k/a STELOR PRODUCTIONS, INC.,

      Plaintiff,                                   Case No. 05-80393-CIV-HURLEY

v.

STEVEN A. SILVERS, a Florida resident,

      Defendant.

---

## DECLARATION OF GAIL A. MCQUILKIN

      I, GAIL A. MCQUILKIN, declare under penalty of perjury that the following is based upon my personal knowledge and is true and correct, and that all emails and letters attached as Exhibits are true and correct copies.

      1.      I am a partner and managing shareholder in the firm of Kozyak Tropin & Throckmorton, counsel for defendant, Steven A. Silvers ("Silvers").    I was also counsel for Silvers in the prior action before this Court entitled <u>Stelor Productions, Inc. v. Steven A. Silvers</u>, Civil Action No. 04-80954 (the "District Court Action").

      2.      I am the attorney who has been primarily involved in the dispute between Silvers and Stelor Productions ("Stelor"), and the person with the most personal knowledge of the communications between this office and Stelor's counsel.

      3.      I was unable to attend the May 23, 2005 preliminary injunction hearing before Magistrate Judge Hopkins due to a prearranged trip out of the country from May 13 – 31.    Prior to my departure on this trip, I had a telephone conversation with Stelor's counsel, Kevin Kaplan, in which I informed him that I was leaving to go out of the country.    Mr. Kaplan asked me if I was attending the hearing.    I informed him that I was not, but that my partner Ken Hartmann would be there.    On the morning of the hearing, Stelor filed a lengthy declaration from its

1

president, Steven Esrig, and one from Mr. Kaplan, containing a few emails from me that they represented to be the bulk of my communications regarding Stelor's performance under the Settlement Agreement. Esrig also attributed several unsubstantiated statements to me, which were untrue. And, as shown below, these emails were but a small fraction of the dozens of emails I had exchanged with Mr. Kaplan, and Stelor's prior counsel, asking for Stelor to comply with the Settlement Agreement.

4. This declaration is submitted in support of Silvers' Objection to the Magistrate Judge's Report and Recommendation, and to provide the Court with the true facts that support Silvers' lawful right to terminate the License Agreement.

I. **Silvers Initial Right To Terminate the License Agreement**

5. Paragraph V (A) and (C) of the License Agreement between Silvers and Stelor Productions ("Stelor") gives Silvers, the Licensor, the right upon 30 days notice to audit the books and records of Stelor. *See* Exhibit A. On November 5, 2004, I sent notice to Stelor that Silvers wanted the audit and sought for a date that the audit can take place. *See* Exhibit B. On or about November 10, 2004, Stelor's counsel informed me that Stelor would not permit the audit.

6. The License Agreement also gives Silvers the contractual right to terminate the License Agreement once he provides Stelor with notice that it is in breach, and gives Stelor 60 days to cure the breach. *See* Exhibit C. On November 12, 2004, I sent Stelor the requisite 60-day notice of its numerous breaches of the License Agreement, the failure to permit the audit being just one of many breaches. *See* Exhibit D. This letter was not "notice of termination of the License Agreement" but notice to Stelor that it had 60 days to cure its breaches as required under the License Agreement, in order to remain as licensee. In fact, this provision gives Silvers 60-days to consider whether he will exercise the option to terminate.

7. Stelor failed to cure a single breach within the 60-day cure period. On January

2

11, 2005, Silvers exercised his right to terminate the License Agreement, and on January 13, 2005, I sent Stelor a notice of termination of the License Agreement advising it that the post-termination provisions now controlled. *See* Exhibit E.

## II.    The Settlement Agreement

8.    Once terminated, Stelor's counsel approached me to negotiate a settlement. I worked with Stelor's then counsel, Yano Rubinstein, Esq., to negotiate the dispute, including the pending claims each party had filed against the other in the District Court Action. I participated in drafting the Settlement Agreement between the parties that was executed on January 28, 2005. *See* Exhibit F.

9.    In the Settlement Agreement, the parties preserved their positions and claims asserted in the District Court Action. As reflected in the fifth WHEREAS clause in the Settlement Agreement, the parties intended that only by virtue of Stelor's full performance of its obligations under the Settlement Agreement would Stelor's breaches of the License Agreement be considered cured.

10.    Consistent with this intent, in paragraph 3 of the Settlement Agreement, Silvers agreed to "withdraw his notice of termination of the Licensing Agreement." Stelor acknowledges that the notice of termination of the License Agreement is the January 13, 2005 letter. Silvers *never* agreed to withdraw his 60-day notice to Stelor regarding its breaches or to provide Stelor with a second 60-day cure period if it did not perform under the Settlement Agreement. Silvers agreement to withdraw the termination was premised entirely upon Stelor's full performance under the Settlement Agreement. That is why there is no release provision in the Settlement Agreement or a provision requiring Silvers to give additional notice to Stelor of its failure to perform, or an additional cure period. The Settlement Agreement is terminable at will, and if terminated the parties are simply restored to their pre-settlement position.

3

11.    Esrig's sworn statement that this dispute was "entirely resolved by the parties, pursuant to the Confidential Settlement Agreement," and by virtue of "a stipulation of dismissal with prejudice" of the District Court Action, is patently false.    Silvers agreed to dismiss his claims against Stelor **without prejudice** to protect his right to re-file an action against Stelor if necessary.    And that is what this Court expressly ordered. *See* Exhibit G.

### III.    Stelor Refuses To Adhere to The Settlement Agreement

A.    The Audit

12.    Esrig's sworn statement that the first time I asked for an audit after the Settlement Agreement was April 22, 2005 is completely false.    Starting February 1, 2005 - two days after the Settlement Agreement was signed – until April 26, 2005, the day before Silvers reinstated the termination, I repeatedly asked for an audit date.    Stelor either refused to respond, or stonewalled.

13.    On February 1, 2005, I sent an email to Mr. Rubinstein, Stelor's counsel, asking him to, among other things, provide a date for the audit. *See* Exhibit H.    Two weeks later on February 15, 2005 I sent another email to Mr. Rubinstein asking him whether he had confirmed a date for the audit. *See* Exhibit I.    Portions of the email are redacted to protect confidential litigation strategy relating to Google, Inc.

14.    I received no response confirming an audit date.    A week later on February 22, 2005, I sent an email to Mr. Rubinstein asking him for, among other things, a date for the audit. *See* Exhibit J.    Another week passed without a response to my request for an audit date.

15.    On or around March 1, 2005, I learned that Mr. Rubinstein was no longer representing Stelor, and that I should communicate with Mr. Kaplan, Stelor's then local counsel. On March 2, 2005 I sent an email to Mr. Kaplan advising him that Stelor needed to provide a date for the audit. *See* Exhibit K.    Portions of the email are redacted to protect confidential

4

litigation strategy relating to Google, Inc.

