UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CIVIL DIVISION

CASE NO. 05-80387-CIV-RYSKAMP/VITUNAC

Steven A. Silvers, an individual
    Plaintiff
v.
Google Inc., a Delaware corporation
    Defendant

## SILVERS' STATEMENT OF DISPUTED FACTS IN OPPOSITION TO STELOR'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Steven Silvers files this statement of disputed facts in opposition to Stelor's Motion for Summary Judgment. This statement contests certain of the facts alleged in Stelor's Statement of Material Facts Supporting Motion for Summary Judgment against Silvers (Docket No. 142). The additional omitted facts which create additional factual issues, but which do not dispute the "material facts" alleged by Stelor are set forth in Silvers' Memorandum of Law In Opposition To Stelor's Motion For Summary Judgment. The paragraph numbers below correspond to the paragraph numbers in Stelor's Statement of Material Facts.

9. Stelor states in paragraph 9 that Stelor:

> …forwarded various documentation to Silvers, including a certification dated March 8, 2005 as required pursuant to paragraph 12 of the Settlement Agreement, and checks for payments required under that Agreement. The checks included reimbursement for domain name registration expenses, insurance payment reimbursements, royalty advances for February, March and April. All of these checks were cashed. (Stelor's citations omitted).

This is a gross overstatement that ignores the truth.

1

    The first advance royalty payment was due on February 1, 2005. Stelor did not make that payment until the seventh of February, a week late. (A10 par 40-47, ex.s QQ-ZZ) When it was received, Silvers requested that the payment be made payable to his corporation and not him personally. Stelor agreed and advised Silvers to return the check for immediate replacement of a check made payable to the Silvers' entity. (A10 par 40-47, ex.s QQ-ZZ) The parties further agreed that all future checks would be made payable to the Silvers' entertainment entity. (A10 par 40-47, ex.s QQ-ZZ) The first check was returned and as of February 22, 2005, Stelor had still not replaced it. Silvers e-mailed Stelor demanding payment and demanding that the March advance royalty payment be made on a timely basis. As of March 2, 2005, when neither the February advance royalty payment nor the March advance royalty payment had been paid, Silvers again made a written demand for payment. (A10 par 40-47, ex.s QQ-ZZ) Finally, albeit untimely, Stelor made the February and March advance royalty payments. (A10 par 40-47, ex.s QQ-ZZ) The April payment was due on April 1, 2005 and again Stelor breached its obligation for "full performance" under the settlement agreement and made the April payment late and again to the wrong payee. It was again returned to Stelor for re-issue. On April 8, 2005, Stelor agreed in writing to send a replacement check. (A10 par 40-47, ex.s QQ-ZZ) On April 11, 2005, Stelor's president Esrig sent an e-mail to counsel for Silvers unequivocally stating that he would not make the April payment, which was a material obligation under the settlement agreement, until counsel for Silvers provided him with a draft of the complaint against Google, which was not an obligation of Silvers under the settlement agreement. This was an intentional material breach. (A10 par 40-47, ex.s QQ-ZZ).

The settlement agreement specifically provided that Stelor would pay for Silvers' health insurance coverage not to exceed $1,000 per month. On February 15, 2005, Silvers' counsel notified Stelor that the required amount was a hair under $1,000.00 a month. (A10 par 48-54, ex. AAA-III)  Stelor was obligated to pay Silvers $1,000 per month in order for Silvers to maintain his health insurance. Those health insurance advances were also due on the first of each month. On March 2, 2005, Council for Silvers e-mailed Stelor demanding both of the February and now past due March health insurance reimbursements. . (A10 par 48-54, ex. AAA-III) The next day Stelor responded to the e-mail discussing other matters and ignoring the demand for the health insurance payments. (A10 par 48-54, ex. AAA-III)  Counsel for Silvers again e-mailed Stelor on March 3, 2005 requesting a response regarding the health insurance. When that was again ignored, on March 5, 2005 counsel for Silvers again requested payment and/or a response to the prior inquiries regarding health insurance payments. (A10 par 48-54, ex. AAA-III) Silvers' continued again and again and again to request Stelor to make the health insurance payments and sent e-mails requesting payments on April 5, on April 7, and again on April 8, 2005. (A10 par 48-54, ex. AAA-III)   On April 11, 2005 Stelor's President Steven Esrig sent an e-mail to counsel for Silvers unequivocally stating he instructed his attorney Kevin Kaplan not to release the past due health insurance checks (as required by the settlement agreement) until he received a copy of the draft Google complaint (not required by the settlement agreement). Finally, on April 14, 2005 Stelor paid the past due February and March, 2005 health insurance payments but failed to pay the April 2005 health insurance payment which was now two weeks past due. (A10 par 48-54, ex. AAA-III).

On April 27, 2005, when Silvers declared the agreement in breach and terminated, the April health insurance payment had not been made. (A10 par 57).

11.   In paragraph 11 Stelor states:

> … the Termination Letter provided, the License Agreement was terminated "effective immediately". Silvers, thus, failed to comply with the explicit requirements in the license agreement that 60 days' notice and opportunity to cure any alleged breaches be provided as an express precondition for any right of termination.

