# EXHIBIT A

Page 1

UNITED STATES DISTRICT CIRCUIT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-80387 CIV RYSKAMP/VITUNIC

STEVEN A. SILVERS, an individual,
    Plaintiff,
v.
GOOGLE INC., a Delaware corporation,
    Defendant.
_____

GOOGLE INC., a Delaware corporation,
    Counterclaimant,
v.
STEVEN A. SILVERS, an individual;
STELOR PRODUCTIONS, INC., a Delaware
Corporation; STELOR PRODUCTIONS, LLC, a
Delaware limited liability company,
    Counterdefendants.
_____

DEPOSITION OF STEVEN SILVERS
VOLUME I

Tuesday, October 10, 2006
1:00 p.m. - 8:00 p.m.
2699 South Bayshore Drive
Miami, Florida 33133

Reported By:
Thomas R. Neumann
Notary Public, State of Florida
Network Reporting Corporation
Phone:  888.358.8188
       305.358.8188

- - -

Page 66

1   A   Substance of the case, I don't believe so.
2   Q   The merits of the case?
3   A   I don't believe so.
4   Q   What about with representatives of Stelor,
5   have you had any discussions with them? I'm not
6   talking about settlement discussions now.
7   Discussions with Mr. Esrig or Mr. Jeffrey about the
8   merits of the case down here?
9       MS. CALABRIA: At what time, Kevin?
10  BY MR. KAPLAN:
11  Q   At any time. Since it was filed April
12  2005.
13  A   When you say substance I don't know if you
14  can quantify that for me.
15  Q   For example, whether your notice was
16  valid, your notice of default or termination?
17  A   I don't believe so. I mean I don't
18  recall.
19  Q   Did you ever express the view to Mr. Esrig
20  that the notice Ms. McQuilkin served, the notice of
21  termination in April 2005 was inadequate?
22  A   I don't recall. I might have had
23  conversation with him about what he had communicated
24  to me that his lawyers believed. I don't believe
25  that I would have brought that up to him.

Page 67

1   Q   Did you ever mention to Mr. Esrig your
2   view that Ms. McQuilkin blew it in terms of the
3   notice.
4   A   I might have mentioned to him that I
5   thought perhaps there might have been a possibility
6   of that, but nothing definitive because as far as
7   Gail was concerned the notice was properly --
8       MR. COOPER: Let's not -- please don't go
9       into attorney client communications, and if
10      these communications were part of your
11      communications with him regarding settlement
12      that's also not fair game and please tell him
13      that's part of our settlement discussions and
14      don't answer the question.
15      I wasn't privy to those. I'm not sure --
16      I mean he is prefacing his question telling you
17      I'm not asking for settlement discussions, but
18      then he is asking you for them. So you need to
19      be able to draw the line here and I can't help
20      you with that. Please keep a close eye on not
21      revealing attorney-client privilege and if
22      these communications had to do with settlement
23      tell him so and don't answer.
24      THE WITNESS: Okay.
25

Page 68

1   BY MR. KAPLAN:
2   Q   If Mr. Esrig says that you told him,
3   Ms. McQuilkin blew the notice requirement, do you
4   dispute that?
5   A   I don't recall ever saying that to him and
6   if it was it was probably during -- and if it was it
7   was during the settlement negotiations. I don't
8   believe I ever said that to him.
9   Q   Are you sure it was during the settlement
10  negotiation?
11  A   I'm not sure. I can't be a hundred
12  percent positive.
13  Q   When did the discussion -- where did the
14  discussion take place in which you recall mentioning
15  to Mr. Esrig the possibility, as you put it, that
16  Ms. McQuilkin blew the notice requirement?
17  A   First of all, I don't recall mentioning
18  that ever. So if that's something that Mr. Esrig
19  has communicated, I don't have any knowledge of
20  that. The only time that I met Mr. Esrig was when I
21  spoke to him up in Maryland when we tried to
22  negotiate a possible settlement and then I met him
23  and Mr. Jeffrey in a restaurant a day or two later.
24  There was a number of communications going back and
25  forth that they were basically trying to persuade me