16.     On March 5, 2005, I received a response from Mr. Kaplan that Stelor will provide an audit date prior to March 15. *See* Exhibit L.

17.     On that same day I sent a reply email letting Mr. Kaplan know that they must comply with the audit request immediately, giving him three days to provide us with an audit date. *See* Exhibit M. Portions of the email are redacted to protect confidential litigation strategy relating to Google, Inc.

18.     Stelor did not provide me with an audit date within three days, and did not provide an audit date by March 15, 2005 as stated by Mr. Kaplan in his March 5, 2005 email. Over the next five days I called Mr. Kaplan about the audit but he would not confirm a date. On March 22, 2005, I sent another email to Mr. Kaplan again asking for a date for the audit. *See* Exhibit N.   Stelor continued to stonewall, and rather than cooperate and provide me with an audit date, Mr. Kaplan responded to me that he wanted to see a document that would confirm the scope of the audit. *See* Exhibit O.  That same day I responded to Mr. Kaplan informing him that the scope of the audit is set out in the License Agreement. *See* Exhibit P.

19.     Tired of Stelor's stonewalling, I told Mr. Kaplan in a telephone conversation that the audit would take place on April 26, 2005 and asked for confirmation that the auditor would be permitted onsite at Stelor.  He told me he would check with Stelor and get back to me.  On or about April 10, 2005, I had a telephone conversation with Mr. Kaplan in which he informed me "Stelor was going through some personnel changes" and April 26, 2005 would not work, but did not suggest alternate dates.  It had now been almost 90 days since the Settlement Agreement was executed and Stelor was still refusing to cooperate with the audit.

20.     While I was patiently waiting for Stelor to cooperate with the audit, I was working on a draft complaint against Google, Inc. for trademark infringement.  I needed Stelor's

5

cooperation in providing me information about the work it did to develop the Gootopia Website and related projects.   As reflected in my email to Mr. Kaplan dated April 7, 2005, by this date Stelor had not provided me this information.  *See* Exhibit Q.

21.     On or about April 11, 2005 I had a telephone conversation with Mr. Kaplan in which I told him that Silvers would reinstitute the termination of the License Agreement if Stelor continued to refuse to adhere to its obligations under the Settlement Agreement, including providing me with a date for the audit.  That evening, I received an email directly from Esrig in which in advised me that the Stelor board was not interested in "adherence to the license and settlement agreement" and that that he would be happy to see us "finance Mr. Silvers' next lawsuit with Stelor."   He also informed me that only when I provide them with a copy of the draft complaint against Google, Inc. I had drafted would Stelor comply with their obligations to Silvers under the Settlement Agreement.  *See* Exhibit R.

22.     On April 12, 2005, in response to Mr. Esrig's email, I sent a lengthy email to Mr. Kaplan explaining that:  (a) I had no obligation to provide my work product to them; (b) why a complaint of this magnitude takes time to develop; (c) asking that Esrig not contact me directly; (d) asking Stelor to please comply with its obligations under the Settlement Agreement; and (e) once again for Stelor to cooperate by providing me information I needed to prepare the complaint.  *See* Exhibit S.  Portions of the email are redacted to protect confidential litigation strategy relating to Google, Inc.

23.     On April 13, 2005, I sent an email to Mr. Kaplan again asking for a response for the audit date letting him know that Silvers was very frustrated with Stelor's non-performance. *See* Exhibit T.

24.     On Friday April 22, 2005, I sent an email to Mr. Kaplan once again attempting to persuade him to provide a date for the audit by suggesting possible dates.  *See* Exhibit U.    That

6

same day Mr. Kaplan responded that he now had several boxes of information from Stelor for the complaint, but completely ignored my question about the audit dates. *See* Exhibit V.  I promptly replied to Mr. Kaplan's email asking about the audit dates. *See* Exhibit W.  Mr. Kaplan responded by saying he had passed this on to Esrig, but giving no indication what that meant. *See* Exhibit X.

26. On Monday April 25, 2005, I received an email from Mr. Kaplan that contained no response to my last request for an audit date. *See* Exhibit Y. Promotly, I responded to Mr. Kaplan again asking for the audit date. *See* Exhibit Y.  I received an email response from Mr. Kaplan that once again ignored my question about the audit date, but demanding to know when the complaint I was drafting would be ready. *See* Exhibit Y.  On April 26, 2005, I received a lengthy email from Mr. Kaplan but it made no mention of an audit date. *See* Exhibit Z.

B.    Samples of Licensed Product

26. Paragraph VI-C of the License Agreement requires that before commencement of the manufacture and sale of Licensed Product, Stelor shall provide Silvers with a reasonable number of samples of all such Licensed Product and all related advertising and promotional materials. *See* Exhibit AA.  Licensed Product is defined in comprehensive terms. *See* Exhibit AA, page 2.

27. Stelor's repeated failure to provide samples of Licensed Product and advertising and promotional materials to Silvers was one of the many breaches that led Silvers to terminate the License Agreement.

28. Under paragraph 15 of the Settlement Agreement, Stelor agreed to cure this breach and provide Silvers with samples of the products it was offering for sale. *See* Exhibit F.

29. On March 2, 2005, I sent an email to Mr. Kaplan asking him for the samples. *See* Exhibit BB, page 2.  On March 5, 2005, Mr. Kaplan sent an email to me stating, "there are no

7

such samples, as Stelor is not yet offering any product for sale." *See* Exhibit CC.  Skeptical of

the truth of that statement, I responded to Mr. Kaplan that Stelor needed to provide us with that

statement signed under oath. *See* Exhibit DD.

30.    On March 8, 2005, Esrig provided a sworn declaration that Stelor had no products

offered for sale "except for the music available on [I]tunes." *See* Exhibit FF.  Because Stelor had

never reported such sales on any royalty statement, I asked Stelor to provide proper royalty

statements for the last two quarters of 2004 to reflect the Itunes sales.    When Stelor failed to

provide such royalty statements, Silvers tried to uncover the sales through Itunes. He discovered

that the Googles music was one of the world's most downloaded children's songs. *See* Exhibit

EE. Yet, Stelor had not reported a single penny of sales or provided Silvers with any statements

as required under the License Agreement.

31.    And, contrary to Esrig's sworn statement, Silvers discovered that Stelor had been

offering Googles merchandise for sale online through Cafepress.com since 2002 yet he had never

been provided a single sample of the merchandise.  On March 9, 2005, I notified Mr. Kaplan

about the discrepancy between Esrig's sworn statement and what we had discovered.  *See*

Exhibit GG. Portions of the email are redacted to protect confidential litigation strategy relating

to Google, Inc.