Silvers intentionally did not withdraw his notice of default that underpinned the termination. By virtue of the express terms of the parties' settlement agreement, the parties agreed to be held to "full performance" standard. It was the intent of the parties that if either party failed to *fully perform* all of its obligations, the prior notice and opportunity to cure those breaches would not be discharged, released or altered in any way and would be immediately reinstated. (A10 par. 8-11)  Silvers made sure that the settlement agreement did not include a notice and opportunity to cure clause as the parties did not intend for Stelor to have another opportunity to cure. (A10 par 8 – 11)

34.   Stelor states that:

> Silver's Council agreed in late March of 2005 to deferr the audit…. Silver subsequently renewed his request for the audit, but not until late April, when his lawyer sent an e-mail dated April 22, 2005 – **just 5 days before the termination letter!.**

Stelor omits what occurred before and during a five-day period and how Stelor's continued refusal to cooperate with Silvers' right to conduct an audit was the final straw that caused Silvers to declare the settlement agreement and license

4

agreement again in breach and terminated. (A10 par 12 – 25, ex. H – Z).

     Stelors' reference to an agreement to postpone the audit is inaccurate. Counsel for Silvers clarifies that around that time, the parties were discussing the audit to take place during the first week of April. (A10 par. 18-19, ex N-P). Later counsel for Silvers told Stelor in a telephone conversation that they would agree that the audit would take place April 26, 2005. (A10 par 19)  That is the postponement mentioned in the e-mail.  Stelor's attorney Kaplan responded that he would check with his client and get back with Silvers. (A10 par 19)  On April 10, 2005, Kaplan called and informed Silvers that the April 26 date would not work but refused to provide alternate dates. (A10 par. 19)  The following day, April 11, 2005, Silvers' attorney told Kevin Kaplan that Silvers would reinstitute the termination if Stelor continued to refuse to provide a date for the audit. (A10 par. 20)  In response, the president of Stelor sent an e-mail to Silvers' Attorney stating that Stelor will not to comply with the license and settlement agreements despite his Board of Directors' position regarding strict adherence to the same. Esrig went on to say that the law firm representing Silvers' could "finance Mr. Silvers next lawsuit with Stelor". (A10 par 20, ex. R)

     The following day Silvers' attorney again sent a lengthy e-mail to Kevin Kaplan specifically advising him that Stelor's' obligations to comply with the settlement agreement have no bearing on her drafting of the proposed Google complaint and again requesting compliance by Stelor with the settlement agreement. (A10 ex. S)  The next day again Silvers requested an audit date in writing. (A10 ex. T).  On April 22, 2005 Silvers again requested to be provided with an available date for the audit within the next two weeks. (A10 ex. U Approximately an hour later, Kevin Kaplan sent a response e-mail bringing up

5

unrelated issues and ignoring the request for an audit date. (A10 ex. V)  Two hours thereafter Silvers' attorney sent another e-mail again requesting audit dates. (A10 ex. W)  An hour after that, Kevin Kaplan responded by e-mail again bringing up other issues and ignoring the request for the audit date. (A10 ex. X)  Three days later, on April 25, 2005 still not having received an available date after the numerous prior requests, Silvers attorney again requested an audit date by e-mail to Kevin Kaplan.  (A10 ex. Y). Kevin Kaplan again responded approximately (2 minutes later) again addressing other issues and ignoring the request for an available audit date.  (A10 ex. Y)  The next day, April 26, 2005 Kevin Kaplan again wrote a lengthy e-mail to Silvers' attorney again ignoring the request for an audit date. (A10 ex. Z)

**35.**   In paragraph 35, Stelor states that as of April 2005 Stiller was not selling any Licensed Products with the exception of downloads on iTunes and therefore there were no samples to be provided.  In paragraph 36, Stelor contradicts this by saying that samples of promotional materials were available for inspection at its council's offices in April 2005.  Stelor seems to be disputing its own statement of material facts.  In any case, this admission proves that Stelor could not have been reasonably commercializing the Licensed Products as of April 2005, years into the licensing agreement and was clearly in breach.

Nevertheless, Stelor was obligated to give Silvers an advance opportunity to review product samples and marketing materials.

Stelor made fraudulent advertisements on the web that Plaintiff's music (part of the IP) sold over a million downloads and was Grammy nominated. (Instant Silvers ex A).  No such samples were ever provided of these fraudulent marketing

materials and they were published to the world on the internet. There is no cure for this breach.

Despite the rhetoric in Stelor's motion for summary judgment that it complied with the sample requirement, the samples were not provided (A10 par 26-33 ex. F, AA-HH, W, Y and Z). Stelor's own correspondence to Silvers following the April 27, 2005 termination letter reveals that Stelor was fully aware it was in breach of this provision. (A 15)  Stelor's April 29, 2005 letter to Silvers admits there were samples that were not provided stating: "Fifth, samples of licensed products have been collected and are available to Mr. Silvers pursuant to the agreement, provided that the notice of termination is withdrawn…".

>Robert H. Cooper P.A.
>2999 N.E. 191 St. Suite 704
>Miami, Fl. 33180
>305-792-4343 (direct extension)
>305-792-0200 (fax)
>robert@rcooperpa.com
>Fl. Bar No. 0650323

>  s/ Robert Cooper