Page 69

1   that Ms. McQuilkin, you know, basically blew it. I
2   remember that conversation. But I don't know at any
3   time I agreed to that.
4       MR. COOPER: I need to take a break now
5       because it's 2:45. I need to call on the phone
6       here.
7   BY MR. KAPLAN:
8   Q   Let me just ask one question before we
9   break.
10      Did you ever tell anybody other than
11  your lawyers that you were contemplating bringing
12  a malpractice claim against Gail McQuilkin or
13  Kozyak Tropin?
14  A   Once again.
15  Q   Did you ever tell anybody other than a
16  lawyer of yours that you were contemplating bringing
17  a malpractice claim against Gail McQuilkin or Cozyak
18  Tropin?
19  A   No. What I was --
20      MR. COOPER: It's a yes or no question.
21      Did you ever tell anybody? If you didn't tell
22      anybody --
23      THE WITNESS: Not that I can recall.
24      MR. KAPLAN: Don't do that. The witness
25      wasn't finished answering.

(Pages 66 to 69)

### Page 118

1    MR. COOPER: Object to the form.
2    THE WITNESS: I believe that's an issue at
3  hand, yes.
4  BY MR. KAPLAN:
5    Q  And if Google wins in connection with that
6  claim do you agree that would put you in breach of
7  this warranty provision?
8    MR. COOPER: Object to the form.
9    THE WITNESS: I don't have that answer. I
10  mean that's a legal answer to be answered.
11  BY MR. KAPLAN:
12    Q  If Google wins its claim and your
13  ownership of the trademark rights, the Google mark
14  is invalidated, wouldn't that put you in breach of
15  this representation, Mr. Silvers?
16    MR. COOPER: Object to the form.
17    THE WITNESS: It would appear that it
18  would.
19  BY MR. KAPLAN:
20    Q  Now, take a look at paragraph 6 if you
21  would.
22    MS. CALABRIA: Excuse me. What was
23  Mr. Silvers' response?
24    THE WITNESS: It would appear that it
25  would.

### Page 119

1  BY MR. KAPLAN:
2    Q  Take a look at paragraph 6, Article 6, are
3  you there, page 4?
4    A  Uh-huh.
5    MR. COOPER: Roman numeral VI down here.
6  Notices quality control and samples.
7  BY MR. KAPLAN:
8    Q  Specifically paragraph C.
9    A  Uh-huh.
10    Q  It says, "Prior to the commencement of
11  manufacturer and sale of the licensed products
12  licensee shall submit to licensor for his input at
13  no cost to licensor a reasonable number of samples."
14  Do you see that provision?
15    A  Uh-huh.
16    Q  And you complain as one of the basis for
17  terminating the agreement that Stelor failed to
18  comply with that provision, right?
19    A  That's correct.
20    Q  Now we agree -- or rather do we agree that
21  the timing for Stelor's obligation to provide you
22  with samples is prior to commencement of manufacture
23  and sale of the products, right?
24    MS. CALABRIA: Object to form.
25    MR. COOPER: Object to the form.

### Page 120

1  BY MR. KAPLAN:
2    Q  You can answer.
3    A  Yes, that's what it says, yes.
4    Q  So until Stelor starts to manufacture and
5  sell products is it correct that Stelor has no
6  obligation to show you samples?
7    A  No, that's not correct.
8    Q  Why not?
9    A  Read what it says, "Prior to the
10  commencement of manufacturing" it could be a year,
11  it could be six months, it could be two months.
12  They have to have prototypes made before they could
13  manufacture. So it says prior to the commence of
14  manufacturing. It doesn't mean the day before, two
15  days before, and the sale of licensed product.
16    Q  Is it fair to say the provision fails to
17  specify exactly how long prior to the commencement
18  of manufacture and sale samples have to be provided
19  to you?
20    MR. COOPER: Object to the form.
21    THE WITNESS: I think a reasonable and
22  prudent person would know that's not the day
23  before manufacture. So I would have to say
24  that it's not spelled out specifically, but a
25  reasonably prudent person that would be reading