32.    On or about March 20, 2005, Silvers discovered that Stelor had placed an

advertisement relating to its appearance at the upcoming 2005 International Licensing Show in

which it references the launch of a totally new web site.  On March 23, 2005, I called Mr. Kaplan

and asked him why Silvers had not been provided with the advertisement.  Mr. Kaplan asked me

to send him the advertisement, which I did. *See* Exhibit HH. I received no response.

33.    Other than two CDs and one color folder, I received no samples of Licensed

Product from Stelor.   Esrig's sworn statement that Mr. Kaplan advised me on April 26, 2005

8

that samples were in his office for review is absurd. Mr. Kaplan's April 26, 2005 email refers to the information I had been waiting for from Stelor to complete the general allegations in the draft complaint against Google, Inc. *See* Exhibit Z. The relevant email exchange between Mr. Kaplan and myself is attached as Exhibits W, Y and Z.

        C.    <u>Reimburse Silvers For Past Health Insurance Payments</u>

34.    Paragraph 10(c) of the Settlement Agreement required Stelor to reimburse Silvers for health insurance payments he had made to Aurora Collections during his tenure as consultant to Stelor within 15 days of providing some form of proof of payment. See Exhibit F. Because Silvers did not have canceled checks, Brian Blumquist of Aurora Collections complied a very detailed chart listing the payments made by Silvers to Aurora. On February 15, 2005, I sent Mr. Rubinstein an email attaching the chart. *See* Exhibit II. I received no confirmation that payment would be made. On February 22, 2005, I sent an email to Mr. Rubinstein asking him to please confirm that payment to reimburse Silvers would be sent by the end of the month. See Exhibit JJ. Still, no payment.

35.    After I learned that Mr. Kaplan had replaced Mr. Rubinstein as Stelor's counsel, I sent an email to him on March 2, 2005 again attaching the chart of payments provided by Aurora Collections and asking when reimbursement for these payments would be sent. *See* Exhibit KK.

36.    On March 3, 2005, I sent an email to Mr. Kaplan again asking him when we would receive the payment to reimburse Silvers for the insurance premium payments. *See* Exhibit LL. On March 5, 2005, Mr. Kaplan responded to my email by saying that "Stelor finds the chart confusing" and asking for additional proof of payment. *See* Exhibit MM.

37.    On March 5, 2005, I sent an email to Mr. Kaplan refuting that the chart is confusing, and giving Stelor 3 additional days to comply with this provision of the Settlement Agreement. *See* Exhibit NN.

9

38.     In mid-March, Mr. Kaplan told me that Stelor now wanted a statement from Brian Blumquist confirming that Silvers had made these payments. On April 1, 2005, I provided to Mr. Kaplan a copy of a letter Mr. Blumquist sent to me electronically. *See* Exhibit OO. The letter invited Mr. Kaplan or Stelor to call him if they needed additional information.

39.     Continuing to stonewall, Mr. Kaplan added another condition, requesting that he be provided an actual signed letter even though the letter was clearly an electronic communication. I responded to Mr. Kaplan that he should call Mr. Blumquist to verify this letter. This email exchange is attached as Exhibit PP.

D.      Advance Royalty Payments

40.     Under paragraph 10 (a) and (b) of the Settlement Agreement, Stelor was required to pay Silvers by the first of the month beginning February 1, 2005, two monthly royalty advances: one for $5,000 and one to cover the cost of Silvers' health care premiums. *See* Exhibit F.

(i)     The $5,000 Monthly Advance

41.     Immediately after the Settlement Agreement was executed, on February 1, 2005, I sent an email to Mr. Rubinstein telling him to have all checks for Silvers made out to Silvers Entertainment Group. *See* Exhibit QQ. On February 7, 2005, I received a check from Stelor for the $5,000 royalty advance required under paragraph 10(a) of the Settlement Agreement - the check was made out to Steven Silvers rather than Silvers Entertainment Group as instructed by me six days earlier. I called Mr. Rubinstein and he instructed me to send the check back to Stelor to the attention of Mike Sagan. *See* Exhibit RR.

42.     By February 22, 2005, I had yet to receive the first payment Stelor was obligated to make under paragraph 10(a). On February 22, 2005, I sent an email to Mr. Rubinstein asking

10

him to confirm that February's payment was sent, and that we would have the March payment on time. *See* Exhibit SS.

43.    After learning the Mr. Kaplan had replaced Mr. Rubinstein, on March 2, 2005, I sent an email to him advising him that Stelor had not sent the $5000 checks for February and March. *See* Exhibit TT. I followed this email with another email on March 3, 2005 making the same inquiry. *See* Exhibit UU.

44.    On the afternoon of March 3, 2005, I finally received the $5,000 payments for February and March.

45.    On April 5, 2005, five days late, I received the April $5,000 payment. A copy of the Federal Express package containing the check is attached as Exhibit VV. The check, however, was once again made out to Steven Silvers, not Silvers Entertainment Group as previously requested. On April 7, 2005, I sent an email to Mr. Kaplan asking the status of the payments owed to Silver. *See* Exhibit WW. On April 8, 2005, I sent an email to Mr. Kaplan again asking about the payment and asking why Stelor continues to make out the checks to Silvers in his own name, rather than as we instructed twice before. *See* Exhibit XX.

46.    On April 8, 2005 I received an email from Stelor's administrative person stating that a replacement check would be sent out. *See* Exhibit YY

47.    On April 11, 2005, I received an email from Esrig stating that Stelor would not make the payments owed to Silvers unless I provided them a copy of the complaint I was drafting against Google, Inc. *See* Exhibit ZZ.

11

(ii)     The Health Insurance Premium Payment

48.     Esrig's sworn statement that Silvers was required to provide Stelor with evidence of paid premiums before Stelor is obligated to make the second payment under paragraph 10 (b) of the Settlement Agreement is intentionally misleading. There is no such language in paragraph 10(b). *See* Exhibit F. Furthermore, we advised Stelor on February 15, 2005 what the current premium was. *See* Exhibit AAA.

49.     After learning that Mr. Kaplan had replaced Mr. Rubinstein, on March 2, 2005, I sent an email to him with the chart prepared by Aurora Collections showing the current premium amounts and advising him that we had not received payment for February or March. *See* Exhibit BBB. On March 3, 2005, I sent another email to Mr. Kaplan asking for response on the status of the payments. *See* Exhibit CCC. That afternoon I received checks from Stelor for the two missing $5,000 payments, but nothing for the health care premiums. On March 5, 2005, I sent an email to Mr. Kaplan advising him that we had not received the 10(c) payment. *See* Exhibit DDD.