### Page 121

1  this would know that prior to the commencement
2  of manufacturing I should have been provided
3  with adequate samples for my input.
4  BY MR. KAPLAN:
5    Q  So basically you are saying it's a
6  reasonable time prior to the commencement of
7  manufacturing, right?
8    A  I think so, yes.
9    MR. COOPER: Object to the form.
10    THE WITNESS: Yes.
11  BY MR. KAPLAN:
12    Q  What do you think a reasonable time is?
13    A  30 days.
14    Q  Take a look at paragraph 8 of the
15  agreement, intellectual property protection.
16    MR. COOPER: Sorry, paragraph 8 or Section
17  8.
18    MR. KAPLAN: Section 8. Thank you. What
19  do you want me to call them paragraphs,
20  articles?
21    MR. COOPER: Sections.
22  BY MR. KAPLAN:
23    Q  Sections, okay. Section 8, 8A, "Licensor
24  hereby grants licensee all right, power, interest to
25  seek, obtain and maintain all intellectual property

53

**Page 206**

1  withdrawn provided Stelor performed certain
2  obligations?
3     A   The document speaks for itself. I don't
4  know where it would be or not be.
5     Q   It's not in there, is it?
6     A   If you say it's not in there it's not in
7  there.
8     Q   I say it's not in there, so we agree it's
9  not in there?
10    A   No, we don't agree. You say it's not in
11 there. The document speaks for itself.
12    Q   Well, show me in the document where you
13 think is the person who signed it it says the
14 withdrawal of the notice is conditioned on
15 something?
16       MR. COOPER: Objection. The document
17    speaks for itself and you are calling for a
18    legal conclusion with this question.
19 BY MR. KAPLAN:
20    Q   Will you answer, Mr. Silvers?
21    A   I don't have an answer to give you.
22    Q   Now, let's look at the bullet points.
23    A   Okay.
24    Q   There are five of them, right?
25    A   Yes.

**Page 207**

1     Q   These are the specific breaches that you
2  think -- these are the specific reasons why you
3  think Stelor is in breach of the settlement
4  agreement, right?
5     A   Okay.
6     Q   These bullet points all relate to
7  provisions of the settlement agreement, right?
8     A   I believe so.
9     Q   They all reference specific paragraph
10 numbers, correct?
11    A   Yes.
12    Q   Are all of those paragraph numbers
13 references to the settlement agreement?
14    A   I believe so.
15    Q   Are any of them references to the license
16 agreement?
17    A   I do not believe so. Let me see here. I
18 don't believe so.
19    Q   This letter was the first time you ever
20 provided written notice to Stelor of alleged
21 breaches of the settlement agreement, correct?
22    A   I believe so.
23    Q   And the letter purported to terminate the
24 license agreement effective immediately, correct?
25       MR. COOPER: Object to the form.

**Page 208**

1       THE WITNESS: I believe if the settlement
2    agreement was breached the license agreement
3    would be immediately breached. I guess the
4    document speaks for itself.
5  BY MR. KAPLAN:
6     Q   Did you give Stelor 60 days to cure its
7  breaches of the settlement agreement before you
8  terminated the license agreement?
9       MR. COOPER: Object to the form.
10      THE WITNESS: I'm not sure how this
11   worked. I believe if the settlement agreement
12   was breached then the license agreement was
13   automatically breached. There was no need for
14   an additional 60 day curing period.
15 BY MR. KAPLAN:
16    Q   What's the basis for that as you
17 understand it?
18      MR. COOPER: Again, if you have an
19   understanding of that separate and apart from
20   communications with your attorney answer it.
21   If your only understanding is from
22   communications with your attorney don't answer
23   based on attorney-client privilege.
24      THE WITNESS: So I reserve might rights
25   based upon attorney-client privilege which she

**Page 209**

1    communicated to me as to the reasons for her
2    having filed these letters and notices.
3  BY MR. KAPLAN:
4     Q   Just so we are clear. Do you agree that
5  you gave Stelor no opportunity to cure these
6  breaches before terminating the agreements, yes or
7  no?
8       MR. COOPER: Object to the form.
9       THE WITNESS: I don't believe I had an
10   obligation according to my conversation with my
11   counsel that I needed to do that. I can't give
12   you a yes or no answer because there is no yes
13   or no answer to be given.
14 BY MR. KAPLAN:
15    Q   Sir, I'm not asking what you believed was
16 required or not. I'm just asking what you did. Did
17 you give Stelor any opportunity to cure the breaches
18 before you terminated the license agreement?
19      MR. COOPER: You are referring to as of
20   April 27, 2005?
21 BY MR. KAPLAN:
22    Q   Let me ask you a question. I asked you a
23 moment ago to confirm this letter was the first time
24 you ever put Stelor on notice of any alleged
25 breaches of the license -- of the settlement