50.     On or around the beginning of April, Mr. Kaplan informed me that Stelor now determined that they would require Silvers to sign a declaration that he needed $1,000 per month to maintain his health insurance coverage before they would make the payments. On April 5, 2005, I sent Mr. Kaplan that declaration. *See* Exhibit EEE.

51.     On April 7, 2005, I sent an email to Mr. Kaplan asking him the status of the checks. *See* Exhibit FFF. I received no response.

52.     On April 8, 2005, I sent an email to Mr. Kaplan again asking for the February, March and now April insurance premium payments. *See* Exhibit GGG.

53.     On April 11, 2005, I received an email from Esrig stating that Stelor would not make the payments owed to Silvers unless I provided them a copy of the complaint I was

12

drafting against Google, Inc. *See* Exhibit HHH.

54.    On April 14, 2005, Stelor finally sent the payments owing for February and March, but neglected to send the April payment. On April 17, 2005, I sent Mr. Kaplan an email confirming that I received two payments but that Stelor owed another payment for April. *See* Exhibit III. I received no response to my email.

E.    Stelor Has Refused to Perform Other Obligations Under the Settlement

55.    Stelor has not provided to me Silvers' unit interest in Stelor LLC as required under paragraph 9 of the Settlement Agreement.

56.    Stelor has not provided to me certified royalty statements for the third and fourth quarter of 2004 as required under paragraph III-A of the License Agreement.

IV.    Silvers Reinstates His Termination of The Licensed Agreement

57.    By April 26, 2005, more than 90 days had passed and Stelor had not cooperated with the audit (in fact, it had been over 4 months since our initial audit request), and had simply refused to cure its breaches of the License Agreement by full performance under the Settlement Agreement. Accordingly, Silvers exercised his right to reinstate his notice that the License Agreement is terminated. On April 27, 2005, I sent a letter to Stelor similar to the one I had sent on January 13, 2005, to advise Stelor that the License Agreement was terminated and the post-termination provisions controlled. See Exhibit JJJ.

58.    True to Stelor's past performance of refusing to comply with its obligations until the License Agreement is terminated, Stelor's counsel sent a letter to me on April 29, 2005 offering to perform **if** Silvers withdrew the termination. *See* Exhibit KKK.

Dated: June 15, 2005

Gail A. McQuilkin

3339.101/254343.1

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this __17__ day of June, 2005, to: Kevin C. Kaplan, Daniel F. Blonsky and David Zack at Burlington Weil Schwiep Kaplan & Blonsky, P.A., 2699 S. Bayshore Drive, Penthouse A, Miami, FL 33133.

3339.101/254343.1

14

# Exhibit A

E.   All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.   Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

### IV. AUDIT

A.   LICENSOR shall have the right, at his own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE. 

B.   In the event that audit inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be required that year. That period and date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.   All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.   In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

### V. WARRANTIES AND OBLIGATIONS

A.   LICENSOR represents and warrants that:

(i)   the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)   the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)   LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

---

# Exhibit B

**Kozyak Tropin & Throckmorton, P.A.**
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Gail A. McQuilkin                                    Telephone (305) 372-1800
gam@kttlaw.com                                       Fax (305) 372-3508

Via Overnight Delivery
Federal Express Tracking No. 7903-2948-5586

November 5, 2004

Steven A. Esrig
President
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:   Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to Paragraph IV of the Agreement, this will serve as the Licensor's 30-day notice to Stelor that Mr. Silvers is exercising his right to have a certified public accountant conduct an audit of Stelor's "books and records and all other documents and material in the possession of or under the control of" Stelor that relate to this Agreement, the Licensed Intellectual Property and the Licensed Products. In addition to Stelor's books and records, the particular documents and other material that should be made available for this audit include:

1.   All documents, including advertisements, marketing materials, correspondence, agreements, and letters of intent, that show your efforts to "promote, market, sell and distribute" the Licensed Products;

2.   All sublicenses;

3.   All copyright and trademark registration applications and registrations;

4.   All domain name registrations;

5.   All documents regarding enforcing rights as to third-party uses of the Licensed Intellectual Property; and

6.   Proof of insurance as required under Paragraph XIV.

Page 2

In addition, Mr. Silvers is requesting that a number of samples of all Licensed Products manufactured, or in production be produced during such audit.

You, or your counsel, should schedule and coordinate the audit through us by providing us with a date and location.

Very truly yours,

Gail A. McQuilkin

c:    Steven Silvers
     Kenneth R. Hartmann, Esq.

/ksm3

Exhibit  C

---



VIII.  INTELLECTUAL PROPERTY PROTECTION

A.    LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.    LICENSOR shall maintain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademark(s) or the validity thereof.

C.    LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademark(s) inures to the benefit of LICENSOR and that the LICENSED shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademark(s) except for the license granted herein.

D.    LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties, including, but not limited to, any claim that Licensed Intellectual Property, infringes on or misappropriates any of LICENSOR's Intellectual Property Rights.

E.    Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents, reasonably consistent with this grant. Furthermore, during the term of this agreement, LICENSOR shall not endorse or otherwise any relationship or do involvement with LICENSEE's current or prospective clients, vendors, any Company relationship with the media (press etc.) without the prior express written consent by LICENSEE.

IX.  TERMINATION

A.    Rights to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party further cure such breach

Exhibit  D

LAW OFFICES
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON • 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB#7927-7747-7745

November 12, 2004

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

a.    Failure to pay royalties under paragraph III (A);

b.    Failure to provide a written certified royalty statement under paragraph III (C);

c.    Failure to provide a list of all sub licenses under paragraph III (C);

d.    Failure to use commercially reasonable efforts to promote, a market, sell and distribute the Licensed Products under paragraph V (B)(iii);

e.    Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

f.    Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

g.    Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

h.    Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

---

Page 2

i.    Failure to maintain Licensor's Intellectual Property Rights, namely failure to maintain the domain names googlegame.com, googleagames.com, and googlegames.com, under paragraph VIII;

j.    Failure to register Licensor's Intellectual Property Rights in the name of Licensor, and instead registering copyrights and trademarks in Stelor's name;

k.    Failure to oppose trademark applications for the name Googles, and the domain name registration googles.org, and otherwise protect the Licensed Intellectual Property; and

l.    Unlawful use of the limited power of attorney granted under the Agreement, namely retaining counsel for Mr. Silvers without his knowledge or consent, filing an action in the name of Mr. Silvers to dispute Google, Inc.'s right to use the domain name google.com, and filing an answer in the name of Mr. Silvers in Cancellation Proceeding 92043737.