(Pages 206 to 209)

**Page 210**

1  agreement and you answered, yes, it was.
2     A   To the best of my knowledge, yes.
3     Q   So after putting Stelor on notice of the
4  breaches for the first time in this April 27, 2005
5  letter how much time did you give Stelor to cure
6  those breaches before terminating the license
7  agreement?
8     A   I don't believe there was any time,
9  minimal time.
10    Q   No time, right?
11    A   I don't know if it was no time, but I
12 think it was minimal time.
13    Q   Upon sending this letter you thought the
14 license agreement was terminated, right?
15    A   Yes.
16    Q   That's why the letter says on page 2 on
17 the bottom of the second paragraph --
18    A   Yes.
19    Q   -- that the agreement was terminated
20 "effective immediately," right?
21    A   Yes.
22    Q   Now, you easily could have given Stelor
23 time to cure these alleged breaches, right?
24       MR. COOPER: Object to the form.
25       THE WITNESS: The answer to that question

**Page 211**

1  is based upon the communications with
2  counsel --
3        MR. COOPER: Don't answer.
4        THE WITNESS: Attorney-client that I
5  followed her advice and that was that there was
6  no need to give any more notice.
7  BY MR. KAPLAN:
8     Q   These breaches were the kinds of things
9  that certainly could have been cured, right, if they
10 even existed?
11    A   After the fact. I mean some of these
12 breaches would be able to be cured after the fact of
13 them being breached.
14    Q   Well, let's look at the specific breaches
15 for a second.
16    A   Okay.
17    Q   Look at the first one. You say, "Stelor
18 failed to provide you with unit interests --"
19       MR. COOPER: Let me see your copy.
20 BY MR. KAPLAN:
21    Q   "-- in Stelor LLC under paragraph 9,"
22 right?
23    A   Yes.
24    Q   You got the settlement agreement in front
25 of you?

**Page 212**

1     A   Yes.
2     Q   Take a look at paragraph 9 if you would.
3     A   Alright.
4        MR. COOPER: Just one second. Is your
5  copy of the first page of this April 27 under
6  the word any that paragraph doesn't continue on
7  the next page?
8        MR. KAPLAN: Yes.
9  BY MR. KAPLAN:
10    Q   Are you looking at paragraph 9, sir?
11    A   Yes.
12    Q   All it says is that you acknowledge that
13 Stelor is converting to a Delaware LLC, right?
14 That's the first sentence, correct?
15    A   Yes.
16    Q   And the second sentence says that upon the
17 conversion that any options that were granted to you
18 and the corporation will be converted to a like
19 amount of unit interest under the LLC, right?
20    A   Correct.
21       MR. COOPER: That's not what it says.
22       MR. KAPLAN: Then make an objection to
23 form.
24       MR. COOPER: Objection to form,
25 mischaracterizes the document.

**Page 213**

1        MR. KAPLAN: That's a speaking objection.
2  Just say objection to form because you know the
3  local rules limit your objections to that.
4  BY MR. KAPLAN:
5     Q   So if you are going to get -- if your
6  options are going to be converted to unit interest
7  under the LLC, Mr. Silvers, the conversion has got
8  to take place first, right?
9     A   Okay.
10    Q   Until the conversion occurs and is
11 completed you agree that Stelor couldn't give you
12 any unit interest in the LLC, right?
13    A   They certainly could have provided me with
14 some documentation that that's what they were going
15 to do.
16    Q   Well, what requirement is there in this
17 paragraph to give you documentation of that? That's
18 not what it says, is it?
19    A   Okay. So they failed to do that.
20    Q   Well, the conversion hadn't been completed
21 as of April 2005, right?
22    A   I don't know that to be a fact.
23    Q   Well, don't you think you better -- don't
24 you think you better had -- it's getting late, let
25 me try it again.