This also serves as notice under the Letter Agreement dated June 1, 2002, that Stelor has breached the Letter Agreement by its:

a.    Failure to pay Mr. Silvers consultancy fees and expenses;

b.    Failure to provide Mr. Silvers with an agreement granting him stock options for 1,000 shares of Stelor's stock;

c.    Making unauthorized statements and representations on behalf of Mr. Silvers; and

d.    Attempting to transfer, release and waive Mr. Silvers rights, title, and interest in his intellectual property.

Pursuant to paragraph 1 of the Letter Agreement, Mr. Silvers will exercise his right to terminate the License, Distribution and Manufacturing Agreement unless Stelor cures these breaches within 30 days.

Very truly yours,

Gail A. McQuilkin

c:    Steven A. Silvers
       Laurence Hefter

044513

---

Exhibit  E

---

LAW OFFICES
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON • 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

GAIL A. McQUILKIN
DIRECT DIAL (305) 377-0856
garm@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including, names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sublicensees of the termination of the License Agreement.

Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Essig
Page 2

Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

c:  Steven A. Silvers
    Laurence Hefter
    Yano A. Rubinstein
    William Borchard

*Exhibit  F*

---

CONFIDENTIAL SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into by Stelor Productions, Inc. ("Stelor") and Steven A. Silvers ("Silvers"). Stelor and Silvers are collectively referred to herein as "the Parties."

WHEREAS, Stelor brought a complaint in the United States District Court for the Southern District of Florida (Case No. 04-80954-CIV-HURLEY) against Silvers alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers brought a counter-complaint against Stelor alleging breach of, (1) the License, Distribution and Manufacturing Agreement; and (2) the Letter Agreement;

WHEREAS, Silvers on January 13, 2005 sent a notice of termination of the Licensing, Distribution and Manufacturing Agreement to Stelor;

WHEREAS, Stelor has invested substantial time, effort, and money in developing a business involving the GOOGLES IP and fully intends to continue developing and commercializing such business, including sub-licensing some or all of the GOOGLES IP;

WHEREAS, the Parties intend that full performance by each Party of its obligations under this agreement cures the breaches alleged against each by the other Party, and

WHEREAS, the Parties wish to resolve all of the foregoing disputes to their mutual satisfaction.

//

//

SILVERS_____          STELOR 

1

---

THEREFORE, the Parties hereby agree as follows:

1. Domain Name Administration:

   a. Silvers shall give Stelor, as the administrative contact for the GOOGLES IP domain names, the right to control the DNS records and make changes to the administrative contact information for all GOOGLES IP domain names, and shall advise the domain name registrar known as godaddy.com to this effect. Silvers will provide proof that Stelor has such rights no later than February 15, 2005. Silvers shall cooperate with any other request from Stelor regarding necessary administrative issues relating to the domain names, and all communications by Silvers, relating to domain names, shall be through Kozyak Tropin and Throckmorton ("KTT").

   b. KTT will create and control a domain name renewal database to ensure timely renewal of domain names owned by Silvers, and will communicate with Stelor's counsel regarding any deadlines or other administrative issues.

2. Pending and Future Actions Relating to the GOOGLES IP:  Silvers will cooperate with Stelor and Stelor's counsel in all respects in pending and future trademark and domain name dispute proceedings filed by Stelor, including but without limitation, providing any and all documents and other evidence needed to support Stelor's position.

3. The License, Distribution and Manufacturing Agreement:  Silvers withdraws his notice of termination of the License Agreement, and reaffirms his obligations under

SILVERS_____          STELOR 

2

the License Agreement.

4. **Post-Settlement Communications:** Silvers shall communicate with Stelor solely through KTT.

5. **USPTO Correspondent of Record:** Silvers shall change the correspondent on all GOOGLES IP trademark applications and registrations to the name of Stelor's counsel no later than February 15, 2005, and shall not change the correspondent in the future as long as the Licensing, Manufacturing and Distribution Agreement is in effect. Stelor's counsel shall KTT with all correspondence to and from the USPTO

6. **Sale or Assignment of the GOOGLES IP:** KTT and Stelor's counsel shall include each other in any and all negotiations and discussions with Google Inc. that relate to resolving the pending trademark and domain name disputes or the sale or assignment of the GOOGLES IP.

7. **Domain Name Renewal Expenses:** Stelor agrees to reimburse Silvers for documented expenses incurred to date in renewing GOOGLES IP domain names. Future GOOGLES IP domain name renewal expenses will be reimbursed by Stelor. All requests for reimbursement will be submitted by KTT to Stelor, and all payments by Stelor will be sent to Silvers through KTT.

8. **Options Acknowledgement:** Stelor agrees that it will confirm in writing that no additional options have been granted that would obligate it to provide such options under the now expired Letter Agreement.

9. **LLC Acknowledgement:** The Parties acknowledge that Stelor Inc., a Delaware "C" Corporation, is in the process of converting to a Delaware LLC. Any options granted

SILVERS_____          3          STELOR

---

to Silvers from the Stelor Inc. "C" Corporation will be converted to a like amount of unit interests under the LLC.

10. **Royalty Advances:**

a. For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor shall advance Silvers $60,000 a year against future royalties. The advance will be made in equal monthly installments payable on the first of each month beginning February 1, 2005.

b. For as long as the Licensing, Distribution and Manufacturing Agreement is in effect, Stelor will provide Silvers with an additional monthly advance on expected future royalties equivalent to that amount required by Silvers to maintain his insurance coverage through the Aurora Collection, Inc. (or other insurance or medical provider of Silvers' choosing), as long as such coverage is offered. Such advance will not exceed $1,000 per month.

c. Stelor will reimburse Silvers for insurance premiums through the expiration of the "Letter Agreement," not to exceed $4,000. Such reimbursements will be provided to Silvers within 15 days of Stelor receiving evidence of paid premiums.

11. **Recoupment and Termination of Royalty Advances:** Royalties advanced under this Agreement will be recaptured by Stelor once royalty payments exceed the amount specified in paragraph  Such deductions will not exceed 20% of any given royalty payment.

12. **Royalty Statements:** Stelor shall confirm in writing that no royalty payments are outstanding, and thus no royalty statements are due.

SILVERS_____          4          STELOR 

---

13. **Trademark Registrations:** Stelor shall provide to Silvers through KTT proof that all applications and registrations for trademarks and domain names with the "GOO*" prefix or identified as Googles IP in the License Agreement filed by or on behalf of Stelor show Silvers as the owner.