Page 291

1  just ask you about one exhibit that's attached to
2  that. Let me turn to that page. Just give me one
3  second. It's Exhibit FFF.
4         (Deposition Exhibit 118 was
5         marked for identification.)
6     MS. CALABRIA: Kevin, is this the April
7  29th letter?
8     MR. KAPLAN: No. This is Gail McQuilkin's
9  June 17th declaration.
10    MS. CALABRIA: Give me one second, please.
11 Let me try to find it.
12    The first or second action?
13    MR. KAPLAN: 80393.
14    MS. CALABRIA: Was that the first or the
15 second?
16    MR. KAPLAN: Second.
17    MS. CALABRIA: Okay, go ahead.
18 BY MR. KAPLAN:
19    Q  Okay. Is that a declaration that you
20 signed, Mr. Silvers?
21    A  Yes.
22    Q  Did you understand that form to be
23 something that confirmed you were making those
24 statements under oath?
25    A  That's what it says.

Page 292

1     Q  This is like an affidavit, right?
2     A  That's what it says.
3     Q  It says you paid to the Aurora Collection
4  the amounts reflected in a chart, but I don't see
5  that chart attached. That statement was true, that
6  you paid those amounts to the Aurora Collection?
7     A  If I said that that's what it was.
8     Q  How did you pay, cash, check?
9     A  By check, I believe.
10    Q  Why couldn't you just provide copies of
11 the checks to Stelor?
12    A  Because the checks were made payable to
13 the Aurora Collection not to the insurance company.
14 The only person that could prove that the checks
15 were being made to the insurance company on my
16 behalf was the Aurora Collection who directly made
17 the checks from their company, deposited it
18 directly to -- excuse me, sent directly to
19 Neighborhood Health Partnership, the insurance
20 company. And that was made clear to Stelor that
21 that's the way it was going to be handled.
22    I probably could have had no problem
23 supplying checks, but the checks would have been
24 shown they were made payable to the Aurora
25 Collection not to the insurance company.

Page 293

1     So then we would have had the issue of
2  what I was paying checks to the Aurora for. Check
3  came to me, I took the check and sent it to the
4  Aurora Collection. The Aurora Collection turned
5  around and sent it to the insurance company, end
6  of story.
7     Q  So you had the checks, right? The checks
8  that you paid to the Aurora, you had those, they
9  were readily available, correct?
10    A  Yes. I had checks that I made payable to
11 Aurora for my monthly insurance premiums.
12    Q  And you could easily have provided those
13 checks to Stelor, correct?
14    A  They were never -- there was no checks
15 that were asked to be provided by Stelor. There was
16 documentation that was asked by me to provide Stelor
17 of health insurance premiums being paid by Aurora
18 not by Steven Silvers. Let's make that clear.
19    So I took the liberty of contacting the
20 CEO of the company of Aurora Collection, Ryan
21 Blumquist and he turned around provided
22 documentation -- proper documentation of the money
23 that was paid by me on behalf of my insurance that
24 was sent to the insurance company.
25    Q  Mr. Silvers, I need you to answer the

Page 294

1  questions that I'm asking. I got a limited amount
2  of time left for the deposition, and if you are not
3  going to answer my questions then we will have an
4  issue when we get to the end of that time and I'm
5  not done with my questions.
6     I understand what you are saying but
7  that's not what I asked you. Listen to my
8  question and please answer what I asked.
9     You had the checks that you paid to
10 Aurora, correct?
11    A  Yes.
12    Q  You could easily have provided those
13 checks to Stelor, correct?
14    MR. COOPER: Object to the form.
15    THE WITNESS: If they would have asked me
16    to provide checks to them I could have easily
17    done that, that's correct.
18 BY MR. KAPLAN:
19    Q  In fact, you refused to provide those
20 checks to Stelor, correct?
21    A  No. I'm not sure that's an accurate
22 statement. Why would I refuse to provide checks to
23 Stelor?
24    Q  Did your lawyer ever ask you to assemble
25 those checks to provide to Stelor?