14. **Audit:** Stelor shall cooperate in the audit of the books and records of Stelor by Aronson and Company onsite at Stelor Productions as per section IV of the Licensing, Distribution and Manufacturing Agreement. Any information obtained by the auditor will be restricted to KTT, on an "attorneys' eyes only" basis and the identity of any licensee, sub-licensee, vendor, or any other third-party shall remain confidential.

15. **Licensed Products Samples:** Stelor shall provide Silvers through KTT samples of any Licensed Product that is being offered for sale.

16. **USPTO Correspondence:** Stelor's counsel shall keep KTT advised as to the status of any pending or future trademark or domain name disputes filed by Stelor against Google Inc. by copying KTT on all pleadings and correspondence, and by giving notice to KTT of any other trademark or domain name disputes filed against Google Inc.

17. **Reservation of Jurisdiction:** The Parties agree to submit to the exclusive continuing jurisdiction of the United States District Court, Southern District of Florida, for enforcement of all provisions of this Agreement. In the event that a dispute arises concerning the obligations of any Party under this Agreement, the Parties agree to submit any such dispute to this court for resolution. The successful or prevailing party (as determined by the Court) shall be entitled to recover its reasonable attorneys'

SILVERS_____          5          STELOR

---

fees and other costs incurred in that litigation from the unsuccessful or non-prevailing party in addition to any other relief to which the prevailing party might be entitled.

18. **Injunctive Relief:** The Parties hereby agree that there is no adequate remedy of law in the event that either party negotiates or settles the disputes with Google Inc. without the other party. In the event that either party attempts to negotiate with Google Inc. without the other party's participation, that shall be a breach of this Agreement, and such breach will create irreparable harm, and that injunctive relief will be necessary to maintain the rights of the non-breaching party. Accordingly, each party agrees to such injunctive relief.

19. **Joint Settlement Negotiations with Google Inc.:**

a. In view of the current existence of litigation and proceedings in the TTAB, jointly referred to as "Litigation", the parties recognize the need to resolve this Litigation reasonably such that Stelor can continue to develop and promote its business.

b. Due to the present status of development of Stelor's business, any event that causes Stelor to delay offering its web-based service to the public will cause severe injury to Stelor. Silvers therefore agrees that, in the event of a settlement with Google Inc., he will not object to Stelor's continued use of the googles.com domain to transition to a new domain name. The length of time of such transition will be at Stelor's sole discretion.

c. In the event of a monetary, stock, or similar settlement with Google Inc., such sale will include a complete sale or assignment of the GOOGLES IP, The proceeds from that settlement shall be divided as follows:

SILVERS_____          6          STELOR 

Silvers shall receive 70% of the first $30 million; 50% of the next $20 million; 30% of the next $30 million; 20% of the next $20 million; 10% of the next $20 million and 5% of any amount over $120 million, with the remainder in each case going to Stelor, Silver's total share of the proceeds shall not exceed $50 Million in any event.

    d. Nothing in this provision creates an affirmative action by either party to enter any settlement with Google Inc., or to sell or assign the GOOGLES IP to Google Inc. Silvers understands and agrees that he cannot sell or assign the GOOGLES IP to Google Inc. without obtaining Stelor's written approval. Both parties agree that they will negotiate in good faith.

20. <u>Confidentiality and Disposition of this Action</u>:

    a. The settlement shall not be provided to the court unless necessary to enforce rights, and then under seal. A Joint Stipulated motion to withdraw actions shall be filed no later than Friday, January 28, 2005. The fact that a settlement has been reached and all terms and obligations shall be confidential except to the extent necessary to advise Google Inc. that the parties have resolved all differences.

    b. The complaint and counterclaim shall be dismissed without prejudice.

21. <u>Exclusive Authority/No Assignment</u>:

    a. Stelor and Silvers represent and warrant that no other person or entity has or had any interest in the Claims, demands, obligations, or causes of action

released as part of this Agreement, that they have the sole right and exclusive authority to execute this Agreement and receive the considerations specified herein, and that they have not sold, assigned, transferred, conveyed, or otherwise disposed of any of the Claims, demands, obligations, or causes of action released as part of this Agreement.

    b. The signatories to this Agreement each warrant that they have the power to bind the person or entity on whose behalf they signed, and will hold harmless any party to this Agreement for any attorney fees, costs, expenses, or damages incurred or paid as a result of finding that such person or entity lacks such authority, or does not have sole right to the Claims that are the subject of this Agreement, or that any such Claim has been assigned.

22. <u>Voluntary Agreement</u>: Stelor and Silvers each represent that the Agreement is freely and voluntarily entered into, with the independent advice of each party's attorneys and they have not been induced to execute this Agreement by reason of the disclosure or non-disclosure of any fact or representation not set forth in this Agreement.

23. <u>Non-disparagement</u>: Each Party, on behalf of itself, its officers, directors, attorneys, agents, and employees, agrees not to make or publish, either orally or in writing, any disparaging statements concerning the other Party or its current and former officers, directors, attorneys, agents, shareholders, or employees.

24. <u>Entire Agreement</u>: This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous contracts, agreements, promises

SILVERS_____     7     STELOR 

SILVERS_____     8     STELOR 

---

and understandings, with the exception of the License, Distribution and Manufacturing Agreement as well as the Letter Agreement previously entered into by the parties. This Agreement may not be altered, modified or otherwise changed in any respect except by writing, duly executed by Stelor and Silvers. No representations, circumstances or conditions existing before the Agreement shall be used in any way by any party to the Agreement to modify the Agreement.

25. <u>Joint Preparation</u>: Stelor and Silvers declare that they have read this Agreement, and know and understand its contents, and they each comprehend and agree to all its terms, conditions, and meanings and their significance; all signatories and their counsel have cooperated in the drafting and preparation of this Agreement, and this Agreement therefore shall not be construed against any signatory. The Agreement shall not be construed against any of them based upon any claim of unequal sophistication or bargaining power.

26. <u>Governing Law</u>: This Agreement shall be deemed to be made under, shall be construed in accordance with, and shall be governed by the laws of the State of Florida.

27. <u>Duplicate Originals</u>: This Agreement may be executed in duplicate originals, each of which is equally admissible in evidence in an action to enforce this Agreement, and each original shall fully bind each party who has executed it.

28. <u>Facsimile Signatures</u>: The signatures required for the execution of this Agreement may be transmitted by facsimile, and any such signature shall be deemed a duplicate original, and may be admitted in evidence and shall fully bind the party and person making such signature.

29. <u>Effective Date</u>: The Effective Date of this agreement shall be the date on which all Parties have signed this Agreement.

30. <u>Each Party Agrees to operate in good faith as to the terms of this agreement</u>.