(Pages 291 to 294)

Page 303

1  down the googles.com Web site, didn't you?
2  A  Yes.
3      MR. COOPER:  Object to the form.
4  BY MR. KAPLAN:
5  Q  So what was the point of that assurance
6  that you gave to Stelor?
7  A  Things had changed between our
8  relationship and basically what they had done they
9  didn't keep their word to me about specific things,
10 and I'm sure that my reasons were sound.
11 Q  Is it fair to say that in taking those
12 actions in April of 2005 you did not stand by the
13 promise you made to Stelor in 2003, is that fair to
14 say?
15 A  Two years is a long time for things have
16 changed.
17 Q  So the answer to my question is yes,
18 correct?
19 A  Yes.
20 Q  Alright.  Take a look at Exhibit E if you
21 would.  That's an April 14, 2003 letter that I sent
22 to your lawyer Ms. McQuilkin.  Do you recognize that
23 letter?
24 A  I don't think I would have seen this
25 letter but that's okay.

Page 304

1  Q  Take a look at the checks.
2  A  Okay.
3  Q  Do you recognize those checks?
4  A  Yes.
5  Q  You received those checks, your lawyer
6  received those checked?
7  A  I believe so.
8  Q  Your lawyer cashed those checks?
9  A  No.
10 Q  Are you sure about that?
11 A  Let me see, hold on.  I may have made a
12 mistake here, excuse me.  Yes, I'm sorry.  I think
13 these checks were involving the settlement agreement
14 action, and these were checks that were owed to me.
15 Q  In fact, let me show you Exhibit 120,
16 copies of those cancelled checks with the
17 endorsement of your lawyer's at Kozyak Tropin; is
18 that correct?
19     (Deposition Exhibit No. 120 was
20      marked for identification.)
21 THE WITNESS:  Yes, I believe so.
22 MS. CALABRIA:  What are you marking as
23 Exhibit 120?
24 MR. KAPLAN:  The four checks -- those
25 checks with the cancelled marks.

Page 305

1  THE WITNESS:  These are '05, right, okay.
2  Before the termination.
3  MS. CALABRIA:  And attached to an April
4  29th letter?
5  MR. KAPLAN:  I don't know, they are
6  someplace.
7  MS. CALABRIA:  Is the first one dated
8  4/28/05?
9  MR. KAPLAN:  3/7/05.
10 THE WITNESS:  These were all checks that
11 were previously owed to me.
12 BY MR. KAPLAN:
13 Q  Okay.  And they were received by your
14 lawyers and cashed, right?
15 A  Okay.  So you have here -- there was only
16 two checks received by my lawyer and cashed.  The
17 other ones were received by me, I believe, and
18 cashed.  Pay to the order of Bank of America.  These
19 checks here are for 5,000 and 5,000 and 5,000 were
20 paid to me so the payment was not to my lawyer.  The
21 only checks that were paid to my lawyer were the
22 2,000, the 4,000 and 318.
23 Q  So the first three checks in Exhibit 120
24 were paid to your lawyer and deposited by your
25 lawyer, correct?

Page 306

1  A  Yes, and they subsequently, I think, gave
2  me a check for that amount.
3  Q  And the next -- the last three checks were
4  paid directly to you and cashed by you, correct?
5  A  Yes.
6  Q  Hand me that exhibit back.
7  A  (Witness complies.)
8  Q  Okay.  Let me show you a March 23, 2005
9  e-mail from Gail McQuilkin to me.  Take a look at
10 this.  I'm going to give Johanna the record site and
11 let me know when you are done reading it.  That's
12 Exhibit 121.
13     (Deposition Exhibit No. 121 was
14      marked for identification.)
15 MS. CALABRIA:  So what exhibit was that,
16 Kevin?
17 MR. KAPLAN:  Hold on.  It's in the Esrig
18 declaration, Exhibit H.
19 MS. CALABRIA:  Repeat that.
20 MR. KAPLAN:  That's in the supplemental
21 Esrig declaration, Exhibit E.
22 MS. CALABRIA:  What's the docket entry?
23 MR. KAPLAN:  53.
24 BY MR. KAPLAN:
25 Q  Are you finished reading this e-mail,