[Signature Page Follows]

SILVERS_____     9     STELOR

SILVERS_____     10     STELOR

THE FOREGOING IS AGREED TO BY:

DATED: January 28, 2005    Stelor Productions, Inc.

By: _Steven A Esrig_

Its: _President / CEO_

DATED: January ___, 2005    Steven A. Silvers

By: _____

APPROVED AS TO FORM AND CONTENT:

DATED: January 28, 2005    Summers Rubinstein, P.C.

By: _____

Yano L. Rubinstein, Esq.

Attorneys for Stelor Productions, Inc.

DATED: January ___, 2005    Kozyak, Tropin & Throckmorton, P.A.

By: _____

Gail McQuilkin, Esq.

Attorneys for Steven A. Silvers

SILVERS_____    11    STELOR_____

---

# Exhibit  G

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-80954-CIV-HURLEY

STELOR PRODUCTIONS, INC.,
     plaintiff,

vs.

STEVEN A. SILVERS,
     defendant.

_____/

**CLOSED CASE**

## ORDER OF FINAL DISMISSAL WITHOUT PREJUDICE AND CLOSE-OUT

THIS CAUSE is before the court upon the parties' joint stipulation for dismissal without prejudice filed February 8, 2005. Having considered the stipulation, it is hereby

ORDERED AND ADJUDGED:

1. This case is DISMISSED WITHOUT PREJUDICE, with each side to bear its own costs and attorneys' fees.

2. There being nothing further for the court to resolve, it is further ordered that the Clerk of the Court shall enter the case as CLOSED and terminate all pending motions as MOOT.

DONE and SIGNED in Chambers at West Palm Beach, Florida this ____ day of February, 2005.

_Daniel T. K. Hurley_
Daniel T. K. Hurley
United States District Judge

Copies furnished:
Adam T. Rabin, Esq.
Kenneth R. Hartmann, Esq.
Yano Rubinstein, Esq.

---

FILED by _MC_ D.C.
ELECTRONIC

Feb 8 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.- MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

STELOR PRODUCTIONS, INC.,    CASE NO. 04-80954-CIV-HURLEY
a Delaware corporation,
                                Magistrate Judge James M. Hopkins
     Plaintiff,

v.

STEVEN A. SILVERS,
a resident of Palm Beach County, Florida

     Defendant.
_____/

## JOINT STIPULATION FOR DISMISSAL, WITHOUT PREJUDICE, OF ALL CLAIMS

Plaintiff, Stelor Productions, Inc. and Defendant Steven A. Silvers, hereby jointly stipulate, pursuant to Fed.R.Civ.P.41(a)(1), to the dismissal, without prejudice, of all claims asserted by each party against the other party in this action.

Respectfully submitted,

Adam T. Rabin                    Kenneth R. Hartmann (FBN: 664286)
DIMOND KAPLAN & ROTHSTEIN, PA    Gail A. McQuilkin (FBN: 969338)
200 S.E. First Street, Suite 708 KOZYAK TROPIN & THROCKMORTON, PA
Miami, FL 33131                  2525 Ponce de Leon, 9th Floor
T: 305-374-1920                  Coral Gables, Florida 33134
Co-Counsel for Defendant         T: 305-372-1800 / F: 305-372-3508
                                 Counsel for Defendant

Yano L. Rubinstein, Esq.
SUMMERS RUBINSTEIN
580 California Street, 16th Floor
San Francisco, California 94104
Counsel for Plaintiff

1 of 1                                          49/c]

Exhibit  H

**GAIL A MCQUILKIN - settlement**

From:      GAIL A MCQUILKIN
To:        Yano Rubinstein
Date:      2/1/2005 8:52 AM
Subject:   settlement

Yano -

A few housekeeping items.

1. Who is going to be the correspondent for Stelor for the trademark registrations - Hefter or you?

2. All payments paid directly to Silvers need to be made out to Silvers Entertainment Group, Inc.

3. How is the insurance premium payments going to be handled?  Paid directly to Aurora?

4. It is probably a good idea for me to have a contact person at Stelor regarding the payments who can call me as well if there are issues or problems.  I also need to ask about Silvers 1099 for 2004.  Probably a good idea to send it to me.

5. Domain names.  There are several "GOO" domain names that Stelor registered through a registrar different than godaddy.com  To create the database for renewals we need to have all the "GOO" related domain names registered at Godaddy.  I'm not sure how to make this change.  It might be a good idea for me to speak to a person at Stelor who has responsibility for this.  That way I can also informed directly if there are admin issues that need to be addressed by Silvers.

6. We need a date for the auditor to go to Stelor.  We should talk about what we want from the auditor that will help us with Inc.

7. We need to file a joint stipulation of dismissal.  I drafted one already and will send it to you under a different e-mail.

Call me later when you have time.  I am leaving to go out of town this evening but have my cell.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  I

**GAIL A MCQUILKIN - items**

From:      GAIL A MCQUILKIN
To:        Yano Rubinstein
Date:      2/15/2005 11:13 AM
Subject:   items

Hi Yana -

Did you confirm a date to go to Stelor to look at documents?  Also,
Let me know.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

## Exhibit  J

**GAIL A MCQUILKIN - stuff**

From:    GAIL A MCQUILKIN
To:      Yano Rubinstein
Date:    2/22/2005 11:27 AM
Subject: stuff

Yano -

   I have not heard back from Esrig and I need to get answers to some things.  Can you run interference?

1. Confirm that we are getting a check for these at the end of this month

      Feb and March payment
      reimbursement for the insurance premiums
      reimbursement for the domain name renewals

2. A date to go there next week (I really need to get this scheduled asap).

3. What information we are sending to Bridges now

4. Need a letter from Aurora terminating Steve's coverage so he can convert to an individual plan under NHP.
The wording on this needs to be careful so we need to discuss.

Can you find this out and then call me later today.  Thanks.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

file://C:\Documents%20and%20Settings\Administrator\Local%20Settings\Temp\GW}000...  6/14/2005

---

## Exhibit  K

From:    GAIL A MCQUILKIN
To:      kkaplan@bwskb.com
Date:    3/2/2005 4:42:32 PM
Subject: Googles

Kevin -

   Here are the issues we need to resolve under the settlement agreement:

1. Silvers is owed two checks for $5000 each for Feb and March.  The checks going forward need to be
to me by the 1st of the month.

2. Attached is the chart showing payments made by Silvers on his insurance premiums during the life of
the consulting agreement.  The only two payments Stelor is not to reimburse him for are Dec 2004 and
Jan 2005.  Under the settlement he is to be reimbursed starting Feb. 1.  He is now owed for March 2005
too.  By my calculation the total it comes to $5,141.96.