Page 311

1   A   I don't recall. I don't recall my frame
2   of mind back then.
3   Q   Do you agree that Stelor could reasonably
4   expect upon receiving this e-mail that it would have
5   a week or two weeks to schedule the audit?
6   A   I don't see the e-mail of the response to
7   what happened in this response. "Please give me a
8   date in the next two weeks other than the April 28th
9   or 29th which are good for him for the visit.
10  Thanks." From what I remember my lawyer instructing
11  me I guess it's attorney privilege what she told me.
12  So I can't answer that question.
13  Q   You can't answer my question.
14      Is it reasonable to expect -- for Stelor
15  to expect based on this communication that it had
16  a week or two to schedule the audit, yes or no?
17      MR. COOPER: Object to the form.
18      THE WITNESS: Based upon that e-mail I
19  would have to say yes.
20  BY MR. KAPLAN:
21  Q   In fact, the e-mail say the auditor is
22  preparing a letter outlining the documents and
23  records he will need available, do you see that?
24  A   Yes.
25  Q   Was that letter ever provided to Stelor?

Page 312

1   A   I'm not certain. I do not know that
2   answer.
3   Q   Assuming it wasn't, do you know why?
4   A   No, I don't.
5   Q   Would it be reasonable for Stelor to
6   expect to see that letter before it provided dates
7   for when the audit would be scheduled?
8       MR. COOPER: Object to the form.
9       THE WITNESS: I don't know what my
10      lawyer's frame of mind was about this letter.
11      I know there was a lot of communication going
12      back and forth between you on behalf of Stelor
13      and myself and Gail on behalf of myself.
14      I remember that period distinctly and
15      there was a lot of back and forth e-mails to
16      that effect. I think she was waiting on dates
17      from you and you were waiting on dates from
18      her. I don't know the specifics between the
19      two of you.
20  BY MR. KAPLAN:
21  Q   Turn, if you would, to Exhibit I, the next
22  one. Do you see the e-mail April 26th from
23  Ms. McQuilkin to me, have you ever seen that before?
24  A   April 26, this is the 22nd --
25  Q   "I cannot get into this with you right

Page 313

1   now. I assure you I will get back to you and Stelor
2   by Friday." Ever seen that e-mail?
3   A   I don't believe so.
4       MR. COOPER: Is this redacted?
5       MR. KAPLAN: Yes.
6   BY MR. KAPLAN:
7   Q   So this is one day before you sent the
8   termination letter, correct?
9   A   It appears that way, the 26th and the
10  27th.
11  Q   Had you decided to terminate on April
12  26th?
13  A   I believe Gail was preparing something for
14  the 27th. It was obvious the 27th when you got the
15  letter.
16  Q   A little misleading for her to write back
17  and say, "I assure you I'll get back to you and
18  Stelor by Friday." when she was intending to send a
19  termination letter on your behalf on Wednesday,
20  right?
21      MR. COOPER: Object to the form. Don't
22      answer on attorney-client privilege.
23  BY MR. KAPLAN:
24  Q   That's not privilege. I'm asking for your
25  view.

Page 314

1       Do you agree it was a little misleading
2   for her to assure us she would get back to us on
3   Friday when she intended to send a termination
4   letter the next day. Do you agree or not?
5       MR. COOPER: Same objection,
6       attorney-client privilege. Don't answer.
7   BY MR. KAPLAN:
8   Q   Take a look at the last exhibit to this
9   declaration, two certificates of insurance. What's
10  wrong with those certificates?
11  A   These were the ones after the fact, I
12  believe. I'm not a hundred percent certain on that,
13  but I believe these are the ones that were -- hold
14  on one second.
15  Q   The first certificates were policy term
16  July 2004 to July 2005. Do you agree that's before
17  the fact, right?
18  A   No. We have certificates or some
19  information that was originally sent to us that are
20  different from these numbers and these policy
21  figures.
22  Q   Does this certificate of insurance satisfy
23  what you understood to be the insurance requirements
24  for the period July '04 to July '05, yes or no?
25  A   I cannot give you a definitive answer on