3. Health insurance termination.  This is very critical to Silvers so that he can continue with health care
coverage.  Silvers is trying to convert to an individual plan through NHP, Aurora's insurance company.
That will reduce the premiums by a couple hundred dollars a month.  But to do that Aurora needs to send
to Neighborhood Health Partnership on Aurora official letter head, addressed to "Premium
Services" informing them that April 1, 2005, Aurora will no longer be offering health insurance
benefits to "ANY" of their employees, and that they have informed Steven A. Silvers of this event
and that he has 63 days within which to secure a non-group conversion policy.  This really needs to
get done asap for everyone's benefit.

4. Silvers is owed  for domain name registration renewals.  He submitted the receipts for these to Stelor
already for $318.00.

5. Options.  Under the consulting agreement Silvers was entitled to 1,000 options for Stelor stock under
Stelor stock option plan, and another 1,000 if anyone's available options increase.  Before the settlement,
Stelor sent Silvers an option agreement that provided only for 1000 options that would vest over time.  As
part of the settlement Stelor was to provide written confirmation that no additional options have been
granted.

6. Stelor needs to confirm in writing that no royalty payments to Silvers are outstanding and thus no
royalty statements are due.

7. Audit.  We need a date for the auditor to go to Stelor.  As we discussed, the sooner the better, and we
can work on how we will use him to benefit our negotiations with Inc.

8. Stelor needs to provide us with samples of all products they are offering for sale.

9. Stelor needs to provide proof that all trademark applications and registrations and domain names with
the "GOO" prefix or identified as Googles IP in the License Agreement show Silvers as the owner.

One of the things Silvers needed to do was to change the correspondent on all trademark registrations to
Larry Hefter.  We did that and I have informed Larry of that.

Yano and I discussed the issue of the domain name password.  Under the agreement Silvers agreed to
give Stelor as the Admin contact the ability to control the DNS records (to select and change the server).
We learned form Godaddy that it cannot do that so it is impossible to do.  Yano and I agreed that if Stelor
needs to change the server for the domain name, they will call me and I will have the records changed
and that will satisfy this.

REDACTED

REDACTED

Talk to you soon.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

# Exhibit  L

---

From:       "Kevin C. Kaplan" <kkaplan@bwskb.com>
To:         <GAM@kttlaw.com>
Date:       3/5/2005 10:17:04 AM
Subject:    Googles

Gail,

I have the following information in response to your recent email.

1.  I understand you received the checks.

2.  Stelor finds the chart confusing.  Please just provide us with receipts or proof of the actual payments, and Stelor will provide the reimbursement.

3.  Stelor is just trying to work through the pending issues with Aurora, and is committed to taking care of this issue expeditiously. Please allow Stelor a few more days to do so.

4.  Stelor has no record of receiving the receipts.  Please provide us with copies, and Stelor will provide the reimbursement.

5.  Stelor will confirm in writing that no one's available options have increased.

6.  Stelor will provide written confirmation.

7.  Stelor will provide a date prior to March 15, 2005.

8.  There are no such samples, as Stelor is not yet offering any product for sale.

9.  Stelor will provide proof regarding the applications, registrations and names.

10.  By the same token, Stelor requires proof that Silvers changed the correspondent information.  As of my last conversation with Larry Hefler, he was unaware that had been done.  Please provide us with this proof as soon as possible.

I appreciate your view on providing information to Bridges.  I will get back to you on that quickly.

Kevin

*****************************************
Kevin C. Kaplan, Esq.
Burlington, Weil, Schwiep,
  Kaplan & Blonsky, PA
2699 S. Bayshore Drive, Penthouse
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261
kkaplan@bwskb.com
*****************************************

# Exhibit  M

GAIL A MCQUILKIN - Re: Googles

| From: | GAIL A MCQUILKIN |
|---|---|
| To: | Kevin C. Kaplan |
| Date: | 3/5/2005 11:12 AM |
| Subject: | Re: Googles |

Kevin -

REDACTED                  He is giving them three buisness
days to get into compliance.

1. I understand you received the checks. Yes we did.

2. Stelor finds the chart confusing. Please just provide us with
receipts or proof of the actual payments, and Stelor will provide the
reimbursement. There is nothing in the least bit confusing about the chart. Stelor has three days to
get us the check. FYI - putting aside the amounts paid thru Nov that Silvers is to be reimbursed
for, the settlement was signed in Jan and Stelor was to provide us up front payment for Feb
(which they did not) and March (which they did not).

3. Stelor is just trying to work through the pending issues with
Aurora, and is committed to taking care of this issue expeditiously.
Please allow Stelor a few more days to do so. They have three days.

4. Stelor has no record of receiving the receipts. Please provide us
with copies, and Stelor will provide the reimbursement. He has provided these three times already. They
have three days to pay.

5. Stelor will confirm in writing that no one's available options have
increased. Make it under oath, notarized, under penalty of perjury.

6. Stelor will provide written confirmation. Make it under oath, notarized and under penalty of perjury.

7. Stelor will provide a date prior to March 15, 2005.  Three days to give us a date.

8. There are no such samples, as Stelor is not yet offering any product
for sale. Make it under oath, notarized, and under penalty of perjury.

9. Stelor will provide proof regarding the applications, registrations
and names. They have three days

10. By the same token, Stelor requires proof that Silvers changed the
correspondent information. As of my last conversation with Larry
Hefler, he was unaware that had been done. Please provide us with this
proof as soon as possible. There is nothing in the agreement that obligates us to do this, and
everything was changed electronically so there is nothing to provide. Stelor knows how to go
online to the USPTO office to view the changes. It will take all of ten minutes to do this. I talked
to Larry and showed him the e-mail I had sent him, and he knows about the changes.

REDACTED

file://C:\Documents%20and%20Settings\Administrator\Local%20Settings\Temp\GW}0000...  5/9/2005

Exhibit  N

---

Page 1 of 1

GAIL A MCQUILKIN - dates for audit

| From: | GAIL A MCQUILKIN |
|---|---|
| To: | kkaplan@bwskb.com |
| Date: | 3/22/2005 11:55 AM |
| Subject: | dates for audit |

Kevin -

We need to set up the date for the auditor to go to Stelor. These are they dates they have open. Let me
know today which dates works best. Otherwise I will just select one. Thanks.

Thursday March 31st, Friday April 1st, or Monday April 4th.

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, PA
2525 Ponce de Leon
Coral Gables, FL 33134
(305) 372-1800 office
(305) 372-3508 fax
gam@kttlaw.com

Exhibit  O

file://C:\Documents%20and%20Settings\Administrator\Local%20Settings\Temp\GW}0000...  5/9/2005